# EXHIBIT C

Keith O. Reeves, M.D.

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                      CHARLESTON DIVISION

 3

     IN RE: BOSTON SCIENTIFIC  }   MDL NO. 2326
 4   CORP., PELVIC REPAIR       }
     SYSTEM PRODUCTS            }
 5   LIABILITY LITIGATION       }
                                }
 6   THIS DOCUMENT RELATES      }
     TO:                        }
 7                              }
     Katrina Hinnewinkel v.     }
 8   Boston Scientific Corp.    }   2:17-cv-04127
     and C.R. Bard, Inc.        }

 9

10

11   *********************************************

12            ORAL AND VIDEOTAPED DEPOSITION OF

13               KEITH O. REEVES, M.D.

14                 January 16, 2020

15   *********************************************

16

17

18

19           ORAL AND VIDEOTAPED DEPOSITION OF KEITH O.
     REEVES, M.D., produced as a witness at the instance of
20   the Defendant, and duly sworn, was taken in the
     above-styled and numbered cause on January 16, 2020,
21   from 10:12 a.m. to 5:41 p.m., before Janet G. Hoffman,
     CSR in and for the State of Texas, reported by machine
22   shorthand, at the office of Potts Law Firm, 3737 Buffalo
     Speedway, Suite 1900, Houston, Texas, pursuant to the
23   Federal Rules of Civil Procedure and any provisions
     stated on the record or attached hereto.  Rule 30(b)(5)
24   was waived, by agreement of counsel.
```

Keith O. Reeves, M.D.

Page 2

```
1              APPEARANCES
2
3  FOR THE MDL PLAINTIFFS:
4     MS  CALSIE BOYD
       POTTS LAW FIRM
5     3737 Buffalo Speedway, Suite 1900
       Houston, Texas  77098
6     713 963 8881
       cboyd@potts-law.com
7
8  FOR DEFENDANT C R  BARD, INC :
9     MR  COURTLAND C  CHILLINGWORTH
       REED SMITH LLP
10    101 Second Street, Suite 1800
       San Francisco, California  94105
11    415 659 5698
       cchillingworth@reedsmith.com
12
13 FOR DEFENDANT BOSTON SCIENTIFIC CORPORATION:
14    MR  WILLIAM NORTHRIP (by videoconference)
       SHOOK, HARDY & BACON, L L P
15    111 S  Wacker Dr , Suite 4700
       Chicago, Illinois  60606
16    312 704-7700
       wnorthrip@shb.com
17
18 FOR PLAINTIFFS KATRINA HENNEWINKEL and TAMMY PIZZITOLA:
19    MS  SHEILA M  BOSSIER
       BOSSIER & ASSOCIATES, PLLC
20    1520 North State Street
       Jackson, Mississippi  39202
21    601 352-5450
       sbossier@bossier-law.com
22
23
24
```

Page 3

```
1  FOR DEFENDANTS JOHNSON & JOHNSON and ETHICON INC.:
2     MS. KATIE A. FILLMORE
       BUTLER SNOW
3     515 Congress Avenue, Suite 1900
       Austin, Texas 78701
4     737.802.1800
       katie.fillmore@butlersnow.com
5
6  ALSO PRESENT:
7     MS. MARY GAASCH, videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

I N D E X

PAGE

Appearances................................   2

KEITH O. REEVES, M.D.

EXAMINATION
  By Mr. Chillingworth...................   7
  By Ms. Fillmore.......................  151
  By Mr. Northrip........................  230

ERRATA PAGE............................  233
ACKNOWLEDGMENT OF DEPONENT...............  234
REPORTER'S CERTIFICATION.................  235

E X H I B I T S

NO.       DESCRIPTION        PAGE
Exhibit 1    Deposition notice         9
Exhibit 2    Cross-notice of deposition   9
Exhibit 3    Reliance list from
             literature review         17
Exhibit 4    Witness's general
             liability and causation
             report                    19
Exhibit 5    Articles relied upon by
             witness                   42
Exhibit 6    Alyte MSDS                49
Exhibit 7    Deposition transcript of
             Frank Zakrzewski          55
Exhibit 8    Dr. Culligan's article    69
Exhibit 9    FDA notification, October
             2008                      79
Exhibit 10   FDA notification, July
             2011                      80
Exhibit 11   FDA article entitled
             Urogynecologic Surgical
             Mesh Implants             81
Exhibit 12   IFU, Bates No.
             AVA2E9578309             114
*no Exhibit 13 marked

Page 5

Exhibit 14   Dr. Binette medical
             record, 005101           164
Exhibit 15   Plaintiff's medical record
             dated 3-18-04            165
Exhibit 16   Dr. Schroeder's operative
             report, 005086           166
Exhibit 17   Dr. Gilmore's operative
             report                   167
Exhibit 18   Dr. Gilmour's medical
             record for plaintiff      168
Exhibit 19   Dr. Hutchings' medical
             record for plaintiff,
             005062                    169
Exhibit 20   Dr. Hutchings' operative
             report, 005089           172
Exhibit 22   Dr. Hutchings' follow-up
             visit with plaintiff,
             005050                    177
Exhibit 23   Dr. Hutchings' operative
             report, 005093           178
Exhibit 24   Dr. Hutchings' medical
             report, 005040           183
Exhibit 25   Dr. Hutchings' medical
             record, 005034           187
Exhibit 26   Dr. Hutchings' operative
             report, 005097           188
Exhibit 27   Dr. Kim's progress note,
             00001789                  190
Exhibit      Dr. Kim's operative
             report, 00001789         191
Exhibit 28   Ultrasound report,
             00001802                  191
Exhibit 29   Dr. Kim's operative
             report, 001708           192
Exhibit 30   Dr. Kim's operative
             report, 001833           198
Exhibit 31   Dr. Kim's progress notes,
             005220                    202
Exhibit 32   Sigmoidoscopy with
             endoscopic ultrasound
             procedure report, 005213  205
Exhibit 33   Dr. Banks' medical notes  208
Exhibit 34   MRI report dated 2-19-19  209
Exhibit 35   Dr. Hibner's operative
             report                    212
Exhibit 36   Chiropractic record       223

Keith O. Reeves, M.D.

Page 6

1        THE VIDEOGRAPHER:  Okay.  We are now on
2   the record.  My name is Mary Elizabeth Gaasch.  I'm a
3   videographer for Golkow Litigation Services.  Today's
4   date is January 16th, 2020.  The time on the monitor is
5   10:12 a.m.  The video deposition is being held in
6   Houston, Texas in the matter of Boston Scientific Corp.
7   Pelvic Repair Systems -- System Products Liability
8   Litigation, Katrina Hinnewinkel versus Boston Scientific
9   Corp., and C.R. Bard, Incorporated.  The deponent is Dr.
10  Keith O. Reeves.  Will counsel identify themself and
11  state whom they represent.
12        MR. CHILLINGWORTH: : Courtland
13  Chillingworth from C -- from Reed Smith for C.R. Bard.
14        MS. BOYD:  Calsie Boyd with Potts Law Firm
15  on behalf of MDL plaintiffs.
16        MS. BOSSIER:  Sheila Bossier on behalf of
17  Plaintiff Katrina Hinnewinkel as well as Plaintiff Tammy
18  Pizzitola in the Tammy Pizzitola versus Ethicon, Inc.,
19  and C.R. Bard case, wherein Dr. Reeves' deposition has
20  been cross-noticed.  Also plaintiff -- just for the
21  record, Plaintiff Pizzitola adopts the objections that
22  were filed by plaintiff's steering committee on behalf
23  of all the plaintiffs and Ms. Hinnewinkel.
24        MR. NORTHRIP:  William Northrip on behalf

Page 7

1   of Defendant Boston Scientific.
2        MS. FILLMORE:  And Katie Fillmore on
3   behalf of Defendants Ethicon and Johnson & Johnson.
4        THE VIDEOGRAPHER:  Okay.  The court
5   reporter is Janet Hoffman, and she will now swear in the
6   witness.
7        KEITH O. REEVES, M.D.,
8   having been first duly sworn, testified as follows:
9        EXAMINATION
10  BY MR. CHILLINGWORTH:
11     Q.  All right.  Good morning, Dr. Reeves.  My name
12  is Court Chillingworth.  I represent C.R. Bard here
13  today, as you just heard me say.  Could you please state
14  your full name for the record?
15     A.  Keith, middle initial is O.  Last name is
16  Reeves, R-E-E-V-E-S.
17     Q.  And you and I have never spoken before today.
18  Is that correct?
19     A.  That is correct.
20     Q.  And other than in the context of -- of
21  different depositions, you haven't had any contact with
22  my law firm, Reed Smith.  Is that correct?
23     A.  Not that I can recall.
24     Q.  Okay.  And you've been deposed many times.  Is

Page 8

1   that correct?
2      A.  That is correct.
3      Q.  Okay.  So is it okay if I skip the ground
4   rules that we tend to like to go through since we don't
5   have a lot of time today?
6      A.  Be my guest.
7      Q.  Okay.  Just one thing I want to make sure is
8   that if you don't understand a question, please let me
9   know and I'll try to rephrase it.  And you understand
10  that you're under oath here today?
11     A.  Yes.
12     Q.  Okay.  And we're here today to discuss -- I
13  will call them two sets of opinions:  One is your --
14  your general opinions concerning the Alyte from your
15  perspective as a physician.  Is that correct?
16     A.  That is correct.
17     Q.  Okay.  And then you are also here to give your
18  case-specific causation opinions from your perspective
19  as a physician for Plaintiff Ms. Hinnewinkel.  Correct?
20     A.  Correct.
21     Q.  Okay.  And although I understand you have
22  opinions about other Bard products, you are not -- the
23  purpose of your -- your general expert report and --
24  that is the topic of our deposition today is to elicit

Page 9

1   your opinions about the Alyte, not any other products.
2   Correct?
3      A.  We are on the same page.
4      Q.  Okay.  And you're not here to give any
5   case-specific opinions about anyone other than
6   Ms. Hinnewinkel.  Correct?
7      A.  Correct.
8      Q.  Okay.  And as we go through here, I'm -- I'm
9   generally going to first focus on the general stuff and
10  then move to case-specific.  At the beginning here, I
11  may meld some of the things so we can get some of the
12  logistics out of the way.
13     A.  All right.
14        THE CHILLINGWORTH:  Mark this as 1,
15  please.
16        (Exhibit 1 marked.)
17        THE CHILLINGWORTH:   And then I'll mark
18  this as 2.
19        (Exhibit 2 marked.)
20     Q.  (By Mr. Chillingworth)  Okay.  Dr. Reeves, are
21  you familiar with Exhibit 1?
22     A.  Yes.
23     Q.  And are you familiar with Exhibit 2?
24     A.  I'm seeing this for the first time today.

Keith O. Reeves, M.D.

Page 10

1    Q.  Okay.  Okay.  Let's look at Exhibit 1, then.
2  Is it your understanding that this is the -- the notice
3  that was served to schedule your deposition?  Correct?
4    A.  Yes.
5    Q.  And if you could please skip to page 5, do you
6  see there's -- it says document requests?
7    A.  Yes.
8    Q.  And then there's several documents that are
9  requested.  Correct?
10   A.  Yes.
11   Q.  And I understand you have brought documents
12 with you today.  Is that correct?
13   A.  That is correct.
14   Q.  And does that include No. 4, your complete
15 entire file in the -- for the matters of in re Boston
16 Scientific Corp. Pelvic Repair System Product Liability
17 Litigation, Katrina Hinnewinkel versus Boston Scientific
18 Corp., and C.R. Bard, Inc.?
19   A.  Yes.
20   Q.  Okay.  And did you endeavor to look for all
21 the documents that were requested on this -- in this
22 deposition notice?
23   A.  Correct.
24   Q.  You did.  Okay.  And have you -- have you

Page 11

1  brought everything that you have that's -- that fits
2  this -- these categories?
3    A.  Yes.
4    Q.  Okay.  First thing I want to touch on are the
5  things that you've brought.  Calsie handed me a stack of
6  papers today that -- for production she said coming from
7  you.  And it includes the amended notice of videotaped
8  deposition, the subpoena, a copy of your general --
9  general liability and causation report, and your
10 case-specific report for Mrs. -- Ms. Hinnewinkel.  Those
11 are things you're producing today.  Correct?
12   A.  Correct.
13   Q.  Okay.  I'm not actually going to mark these as
14 exhibits because we already have it, you know, tenfold.
15 But what I do want to look at is some of the other
16 things that have been produced here.  And I'm going to
17 eventually mark as -- as 3, but I'm going to go through
18 some of the components here.
19       First, there's a time log.  It's called --
20 there's a document called time log for Alyte General
21 Liability and Causality Report, and it lists several
22 dates.  And it describes -- there's a column describing
23 the events that were pertinent to those dates and time
24 spent on those dates.  Is this a full representation of

Page 12

1  the time you've spent on your Alyte general liability
2  and casualty [sic] report?
3    A.  I completed that before I met on Monday with
4  Derek and Calsie for about an hour.  That is not on that
5  list.
6    Q.  Okay.
7    A.  And I was here this morning at 8:30, but I was
8  mostly drinking coffee and just reviewing notes.
9    Q.  Okay.  And so other than yesterday and today,
10 it's -- this -- the calculation is you spent a day, 10
11 hours and 17 minutes on the general liability report.
12 Correct?
13   A.  That is correct.
14   Q.  Okay.  And then the next one we have is a time
15 log for Ms. Hinnewinkel, and it's -- again, it's the
16 same thing.  There's a column of dates, a corresponding
17 column of events, and a corresponding column of the time
18 spent on those events and on those dates.  And again, is
19 this a -- a full representation of the time you've spent
20 on your case-specific opinions for Ms. Hinnewinkel?
21   A.  Yes.
22   Q.  Okay.  And as opposed to the general causation
23 of opinions, did you spend time discussing the
24 Hinnewinkel case-specific opinions either yesterday or

Page 13

1  today?
2    A.  No.
3    Q.  Okay.  Then there's another time sheet -- oh,
4  I see.  This is a -- there's another document here
5  called 2019 Medical/Legal Consulting.  And there's a
6  column for date, a column for payee, and there's a few
7  redactions.  But on -- there are two entries for Derek
8  Potts for Bard, Derek Potts for Hinnewinkel.  And that's
9  on -- from October 2nd, 2019.  And then it -- it shows
10 an amount billed for those days, amount paid for those
11 days, tax to be paid, and then net from after the taxes,
12 and the date that -- it looks like that amount due was
13 paid.
14       Is this an accurate representation of what
15 you've billed for your Alyte opinion and your general
16 opinion and your Hinnewinkel case-specific opinion?
17   A.  It is.
18   Q.  Okay.  Then there are three sets of -- of
19 handwritten notes that are on yellow kind of
20 legal-pad-type paper.  And these are all obviously
21 copies of those.  And the first set, it looks at the top
22 like it says Hinnewinkel depo notes.  Is this a set of
23 just notes from your review of -- of Plaintiff
24 Ms. Hinnewinkel's deposition?

Keith O. Reeves, M.D.

Page 14

1    A.  Yes.
2    Q.  Okay.  And then the next one is a -- it's
3  entitled -- again, handwritten notes on yellow legal pad
4  and at the top it says depo of Laura Bigby.  Are these
5  your notes from your review of Ms. Bigby's deposition?
6    A.  Yes.
7    Q.  Okay.  And then the next -- the third and last
8  set of notes -- handwritten notes on yellow legal pad,
9  it's hard for me to look -- tell what -- what's written
10  on top.  Can you...
11    A.  It says Bracken depo notes.
12    Q.  Okay.  That's what I figured.  But just to be
13  sure.  So these -- so these are your notes from your
14  review of Mr. Bracken?
15    A.  Correct.
16    Q.  Of Mr. Bracken's deposition.  Excuse me.
17  Okay.  The next thing in the packet here is a document
18  that has the case heading for Ms. Hinnewinkel and the
19  MDL, and it's called docs to Dr. Reeves for expert
20  review.  And there's a column document description and
21  then a right column for Bates numbers.  And is this a
22  complete representation of the documents that you
23  reviewed for Ms. Hinnewinkel?
24    A.  As far as I know, yes.

Page 15

1    Q.  And you don't recall reading any other
2  case-specific records for Ms. Hinnewinkel?
3    A.  No.
4    Q.  Okay.  The final one in this packet that I'm
5  going to mark as Exhibit 3 is a document entitled
6  reliance list from literature review.  And it's a
7  several-page -- just spitballing, about an 8- or
8  10-page-long list, and it looks like mostly articles --
9  titles of articles.  But I also see, like, the Alyte IFU
10  in there.  Anyway, can you tell me -- can you tell me
11  about this -- the reliance list, what -- what this is?
12    A.  That is a list of what you have three binders
13  full of right there.  Those are articles that I have
14  collected over the years.  And you've asked me to be
15  all-inclusive, so this is all-inclusive.
16    Q.  Okay.
17    A.  And those are the articles; that's a list of
18  the articles.
19    Q.  And just so everyone knows, Mr. Reeves has
20  given us three binders, which are labeled Mesh Volume 1
21  and Mesh Volume 2, Mesh Volume 3.  And what you're
22  saying is this reliance list is, essentially, an index
23  of the documents that are in those folders.  Correct?
24    A.  Correct.

Page 16

1    Q.  Okay.  And did you specifically -- did you
2  rely on any documents in -- on this list specifically
3  for the preparation of your general opinions concerning
4  the Alyte, or is -- you said these are -- these are
5  documents you've collected through the year.  I'm trying
6  to figure out if there are particular ones that you
7  focus -- that you actually read in preparation for your
8  general report.
9    A.  One article that I cited in the report that I
10  don't know that -- is -- I -- it's -- I know it's in one
11  of the binders, but it's -- it's the Crosby article.
12  That's the last -- that's the author's -- lead article's
13  last name.
14    Q.  Okay.
15    A.  I just want to -- that article is cited in my
16  report.  The other several hundred articles are not all
17  cited.
18    Q.  Got it.  Okay.  And I guess we'll -- yeah,
19  we'll take a look.  But -- so the Crosby report is one
20  that you -- that you specifically reviewed for your
21  general causation opinion?
22    A.  Correct.
23    Q.  Okay.  And we'll -- we'll take a look at your
24  report in a second and look at the list you have there,

Page 17

1  and we'll -- we'll kind of sort out the records out of
2  this list with that.  So anyway...
3    A.  That's a whole day's work, Counselor.
4        THE CHILLINGWORTH:  So Madam Reporter,
5  I'm going to mark this packet as No. 3.
6        (Exhibit 3 marked.)
7    A.  For the sake of completeness, I'd like to
8  interrupt, if I may, here.
9    Q.  Sure.
10    A.  I have another stack of articles.  Did you get
11  this stack of articles, or do you know?
12    Q.  I don't know.
13    A.  Because they're -- they're here, and I'm going
14  to likely be referring to them over the course of the
15  day.  And these are more recent and specific than
16  anything that's over there simply because these are
17  newer.
18    Q.  Okay.
19    A.  Okay?
20    Q.  Can we --
21        MS. BOYD:  When we take a break, we can get
22  a -- we can get copies of that, if that --
23        MR. CHILLINGWORTH:  Yeah, Yeah.
24        MS. BOYD:  -- would be okay.

Keith O. Reeves, M.D.

Page 18

1    MR. CHILLINGWORTH:  Okay.
2    Q.  (By Mr. Chillingworth)  And so -- and -- and
3  just that -- that was the next thing I was going to
4  mention, is that you have a stack of papers in front of
5  you with Post-it notes with handwriting on it.  And --
6  and we'll -- we'll talk about that at a break and have
7  a -- we're going to deal with that.  But -- but you're
8  telling me, though, that those are articles -- that --
9  that entire set of documents in front of you is -- are
10  articles that -- that you have reviewed subsequent to
11  anything that's -- that are in the binders?
12    A.  Correct.
13    Q.  Okay.
14    A.  And I would also elaborate and say that these
15  articles constitute the crux of the report that I've
16  written.
17    Q.  Okay.  So you reviewed them before you wrote
18  the report?
19    A.  Absolutely.
20    Q.  Okay.  Okay.  So this isn't -- these aren't
21  new documents that -- that you've read subsequent to the
22  report that now you're supplementing your opinion with?
23    A.  Correct.
24    Q.  Okay.  We'll take a look at a break, and we'll

Page 19

1  move on.
2    A.  I just want to provide you with all the
3  material you want to read, Counselor.
4    Q.  Well, I love reading.
5    A.  All right.
6    Q.  Do you have a copy of your report with you?
7    A.  Several.
8    Q.  Several.  Okay.  Just for sake of marking
9  something as an exhibit, I'm going to mark your general
10  liability and causation report as Exhibit 4, but feel
11  free to work off of yours.
12    A.  Okay.
13        (Exhibit 4 marked.)
14    Q.  (By Mr. Chillingworth)  Okay.  So your general
15  liability causation report consists of, number one, your
16  Rule 26 report.  Correct?
17    A.  Correct.
18    Q.  Then it includes a -- if you flip to after
19  page 22 after your signature...
20    A.  I'm there.
21    Q.  Okay.  And there's unnumbered document -- or
22  record called bibliography for general report -- general
23  expert report on Alyte.  And there are some documents
24  listed by Bates number, a trial transcript from Cisson,

Page 20

1  some FDA records, and several articles.  Is this -- and
2  it goes -- and it's listed from No. 1 to No. 88.  Is
3  this representative of the entirety of the records that
4  you reviewed specifically for your Alyte general expert
5  report?
6    A.  Correct.
7    Q.  Okay.  And those include the copies you have
8  in front of you?
9    A.  They do.
10    Q.  Okay.  And this list is considerably shorter
11  than your reliance list.  Is it fair to say that -- that
12  if one of these -- one of the articles that are in your
13  -- your bibliography here are not -- I'm sorry.  If
14  there's a report -- an article or document on your
15  reliance list that is not in your bibliography, then you
16  did not rely on it in drafting your general report?
17    A.  With the exception of the Crosby paper that I
18  mentioned earlier.
19    Q.  Okay.  Okay.  So other than that, if it's --
20  if something on the reliance list is not here, you
21  didn't review it specifically for -- for this report?
22    A.  Correct.  And I think the best way to
23  conceptualize this is to say that that stack of binders
24  over there represents general knowledge and the articles

Page 21

1  listed here are specific for this report.
2    Q.  Okay.  And then the next item is your CV.
3  Correct?
4    A.  Correct.
5    Q.  And we'll talk about that in a second, but is
6  there -- generally, is there anything that you need to
7  update your CV with?
8    A.  No.
9    Q.  Okay.  Then the next item is your fee
10  schedule, which indicates that for research,
11  conferences, emails, report writing, depositions, and
12  trial testimony your rate is $500 an hour.  Is that
13  correct?
14    A.  That is correct.
15    Q.  And then the last item is a list of previous
16  testimony, and there are 25 cases listed.  Are these
17  cases in which you appeared as experts?
18    A.  Correct.
19    Q.  And were you -- did you represent plaintiffs
20  in each of these cases?
21    A.  Yes.
22    Q.  Okay.  And -- okay.  There are about 16 cases
23  that involve Bard as the defendant.  Is that correct?
24    A.  I haven't made a record of that.  I'm taking

Keith O. Reeves, M.D.

Page 22

1 your word. You're reading it and I'm not, so I'll --
2 I'll --
3     Q. Sure. Understood.
4     A.  -- I'll take your word for it.
5     Q. And these cases that are listed here against
6 C.R. Bard and Ethicon, are they -- are they all for
7 pelvic mesh or vaginal mesh products?
8     A. To the best of my knowledge, yes.
9     Q. Okay. And there are two cases listed here.
10 Janet Gager or Gajer (phonetic) versus Karl Storz and
11 Rachel King versus Storz. Can you tell me the nature of
12 those cases?
13     A. Those were Power Morcellator cases.
14     Q. Okay. And then set No. 22 -- 21 and 22, Sehg
15 versus Olympus, Wahrhan versus Olympus. Can you -- what
16 were those cases?
17     A. Morcellator cases.
18     Q. Morcellator cases. Okay. And in those cases
19 you represented the plaintiffs too?
20     A. Correct.
21     Q. Okay. And what was -- what is the nature of
22 the product in those cases?
23     A. A power morcellator.
24     Q. Okay.

Page 23

1     A. And I can give you more explanation if you
2 need --
3     Q. No, I don't need --
4     A. Okay.
5     Q. All right. So let's take a look at your CV.
6 Actually, given the timing we have, I might just -- I'm
7 going to skip to other questions here. Have you --
8 specific to -- I'm going to mix adjectives here. For
9 your general report, did you review any Bard company
10 depositions?
11     A. Yes.
12     Q. And your notes indicate Mr. Bracken,
13 Ms. Bigby. Were there any other --
14     A. Those are the only two that I recall.
15     Q. Okay. Did you review any expert reports from
16 -- from the Alyte litigation?
17     A. I looked at the deposition of Dr. El-Ghannam.
18 Is that the correct pronunciation of the last name?
19         MS. BOYD: El-Ghannam?
20     A. El-Ghannam, yes.
21     Q. (By Mr. Chillingworth) Is that the only --
22 well, in terms of reviewing expert -- other expert
23 records in the Alyte litigation, was that the only
24 expert record, you know -- in other words, you haven't

Page 24

1 reviewed any expert reports from the Alyte litigation?
2     A. No, not recently.
3     Q. Okay. So the only material related to expert
4 opinions being given in the Alyte litigation is the
5 El-Ghannam deposition?
6     A. Yes.
7     Q. Okay. Okay. And did you review the design
8 history file for the Alyte?
9     A. If you can produce that and I could look at
10 it, I might be able to answer that question. I'm not
11 sure exactly what you're referring to.
12     Q. Okay. Did you -- did you see -- did you
13 review any records dealing with design history?
14     A. I have their IFU and a pelvic health/pelvic
15 reconstruction -- looks like an advertising flier.
16     Q. Okay.
17     A. I don't think I've seen anything more
18 pertinent than that.
19     Q. Okay. Did you review the -- you understand
20 what the 510(k) process is. Correct?
21     A. Yes.
22     Q. And the Alyte is a product that was cleared by
23 the FDA through the 510(k) process. Correct?
24     A. Yes.

Page 25

1     Q. Did you review any records in connection with
2 Bard's submission -- 510(k) submission to the FDA?
3     A. No.
4     Q. Did you collaborate with counsel in the
5 preparation of your general report?
6     A. I showed them a rough draft, and I -- the
7 other thing I should emphasize here -- I'm not the
8 world's best typist. Okay? And so I used a voice
9 recognition program, and I dictated the report. And
10 they got a copy of the final report to look at for
11 spelling and grammatical errors. But in terms of
12 changing the wording or feeling like I got any
13 significant assistance in writing this report, I'm
14 comfortable telling you this is mine.
15     Q. Okay.
16     A. One of the things that happens when you're
17 dictating, if you're from Texas, is that the computer
18 hears mash and not mesh. So I had to go back through
19 and change the word mash to mesh in several instances.
20 But that's the extent of it.
21     Q. Okay. Did you receive any prepared notes from
22 counsel in the preparation of your -- of your expert
23 report, your general expert report?
24     A. A lot of the stuff that is referred to

Keith O. Reeves, M.D.

Page 26

1  initially in the report, the other trial testimony, I
2  have -- I have no access to that stuff.  So counsel
3  provided me with that stuff.
4      Q.   Okay.  Okay.  And just -- so you're -- what
5  you're saying is in terms of what you were provided --
6  counsel provided you in terms of -- I said prepared
7  notes.  It's -- you're saying it's the past trial --
8      A.   Correct.
9      Q.   -- references --
10     A.   Yes.
11     Q.   -- that are made in your report?
12     A.   Yes.
13     Q.   Anything else?
14     A.   No.
15     Q.   Did you receive any other kind of assistance
16  in preparing your report?
17     A.   None.
18     Q.   Okay.  And are all the opinions you intend to
19  offer in this case -- all the general opinions you
20  intend to offer regarding the Alyte contained in your
21  general report?
22     A.   Yes.
23     Q.   All right.  Any further work you intend to do
24  on this case before you testify?

Page 27

1      A.   No.
2      Q.   Okay.  Is there any information you wish --
3  you wanted to have to formulate your general opinions
4  concerning the Alyte?
5      A.   No.
6      Q.   Okay.  Now, my understanding is that you are
7  currently retired.  Is that correct?
8      A.   Correct.
9      Q.   Okay.  And when did you retire?
10     A.   December the 31st of '13.
11     Q.   And you're a gynecologist.  Correct?
12     A.   Correct.
13     Q.   Okay.  And after -- and you retired from
14  practice in, you said, December 2013?
15     A.   Correct.
16     Q.   Okay.  Have you had any employment since then?
17  I mean, you've been retained as expert counsel.  Other
18  than expert -- being retained as expert counsel, in the
19  time from your retirement to presently?
20     A.   No.
21     Q.   And is it fair to say that any work you've --
22  you have performed for compensation has been related to
23  litigation appearing as expert witnesses?
24     A.   Yes.

Page 28

1      Q.   Okay.  And are you doing any research outside
2  of litigation presently?
3      A.   No.
4      Q.   And have you done any research outside of
5  litigation since your retirement?
6      A.   No.
7      Q.   Okay.  In your CV you list a number of
8  presentations that you've given.  You might want to --
9  do you have your -- do you want to refer to it?
10     A.   I've got it.
11     Q.   Okay.  And you see where you -- you see
12  presentations and you list several presentations?
13     A.   Yes.
14     Q.   Okay.  The second one down is Vaginal
15  Mesh--the Legal Consequences.  Can you tell me about
16  that presentation?
17     A.   That's only five years ago, Counselor.  I
18  don't have any specific recollection about it except
19  that I discussed the legal consequences of vaginal mesh
20  and made a presentation to several different law firms
21  on February the 26th --
22     Q.   Okay.
23     A.   -- of 2015.
24     Q.   And other than generally talking about the

Page 29

1  legal aspects of vaginal mesh, you can't be more
2  specific than that?
3      A.   Unfortunately, I cannot.  That's five years
4  ago.  I have no recollection at all of that.
5      Q.   And just to be clear, you're not an attorney.
6  Correct?
7      A.   No, I'm not an attorney.
8      Q.   Okay.  And the next one down is Mesh in the
9  Vagina.  The Anterior Compartment, Even -- even longer
10  ago, in January of 2012.  Any specific recollection of
11  this report -- or this presentation, what it was about?
12     A.   This was a combined grand rounds presentation
13  to the OB-Gyn and urology departments at Houston
14  Methodist Hospital.  I also was presenting along with
15  Urogynecologist Sophie Fletcher and Ricardo Gonzalez,
16  who is a female pelvic medicine urologist as well.
17     Q.   Okay.  Can you tell -- kind of generally
18  describe what it was you were talking about in terms of
19  Mesh in the Vagina, the Anterior Department?
20     A.   Well, we were talking specifically about how
21  it was being used at the time I made the presentation.
22  And all three of us were actively working in this arena,
23  and we wanted to give kind of a "where are we now"
24  presentation to the departments of OB-Gyn and urology

Keith O. Reeves, M.D.

Page 30

1 with that talk.
2    Q.  Okay.  On the next page you list publications.
3 And -- and this is a current list of your publications
4 that you've -- you've had authorship credit for.
5 Correct?
6    A.  Correct.
7    Q.  Okay.  And were these -- were these case
8 studies?
9    A.  No.
10    Q.  Were any -- sorry.  Go ahead.
11    A.  The first listing there is actually a
12 gynecologic surgery textbook.
13    Q.  Okay.
14    A.  And I was author.  And there were four
15 authors, and I don't remember specifically how many
16 chapters it had.  Probably 40 or 50.  I was responsible
17 for writing eight of the chapters having to do primarily
18 with vaginal and pelvic surgery in that textbook.
19    Q.  All right.  And are any of the publications
20 listed here clinical studies?
21    A.  Yes.
22    Q.  Which ones?
23    A.  About midway down you can see Preterm External
24 Cephalic Version in an Outpatient Environment.  That was

Page 31

1 published in the American Journal of Obstetrics and
2 Gynecology in 1995.  And those were my patients and
3 there were about 142 patients in the study, as I recall.
4 And that was a study of doing external cephalic version
5 to convert a baby in breech presentation to cephalic
6 presentation to avoid a Cesarean delivery.
7    Q.  Okay.  Going down to the, I think, either
8 it's -- you can see it's Hurtado, EA, Bailey HR, Reeves,
9 KO?
10    A.  Yes.
11    Q.  And it's Rectal Erosion of Synthetic Mesh Used
12 in Posterior Colporrhaphy Requiring Surgical Removal.
13 Was that a case study?
14    A.  That's a case report.
15    Q.  Case report?
16    A.  Yes.  That's a report of an individual
17 patient.
18    Q.  Right.  Okay.  Okay.  And can you tell me
19 about that study?
20    A.  It was a woman who presented to The Methodist
21 Hospital emergency room in septic shock.  And as it
22 turns out, she had had mesh put in her pelvis that had
23 eroded into the rectum, and she came in with mesh in the
24 rectum.  And the mesh eroding like that into the bowel

Page 32

1 caused widespread peritonitis, and she's lucky to be
2 alive.
3    Q.  And what was your role in that study -- that
4 report?  Excuse me.
5    A.  Well, I did the gynecology the other -- the --
6 Hurtado was a urogynecology fellow, and Randy Bailey was
7 the colon rectal surgeon.  So it was a case involving
8 colon rectal surgery and gynecology to take the mesh out
9 and to take care of the woman following surgery.
10    Q.  Okay.  Have you written about any clinical
11 studies, other than -- have you written about any
12 clinical studies involving synthetic vaginal or pelvic
13 mesh?
14    A.  No.
15    Q.  Okay.  And is this the only publication that
16 you have any authorship credit for regarding synthetic
17 mesh in either -- either vaginal mesh or pelvic mesh?
18    A.  Yes.
19    Q.  Okay.  Okay.  Can you tell me when you were
20 retained -- the date you were retained for both the
21 Alyte, you know, general opinion and the case -- the
22 Hinnewinkel case-specific?
23    A.  If you would go back and look at that time
24 log, the first date listed is the date that I came up

Page 33

1 here to meet with the Potts Law Firm about what you're
2 asking.
3    Q.  Okay.  Okay.  All right.  And do you have any
4 other records of your time -- timekeeping in this case?
5    A.  I thought that was pretty exhaustive.
6    Q.  Yeah.  No, it's good.  I was just making sure.
7 Okay.  So in your career have you ever implanted an
8 Alyte?
9    A.  Never.
10    Q.  Have you ever implanted any Bard pelvic mesh
11 product?
12    A.  Never.
13    Q.  Have you ever explanted an Alyte?
14    A.  Yes.
15    Q.  Can you -- can you describe how many times, or
16 estimate?
17    A.  No idea.
18    Q.  Generally, when you would do -- how many --
19 the Alyte came on the market in 2011 in the U.S.
20 Between 2011 and 2013 when you retired, can you estimate
21 how many pelvic mesh explants you have done -- you had
22 done?
23    A.  You know, my practice morphed.  And probably
24 starting in about 2006, 2007, I was the founding medical

Keith O. Reeves, M.D.

Page 34

1 director of an entity named The Methodist Hospital
2 Center For Restorative Pelvic Medicine.  And I put
3 together a multispecialty group consisting of
4 urologists, gynecologists, colon rectal surgeons, and
5 plastic surgeons.  And we became a referral center for,
6 certainly, the state of Texas and especially southeast
7 Texas, for women to come to who were having problems
8 with pelvic support problems.
9        And since I was the senior gynecologist, I
10 was the one who was involved primarily in taking out
11 mesh products that were causing problems.
12    Q.  Okay.
13    A.  And I started doing that when the center was
14 created, and actually for a couple of years before that.
15 And in the final -- in the several final years of my
16 practice, I would say probably 40 to 50 percent of my
17 operative cases were involved in taking out vaginal
18 mesh.
19    Q.  Okay.  And can you -- now, when you say
20 vaginal mesh, are you including mesh that has been
21 implanted abdominally in addition to vaginally?
22    A.  Yes.
23    Q.  Okay.  And when you do an explant -- when you
24 were doing explants, did you generally know what the

Page 35

1 product was that had been implanted?
2    A.  We tried to get records on everyone.  That's
3 not nearly as easy as saying so.  And we, in many
4 instances, knew, but I'm going to guesstimate and say
5 that in just as many instances we did not know exactly
6 what we were taking out.
7    Q.  Is it fair to say that you wouldn't be able to
8 estimate -- well, okay.  And when you said you -- you
9 had explanted the Alyte, can you give an estimate of how
10 many times you've done that?
11    A.  I cannot.
12    Q.  Okay.  Do you know the indications for use for
13 the Alyte?
14    A.  Yes.
15    Q.  Okay.  And can you describe those?
16    A.  They are -- it's a product designed for pelvic
17 support of the vagina and/or of the uterus in women who
18 come in with uterine or vaginal prolapse.
19    Q.  Okay.  And can you describe how the Alyte is
20 placed in the body?
21    A.  Yes.  It's a Y device.  The top of the device
22 is actually the two arms of the Y folded over each
23 other.  And that folded portion is sewn into the sacral
24 promontory, and the anterior side of the Y is sewn into

Page 36

1 the uterus or into the top of the vagina.  And the
2 posterior aspect of the Y is sewn into the underside of
3 the uterus or the underside of the vagina.
4    Q.  And it's placed abdominally.  Correct?
5    A.  Yes.
6    Q.  Okay.  And have you reviewed any clinical
7 research regarding the use of the Alyte?
8    A.  Only what I've shown you here.
9    Q.  Well -- so I haven't seen your stack of --
10    A.  Okay.  All right.
11    Q.  -- your reports yet.
12    A.  Okay.
13    Q.  But do you recall offhand reviewing any
14 clinical studies regarding the Alyte?
15    A.  No.  There are not many, as a matter of fact.
16 It wasn't on the market that long.  And I think the only
17 specific study that I can recall that was done with
18 Alyte was the Culligan study.
19        THE REPORTER:  The what?
20        THE WITNESS:  Culligan, C-U-L-L-I-G-A-N.
21    Q.  (By Mr. Chillingworth)  And there's the
22 Culligan study that was published in 2014.  Is that
23 correct?
24    A.  Correct.  Sure.

Page 37

1    Q.  Is that the one you're -- you're referring to?
2    A.  Yes.
3    Q.  Okay.  Were you aware that he has another
4 study from 2019?
5    A.  I'm not.
6    Q.  Okay.  Do you have an understanding of how
7 many women have been implanted with the Alyte?
8    A.  No.
9    Q.  Do you have knowledge of the success rate of
10 the Alyte?
11    A.  I don't -- I'm not aware of those studies.
12 Culligan got -- he had a numerically -- that his -- that
13 initial study -- I'm suspecting the one you're referring
14 to in '19 -- I would hope followed up on some of those
15 patients in the initial study.  But I think he had about
16 a 142 or 150 patients in the initial study, as I recall.
17    Q.  Okay.  We'll talk about that more.  But other
18 than Dr. Culligan's 2014 study, you haven't seen any
19 other -- or you're not aware of any other clinical
20 studies involving the Alyte?
21    A.  I'm not aware any that.  Doesn't mean they're
22 not out there; I just didn't encounter any.
23    Q.  Sure.  Okay.  And we talked -- you're a
24 gynecologist.  Correct?

Keith O. Reeves, M.D.

Page 38

1    A.  Correct.
2    Q.  And you have no training in bioengineering.
3  Is that correct?
4    A.  I do not.
5    Q.  You're not an expert in bioengineering.
6  Correct?
7    A.  No.
8    Q.  Okay.  Also no training in materials sciences.
9  Correct?
10   A.  No.
11   Q.  And so not an expert in materials sciences?
12   A.  No.
13   Q.  Okay.  No training in polymer science.  Is
14  that correct?
15   A.  Correct.
16   Q.  Not an expert in polymer science.  Correct?
17   A.  No.
18   Q.  You're not a pathologist.  Correct?
19   A.  No.
20   Q.  You're not an expert in interpreting pathology
21  science, are you?
22   A.  I am not.
23   Q.  Okay.  Did -- oh, have you ever designed a
24  medical device?

Page 39

1    A.  Yes.
2    Q.  Okay.  And what kind of device was that?
3    A.  It was a clamp that I came up with to be able
4  to use to grasp the uterosacral ligaments and the
5  sacrospinous ligaments when doing sacrospinous ligament
6  fixation.
7    Q.  Okay.  And -- and have you developed --
8  or sorry.  Have you designed a pelvic mesh device?
9    A.  Never.
10   Q.  Never.  Okay.  Are you an expert in FDA
11  regulations?
12   A.  No.
13   Q.  Have you ever prepared a 510(k) or premarket
14  approval application?
15   A.  No.
16   Q.  Do you have an understanding of the
17  requirements for a 510(k) application?
18   A.  Not in any detail at all.
19   Q.  Okay.  Do you know what ISO 10993 standards
20  are?
21   A.  No.
22   Q.  Are you -- do you consider yourself an expert
23  in biocompatibility?
24   A.  No.

Page 40

1    Q.  Okay.  Have you ever drafted -- you know what
2  instructions for use are --
3    A.  Yes.
4    Q.  -- in the context of medical devices?
5    A.  Yes.
6    Q.  Have you ever drafted an IFU?
7    A.  No.
8    Q.  Have you reviewed the Alyte IFU?
9    A.  Yes.
10   Q.  Okay.  We'll talk about that in a second.
11  Have you prepared an IFU that you would deem appropriate
12  for the Alyte?
13   A.  I have not.
14   Q.  Have you prepared any language that you would
15  have preferred to have seen in the IFU that is not
16  already in there?
17   A.  Have I -- can you restate that?
18   Q.  Yeah.  Have you -- my first question was a
19  little bit too open-ended.
20   A.  Okay.
21   Q.  So what I meant was have you drafted any
22  language that you would have placed into the IFU to make
23  it appropriate?
24   A.  I have not drafted any language, no.

Page 41

1    Q.  Okay.  And are you -- do you consider yourself
2  an expert in the design of polypropylene medical
3  devices?
4    A.  No.
5    Q.  Okay.  Are you an expert in the design of
6  pelvic mesh?
7    A.  No.
8    Q.  Are you an expert in the manufacturing of
9  pelvic mesh?
10   A.  No.
11   Q.  Okay.  I'm sure you're used to these
12  questions.
13   A.  I am.
14   Q.  Okay.  Let's take a look at your general
15  report, and let's start from the beginning.
16   A.  Are we at a good breaking spot?  We've been
17  going 50 minutes.
18       THE VIDEOGRAPHER:  We are off the record.
19  It is 10:59.
20       (Short recess.)
21       THE VIDEOGRAPHER:  Okay.  We are back on
22  the record.  It is 11:23.  This is the beginning of
23  media two.
24   Q.  (By Mr. Chillingworth)  All right.  So when we

Keith O. Reeves, M.D.

Page 42

1  went on break, we went ahead and made copies of the
2  articles that you brought -- that you brought with you
3  with the notes that you have on it. We're going to --
4  we'll --
5       MR. CHILLINGWORTH: Keep a placeholder for
6  Exhibit 4, please, because we're going to mark this
7  Exhibit 4.
8       (Discussion off the record.)
9       (Exhibit 5 marked.)
10      Q. (By Mr. Chillingworth) And just to make it so
11  we know in the future what we're talking about, Exhibit
12  5 consists of two -- these are the articles. And I'm
13  giving the first listed author's name, unless something
14  else is listed. First is Toozs-Hobson; second is Liang;
15  third is Liu; fourth is Barone; fifth is Bako, sixth is
16  Welk; next is Weyhe; next is Chapple. Or is that
17  Chapple? Do you know?
18      A. I think it's probably Chapple, but I don't
19  know.
20      Q. Okay. Chapple. Culligan from -- from 2013 --
21  I said 2014 earlier. 2013. It's actually published --
22      A. It was published in 2014.
23      Q. Yeah. So we'll call it 2014, just to be
24  consistent.

Page 43

1       A. Okay.
2       Q. Then one by Glazener. Patel is the next one.
3  Bienkowski; Svabik, S-V-A-B-I-K; and then Mironska,
4  M-I-R-O-N-S-K-A.
5       THE WITNESS: And if you want me to, I'll
6  give you my stack so you can get the spelling of all
7  these names at some point in the day.
8       Q. (By Mr. Chillingworth) And again, just to
9  clarify, these are the articles that you principally
10  relied on in formulating and drafting your opinion in
11  your general expert report?
12      A. Correct. And what these articles have going
13  for them, for the most part, is currency. They're
14  review articles, and I didn't go back longer than a
15  decade when I was looking for articles to use.
16      Q. Okay. Okay. And if I could focus you back on
17  the bibliography of your expert report -- your general
18  expert report -- I'll just represent to you that I've
19  seen all of those articles except for Bienkowski and the
20  last one, Mironska. So at some point we may regroup and
21  revisit. Just -- I need to take a look at those
22  articles --
23      A. Sure.
24      Q. -- and we can talk about it. Anyway, so now

Page 44

1  we're going to start plowing through the report, if
2  that's all right. So on the first page under the
3  heading opinions regarding Bard practices and products,
4  and -- so we talked about this earlier, but the purpose
5  of this report is to give your opinions concerning the
6  Alyte. Correct?
7       A. Correct.
8       Q. And -- and not any other -- you may -- you
9  have opinions about other Bard products, but we're
10  trying to elicit your opinions about the Alyte
11  specifically. Correct?
12      A. Correct.
13      Q. Okay. And when you say Bard practices, what
14  exactly are you -- are you -- do you -- what are your
15  opinions concerning Bard's practices?
16      A. I think the thing that really concerned me the
17  most -- if this is a practice -- or a business
18  principle, if you will, is the fact that this product
19  was put onto the market without any supporting clinical
20  study at all. There was no prospective, randomized
21  clinical trial showing that this product was safe or
22  effective. And it was marketed and it was cleared by
23  the FDA and without any clinical data at all showing
24  that it was safe or effective. And I think that's an

Page 45

1  unwise business practice, if you will.
2       Q. Do you have criticism of the FDA for -- for
3  clearing it for the market?
4       A. I'm not here to criticize the FDA. We don't
5  want to go there.
6       Q. Fair enough. And so we'll talk -- we'll get
7  into that. But essentially, if we could distill your
8  opinion about Bard practices, it's, as you've described
9  it, putting the Bard product on the market without what
10  you say are clinical studies. Is that correct?
11      A. Correct.
12      Q. Is there any other aspect of Bard's practices
13  that you're opining on in this report or in this case?
14      A. Well, I think it all flows from that. I mean,
15  everything that happened with Alyte. And Bard is not
16  alone in this regard. But the manufacturers of mesh
17  products did not have any clinical trials before these
18  products came to market. And they made the assumption
19  that a product that had been placed in the abdomen would
20  be analogous to a product that was used for vaginal and
21  pelvic organ support.
22       And there's a real problem from an anatomy
23  standpoint, to confuse the abdomen with the vagina. But
24  the manufacturers did that. And to assume that a

Keith O. Reeves, M.D.

Page 46

1  product is going to act in the same fashion in one
2  location as it did in another is just balderdash.  It
3  didn't work like that.
4      Q.  And when you say they assume, what are you
5  basing your -- your statement that Bard was making
6  assumptions about -- about hernia mesh versus pelvic
7  mesh?
8      A.  Well, that was because that was the predicate
9  device that was used.  They were using abdominal hernia
10 repair predicate devices when they came onto the market
11 with vaginal mesh products.
12     Q.  Okay.  And we'll get into this a little later,
13 but when you say assume, you're not -- you're not --
14 you're not intending to interpret frame of mind or -- or
15 motive, or anything to that effect, are you?
16     A.  I wasn't there when those decisions were made.
17 I can't speak to that.
18     Q.  Okay.  Let's keep going here.  In this first
19 sentence after that heading, Bard's Alyte mesh is not
20 suitable for its intended applications as a permanent
21 prosthetic implant for POP and general liability in the
22 human body and is defective and unreasonably dangerous
23 because the manufacturer of its raw polypropylene resin
24 has clearly warned that it should not be placed inside

Page 47

1  the human body.
2          Did I read that correctly?
3      A.  You did.
4      Q.  Okay.  Thanks.  When you -- just for
5  clarification -- when you say it's not suitable for its
6  intended applications as a permanent prosthetic implant
7  for POP -- and then this is the term I want
8  clarification on -- general liability in the human body,
9  can you clarify what that means?
10     A.  Poor wording on my part.  I don't know what
11 general liability in the human body really represents.
12 They had liability because they made the product, but
13 liability is not a medical term.
14     Q.  Right.  So you're not -- okay.  So this is not
15 a general medical term?
16     A.  No.
17     Q.  And you're not giving any legal opinions in
18 this case?
19     A.  Not qualified to do that.
20     Q.  Okay.  All right.  So leaving that aside, can
21 you give me the basis for this opening statement?
22     A.  Well, I think what happened with the product
23 once it was put into the body, for all the women who had
24 problems with it, is proof positive that it should not

Page 48

1  have been used.
2      Q.  So -- but when -- I'm referring specifically
3  to the part of this sentence that says, because the
4  manufacturer of its raw polypropylene resin has clearly
5  warned it should not be placed inside the human body.
6  So you're -- in this sentence here, you're drawing a
7  connection between the -- a warning given by a
8  manufacturer of raw polypropylene resin to the
9  suitability for the product in the human body.  Am I
10 correct in that -- in characterizing it that way?
11     A.  Yes.
12     Q.  Okay.  And what is the basis for -- for -- for
13 drawing a connection between a warning given by a
14 manufacturer of raw polypropylene and your opinion that
15 it's unsuitable for -- for permanent prosthetic implant,
16 for POP?
17     A.  On page 2 of my report, second paragraph, the
18 medical application caution was stated, quote, Do not
19 use this Phillips Sumika Polypropylene Company material
20 in medical applications involving permanent implantation
21 in the human body or permanent contact with internal
22 body fluids or tissues.
23     Q.  Okay.  At the end of that, what you just read,
24 there's a footnote 46.  And that's the first footnote in

Page 49

1  your report.  Just representing to you.  And if we flip
2  back to your bibliography, are those numbered records?
3  Are those intended to correspond with footnotes that you
4  have in your report?
5      A.  The numbers don't match?  Is that what you're
6  suggesting to me?
7      Q.  Yeah.  And I'll just say in general -- that's
8  generally the case in the report.
9      A.  Okay.
10     Q.  And -- but I just wanted to know if there was
11 a -- you know, maybe if there was something I was
12 missing about how, you know, the footnotes -- if -- you
13 know, if the footnote was supposed to correlate with the
14 bibliography or if there's a separate set of sources
15 that are connected with these footnotes that we should
16 be looking at.
17     A.  No, there's nothing separate.  In the best of
18 all possible worlds, those numbers would have all lined
19 up.
20     Q.  Okay.  Okay.  Well -- and I -- let me mark
21 this one as No. 6.
22         (Exhibit 6 marked.)
23     Q.  (By Mr. Chillingworth)  Okay.
24         MR. CHILLINGWORTH:  Oh -- you don't

Keith O. Reeves, M.D.

Page 50

1  have -- do you have it yet?  Oh, is it just sitting --
2      (Discussion off record.)
3      Q.  (By Mr. Chillingworth)  Okay.  So the language
4  you were just referring to, the medical application
5  caution, it comes from this document, the Phillips
6  Sumika Material Safety Data Sheet, as far as -- as best
7  you know.  Correct?
8      A.  As far as I know, yes.
9      Q.  Okay.  And do you know if there is data to
10  support that medical application caution?
11      A.  I do not know that.
12      Q.  Okay.  And are you familiar with material
13  safety data sheets outside of litigation?
14      A.  I have had occasion to see them when I've
15  opened products, if that's what you're talking about.
16      Q.  Okay.
17      A.  But only to the extent that I was going to be
18  using something.  And then I would look at it before I
19  would do anything.  I would look at the MSDS before I
20  would do anything with the product.
21      Q.  And is that in the course of your practice of
22  medicine?
23      A.  Yes.
24      Q.  Okay.  And what kind of products would you

Page 51

1  look at -- would come with an MSDS in your practice?
2      A.  Well, sometimes intrauterine devices would
3  have that information on them.  There is something
4  called a Hulka clip that was used for tubal ligation.
5  There was also a Falope ring that was used for tubal
6  ligation.  And those kinds of manufactured products that
7  were going to be permanently in the body would have an
8  MSDS with them.
9      Q.  An MSDS or instructions for use?
10      A.  Both.
11      Q.  Okay.  Do you understand what the purpose of
12  an MSDS is?
13      A.  Informational.
14      Q.  Informational for who?
15      A.  For anybody they distribute it to.
16  Physicians, if they wanted.  But if -- if you're a
17  manufacturer of the product in its base form, this
18  should be going to the medical device manufacturer for
19  them to have before they use it to make a device, it
20  would seem to me.  I'm not claiming any expertise in
21  material safety data sheets, by the way.
22      Q.  Okay.  And in your experience, when you've
23  seen material safety data sheets accompany products that
24  you've used in your practice, were the products finished

Page 52

1  products?
2      A.  Yes.  I would never see anything from the raw
3  material.  They were finished products.
4      Q.  Okay.  Okay.  So have you ever seen a material
5  safety data sheet for raw materials in your practice of
6  medicine?
7      A.  No.
8      Q.  Okay.  Have you ever sought out material
9  safety data sheets for the raw materials in medical
10  devices that you've used in your practice?  Have you
11  ever sought them out?
12      A.  Not generally.  Most of the things that I was
13  using had been on the market for a long time, and there
14  were very few truly unique products that were introduced
15  that would have something like this accompanying it.
16  The -- the two devices I mentioned for tubal ligation
17  were around when I started practice, and they were still
18  around when I retired.
19      Q.  Okay.
20      A.  Okay?
21      Q.  And we've talked about your -- you don't have
22  expertise in bio -- bioengineering or polymer science.
23  Correct?
24      A.  Correct.

Page 53

1      Q.  And do you have any understanding of the
2  comparison of characteristics between raw polypropylene
3  and a finished product made from polypropylene
4  monofilament?
5      A.  That's a very complex question.  Can you
6  rephrase that?
7      Q.  Sure.
8      A.  I'm not sure that I understand what you're
9  asking me.
10      Q.  Sure.  So let's look at the MSDS.  And if we
11  go to Bates number -- I'll just -- it's -- I'll just use
12  the last two -- 89.
13      A.  Okay.  I'm there.
14      Q.  And underneath Section 9, it says physical and
15  chemical properties.  And next to appearance and odors
16  it says opaque, translucent waxy pellets or fluff, Mild
17  odor.  Is that correct?
18      A.  Correct.
19      Q.  So a device like the Alyte isn't waxy pellets
20  or fluff.  Correct?
21      A.  No, it's not.  It's got to be manufactured.
22      Q.  So that's what I'm saying.  The physical and
23  chemical properties of polypropylene resin, do you --
24  can you characterize the difference between that and the

Keith O. Reeves, M.D.

---

Page 54

1  physical and chemical properties of finished products,
2  like the Alyte?
3      A.  Well, they use the one to make the other, and
4  they're not anything like the same.
5      Q.  The --
6      A.  They use the raw polypropylene to make the
7  finished product.  But obviously, when people are
8  implanting mesh, they're not putting in opaque,
9  translucent waxy pellets or fluff.
10      Q.  Right.
11      A.  Okay?  They're putting in something that they
12  have made from this product.
13      Q.  Sure.  And you don't have an understanding
14  of -- right.  You're not an expert in the process that
15  goes from using resin in its raw form to the -- the
16  polypropylene monofilament to the final product.  Is
17  that correct?
18      A.  Not my area of expertise.
19      Q.  Okay.  And so have you been made aware -- so
20  this material safety data sheet was put out by -- by
21  this Phillips Sumika Company.  Have you been made aware
22  of testimony given by -- by a person designated for this
23  company as the person most knowledgeable for the MSDS
24  that indicated that there was no scientific basis for

Page 55

1  this medical application caution?
2      A.  Don't think I've seen that testimony.
3      Q.  Okay.  This is going to be No. 7.
4          (Exhibit 7 marked.)
5      Q.  (By Mr. Chillingworth)  Okay.  So this is
6  deposition transcript for the videotaped Federal Rules
7  of Civil Procedure 30(b)(6) deposition of Chevron
8  Phillips Chemical Company LLC by Frank -- and this is --
9  I'm going to just pronounce it phonetically.  This is
10  not how you pronounce it, but Zakrzewski.  As far as I
11  know, that's not how you really pronounce it, but I'm
12  going to butcher it.
13          And if you could please turn to -- this is
14  in 2-by-2 format -- page 11, but it's really -- I'm
15  asking you to look at page 41 of the transcript.
16      A.  I'm there.
17      Q.  Okay.  And here the attorney -- if you look
18  at starting at line 2, the attorney is describing the
19  nature of the reason why this witness has been asked to
20  be -- appear for deposition.  And it says -- paragraph 1
21  to the deposition notice states, The subject matter of
22  Boston Scientific's notice shall be statements
23  concerning the use of the material for implantation in
24  the human body contained in the section titled Medical

Page 56

1  Application Caution on page 1 of the material safety
2  data sheet for Boston [sic] Sumika Polypropylene
3  Company, Marlex polypropylenes, version dated January
4  28th, 2004, and subsequent versions, specifically the
5  location of, the basis for, and the purpose of this
6  inclusion of this language.
7          And did I read that correctly?
8      A.  Yes.
9      Q.  I know I did it quickly.
10      A.  More or less.
11      Q.  Yes.  Thank you.  And then you see the
12  witness on line 21 agrees that that's -- it says, Yes, I
13  can talk about these topics.  Correct?
14      A.  Yes.
15      Q.  Okay.  If you'll look at page 45, line 13, it
16  says -- the question is:  Okay.  Was the application
17  statement added to the material safety data sheet for
18  Marlex polypropylene in January of 2004 for legal
19  reasons?
20          And the witness responds, I would say that
21  legal had some input into the MSDS, but I don't know
22  that for certain because I didn't write it.  Okay?
23      A.  All right.
24      Q.  And then starting on 24 on that page, Was the

Page 57

1  medical application statement that we've highlighted in
2  Deposition Exhibit 3 added to the polypropylene MSDS
3  based on any scientific testing that was conducted?
4          And the answer was, Not that I'm aware of,
5  no.
6          Question:  And was the medical application
7  statement for polypropylene in the MSDS marked as
8  Deposition Exhibit 3 based on any scientific -- specific
9  scientific data on polypropylene?
10          Answer:  No, not that I'm aware of.
11          Question:  Was the medical application
12  statement that we've been looking at in Deposition
13  Exhibit 3 added to the polypropylene MSDS based on any
14  review of the scientific or medical literature on
15  polypropylene?  And there's an objection.  And goes...
16          And the question is repeated on page 47,
17  lines 48 to 12.  And the witness responds, Answer:  I'm
18  not -- Yeah, I'm not aware of any testing or information
19  on polypropylene related to that statement.
20          Then question:  And was the medical
21  application statement for the polypropylene material
22  data safety sheet added to the MSDS based on any
23  scientific concerns with vaginal mesh specifically?
24          And the answer is no.

Keith O. Reeves, M.D.

Page 58

1    Does that -- did I basically read that
2    correctly?
3         A.   You did.
4         Q.   Okay.  And does that cause you to revise your
5    concern about the medical application caution, knowing
6    that -- that it wasn't based on any sort of scientific
7    data or research?
8         A.   I'm seeing this for the first time.  Okay?  I
9    have not seen this deposition before.  And I hear what
10   you're telling me, and I hear what you're suggesting.
11   What I don't think this adequately explains is why, as I
12   indicated in my report, that Bard went to such trouble
13   to hide this from the manufacturer of the product in the
14   first place.  They did not want Chevron Phillips to know
15   that they were going to be putting this in the body.
16   And if you're telling me -- and if you know this, that
17   this is done strictly to avoid litigation, then I hear
18   you.  But that's -- they've gone to an awful lot of
19   trouble to hide this information from the polypropylene
20   manufacturer.
21        Q.   And what are you basing that on?
22        A.   Based on what I put in my report.  That is a
23   direct quote from what they did.
24        Q.   So in other words -- so but you are -- the

Page 59

1    source of your information is what?  You have content in
2    here describing, you know --
3         A.   Sure.
4         Q.   -- like you said, sort of a -- for lack of a
5    better term, alleged conspiracy.  And what is the source
6    of --
7         A.   The documents that I cited when I was writing
8    this.  And this was -- you know, a lot of this was from
9    prior -- this was -- the language that I use here is not
10   original in my report.  This is used in previous
11   depositions that I had given.  And I did not -- and this
12   information was provided to me.  I did not come up with
13   the trial transcripts.  I don't have any way of getting
14   that.  I was given this information.
15        Q.   Okay.  So -- your description of, you know,
16   page 2, page 3, and kind of spilling over onto the -- to
17   the -- those first two lines on page 4, that information
18   was -- was given to you.  And you, yourself, did not
19   mine through documents to find what appears in your
20   record here?
21        A.   That is correct.
22        Q.   Okay.  And do you know where -- what the
23   source of this information was?
24        A.   I took it at face value.  I don't know where

Page 60

1    the original source material came from.  I think, based
2    on the Bates numbers, that this must be prior trial
3    testimony; but I'm not sure about that.
4         Q.   Okay.  But if you see -- if you look on page
5    2.  And on -- right underneath the quoted language for
6    medical application caution --
7         A.   Yes.
8         Q.   -- and look at that subsequent paragraph and
9    then a line that starts third from the bottom, in fact,
10   Darois admitted in his Cisson trial testimony that Bard
11   made efforts to conceal its use of material from Boston
12   [sic] Sumika and others because Bard knew that Boston
13   [sic] Sumika would not allow it to continue using its
14   material for permanent implants if it found out.
15   There's a footnote for 48.  And looking at footnote 48
16   is the Crosby article you mentioned earlier.
17        A.   Incorrect citation.  Okay.
18        Q.   So -- and I'll just represent to you that
19   that's, again, throughout.  So you don't -- you can't
20   tell me based on the footnotes where this information
21   came from?
22        A.   I cannot.
23        Q.   And -- and are you purporting to know what --
24   what was going on in the minds of -- of the -- of the

Page 61

1    employees mentioned in -- in this narrative?  Sorry.
2         Can you -- are you opining on the frame of
3    mind and motives of the employees that you are talking
4    about in this narrative?
5         A.   No.
6         Q.   Okay.  Can you opine on that?
7         A.   Of course not.
8         Q.   Okay.  And so -- I guess I'll have to move on
9    because we're short on time.  So let's move to page 4.
10   I'm looking at the -- the first full paragraph -- I'm
11   sorry -- the second first -- the second full paragraph
12   on page 4.  And the first sentence there is there is
13   literature showing reports of cancer associated with
14   polypropylene.  And -- and I'll just, you know, again
15   represent to you that you have footnotes 58, 59, 60
16   cited there.  But those -- those footnotes line up in
17   your bibliography with the Bracken deposition.
18        A.   Okay.
19        Q.   Okay?  So first of all, I know you've --
20   you've previously testified in -- in the -- in the Align
21   and Avaulta cases.  But you don't intend to opine that
22   polypropylene causes cancer?
23        A.   These are just case reports that I'm
24   repeating.  I'm not saying that polypropylene causes

Keith O. Reeves, M.D.

Page 62

1 cancer. This is just a citation of what's in the
2 literature.
3     Q. I know you've said in past testimony that you
4 can't say to a reasonable degree of medical certainty
5 that polypropylene creates a risk of cancer. Is that
6 correct?
7     A. That's exactly what I said.
8     Q. Okay. And because we don't have the articles,
9 you know, directly cited here, can you tell me what
10 articles you were referring to?
11     A. I don't have those -- I thought that this was
12 -- when I turned in the bibliography, I thought before
13 it was typed up that the law firm was going to make sure
14 that the citations were correct. And I don't have
15 those. What you see is what you get here. I don't have
16 the articles.
17     Q. Okay. So as we're sitting here today, it's
18 the deposition, you can't cite the articles that -- that
19 form the basis of this -- of this discussion of cancer
20 and polypropylene?
21     A. Correct. This was copied and pasted from
22 prior testimony. And if I were to go back through all
23 of the depositions I've given, I could eventually come
24 up with these articles. This is not -- I didn't bring

Page 63

1 this up, but I can't give you the correct citations as
2 we sit here today.
3     Q. Okay. Thank you. On the -- all right. On
4 the last paragraph on page 4 in the very last sentence,
5 which starts on -- you see where it says, This double
6 thickness affects?
7     A. Yes.
8     Q. Okay. Well, I'll just read that whole thing.
9 The Alyte is a Y-shaped piece of polypropylene that is
10 single thickness for the pieces attaching to the
11 anterior and posterior serosal walls of the vagina but
12 is double thickness where these two single layers meet
13 for the -- for attachment to the sacrum. This double
14 thickness affects the porosity and pore size of the
15 sacral attachment piece and the anterior and posterior
16 vaginal arms. So it's that last sentence that I want to
17 touch on.
18     A. Okay.
19     Q. Okay. How did you come to form that opinion?
20     A. Just looking at the picture of the product
21 itself.
22     Q. Okay.
23     A. It's doubly thick.
24     Q. And -- and the opinion that the double

Page 64

1 thickness affects pore size -- porosity and pore size,
2 what's the basis of that?
3     A. Well, one overlies the other. And the pore
4 sizes are not going to be the same if you look from the
5 outside in. If you look from the outside and then go
6 down to the sacrum, you've got two products overlying
7 each other. And they don't line up perfectly so that
8 one is on top of the other. In fact, they overlap some.
9 And to the extent that they overlap, the pore size --
10 the composite pore size is going to be reduced.
11     Q. Okay. And you've never implanted an Alyte.
12 Correct?
13     A. Correct.
14     Q. Have you ever seen an Alyte?
15     A. Yes.
16     Q. Okay. And -- and that -- in the -- you're
17 able to see overlapping pores?
18     A. Yes.
19     Q. Okay. And -- but how does it affect -- you've
20 seen just out of the package the double thickness
21 affecting porosity and pore size?
22     A. Yeah, because of the way that the one overlies
23 the other. Okay?
24     Q. Just because it overlies the other?

Page 65

1     A. Yes.
2     Q. Okay. Is there -- and that's based purely on
3 your observation?
4     A. Yes.
5     Q. Okay. Now, the next page you start talking --
6 we get into discussion of the Barone article. Correct?
7     A. Uh-huh.
8     Q. And can you give me your synopsis of the
9 Barone article? And this is contained, I think --
10     A. You've got the article.
11     Q. Yeah.
12     A. Barone looked at four separate mesh products.
13 And he designed a system to apply force -- varying
14 degrees of force to all four products. And then when he
15 applied the force, he measured what happened to the mesh
16 product as a result of force being applied. And he
17 demonstrated that when force was applied, what had
18 previously been a mesh ended up being essentially a
19 solid piece of polypropylene.
20     Q. And his study was conducted in -- in a
21 laboratory?
22     A. Correct.
23     Q. And it was -- the forces that were applied
24 were -- they were -- how were the forces that were

Keith O. Reeves, M.D.

Page 66

1 applied generated?
2    A.  They were used -- they were using weights.
3 And the forces that were applied are consistent with the
4 forces that would be encountered in the female pelvis.
5 He was not applying extraordinary amounts of force.
6    Q.  Okay.  So it indicates -- and I'm reading from
7 your report --
8    A.  Okay.
9    Q.  And it indicates kind of halfway down that --
10 a little more than halfway down that first full
11 paragraph on page 5, After applying the force of 5
12 newtons, Alyte had the greatest decrease in porosity by
13 15 percent.  Five newtons, what is that?  Can you --
14 what does that translate to?
15    A.  Force -- I can directly, from that same
16 paragraph -- force is equal to 1 N if it accelerates a
17 mass of 1 kilogram to 1 meter per second squared.
18 That's the definition of the force.
19    Q.  Okay.
20    A.  Okay?
21    Q.  And what is the -- what is the top level of
22 force -- in vivo force that would be applied in an
23 Alyte?
24    A.  I don't know that we can answer that.

Page 67

1    Q.  What is -- is 5 newtons -- is that a -- is
2 that a force that one would expect to be applied to the
3 device in vivo?
4    A.  Absolutely, yes.  The same is true for 10.
5    Q.  And -- and what is that based on?
6    A.  Based on studies that Barone had done.  And I
7 didn't quite the whole article to you here.  But these
8 amounts of force that he used in the study are
9 compatible with, consistent with forces that are
10 encountered on a routine basis in the female pelvis.
11    Q.  Do you know how that was determined?
12    A.  No, I do not.
13    Q.  Okay.  And has anyone -- has Dr. -- I'm sorry.
14 I said Dr. Barone.  I guess he -- did the study -- has
15 this study been analyzed or subject to peer review?
16    A.  By definition, it's published, yeah.
17    Q.  Okay.  And are you aware of any sort of
18 contrary opinions to it?
19    A.  No, I'm not.
20    Q.  Okay.
21    A.  This was published in the American Journal of
22 Obstetrics & Gynecology, which is the premier OB-Gyn
23 publication in the United States.  It was peer-reviewed.
24 And I have not seen or heard of any criticism of the

Page 68

1 methodology, the results, or the conclusions that were
2 drawn.  I think this is solid work.
3    Q.  But just to go back to reiterate, you don't
4 know how the calculation was done to determine that this
5 amount of force was somehow a simulation of force that
6 would be experienced in vivo?
7    A.  No.  I think that's knowable information; I
8 just don't know it.
9    Q.  All right.  Looking on this -- the next
10 paragraph on page 5, I just want to highlight this
11 and -- oh, sorry.  The first sentence, There's no
12 definitive knowledge about what harmful side effects
13 these products can cause after years in the human body.
14       And what is that based off of?  And when
15 you say these products -- I'm sorry.  Let me -- sorry to
16 interrupt you, but you said harmful side effects, these
17 products can cause after years in the human body.
18    A.  I'm talking about pelvic mesh.
19    Q.  Okay.  And did Barone specifically look at the
20 Alyte?
21    A.  Yes, he did.
22    Q.  So he did.  Yeah, he did.  Okay.  Now with --
23 in reference to the sentence, what is the basis for your
24 opinion that there is no definitive knowledge about what

Page 69

1 harmful side effects the Alyte can cause years -- after
2 years in the human body?
3    A.  Well, it was not on the market that long.  And
4 some women who had Alyte implanted -- excuse me -- still
5 have Alyte implanted, and we don't know what has
6 happened to them because in some instances the Alyte has
7 not been taken out.
8       THE CHILLINGWORTH:  Okay.  This is going
9 to be No. 7.
10       THE REPORTER:  I think we already have a
11 7.
12       (Exhibit 8 marked.)
13    Q.  (By Mr. Chillingworth)  Dr. Reeves, what I've
14 given to you is --
15    A.  This is the Culligan paper.
16    Q.  -- Culligan paper.  And this one is from 2019.
17 And I know earlier you had said you haven't had a chance
18 to -- you haven't reviewed this article before.
19    A.  I have not seen this.
20    Q.  Okay.
21    A.  May I ask what's --
22    Q.  Yeah.
23    A.  Was this -- is this strictly online now?
24 because at the bottom here it says Female Pelvic

Keith O. Reeves, M.D.

Page 70

1  Medicine and Reconstructive Surgery, Volume 00, Number
2  00, Month 2019.  Has this actually seen print yet, do
3  you know?  Or did you get this online?
4      Q.  I -- well, this is in our files, so...
5      A.  Well, for that reason, I'm not surprised that
6  I haven't seen it, because I get Female Pelvic Medicine
7  & Reconstructive Surgery, and I haven't seen this.
8      Q.  Okay.  Well, let's take a look at it, though.
9      A.  Okay.
10     Q.  And you see under objective it says, The
11 objective of the study was to describe anatomic and
12 symptomatic outcomes at five years or longer after
13 robotic-assisted laparoscopic sacro --
14     A.  Sacrocolpopexy.
15     Q.  -- sacrocolpopexy.  I'm sorry.  I've got an
16 audience, so I got stage fright.  -- using very
17 lightweight polypropylene Y mesh.  And looking down to
18 results, 80 percent of the potential study group, which
19 is 253 out of 316, presented for examination and
20 subjective assessment at five years or longer after
21 their indexed surgeries.  Surgical success rate was 226
22 (89.3 percent) of 253 with no apical failures.  Only 4.4
23 percent of the group (11 out of 253) met both objective
24 and subjective failure criteria.  And 16 were classified

Page 71

1  as -- 16 patients were classified as surgical failure
2  owing to subjective criteria alone, despite having no
3  significant objective prolapse on examination.  10
4  patients (4 percent) elected to undergo subsequent POP
5  repair.  And so -- I read that correctly.  Correct?
6      A.  Yes.
7      Q.  Okay.  If we go to the second page, and
8  underneath results, it says, The mean follow-up period
9  was 66 months.  I'm sorry.  I'm looking at the very last
10 sentence of that page --
11     A.  Okay.
12     Q.  -- as it spills over.  The mean follow-up
13 period was 66 months with a range of 58 to 80 months.
14 Do you see that?
15     A.  Yes.
16     Q.  Okay.  And then skipping to the second column,
17 the second full paragraph, after -- there's the
18 description of Table 3 -- indicates there was no mesh
19 exposures or mesh-related complications found.  And the
20 independent examiners could not determine location of
21 the mesh edges in any patient.  In addition, no patients
22 reported any treatments for mesh-related complications
23 during postoperative interval.
24         And then looking a little bit farther

Page 72

1  down, it says, Overall SSQ-8 scores were very good, with
2  88 percent of the patients indicating they're satisfied
3  or very satisfied with the surgery, 87 percent saying
4  that they would definitely do it all over again if they
5  had a chance, and 86 percent stating that they would
6  definitely recommend to a friend.
7          And anyway, so, again, I realize that this
8  is the first time that you've been -- that this has been
9  put in front of you.  But does this suggest to you that,
10 contrary to the sentence that there's -- that there's no
11 knowledge about what the long-term side effects -- or
12 the harmful side effects after years in the human body,
13 does this study give you pause in that opinion and
14 suggest there is clinical data to suggest the opposite?
15     A.  I'm going to suggest to you that this is the
16 only paper that I think you're going to be able to
17 produce today that has these kinds of statistics.  For
18 the record, which did not appear -- here it is.  PIC
19 Culligan is a paid consultant for Intuitive Surgical,
20 Coloplast, and C.R. Bard, and is a stockholder in
21 Origami Surgical.
22          So I do know that in the first paper that
23 was written by him five years earlier he indicated that
24 he was a paid consultant.  I also know that the

Page 73

1  follow-up for all the patients, according to his first
2  paper, the follow-up examinations were done by a
3  clinical nurse and not by a physician.  I have not seen
4  this paper, so I can't comment on it without having read
5  it in some detail.  And I don't know who did the
6  examinations.  And I would say to you that, based on my
7  knowledge of the literature, this paper with positive
8  results is in a distinct minority.  And if you've got
9  another paper that you can show me today right now that
10 has these kind of results, I'd like to see it.  But I
11 think this is a unique minority opinion rendered by
12 somebody who is paid by Bard and for whom Bard provided
13 the mesh that was used.
14     Q.  But you know of no other clinical study
15 involving the Alyte.  Correct?
16     A.  Not specifically as such, no.
17     Q.  Well, except for Dr. Culligan's original
18 article?
19     A.  Original article.  Right.
20     Q.  Which is it included in your --
21     A.  Yes, it is.
22     Q.  Okay.  So I won't show that to you.  If you
23 want to turn -- flip to that, if you can.
24     A.  The original paper?

Keith O. Reeves, M.D.

Page 74

1    Q.  Yeah, the original paper.
2    A.  Okay.  I've got it.
3    Q.  Okay.  And what is your understanding of this
4  study as you read it?  Like, instead of having me read
5  it, can you paraphrase what the study was?
6    A.  He put -- it was 150 patients.  He put an
7  Alyte device in 150 patients and followed them for a
8  year and had them come back.  And they were examined by
9  a nurse.  And he claimed in the first paper on page 733
10  the clinical cure rate was 95 percent.
11    Q.  Right.  So that's a pretty good result.
12  Correct?
13    A.  It is.
14    Q.  And -- and you've had a chance to review this
15  paper at length.  Correct?
16    A.  Yes.  But let me also share with you about
17  this paper, that it was not randomized and there was no
18  control group.  From a strictly scientific standpoint,
19  regardless of the results that he obtained, this is not
20  a well-designed study.
21    Q.  Does -- and you, yourself, have not done any
22  clinical studies.  Correct?
23    A.  Oh, I've done clinical studies.  I've
24  participated in those.  Surely.

Page 75

1    Q.  I'm sorry.  Strike that.  So your -- the
2  source of your criticism of this -- of this article is
3  that it wasn't double blind and -- or I'm sorry -- did
4  you say double blind?
5    A.  All of the above.  It was --
6    Q.  Double blind and wasn't prospected.
7    A.  It was not randomized, it was not double
8  blinded, and there was no control group.  This is not
9  good science.
10    Q.  And is there literature to support your
11  opinion that this is not good science, that -- that
12  unless it meets those three criteria, it has -- that --
13  are you trying to say that there's no -- no value to the
14  analysis simply because it doesn't meet those criteria?
15    A.  I'm just saying it should be taken with a very
16  big grain of salt.  If you were to look at something
17  like the Cochrane Review or other studies that I have
18  cited here, this study would not have been included
19  because of the methodology used.
20    Q.  But the Cochrane Review, was that looking at
21  abdominally placed --
22    A.  I'm just talking about Cochrane Reviews in
23  general.  I'm saying that they would not rely on a study
24  that from a prospect -- that from a design standpoint

Page 76

1  was this weak.
2    Q.  But again, there are -- even if that's your
3  opinion, there is no other study out there, other than
4  this study and the later one, concerning the Alyte.
5  Correct?
6    A.  You are correct.
7    Q.  Okay.  So there isn't a study concerning the
8  Alyte that would suggest that -- that the findings in
9  here -- in these two articles that question the results
10  of the findings.  It's -- your criticism is the -- is
11  the methodology?
12    A.  Correct.  And the fact that there are how many
13  lawsuits against Alyte from the general population.  The
14  public speaks in its own regard with -- really, as it
15  relates to that.  And the women who had Alyte implanted
16  may not have been in Culligan's study.  That doesn't
17  mean that they didn't have horrific problems with the
18  product.
19    Q.  Do you know one way or the other?
20    A.  I have no idea how many products [sic] have
21  been filed against C.R. Bard for Alyte.
22    Q.  But you're talking about these women in the
23  study.  Do you know anything about these women in the
24  study other than what is in the article?

Page 77

1    A.  Of course not.
2    Q.  Okay.  And -- and so you talked about the
3  spectrum of science.  Where does the number of lawsuits,
4  as a tabulation, factor into scientific research as
5  compared to, say, the study that Dr. Culligan did?  I
6  mean, if you're balancing Dr. Culligan against the
7  number of lawsuits, I -- is there -- is it considered
8  scientifically valid to consider the number of lawsuits
9  in evaluating the efficacy or safety of a device?
10    A.  Well, I don't think you can relate the one to
11  the other in that regard.
12    Q.  Okay.
13    A.  Okay?  I'm just saying that people who have
14  had adverse experience with Alyte may not have been
15  people that Culligan implanted, but they're speaking
16  with their feet when they go to the front doors of the
17  courthouse and say "I've been implanted with a faulty
18  device, I'm having these problems, and I need
19  compensation for it."
20    Q.  Does any of the literature that you cite make
21  reference to lawsuits in analyzing product or materials?
22    A.  Absolutely not.
23    Q.  And are you aware of any study that would
24  opine on the efficacy or safety of a product in

Keith O. Reeves, M.D.

Page 78

1 recognized science that would rely on the number of
2 lawsuits filed against the manufacturer?
3    A.  I would suggest to you that the original FDA
4 bulletin was the result of over a thousand complaints
5 made to the FDA about mesh products particularly.
6    Q.  Okay.
7    A.  And that has resulted in -- the last time I
8 counted -- three or four FDA bulletins.  And it has
9 resulted in a change in classification from mesh
10 products from Class II to Class III, saying that you've
11 got to do the research and you've got to show these
12 items are safe and effective before you can put them on
13 the market.
14    Q.  All right.  But those -- those FDA
15 communications were specifically aimed at transvaginal
16 products.  Correct?
17    A.  Alyte is off the market.
18        MR. CHILLINGWORTH: :  Strike as
19 nonresponsive.
20    Q.  (By Mr. Chillingworth) Those FDA
21 communications that you reference were directed at
22 transvaginal -- transvaginally placed surgical mesh.
23 Correct?
24    A.  They could have also been placed abdominally.

Page 79

1    Q.  That's -- but that's --
2        MR. CHILLINGWORTH: :  Again, move to
3 strike as nonresponsive.
4    Q.  (By Mr. Chillingworth) Okay.  These are goes
5 to be the next two.
6        (Exhibit 9 marked.)
7        THE WITNESS:  We've been going for another
8 hour.  Is this a good spot to take a break?
9        MR. CHILLINGWORTH:  Let's finish this up
10 and then --
11        THE WITNESS:  Okay.
12        MR. CHILLINGWORTH:  Oh, actually, you know
13 what?  Fair enough.
14        THE VIDEOGRAPHER:  We are off the record.
15 It is 12:18 p.m.
16        (Short recess.)
17        THE VIDEOGRAPHER:  Okay.  We are back on
18 the record.  It is 12:20, and this the beginning of
19 media three.
20    Q.  (By Mr. Chillingworth) Okay.  I've handed --
21    A.  They're the same.
22    Q.  They look very similar.
23        MS. BOYD:  No, they're different.  Two
24 different ones.

Page 80

1        MR. CHILLINGWORTH:  Oh, did I -- I may
2 have actually -- okay.  Let's go off the record real
3 quick.
4        THE VIDEOGRAPHER:  Okay.  We are off the
5 record.  It is 12:21.
6        (Short recess.)
7        THE VIDEOGRAPHER:  Okay.  We are back on
8 the record.  It is 12:22, and it's a continuation of
9 media three.
10    Q.  (By Mr. Chillingworth) Okay.  So we just
11 marked and cleared up Exhibit 8.  I'm sorry.  Exhibit 9
12 is the 2008 public health -- FDA public health
13 notification Serious Complications Associated With
14 Transvaginal Placement of Surgical Mesh in Repair of
15 Pelvic Organ Prolapse and Stress Urinary Incontinence.
16        And No. 10 is the 2011 warning of the same
17 nature.
18        (Exhibit 10 marked.)
19    Q.  (By Mr. Chillingworth)  Now, were these the
20 bulletins that you were referring to?
21    A.  Yes.
22    Q.  Okay.  And -- and from looking at these, is
23 there any warning or caution being communicated by the
24 FDA pertaining to abdominally placed surgical mesh?

Page 81

1    A.  This says -- the 2008 says transvaginal
2 placement of surgical mesh, and the 2011 says
3 transvaginal placement of surgical mesh.
4    Q.  Okay.  So these -- these would not apply to
5 the Alyte.  Correct?
6    A.  Correct.
7    Q.  Okay.  Is there any other FDA publication that
8 you're -- or bulletin that you're referring to that --
9 that you're referring to -- you're referring to FDA
10 bulletins.  Were there any other that you're referring
11 to?
12    A.  The one that took the products off took them
13 all off the market.
14    Q.  Okay.  And so this one will be No. 11.
15        (Exhibit 11 marked.)
16    Q.  (By Mr. Chillingworth) Okay.  And this is
17 from the FDA website, and it's sort a summary of the --
18 its bulletins, as you will, and orders pertaining to
19 surgical mesh -- urogynecological surgical mesh
20 implants.
21        And are you saying that the 2019 order
22 concerning surgical mesh from the FDA had anything to do
23 with abdominal -- abdominally placed surgical mesh?
24    A.  Yes.

Keith O. Reeves, M.D.

Page 82

1    Q.  How so?

2    A.  Look on page 2 out of 3.  Surgical mesh has

3  been used for urogynecologic procedures, including

4  repair of pelvic organ prolapse and stress urinary

5  incontinence.  It is permanently implanted to reinforce

6  the weakened vaginal wall for POP repair or support the

7  urethra or bladder neck for the repair of SUI.  There

8  are three main surgical procedures performed with

9  surgical mesh to treat pelvic floor disorders with

10  surgical mesh:  Transvaginal mesh, transabdominal mesh,

11  and mesh sling.

12    Q.  But it doesn't say -- but the order is not

13  direct at transabdominal mesh, is it?

14    A.  This says transvaginal mesh, but there has

15  been an order that demanded that they go from Class II

16  to Class III devices, all forms of mesh.  That's from

17  the FDA.

18    Q.  All right.  But can you point to that order?

19    A.  If you'll give me the time I need to find the

20  notes that I made, I can get to it.  I'm not sure you

21  want to expend that time for me to look for it.

22    Q.  All right.  But in terms of these bulletins,

23  we can agree that they were directed at transvaginal

24  mesh?

Page 83

1    A.  Yeah.  But these are -- these are not

2  exclusionary.  These are not the only FDA bulletins

3  published on mesh.

4    Q.  Okay.

5    A.  Because the one that I'm recalling said that

6  for any of this -- for any vaginal mesh, any pelvic

7  mesh -- let's use the term pelvic rather than vaginal or

8  abdominal.  Any pelvic mesh now has been moved from a

9  Class II device to a Class III device.  And the only way

10  that you can market these products is if you submit

11  randomized, prospective, controlled clinical trials

12  showing that they're safe and effective.  And there's no

13  mesh on the market now as a result of that change from

14  Class II to Class III.

15    Q.  Okay.  Well, we can let the record speak for

16  itself.  Correct?

17    A.  Sure.

18    Q.  All right.  Then we can take a break now.

19    A.  Okay.

20        THE VIDEOGRAPHER:  We are off the record.

21  It is 12:28.

22        (Short recess.)

23        THE VIDEOGRAPHER:  Okay.  We are back on

24  the record.  It is 1:03, and this is the beginning of

Page 84

1  media four.

2    Q.  (By Mr. Chillingworth)  We're back on.  And I

3  know we ended up on the conversation about the FDA

4  things.  I know you said you had a list.  Just to be

5  fair to you, if you want to, can we enter that list into

6  the -- as a -- as an exhibit, and then we can let the

7  record speak for itself, going forward?

8    A.  Sure.  And for the record, I had it earlier

9  this morning.  You saw me going through my pockets.  It

10  was a timeline and it started out with 2005 or 2008 and

11  it ended in 2016.  But there were five or six separate

12  bulletin citations notices from the FDA, and I can't

13  find the list that I made earlier today.

14    Q.  We'll agree and let the record speak for

15  itself.

16    A.  All right.

17    Q.  Yeah.  So we can keep going.  I'm going to

18  direct you to the bottom of page 5, the paragraph that

19  -- that -- only two lines on page 5 that spills over

20  onto page 6.  And I'm talking about your general report

21  here.

22    A.  Yes.

23    Q.  And in that paragraph you describe the mesh

24  becoming cord-like or frayed.  And then at the bottom of

Page 85

1  page 6, you use the terms curling -- curling, cording,

2  roping, particle loss, fraying, deformation, and loss of

3  pore size.  And in particular, I just want to kind of

4  get what -- understand the clarification on what you

5  mean by cord-like or cording.

6    A.  If I may, I think this is best shown in the

7  Barone article where there are pictures.  And I would

8  refer you to that paper and look on page 326.e5 at the

9  top of the page.  You can -- and I don't know if I

10  should hold this up for the camera to see it or not.

11    Q.  We'll just -- we can make -- Figure 4 is what

12  you're talking about?

13    A.  Yes, at the top of the page.  And if you will

14  look at numbers E and F, you see at the top of the page

15  and then to the left column there's 0.1 N force, 5 N of

16  force, and 10 N of force.  And Alyte vaginal is the E

17  number and Alyte stem is the F number.  And if you will

18  look at what happens in both 5 and 10, more pronounced

19  in 10 than in 5, you can see that this looks like just a

20  solid piece of polypropylene.  And with really a

21  relatively minimal amount of force, 5 newtons, it's no

22  longer porous at all.  It's just a rope of

23  polypropylene.

24    Q.  And what kind of imaging is this?

Keith O. Reeves, M.D.

| Page 86 | Page 88 |
|---|---|
| 1   A.  These are raw images.  These -- I can't<br>2 remember if these were -- I think these are ultrasound.<br>3 Let me -- or maybe they're photographs.  Just a second.<br>4 Oh, it's a digital -- it's a digital single-lens reflex<br>5 camera.  It's an EOS Rebel T3 Canon.<br>6   Q.  Okay.<br>7   A.  Okay.  So these are -- these are photo --<br>8 microphotographs.<br>9   Q.  Okay.  And then so the term "frayed," can you<br>10 explain -- or fraying, can you -- can you clarify what<br>11 you mean by that?<br>12   A.  It's as opposed to waking up with your hair<br>13 going everywhere all over the map.  When you get up in<br>14 the morning, that looks like something that's frayed, as<br>15 opposed to having your hair brushed or combed and it<br>16 lies down flat and neat.<br>17   Q.  Okay.  And is that demonstrated in any of the<br>18 literature that you've been working on -- working with?<br>19   A.  Picture to that effect?<br>20   Q.  Or anything with a description of it?<br>21   A.  That's what we commonly see at the time of<br>22 surgery.  There can be -- the mesh, when we take it out,<br>23 is not at all like it was when it was put in in the<br>24 first place. | 1 were not specimens of Alyte that had been implanted.  Is<br>2 that correct?<br>3   A.  That is correct.<br>4   Q.  And then when you use the term "particle<br>5 loss", what are you referring to?<br>6   A.  I'm referring to the fact that if you take<br>7 pictures of polypropylene after it has been explanted,<br>8 it's not the same smooth product that it was.  It's<br>9 pocked -- it's pockmarked.  It's notched.  It's not the<br>10 same smooth piece of tissue.  And particles of<br>11 polypropylene have broken off from the mesh compared to<br>12 when it was implanted.<br>13   Q.  Does this -- does this term relate to what you<br>14 later describe as the degradation?<br>15   A.  I think it's part and parcel of the same<br>16 thing.<br>17   Q.  Okay.<br>18   A.  I think, the way I perceive this, degradation<br>19 refers to more chemical and biochemical change.<br>20 Particle loss refers to the physical loss of<br>21 polypropylene itself.<br>22   Q.  Okay.  Okay.  And are there any studies<br>23 describing the particle loss that you're describing here<br>24 in your report? |

| Page 87 | Page 89 |
|---|---|
| 1   Q.  Okay.  And then curling, what are you<br>2 describing with the term "curling?"<br>3   A.  If I had a piece of mesh here, I could show<br>4 you.  But if you -- it's flat, to begin with, and you<br>5 pull on it and put it under tension, instead of staying<br>6 flat, the edges tend to curl in from side to side so<br>7 that what started out as something that's flat -- if I<br>8 can use my hands to demonstrate it.  This is flat.  When<br>9 it's stretched on either side, it curls in like so.<br>10   Q.  Okay.  And is that described in any of the<br>11 literature that you've relied on?<br>12   A.  That term is used frequently because that's<br>13 what is seen in the body when we go in to take it out.<br>14   Q.  Okay.  And so -- and then roping, what do you<br>15 mean by roping?<br>16   A.  That's an exaggeration of curling.  And the<br>17 pictures that I was pointing to earlier in the Barone<br>18 article show that very nicely.  You've just got with 10<br>19 N of force on the Alyte vaginal and the Alyte stem,<br>20 you've got just a solid piece of polypropylene.  And<br>21 it's just like a length of rope, no longer any pore<br>22 size -- or no longer with my pore demonstration at all.<br>23   Q.  And -- and we agree that these -- the<br>24 example -- the pictures in the Barone study were not -- | 1   A.  No.  I think when people have explanted mesh,<br>2 and as one who has done a lot of this, the mesh, when<br>3 it's taken out, does not begin to look like what it was<br>4 when it was put in.<br>5   Q.  Would you expect it to look exactly the way it<br>6 looked like when it's put in?<br>7   A.  Not necessarily, but it needs to maintain some<br>8 of the same configuration for it to effectively be<br>9 adherent to the tissue where it was placed in the first<br>10 place.<br>11   Q.  Okay.  So is it -- just so I understand<br>12 correctly, the terms "cording" and "roping" are related<br>13 to what -- the images that are in the Barone report that<br>14 we referenced.  Correct?<br>15   A.  Yeah, but that's not unique to Barone's work.<br>16   Q.  No, I understand.  I understand.  And I'm<br>17 just -- and the terms "curling" and "particle loss" and<br>18 "fraying" sound like more like, sort of, your subjective<br>19 descriptions of what you've seen when you've explanted<br>20 mesh products.  Correct?<br>21   A.  Correct.  And I should go further and say<br>22 that's not unique to me.  I mean, that's common parlance<br>23 among surgeons who remove this stuff.  That's how --<br>24 that's also what the pathologists will say in their |

Page 90

1  gross description of what they're looking at from a
2  pathology standpoint.
3      Q.  Have you done any studies to correlate
4  curling, particle loss, fraying with clinical symptoms?
5      A.  You're asking if I've done any studies?
6      Q.  Yeah.
7      A.  No, I have not.
8      Q.  Okay.  Are you aware of any studies that have
9  done that?
10      A.  Well, I can tell you that when people are
11  operated on for symptomatology, if they come in and
12  they've got complaints that relate to the mesh
13  placement, and when the mesh is surgically removed
14  these are the phenomena that are observed in the gross
15  mesh.  It's shown to be frayed.  It's shown to have
16  roping and curling.  That's -- that's typically seen
17  when mesh is explanted.
18      Q.  But has there been any study to the effect of
19  trying to tie these observed phenomena to specific
20  symptoms experienced by -- by patients?
21      A.  Well, the consensus of opinion is is that if
22  there is -- with the Alyte product, if there is roping,
23  then there's not going to be any tissue ingrowth to
24  anchor it into the vagina or the uterus.  It's just not

Page 91

1  going to happen because it's a solid piece of
2  polypropylene -- that's the functional standpoint -- and
3  there can't be any tissue ingrowth.  And the macrophages
4  and the fibrous tissue that would normally grow into a
5  mesh product are not going to be able to do that if it's
6  a solid piece of polypropylene.
7      Q.  Okay.  And so you're characterizing that as a
8  consensus opinion.  Correct?
9      A.  Yes.
10      Q.  Okay.  Not necessarily something that's been
11  published or clinically tested.  Is that correct?
12      A.  Well, I don't think we do any clinical tests
13  to see.  We don't put -- the mesh was not put in
14  expecting it to do these things in the first place.
15      Q.  Sure.
16      A.  So I think the only thing you're going to have
17  to demonstrate what's happened is to come up with
18  ultrasound studies, which demonstrate what mesh looks
19  like after it's been in place for a while.  And I've got
20  some of those studies, and they're cited here if you
21  want to go to that.  But we don't -- mesh was never put
22  in place expecting it to curl, fray, or rope.  So there
23  were no studies designed up front to say let's see how
24  much of that's going to occur.  Those are pathology

Page 92

1  studies and findings seen at the time of explant
2  surgery.
3      Q.  Sure.  And then how about sort of
4  retrospectively, have there been studies tying these
5  phenomena to clinical symptoms?
6      A.  Well, I think to the extent that you have mesh
7  that has eroded into a spot where it wasn't supposed to
8  be, for instance, into the bladder or the intestine,
9  that is done where the edges have become sharp where
10  they have been frayed and where they are not smooth and
11  nontraumatic.
12      Q.  But I'm asking if there have been -- you said
13  no -- you can't do clinical studies.  But have there
14  been any sort of retrospective studies at all?  I'm just
15  asking if there are studies correlating these phenomena
16  with -- with clinical symptoms.
17      A.  Not that I'm aware of.
18      Q.  Okay.  Now I'm going to jump to your opinion
19  that's in -- it's a heading on page 7.  And it says
20  Bard's -- let me know when you're there.
21      A.  I'm there.
22      Q.  Okay.  Bard's Alyte mesh is not suitable for
23  its intended application as a permanent prosthetic
24  implant for pelvic organ prolapse in the human body

Page 93

1  because it degrades over time.  As a result, it is a
2  defective design and it unreasonably dangerous.
3          And then that first sentence, it says
4  polypropylene for use as a permanent implant is not
5  inert, despite the claims of Bard employees, Bracken,
6  and Bigby to the contrary.  Oxidation occurs through the
7  synthesis of polypropylene mesh, which results in
8  decreased molecular weight of the polymer chains,
9  weakening and fracturing of the polypropylene fibers,
10  and the release of toxic byproducts.  And just to save
11  time, I will say dot dot dot.
12          So in the -- in this section you cite to
13  the studies from Costello and -- and Clave.  Correct?
14      A.  And there are others.
15      Q.  Okay.
16      A.  There are a lot of studies that show this
17  phenomenon.  These two are considered two of the classic
18  ones, but Ostergard has also done a lot of work in this
19  regard.
20      Q.  Okay.  And so -- well, let me -- sorry to do
21  this.  Let me backtrack real quick.  When we were
22  talking about curling and roping and stuff like that,
23  you have a discussion of what Bard's employee reactions
24  to or, you know, Bard's awareness or reactions to -- to

Keith O. Reeves, M.D.

Page 94

1  the phenomenon on page 6.  Do you see what I'm referring
2  to?
3      A.  Yes.
4      Q.  And that's based on -- is that part of the
5  report that was given to you to insert, or did you
6  actually -- what are the -- what is the basis of your
7  report that's indicating what Bard was aware of?
8      A.  That was given to me to insert.
9      Q.  Okay.
10      A.  Okay?
11      Q.  Okay.  Now back to -- and the idea here is
12  that -- that theory being oxidation appears to result in
13  degradation and had -- the loss of these properties that
14  you're talking about.  Correct?
15      A.  That's just one of the processes that goes on.
16      Q.  Okay.  And when you use the word "inert," what
17  is your -- what is your definition of inert in this
18  context?
19      A.  Something is inert if it's not going to
20  change.
21      Q.  Okay.  So any -- any change, or is there a
22  particular change you're using in this context?
23      A.  Oh, I don't think it's quantified.  I think
24  something is either inert or it's not.  And there are a

Page 95

1  lot of things you can do to say -- we can weigh a
2  product after we take it out, or we can measure a
3  product for its length after we take it out.  And that's
4  been done, by the way.  And you have not touched at all
5  yet on the concept of shrinkage.
6      Q.  We'll get there.
7      A.  I hear you.  But there have been several
8  studies that have shown that shrinkage is a huge
9  phenomenon and causes lots of problems.  The question
10  that -- that arises here is the fact that this product
11  is not inert, responsible for problems.  And there are a
12  number of things that can happen, as this paragraph
13  demonstrates, in terms of all the different kind of
14  biochemical changes that can occur.  And those changes
15  probably to some extent will result in shrinkage.
16          But shrinkage is a physical phenomenon, as
17  far as I'm concerned, as opposed to a chemical change.
18  And the chemical change is the oxidation that occurs and
19  the enzymatic responses that occur.
20      Q.  Okay.  Okay.  So did Costello or -- or am I
21  saying Clave?  Is that --
22      A.  That's correct.
23      Q.  Clave.  In their studies, did they compare
24  explanted -- well, let me -- let me strike that.  So

Page 96

1  what was Costello and Clave's methodology?
2      A.  By definition, if you're going to look at
3  these things, you've got to have explanted mesh.  So
4  they looked at mesh after it was taken out.  And they
5  took -- they took gross pictures of the material to show
6  that these changes had occurred.  And if you look at the
7  top of page 8, I describe what Clave did using high
8  magnification of photos of meshes that were explanted
9  from women.
10      Q.  And so -- I'm sorry.  Go ahead.
11      A.  And the more heavyweight the mesh is, the more
12  of a problem there was.
13      Q.  Okay.  And so their analysis was based on
14  imaging.  Correct?
15      A.  Correct.
16      Q.  Okay.  And did they compare the explanted mesh
17  against a controlled mesh, as far as you know, meaning
18  the mesh that had not been --
19      A.  Absolutely.
20      Q.  I understand.  So I'll go ahead with my next
21  question.
22      A.  You know, the quality control in terms of mesh
23  manufacture meant that every single piece of mesh was
24  going to be the same length within a micron or two,

Page 97

1  okay, to the extent that you can measure that.  And what
2  they did was to say when this product was inserted, it
3  was X centimeters long.  And when it was explanted from
4  Patient Jones, it was reduced by, depending on how long
5  it had been in place and depending on how the body
6  reacted to it.  It was reduced by up to 25 to 50
7  percent.
8      Q.  So would you agree that another valuable data
9  point would be to compare explanted mesh versus --
10  explanted polypropylene versus polypropylene that
11  had been intentionally oxidized, not necessarily in vivo
12  but subject to oxidation outside the body, to get a
13  comparison between the characteristics of -- of
14  polypropylene mesh that you know has gone through
15  oxidation versus -- versus one that's been explanted and
16  you're trying to determine if there's oxidation?
17      A.  Two things.  Number one, I don't think I've
18  ever seen such a study.  And number two, I'm not sure
19  that I would understand why you would want to do it,
20  because oxidation is just one of the processes that
21  occur.  And if you want to get the big picture, then
22  you've got to know essentially every single process that
23  occurs and what does that do to the mesh.  But just to
24  say we're going to look at oxidation only is to ignore

Keith O. Reeves, M.D.

Page 98

1 all the other processes that could be going on in the
2 human body when this product is implanted. So I cannot
3 envision anybody wanting to do that.
4     Q.   Did Costello or Clave take into account all of
5 those other myriad factors in their -- in their studies?
6     A.   I think that they realize that they were all
7 operative. How many of these things they individually
8 looked at, we'd have to get their articles and see
9 everything in the paper and see.
10     Q.   Do you know what assumptions -- if they were
11 making any assumptions, what assumptions they were
12 making?
13     A.   I have no idea what they were assuming.
14     Q.   Okay. At the very beginning, you said you had
15 not read any of the other expert reports in this
16 litigation. Correct?
17     A.   That is correct.
18     Q.   Okay. And so one of defense's experts, ^ Dr.
19 Wrightman, are you familiar with Dr. Wrightman at all?
20     A.   I'm not.
21     Q.   Okay. Well -- and she did -- I'll just -- you
22 know, she did perform a comparison of explanted
23 polypropylene mesh compared to purposely oxidated
24 outside the body piece of mesh using UV and did find

Page 99

1 different characteristics. And I know you said you
2 hadn't seen a study like that, but -- but you weren't
3 aware of that study, I guess, is my ultimate conclusion?
4     A.   No.
5     Q.   Okay. And are you familiar with -- with how
6 the methodology for oxidation tests?
7     A.   No.
8     Q.   Okay. And again, going from 8 to 9, there's
9 discussion about different employees at the company and
10 discussion of emails going back and forth. And just
11 again to confirm, those were -- those weren't -- that
12 part of the text isn't from anything that you read in
13 the record. That was supplied to you?
14     A.   Correct.
15     Q.   Okay. Okay. Now, on the bottom of page 9,
16 the second line up, there's a sentence that starts,
17 Interestingly, in spite of years of scientific
18 literature, its own internal documents and reports from
19 consultants that state that degradation of mesh occurs,
20 Bard's instructions for use continued, the entire time
21 it sold meshes, to be silent on the issue of warning of
22 degradation. The Alyte product IFU makes no mention of
23 degradation.
24         So -- so, now, you've read Ms. Bigby's

Page 100

1 deposition transcript. Correct?
2     A.   Yes.
3     Q.   And you're familiar -- do you recall in her
4 deposition describing interactions with the FDA in terms
5 of getting approval for the FDA -- for the IFU language?
6     A.   Yes. Could you -- I've got my notes that I
7 took here. And if you can tell me where in her
8 deposition, I can tell you if I made any notes to that
9 effect.
10     Q.   Okay. Well, I'll specifically point to page
11 183, line 10 to 184, line 8.
12     A.   I didn't make any notes --
13     Q.   For that one?
14     A.   -- for that one. What I am looking at right
15 here, on page 76 and 77, she was asked is --
16 polypropylene is not inert, and she disagrees with that.
17 So she's stipulating, the way I read this, that -- she's
18 stipulating that polypropylene is inert.
19     Q.   Okay. Okay.
20     A.   And I think that's a extraordinary minority
21 opinion.
22     Q.   Well, okay. But in terms of the actual
23 crafting of the IFU, do you -- do you recall her
24 testimony on the process, an exchange that went along

Page 101

1 with the FDA in finalizing the IFU?
2     A.   The notes that I made regarding the IFU -- I
3 can read these to you, if you want me to.
4     Q.   No.
5     A.   But you don't want to waste that time. I
6 understand.
7     Q.   No, no, no. I mean, I also don't want to get
8 your -- you know, it's better to get the testimony than
9 your shorthand notes on it anyway. But would it
10 surprise you to know that -- that there was a lot of
11 exchange between the FDA and Bard in -- in finalizing
12 the IFU that eventually went on the market?
13     A.   That wouldn't surprise me at all.
14     Q.   Okay. And looking at this statement at the
15 bottom of the first full paragraph of page 10 just
16 before the heading, the new heading, says Bard has the
17 audacity in its Alyte IFU to state after all the years
18 that its mesh products have been on the market that,
19 quote, the effectiveness of this product has not been
20 validated by a prospective, randomized, clinical trial?
21     A.   Correct.
22     Q.   You use the word audacity. Did you read the
23 portion of the -- of Bigby's deposition where she
24 testified that the FDA wanted that inserted and required

Keith O. Reeves, M.D.

Page 102

1  that language to be inserted?
2    A.  For good reason.
3    Q.  So what's audacious about complying with the
4  FDA?
5    A.  Well, they didn't have a choice, apparently.
6  And I didn't realize that the FDA insisted that it be
7  there.  But Bard had the choice and chose not to do so.
8  To do a double-blinded, randomized, prospective clinical
9  trial.  And since -- and I can't speak for the FDA, nor
10  do I pretend to.  But the fact is that they didn't do
11  a clinical trial.  And you're suggesting to me that the
12  FDA insisted that that be put in there.
13    Q.  But the FDA didn't insist on a clinical trial.
14  Correct?
15    A.  That's not the way the product came to market.
16  That's correct.
17    Q.  And -- but -- it's not like there was no data
18  at all to support putting the Alyte on the market.
19  Correct?
20    A.  I think we're going to differ in that regard.
21    Q.  Okay.  The -- so --
22    A.  The only data that they had was a predicate
23  device that was used in the abdominal wall.  Bard had
24  not done any studies showing that their product was safe

Page 103

1  and effective as a transabdominal product.
2    Q.  Now, I mean, they couldn't have used the -- I
3  mean, pelvic mesh products had been on the market since
4  before the Alyte came on the market.  Correct?
5    A.  Correct.
6    Q.  And even if there weren't randomized,
7  double-blind, controlled studies, the fact of -- the
8  years that the product has been on the market creates
9  data that can help support the safety and efficacy of a
10  product.  Correct?
11    A.  Well, there are -- that's what this is all
12  about, Counselor.  And there are virtually no studies
13  out there except for the Culligan study that demonstrate
14  the effectiveness and/or the safety of vaginal mesh
15  products.  That's why they're off the market.
16    Q.  Well -- and the Culligan report was
17  specifically about the Alyte.  Correct?
18    A.  It was.
19    Q.  And there's no other -- we've established
20  there was no other study about the Alyte in -- as
21  actually been implanted in human beings.  Correct?
22    A.  To the best of my knowledge, that's correct.
23    Q.  Okay.  So we're kind of talking about the same
24  thing.  Bard's mesh products -- the next heading -- I'm

Page 104

1  sorry -- Bard's mesh products are not suitable for
2  implantation in the human body as a permanent prosthetic
3  device due to the lack of clinical studies supporting
4  the safety and efficacy of these polypropylene products
5  as therapy for urinary incontinence or pelvic organ
6  prolapse.  Excuse me.
7        So -- so there might not have been a
8  prospective, double-blind clinical -- clinical --
9    A.  Trial.
10    Q.  -- trial.
11    A.  Trial is the word you're looking for.
12    Q.  Right.  But there was -- there was data from
13  other pelvic mesh products on the market.  And you're
14  aware that Bard did a -- that Alyte had been on the
15  market in the EU for a couple of years before it went on
16  the market in the U.S.  Correct?
17    A.  I'm aware that it was introduced in the
18  European market before it was introduced in the United
19  States.
20    Q.  And you're aware that Bard did do a study
21  among physicians, a survey amongst physicians who were
22  using the mesh to -- to -- well, they did a survey
23  concerning the usage of Alyte mesh in the European
24  Union.  Is that correct?

Page 105

1    A.  What you're saying is true.  They did a
2  survey.  It was not a randomized, prospective, clinical
3  trial.  And the people who answered the survey were paid
4  to respond.
5    Q.  And -- but -- and there are also animal
6  studies.  Correct?
7    A.  With Alyte?
8    Q.  Yes.
9    A.  I'm not aware of those.
10    Q.  If there were, that would -- well, anyway,
11  you're not aware of it, but just representing that there
12  were rabbit studies done.  And then not just the
13  European Union doctors who were part of the survey, but
14  just given the fact that the Alyte was on the market in
15  Europe for a couple of years, that, in itself, would
16  generate data.  Correct?
17    A.  If it were collected.
18    Q.  If it what?
19    A.  If it were collected.
20    Q.  If it were collected.  But you could --
21    A.  Can you show me the paper that came out of
22  Europe showing that this was a safe, effective product?
23  Or you're just telling me, hey, it was used in Europe
24  for two years before it was introduced into the United

Page 106

1  States?  And my response to that is, "So what?"
2      Q.  So wouldn't -- wouldn't there be complaint
3  rates?  Wouldn't there be, you know -- if there were --
4  wouldn't the fact that it was on the market generate
5  data based on complaint rates for -- I mean, I'll just
6  leave it at that.
7      A.  No, not unless somebody deliberately set out
8  to collect it.  How many -- how many times does General
9  Motors know that they're going to put a car on the
10  market with a defect?  And they only know that after
11  it's been on the market for a significantly long period
12  of time and that there have been X number of crashes and
13  X number of people killed.  But GM does not
14  deliberately, to the best of my knowledge, unless they
15  do that -- and I'm not a car expert -- but unless they
16  deliberately do that through their car repair data.  And
17  I don't know how that's collected.
18          I do know that I have not seen what you're
19  referring to, and that is, the existence of any Alyte
20  data based on the European experience.  Could it have
21  been done?  Yes.  Did they do it?  If they did it, I
22  don't know it.
23      Q.  But are you familiar with European -- you're
24  familiar with how the FDA has reporting standards for

Page 107

1  adverse events.  Correct?
2      A.  Yes.  The MAUDE database.
3          THE REPORTER:  The what?
4          THE WITNESS:  M-A-U-D-E.
5      Q.  And are you aware one way or another if
6  European Union has any sort of equivalent reporting
7  clearinghouse or standards?
8      A.  I don't know.  They probably do, but the MAUDE
9  database in the United States is felt to be better than
10  nothing but woefully inadequate.
11      Q.  Okay.  But if -- but it would still be a
12  source of data.  Correct?
13      A.  It could be, yes.  But the bottom line is, was
14  it used?  And I don't know that it was used at all.  And
15  you've shown me no evidence that it was used.  Could it
16  have been determined?  Yes.  Was it determined?  Number
17  one, I don't know.  And number two, had it been
18  determined, I'm sure somebody would have published it.
19      Q.  And you've read Laura Bigby's deposition, and
20  she did discuss these sort of data points.  Do you
21  recall?
22      A.  Be more specific for me, please.
23      Q.  The -- she talked about the -- the fact that
24  there was a rabbit study, there was physician

Page 108

1  experiences from other meshes that -- that fed into the
2  analysis and -- well, let me just strike that.
3          I guess my bottom line point is that you
4  don't have data to suggest that in the two years that
5  the Alyte was on the market in Europe that there were
6  any reports that would raise questions about the safety
7  or efficacy of the Alyte.  Is that fair?
8      A.  Of course I don't have that data.  And to add
9  further to that, I don't see any evidence that anybody
10  has that data.
11      Q.  Okay.
12      A.  Okay?  The fact that I don't have it doesn't
13  make me unique.  The data was probably not collected.
14  And if it were collected, it should have been published.
15      Q.  Okay.  And also, you're aware that Bard
16  did biocompatibility studies on the Alyte before it went
17  to market.  Correct?
18      A.  I haven't seen the study.
19      Q.  But you're aware that they --
20      A.  They probably did, yes.
21      Q.  Okay.  So those are all sort of data points
22  that could go into the safety and efficacy of the
23  product.  Correct?
24      A.  Oh, that's a huge leap you're making there,

Page 109

1  Counselor.  Without solid data, you can't make that
2  jump.
3      Q.  And so what is -- what is the basis for
4  your -- your opinion that, in order to have a product go
5  to market showing safety and efficacy -- are you saying
6  that for any implanted surgical product to enter the
7  U.S. market it must be subjected to a double-blind,
8  prospective study?
9      A.  You know, that puts me at odds with the 510(k)
10  process.  And as I've told you, I'm not going to go
11  there.
12          Let me tell you a story.  When I was the
13  medical director of the Methodist Pelvic Floor Center, I
14  got approached by a lot of companies, because I was in a
15  recognized position as having dealt a lot with surgical
16  mesh.  And --
17      Q.  I'm listening.
18      A.  Okay.  And I cannot cite you exactly who
19  approached me, but I think probably Ethicon, J&J did, I
20  think Boston Scientific probably did, and Bard may have.
21  And they all came to me and they said, Reeves, we want
22  you to be a spokesperson for our product.  Will you --
23  because I had been on the speaker's bureau for the Wyeth
24  and the Premarin product.  And they said, "You talk for

Keith O. Reeves, M.D.

Page 110

1 Premarin all the time. Can you speak for our products?"
2 And I said to them, "Show me your
3 randomized, prospective clinical trials demonstrating
4 safety and efficacy." And to the company, none of them
5 had that data. And I said, "I cannot speak for you
6 until you can p0rove to me that your product is safe and
7 effective." And none of them -- and that's the answer
8 to the other question you asked me. Have I ever put in
9 any scientific -- any synthetic mesh products. And the
10 answer is no, I haven't, because it was never shown to
11 me to be demonstrably safe or effective because the data
12 wasn't collected.
13 MR. CHILLINGWORTH: Okay. I have to move
14 to strike that.
15 MS. FILLMORE: I'm going to object to
16 that -- that response. It's outside of the scope of the
17 general expert report as to the parts that relate to
18 Ethicon and Johnson & Johnson. And I'm going to move to
19 strike.
20 THE REPORTER: Just one second. That's
21 Fillmore? Who was that that objected?
22 MS. FILLMORE: Yes, Fillmore.
23 THE REPORTER: Because there's two ladies
24 on the phone.

Page 111

1 MR. NORTHRIP: William Northrip is
2 joining on behalf of Boston Scientific.
3 THE REPORTER: Who?
4 THE CHILLINGWORTH: William Northrip.
5 THE REPORTER: Okay.
6 MR. CHILLINGWORTH: Sorry. I know. And
7 then I'm joining as well also, because -- as
8 unresponsive to the question.
9 Q. (By Mr. Chillingworth) What -- my question
10 was, Is it your opinion that the only products that --
11 that a product should not enter the market -- sorry.
12 Let me be more specific. A surgical implant should not
13 reach the market unless it has first gone through
14 double-blind, prospective studies?
15 A. In the best of all possible worlds, yes.
16 Q. And in your practice did you only use products
17 that went through double-blind, prospective studies?
18 A. Yes.
19 Q. Okay. Did you ever use -- do you know one way
20 or the other if you used products that did not go --
21 surgical implants that did not go through double-blind,
22 prospective studies?
23 A. Well, the answer to that question is I didn't
24 use any surgical implants.

Page 112

1 Q. Okay. Okay.
2 A. I used native tissue repairs only.
3 Q. Okay. Understood.
4 A. Okay?
5 Q. So then the next place I want to go to is page
6 12. That first heading, Bard's Alyte mesh is not
7 suitable for its intended application as a permanent
8 prosthetic implant for pelvic organ prolapse in the
9 human body and is defectively designed and unreasonably
10 dangerous because of the chronic inflammatory response/
11 foreign body reaction it creates resulting in fibrotic
12 bridging, scar plate formation, and mesh encapsulation.
13 Did I read that correctly?
14 A. You did.
15 Q. Okay. And so now you talked earlier about how
16 in roping, that one of the problems with roping is you
17 don't -- you don't achieve ingrowth that you were trying
18 to achieve by implanting mesh. Correct?
19 A. Correct.
20 Q. So you do expect some foreign body -- I mean,
21 I don't -- that's a term of art. But you do respect --
22 you do expect some body reaction to the implant of the
23 mesh; it needs to incorporate. Correct?
24 A. Correct.

Page 113

1 Q. Okay. And so your opinion, essentially, here
2 is that -- that the -- well, you're trying to achieve
3 some ingrowth. That bears some relationship to what
4 you're talking about here, inflammatory response,
5 foreign body reaction?
6 A. Is there a question there?
7 Q. Yeah. Is it -- the understanding that you
8 want some ingrowth. You want some --
9 A. That is correct. By definition, yes, you've
10 got to have some ingrowth. The question is how much and
11 what is the response to the mesh by the body if there's
12 too much inflammation. And what happens is that you get
13 these problems and you get the fibrotic bridging. And
14 what happens in that circumstance is that if you've got
15 two pores that are side by side and there is a
16 pronounced inflammatory response, then the two fibers of
17 mesh will coalesce into a single structure and there
18 won't be any tissue ingrowth. And without tissue
19 ingrowth, it's not going to work like it was designed to
20 work.
21 Q. Okay. Now, so in this section you haven't
22 cited any -- any literature or case study or anything to
23 that effect. What is the basis for your opinion in this
24 small section here?

Keith O. Reeves, M.D.

Page 114

1  A.  Beginning with the human body?
2  Q.  Okay.
3  A.  Is that what you're talking about?
4  Q.  Well, you're -- you're -- is there --
5  A.  I'm just going to ask you.  What I'm
6  describing with that paragraph is common knowledge.  I'm
7  not going way out on a limb talking about how the human
8  body responds to a foreign body.
9  Q.  Okay.  Going to the next section, the Bard
10  Alyte IFU and Patient Brochures failed to adequately
11  warn patients and their surgeons of the inherent risks
12  from using this product.  And first of all, you've
13  reviewed the IFU.  Correct?
14  A.  I have.
15  Q.  Okay.  And just to be sure --
16  A.  I'll bet you've got a copy.
17  Q.  I do.  I just want to make sure we're working
18  about the same thing.
19      THE CHILLINGWORTH:  What number are we
20  on?
21      THE REPORTER:  The next one I think I
22  have is No. 12.
23      (Exhibit 12 marked.)
24  Q.  (By Mr. Chillingworth)  Okay.  So this is the

Page 115

1  IFU you're referring to.  Correct?
2  A.  Yes.
3  Q.  Okay.  And when you mention patient brochures,
4  can you identify what patient brochure you're referring
5  to?
6  A.  (Witness indicated.)
7  Q.  Okay.  Is that -- can we mark that, please?
8  You probably need a copy.  Probably want a copy of that?
9  A.  Go ahead.  You know, I don't know -- this says
10  pelvic reconstruction Bard medical pelvic health.  And
11  this is just something that I found.  I don't know for
12  whom this was designed.  This may have been something
13  for physicians or patients or both.
14  Q.  Okay.
15  A.  Do you have a copy?
16  Q.  Just because that's the one that you -- is
17  that the only one you looked at?
18  A.  That's the only one I brought.  And the IFU.
19  Q.  Let's put a place holder for Exhibit 13, but
20  we'll mark it.  But we can just set it aside.
21  A.  Okay.
22  Q.  So in this paragraph -- the following
23  paragraph -- first of all, it says the Alyte -- begins
24  with the -- talks about adverse events listed in the

Page 116

1  Alyte IFU.  And it goes on to say, however, there are no
2  listings in the IFU of permanent, lifelong, worsening,
3  and debilitating pain, lifelong risk of surgical repairs
4  for erosion, severe and chronic inflammation, and device
5  collapse under the stress of force causing fibrotic
6  bridging, that the product can degrade, that
7  polypropylene can be cytotoxic and cause severe erosion,
8  bridging, that the product -- sorry.  I skipped to a
9  different line -- cause severe erosion or experience
10  particle loss.
11      So that first thing concerning life --
12  permanent, lifelong, worsening, debilitating pain,
13  have -- is it, in your opinion, appropriate to -- to use
14  such, you know, kind of strong.  Let me strike that.
15  <mark>Again, you're not -- you've never drafted
16  an IFU before.  Correct?</mark>
17  <mark>A.  I have not.</mark>
18  <mark>Q.  Okay.  And you're not familiar with the</mark>
19  <mark>process of getting an IFU past the FDA to the market.</mark>
20  <mark>Correct?</mark>
21  <mark>A.  I'm sure it's laborious, but I'm not</mark>
22  <mark>intimately familiar with it.</mark>
23  Q.  Right.  And in terms of, you know, describing
24  the severity of potential complications or the long-time

Page 117

1  potential, are you used to seeing that in instructions
2  for use?
3  A.  No, I haven't.  But I think if you would ask
4  the women who have been damaged by the Alyte device,
5  they would love to have known that that was potentially
6  possible before they allowed it to be put into them.
7  Q.  And instructions for use are directed towards
8  doctors and not patients.  Correct?
9  A.  Well, I share them with patients.
10  Q.  But --
11  A.  That was not mandatory.  I just did it.
12  Q.  Right.  But -- but as a practice, IFUs are
13  directed towards physicians.  Correct?
14  A.  Correct.
15  Q.  Okay.  And is -- and the physicians are
16  supposed to take the information that's in the IFU and
17  use their background and education and experience in
18  formulating a prescription plan or treatment plan and
19  present it to the plaintiff -- or the patient.  Correct?
20  A.  We would hope.
21  Q.  You would hope.  Right.  So would you -- I
22  mean, would you have to -- to include -- you know, if
23  you're -- it already describes -- the IFU already
24  describes pain, it describes inflammation, it describes

Keith O. Reeves, M.D.

Page 118

1  scarification and various different things.  Whether or
2  not the doctor -- whether or not that language
3  adequately informs the doctor of risks, isn't that sort
4  of a subjective thing compared -- depending on the
5  doctor?
6      A.  You know, if there were objective data
7  available, and there weren't, if patients knew going
8  into this up front that they had a potential for
9  shrinkage of up to 25 percent, if they knew that they
10  could have had chronic -- the words I used were chronic,
11  debilitating, life-altering pelvic pain, I think
12  patients have the right to know that.  And is that
13  inflammatory language?  Yes, it is.  But ask the
14  patients who have had the experience with the product if
15  that language is accurate or not.  And the answer is, to
16  the woman, I'll bet they're going to say yes.  And had I
17  known that these products were going to cause this to
18  me, I would have never had it implanted.  That's what I
19  heard every time when I was going to take it out.
20      Q.  To the woman -- every woman who's been
21  implanted with IFU -- maybe I misunderstood you -- but
22  has had permanent, lifelong, worsening, and debilitating
23  pain?
24      A.  I didn't say that.

Page 119

1      Q.  I misunderstood.
2      A.  Okay.  They need to know that that potential
3  is there.
4      Q.  Okay.  But it's supposed to -- the information
5  is supposed to filter through the physician.  Correct?
6      A.  Correct.  And I think if you had told
7  physicians, "Hey, Doc, did you know that your patient
8  has X percent likelihood of having these complications
9  develop?"  I think there would have been a lot fewer
10  synthetic mesh devices used in the female pelvis.
11  Before -- in fact, the FDA took it off the market for
12  that reason.
13      Q.  And that's -- but that's without knowing any
14  one particular doctor's knowledge of the -- an
15  experience and background and training when it comes to
16  implanting pelvic mesh devices.  Correct?
17      A.  I think every doctor is going to have to be
18  evaluated individually in that regard, but I think the
19  point is is that this IFU did not begin to go into the
20  detail required to let physicians know what could happen
21  with these devices, primarily because the manufacturers
22  didn't know because it hadn't been on the market.  They
23  couldn't tell people what they didn't know because they
24  didn't have the data.

Page 120

1      Q.  All right.  So you cite Crosby here.
2      A.  And it's in one of those binders, if you don't
3  have it.
4      Q.  I think I have it here.  So you mention Crosby
5  here in this section of your report.  Now, Crosby, this
6  was a study involving transvaginal mesh.  Correct?
7      A.  Correct.
8      Q.  Okay.  And she did not look at abdominal mesh.
9  Correct?
10      A.  Correct.
11      Q.  Okay.  And you talk about the patients who
12  have had explants, that you indicate that only 51
13  percent were relieved of significant pelvic pain.
14  Correct?
15      A.  Correct.
16      Q.  Okay.  And then on page 137 of -- of Crosby --
17  do you have it in front of you?
18      A.  I don't have it in front of me because it's in
19  one of my binders.  Go ahead and read it to me.  I'll
20  trust you to read it.
21      Q.  Okay.  In our series, we found that patients
22  with a chronic pain disorder were almost three times
23  more likely to have continued pain with mesh removal
24  than those without a chronic pain disorder, 37 percent

Page 121

1  compared with 13 percent.  We hypothesize that patients
2  with preexisting pain syndromes have underlying
3  pathophysiology predisposing them to persistent pain
4  even after mesh has been removed.
5          So not to extrapolate too far from that,
6  but one way to look at that is, you know, whether or not
7  a patient who's had her mesh explanted and she continues
8  to have chronic pain really kind of depends on the
9  patient herself.  Right?  There's -- there's an element
10  of medical profile that goes into whether or not she
11  continues to experience medical -- pain.  Correct?
12      A.  Well, a couple of things pertain to that
13  statement you made.  Number one, that was not a
14  precondition to the -- in the IFU saying to physicians,
15  hey, you ought to ask your patient does she have a
16  history of rheumatoid arthritis, of systematic lupus, or
17  fibromyalgia, or any other chronic inflammatory process
18  that would predispose her to have a problem if you put
19  mesh in here?  Because the manufacturers did not know
20  that.  This was found out only after the fact, and this
21  Crosby paper demonstrates that having those kinds of
22  conditions can predispose patients to have chronic pain
23  after the device was used.
24          Crosby didn't know that they were going to

Keith O. Reeves, M.D.

Page 122

1  find that when they did the study and came up with the
2  data. And certainly the physicians in the -- and the
3  IFU does not tell physicians, hey, guys, don't put this
4  stuff in if your patient has a history of any chronic
5  inflammatory process. I think Crosby is doing a great
6  job of informing the public -- the medical public after
7  the fact. But had the studies been done in the first
8  place, that information should have and could have been
9  available.
10     Q. So she also -- and on page 138, Crosby says
11  quality of life assessment was not performed and the
12  metric use for pain improvement was based at times on
13  subjective phrases in the medical record. Because it is
14  a case series, we cannot comment on the frequency or
15  risk factors of complications of individual vaginal mesh
16  kits.
17         So this is a case -- look at cases, not
18  necessarily, like, a prospective, double-blind study?
19     A. Correct. This is retrospective. They're
20  going back and looking at data after explanting meshes
21  from women.
22     Q. And there's some -- you know, to Crosby's
23  credit, there are some limitations to this study about
24  relying, in part, on subjective phrases and the fact

Page 123

1  that it's -- that these are case series, that it's --
2  they can't comment on the frequency or risk of
3  complications of individual vaginal mesh kits. Is
4  that --
5     A. That's fair. But I think the key concept
6  here, and the reason the Crosby article is important, is
7  because 50 percent of the time when a gynecologic
8  surgeon goes back and takes mesh out, 50 percent of the
9  time patients still have pain, for whatever reason.
10     Q. Okay. Now, bottom of page 12, deposition
11  testimony review. And this -- and let me just ask: So
12  in this section, you are giving your own review of -- of
13  Mr. Bracken and Ms. Bigby's deposition testimony.
14  Correct?
15     A. That is correct. I read those, I took the
16  notes, and I composed this.
17     Q. And this is purely meant to be a summary of
18  your reading of those -- of those deposition
19  transcripts. Correct?
20     A. Yeah.
21     Q. And you're aware from Mr. Bracken's testimony
22  that he -- he testified that he didn't really have any
23  involvement in the design of the Alyte. Correct?
24     A. That's what he said.

Page 124

1     Q. Okay. And turning to page 15, the first full
2  paragraph, it says, She agreed that the 2009 IFU did not
3  mention the 2008 FDA bulletin, nor did it discuss
4  potential need for more surgery following Alyte implant,
5  nor does she recall ever specifically training surgeons
6  about how to implant the Alyte device.
7         And she confirmed that there are no IFU
8  warnings about nerve damage, dyspareunia, or urinary
9  frequency or severity of complications. She's talking
10  about the -- you're referencing the 2009 IFU, which
11  was --
12     A. The original one, yes.
13     Q. -- which was originally submitted to the FDA.
14  But you're aware from her testimony that this IFU never
15  actually reached the U.S. market. Correct?
16     A. I was not aware of that.
17     Q. Okay. And I could show it to you.
18     A. I believe you.
19     Q. Okay.
20     A. Okay?
21     Q. Thanks. I appreciate the timesaver.
22         THE REPORTER: The what?
23         THE CHILLINGWORTH: Timesaver.
24     A. Speaking of timesavers, we've been going an

Page 125

1  hour.
2     Q. (By Mr. Chillingworth) Okay. Thank you. Do
3  you need to --
4     A. Let's take a break.
5     Q. Sure. Let's do it.
6         THE VIDEOGRAPHER: We are off the record.
7  It is 2:01.
8         (Short recess.)
9         THE VIDEOGRAPHER: Okay. We are back on
10  the record. It is 2:08, and this is the beginning of
11  media five.
12     Q. (By Mr. Chillingworth) Okay. Okay. Now I
13  want to turn your attention to page 15 still and the
14  heading Mesh Complication Rates Are Too High. And you
15  cite to Liang -- the Liang article, quote, Complications
16  after sacrocolpopexy appear to increase over time with
17  cumulative incidents of mesh exposure at ten and a half
18  percent over a seven-year period.
19         In looking at Liang's actual article on
20  page 2, that quote comes from the very top there.
21  And -- and the -- after the quoted language, which stops
22  at seven-year period, it says, And those following
23  transvaginal application occur at rates roughly two-fold
24  higher. Correct?

Keith O. Reeves, M.D.

Page 126

1    A.  Correct.
2    Q.  Okay.  So at least Liang is recognizing that
3   this complication that they are observing is at least
4   twice as -- in their study twice as likely or observed
5   twice as more than abdominal procedures.  Correct?
6    A.  Well, partially.  Let me note that Liang is
7   quoting somebody else.  When you see the brackets around
8   the number 6 back in the bibliography, that's actually
9   referring to a paper written by Nygaard, Brubaker, and
10  Zyczynski published in JAMA in 2013.  This is not
11  Liang's work.  He's quoting work by Nygaard, who's also
12  a recognized expert.
13   Q.  Right.  Understood.  But you quoted Liang --
14   A.  And I reference Liang and not Nygaard.  You're
15  correct.
16   Q.  Yeah.  And I just wanted to get the second
17  part of that sentence into the record.
18   A.  That's fine.
19   Q.  And the introduction, the third line up from
20  the bottom, not talking about the footers and stuff, but
21  that actual paragraph, well, it says while Level I
22  evidence supports the use of polypropylene mesh in terms
23  of anatomical consequences in abdominal sacrocolpopexy,
24  evidence is less robust in supporting transvaginal mesh

Page 127

1   kits balancing anatomical successes with complications.
2         And what is meant by Level I evidence, if
3   you know what they're talking about?
4    A.  I think they're talking about information that
5   comes from prospective, randomized, clinical trials.
6    Q.  Okay.  And so starting off the sentence that
7   Level I evidence supports the use of polypropylene in
8   terms of anatomical outcomes in abdominal
9   sacrocolpopexy, that appears to be one of the findings
10  of his report.  Correct?
11   A.  Yeah.  Now, the one thing he's talking about
12  here, when he says anatomical findings, that's all he's
13  referring to.  He's not talking to complications at all.
14  He just says if we use mesh abdominally we can get the
15  anatomic results we want.
16   Q.  Okay.  And then moving on to page 16 of your
17  report.
18   A.  So are you through with Liang?
19   Q.  Yeah, I am.
20   A.  I'm just trying to keep these in order.
21   Q.  Sure.
22   A.  Okay.
23   Q.  You cite -- in this section you cite to
24  Toozs-Hobson.  Correct?

Page 128

1    A.  Yes.
2    Q.  Can you talk to me, please, about the
3   Toozs-Hobson article?  And let me know -- can you give
4   us a synopsis for it?
5    A.  Well, they're -- in a nutshell, the aim of
6   this paper -- and I'm quoting here.  The aim of this
7   paper is to give a brief overview of the literature and
8   provide a framework for categorizing pain associated
9   with vaginal surgery, explore hypotheses for how this
10  might affect some but not others, and describe possible
11  approaches to management.  That's what the paper is
12  about, is pain.
13   Q.  Okay.  And the sentence right above that in
14  the previous paragraph, it says, thirdly, many of the
15  complications currently being blamed on mesh are also
16  consistent.  One second.  Yeah.  Thirdly, many of the
17  complications currently being blamed on mesh are also
18  consistent with traditional prolapse and incontinence
19  surgery.
20         So he seems to be commenting that there's
21  -- that -- that complications being associated with mesh
22  are -- would also occur in native tissue-type repairs.
23  Is that correct?
24   A.  Well, two things pertain.  Number one, he

Page 129

1   doesn't elaborate on that comment.  And number two, I
2   think that the data would suggest when control groups
3   have been used where native tissue repairs have been
4   done comparing -- in comparison to mesh studies, the
5   degree of pain in most native tissue repairs is far less
6   than it is in mesh procedures.  You don't, for instance,
7   see erosion of any native tissue into the bowel or into
8   the bladder.  And in general, it's not as painful.
9    Q.  But in terms of rates, do you have --
10        THE CHILLINGWORTH:  Would you mind
11  reading back the first part of that answer?
12        (The requested question was read.)
13   Q.  (By Mr. Chillingworth)  So are you
14  specifically referencing any specific studies to support
15  that statement that there's data to suggest that --
16  that -- that there's a greater rate of patients
17  experiencing pain from -- from mesh as opposed to native
18  tissue repair?
19   A.  Yeah, I can go through all of these papers one
20  by one and show you where the studies have been done
21  comparing native tissue repairs to mesh repair.
22   Q.  Have you cited any in your actual report?
23   A.  I don't think so.  I don't think so.
24   Q.  Okay.  So going on to Alyte Mesh Use Results

Keith O. Reeves, M.D.

Page 130

1 in the Need For More Surgery, that's the heading of the
2 next section on page -- page 16.
3   A.  That's the Welk paper.
4   Q.  The Welk paper.  Right.  And Welk was -- was a
5 study involving stress urinary incontinence patients.
6 Correct?
7   A.  Let me get to it.  Just a second.
8   Q.  Yeah.
9   A.  Yes.
10   Q.  And it wasn't dealing with any abdominally
11 placed devices?
12   A.  Correct.
13   Q.  Okay.  So -- and I don't think you -- in your
14 report here you complete this paragraph by saying in
15 italics, If it's IFU regarding -- in this IFU
16 regarding --
17   A.  I've lost -- excuse me.  Where are you?
18   Q.  Oh, I'm sorry.  So --
19   A.  Which page are you on?
20   Q.  I'm on -- so that paragraph that starts at the
21 bottom of page 16.
22   A.  Okay.
23   Q.  And it spills over onto page 17.  We're still
24 in that -- that section that we were discussing Welch --

Page 131

1 Welk.  Excuse me.
2   A.  Okay.
3   Q.  And in italics -- language in italics, "In its
4 IFU regarding Alyte, Bard did not mention the risk of
5 having simultaneous hysterectomy or having the surgery
6 performed by a low volume surgeon."  So the -- the study
7 that you're basing this on is Welk.  Correct?
8   A.  Among others.
9   Q.  Among others.  Okay.  What others are you
10 basing that on?
11   A.  Well, again, if you want me to go through
12 these one at a time, I can.  But there are several
13 authors that I have cited who indicate that it's best
14 not to combine hysterectomy with using mesh of any kind.
15   Q.  In this particular study, though, Welk was
16 dealing with -- with surgery for stress urinary
17 incontinence and implanting mesh transvaginally.
18 Correct?
19   A.  Correct.
20   Q.  Okay.  And just so I understand, this --
21 having the surgery performed by a low-volume surgeon.
22 And then at the top of page 17, and you're discussing
23 Welk and you mention high-volume surgeons were less
24 likely to perform simultaneous hysterectomy and more

Page 132

1 likely to perform the surgery in an academic center.
2 What do you mean by -- or what do you mean or what does
3 Welk mean by high volume versus low volume?
4   A.  We're looking at the percentile.  And the
5 high-volume surgeons were in the 75th percentile or
6 higher out of the global network of surgeons who were
7 doing the procedures.  And low-volume surgeons were less
8 than 75th percentile, and they showed that the more --
9 the more of these procedures that surgeons did, the less
10 likely that they were going to have of getting into
11 trouble in terms of complication rates.  And secondly,
12 that the high-volume surgeons were less likely to do a
13 concomitant hysterectomy.
14   Q.  Okay.  So moving on to the next section, Alyte
15 Mesh Use Should Be Restricted.  And you cite to the
16 Chapple article.  Is that -- it's described as a major
17 review article.  Correct?  What is a review article?
18   A.  A review article is one that is not presenting
19 original research.  A review article is looking at
20 literature that has been collected over a given topic by
21 multiple authors, and it's much more powerful if it
22 includes several studies from different centers.
23   Q.  And after your quote from Chapple, there's a
24 parenthetical that says, "Nowhere in its IFU does Bard

Page 133

1 make such a suggestion."  And just to read the quote,
2 "Synthetic mesh for POP should be used only in complex
3 cases with recurrent prolapse in the same compartment
4 and restricted to those surgeons with appropriate
5 training who are working in multidisciplinary referral
6 centers."
7       So looking at the IFU, if you have it, and
8 page 2 underneath, it says -- there's a title of Alyte
9 and then instructions for use and then caution, "Federal
10 law restricts this device to sale by or on the order of
11 a physician.  The Alyte Y-Mesh Graft is intended for use
12 only by physicians who are trained in the surgical
13 procedures and techniques required for pelvic floor
14 reconstruction (including abdominal
15 sacrocolposuspension/sacrocolpopexy) and the
16 implantation of non-absorbable meshes.  The physician is
17 advised to consult the medical literature regarding
18 techniques, complications, and hazards associated with
19 the intended procedures."
20       So I'm not quite, you know, sure what you
21 mean by nowhere in IFU -- in its IFU did Bard make such
22 a suggestion.  But it at least suggests that IFU at
23 least does warn right up front that the physician should
24 be appropriately trained.  Is that correct?

Keith O. Reeves, M.D.

Page 134

1    A.  That's what it says.  Now, it's one thing to
2  say it.  And second issue becomes could Bard have or
3  should Bard have done anything to enforce that
4  recommendation.
5    Q.  Do you know if they could have?
6    A.  Oh, they could have said to their sales force,
7  hey, you're only going to sell this product to hospitals
8  that are tertiary care centers where there are
9  board-certified pelvic floor surgeons, urogynecologists
10  who know how to use this device.  And unless this is
11  going to be done by a subspecialty-trained, subspecialty
12  board certified physician, then we're not going to sell
13  it to you.  Bard could have done that.  And to the best
14  of my knowledge, they did not do that.
15    Q.  In your opinion, has Bard not been involved in
16  training physicians as part of -- in helping -- not
17  directly training, but providing training, but
18  facilitating training with -- between different
19  surgeons?  Are you familiar with that?
20    A.  I don't know what Bard's educational efforts
21  are.
22    Q.  Okay.  Okay.  The next section is Alyte Mesh
23  Does Not Prevent Lateral Cystocele and --
24    A.  That's the Liu article.

Page 135

1    Q.  It's the Liu article.  Right?  And Liu, as you
2  say, compared transvaginal placement to laparoscopic
3  sacrocolpopexy for prolapse repair.
4        Now, the purpose of this -- of the Liu
5  article was to compare transvaginal repair to abdominal
6  repair.  Correct?
7    A.  Yes.
8    Q.  Sorry.  I suddenly misplaced Liu.
9        THE CHILLINGWORTH:  Can we go off record?
10        THE VIDEOGRAPHER:  We are off the record.
11  It is 2:25.
12        (Short recess.)
13        THE VIDEOGRAPHER:  Okay.  We are back on
14  record.  It is 2:25, and this is a continuation of media
15  five.
16    Q.  (By Mr. Chillingworth)  Okay.  So just to go
17  back to my question -- I'm sorry if I'm repeating
18  myself -- the purpose of this article was to compare
19  transvaginal placement versus abdominal placement --
20  correct? -- for prolapse repair?
21    A.  Among others, yeah.
22    Q.  Among others.  Was it specifically trying to
23  measure the efficacy and safety of either procedures, or
24  simply trying to discuss differences in observed

Page 136

1  outcomes?
2    A.  The latter.
3    Q.  And then at the bottom of that paragraph where
4  you quote, you say, They also said, quote, Our results
5  suggested that the new lightweight meshes have a -- may
6  have a weaker suspension force than the original ones,
7  which cannot withstand the excessive load of a prolapsed
8  uterus indefinitely and eventually cause recurrent
9  uterine prolapse.  And that language appears on page 556
10  of Liu.  And it's the final paragraph on page 556.
11    A.  Okay.
12    Q.  Isn't -- isn't she referring to -- well, isn't
13  Liu referring to transvaginal mesh here?
14    A.  Well, they're making several different points.
15  She says at the beginning of the last paragraph, "By
16  contrast, our results suggested that TVM was
17  significantly inferior to LSC for apical suspension with
18  more recurrent uterine or vaginal vault prolapses."
19    Q.  Right.  But this particular paragraph that you
20  quoted at the bottom, it relates to transvaginal mesh.
21  Correct?
22    A.  Let me find the paragraph where that came
23  from.
24    Q.  Sure.  It's the last paragraph on page 556.

Page 137

1    A.  Okay.  Is it the very last sentence in that
2  last paragraph?
3    Q.  That is quoted --
4    A.  Yeah.  Okay.  Yes, I did.
5    Q.  -- but the paragraph relates to transvaginal
6  mesh?
7    A.  It does.
8    Q.  Okay.
9    A.  The main point that I wanted to make with the
10  Liu article has to do with the lateral cystocele.  And
11  that is a problem with Alyte in that the vagina is
12  suspended anteriorially and posteriorly, but it's not
13  supported with anything going out to the side.  So the
14  cystocele, if it occurs, is likely to be lateral because
15  there's nothing out there to prevent that from
16  happening.
17    Q.  But what she's saying is more likely -- it may
18  be more likely in the case of a Y-shaped abdominal mesh,
19  but not necessarily that it is likely, correct, that
20  there be a lateral cystocele?
21    A.  Can you repeat that?
22    Q.  Yeah.  I mean, she's not trying to say --
23  she's -- that is a -- that statement is a comparison
24  comparing Y-shaped abdominal -- abdominally placed mesh

Keith O. Reeves, M.D.

Page 138

1  versus transvaginally placed mesh.  Correct?
2      A.  Yeah.  But only the -- doesn't make any
3  difference whether it's placed abdominally or vaginally.
4  The question is what is being supported.  And with
5  either of those approaches, you're not doing anything at
6  all to support the lateral walls.  You're supporting the
7  anterior and the posterior.
8      Q.  So the next section, Lightweight Mesh With
9  Increased Pore Size Is Not a Panacea.
10     A.  Okay.
11     Q.  And so the heading -- sorry.  This is on page
12  17, again, of your report.
13     A.  Okay.  I've got these.  All right.  I've got
14  the --
15         Weyhe.
16     A.  -- the Weyhe, W-E-Y-H-E, paper, yes.
17     Q.  Let's call it Weyhe.
18     A.  Okay.
19     Q.  Well, anyway, there seems to be a sort of
20  presumption in the title of this section that you're
21  drawing a distinction between lightweight mesh and
22  heavyweight mesh.  And it's not something that gets
23  discussed a whole bunch in your report, but do you have
24  an opinion of the safety and efficacy of lightweight

Page 139

1  mesh versus heavyweight mesh?
2      A.  What was the adjective you used?  About the
3  efficacy?  Was that what you said?
4      Q.  Yeah.
5      A.  Okay.  In general, most studies have shown
6  that lightweight mesh is probably less likely to result
7  in as much fibrosis, scarring, and shrinkage compared to
8  heavyweight mesh because the pore size being larger in a
9  lightweight mesh will allow for better tissue
10  infiltration and will allow for macrophages to get
11  inside of the pores to help prevent infection.
12     Q.  Okay.  So when you're saying it's not a
13  panacea, I mean, at the end -- ultimately, are you
14  saying that no polypropylene material, whether it's
15  lightweight or heavyweight, should be used in pelvic
16  prolapse procedures?
17     A.  I will put it to you like this:  I've never
18  used it.
19     Q.  Okay.  And -- but you've never used it.  But
20  as a general expert in the case, is it your opinion that
21  it should not be used?
22     A.  My opinion and the FDA's opinion.
23     Q.  Okay.  And while the product was on the
24  market, irrespective of what the FDA has subsequently

Page 140

1  done, while it was on the market, is it your opinion
2  that -- that it should -- it should not -- it should
3  never -- while Alyte was on the market -- excuse me --
4  in the U.S. market starting in March of 2011 to when it
5  left the market in the end of 2019, as long as it was on
6  the market, doctors who were attempting to surgically
7  treat patients with pelvic organ prolapse should not use
8  mesh products, be it a polypropylene, for that
9  treatment?
10     A.  I'm not in a position to dictate what the
11  world of gynecology should or should not do.  I can only
12  speak for myself.  I would not have used it.  I did not
13  use it when I was in practice.
14     Q.  But, you know, again, aside from personal --
15  your own personal practice, as a general expert, are you
16  saying it was just categorically unsafe because it was
17  made of polypropylene?
18     A.  Oh, I think the issue is polypropylene, yes.
19     Q.  And does that make it categorically unsafe?
20     A.  Until or unless it's modified substantially, I
21  think it probably is unsafe.  And the big issue is, is
22  that we have no way now, to the best of my knowledge, of
23  predicting for whom it's going to be problematic.  And
24  every time it's put into somebody, it's a roll of the

Page 141

1  dice.  And we have no way of knowing whether a
2  particular woman is going to have life-altering
3  complications as a result of having polypropylene mesh
4  used.
5      Q.  Okay.  I'm going to skip ahead to page 19, and
6  and the heading is Alyte Mesh Shrinks After It Has Been
7  Implanted In the Pelvis.  And you talked -- you touched
8  on it earlier, the concept of shrinkage.  And I know you
9  haven't read Dr. Wrightman's expert report in this case,
10  but let me -- I'll read a sentence from the report.  And
11  let me get your impressions.  Okay?
12     A.  Okay.
13     Q.  Any tissue repair mesh may exhibit shrinkage
14  or contracture as a result of normal healing action on
15  the implant and identical products.  And identical
16  products can exhibit widely varying levels of tissue
17  contracture because of implantation and patient-specific
18  factors.  As a result, a reliable correlation between
19  the degree of shrinkage and mesh material or
20  construction has not and cannot be made.
21         And initially, how would you respond to
22  that?
23     A.  I think she's going out on a limb and saying
24  cannot be made.  She's saying that I could predict the

Keith O. Reeves, M.D.

Page 142

1  future, and I don't think she can do that.
2  Q. Okay. Did you -- and this idea that she puts
3  forward that -- that the tissue-repair mesh may exhibit
4  shrinkage or contracture as a result of normal healing
5  on the implant, is it possible that the product is not
6  actually shrinking. It's just the normal healing
7  process that -- that -- that, you know, incorporates --
8  incorporating the mesh into the tissue that -- that
9  gives the appearance of shrinkage or contracture?
10  A. I think there's no data to support that
11  contention. And if you want me to elaborate, I'm ready,
12  because I've got a lot of data here that talks about
13  shrinkage. And I think that's a huge issue. And I
14  think it's demonstrably shown that it happens. And we
15  know to some extent why it happens more with some meshes
16  than with others, and it has to do with what happens to
17  the mesh once it's implanted.
18  And in spite of the fact that Alyte is a
19  macropore mesh, the problem with Alyte specifically has
20  to do with the fact that when it's put under force and
21  under tension, as it is after implantation in the
22  pelvis, then it is not correctly incorporated into the
23  tissue. It becomes, according to Barone, a solid rope
24  of tissue. And there's no incorporating that.

Page 143

1  Q. Barone didn't look at the Alyte in the body.
2  Correct?
3  A. He did not.
4  Q. Okay.
5  A. But -- and you keep coming back to this as if
6  it's some sort of a big deal. I think his experimental
7  design is spectacular, and he simulated beautifully what
8  happens in terms of force to mesh when it's put into the
9  body. And as one who has taken out all kinds of mesh, I
10  will tell you that you shrinkage is a real phenomenon,
11  scarring is a real phenomenon, and these things happen
12  unequivocally.
13  Q. Have you considered the -- kind of the nature
14  of hurt before? Having me read that sentence to you,
15  have you considered that as a -- as an explanation for
16  shrinkage, that it's a phenomenon that has to do with
17  scarring and incorporation of the tissue into the --
18  into the -- the mesh into the tissue and not some actual
19  measurable shrinkage?
20  A. No. Measurable shrinkage is demonstrably
21  shown. I've got papers that show that unequivocally.
22  They do -- after the mesh has been implanted, they go
23  back and look at patients at different timeframes
24  following the implantation, and they show continuing

Page 144

1  shrinkage. And this is done with ultrasound because
2  it's not possible using x-ray or MRI or CT to show mesh
3  in the body. But ultrasound demonstrates it
4  beautifully.
5  And we're talking about -- and I don't
6  want to split hairs here, but what you're looking at is
7  a composite, a combination of the human response with
8  scar tissue around the mesh itself. So what was put
9  into the body as a single piece of mesh that was
10  designed to lie flat after it's been there for a while
11  is going to shrink. And it's going to shrink because of
12  the fibrosis and the scarring and the contracture of the
13  tissue around the mesh and the mesh itself.
14  If you measure the mesh from point A to
15  point B, it's much less than when it was put in there.
16  Now, the challenge would become -- and I've been there,
17  done that, got the T-shirt. The challenge becomes,
18  trying, if you wanted to, for whatever reason, in the
19  pathology laboratory to dissect the mesh out from the
20  scar tissue. There's no reason to do that, number one.
21  And number two, it's virtually impossible to do it
22  because it is so firmly encased in scar tissue.
23  Q. And how is ultrasound a reliable means of
24  measuring shrinkage in vivo over time?

Page 145

1  A. Because you're looking right -- I mean, we're
2  talking about something that is this far underneath the
3  vaginal mucosa. And you can see clearly unequivocally
4  where the mesh started out because they were doing
5  studies on day one when it was implanted. And using the
6  same machine, same -- same sonographer going back later
7  in time and showing that it shrunk. I mean, I think
8  this is unassailable as far as technique and results are
9  concerned.
10  Q. Okay. On page 20 the heading There Are Safer
11  And More Feasible Design Alternatives to the Bard Alyte
12  Product. And the second sentence you discuss Bard
13  allegedly using industrial-grade polypropylene as
14  opposed to medical-grade polypropylene?
15  A. Yes.
16  Q. What is -- is that -- are those terms of art?
17  A. I have looked to try to see where I came up
18  with that, and I actually did a literature Google search
19  to see if I could come up with the definition of the
20  difference between industrial-grade polypropylene and
21  medical-grade polypropylene. And I think it has to do
22  with the degree of impurity in the medical grade, but I
23  cannot give you further citations there. It's hard to
24  find.

Keith O. Reeves, M.D.

Page 146

1  Q.  Okay.  Fair enough.  And would you agree with
2  me that native tissue repair using the patient's own
3  tissue is not really an alternative design but an
4  alternative procedure?
5  A.  Sure.
6  Q.  Okay.
7  A.  I mean, if you wanted to compare the native
8  tissue to polypropylene, we can do that.  But it's not
9  -- that's a good question.  It's not a different
10 technique necessarily.  It certainly is to a significant
11 extent, but not exclusively.  Some of the surgical
12 principles are the same.  You've got to sew the mesh in
13 place, but you've got to be an experienced gynecologic
14 surgeon to know how to do that.
15 Q.  But your opinion here is there are safer and
16 more feasible design alternatives.  And I guess, you
17 know, is native tissue repair really a design
18 alternative?
19 A.  Well, to the extent that you use a fascia lata
20 graft or a rectus abdominus muscle graft, you're using
21 it in a fashion analogous to some extent to a mesh.
22 Q.  But it's not a -- but it's not mesh.  Correct?
23 A.  No, it's not mesh.  It's native tissue, but
24 it's -- it's native tissue harvested from another site.

Page 147

1  Q.  Okay.  But it's not a --
2  A.  It is not a mesh product.
3  Q.  It's not a mesh product, but it's also not
4  a -- it's not a medical device either, is it?
5  A.  No.  It's the patient's own tissue.
6  Q.  Okay.  And you talk about cadaver and -- or
7  porcine material as a superior -- superior to
8  polypropylene products.  Can you elaborate on that in
9  your opinion?
10 A.  Well, they're not going to have nearly the
11 foreign body response that you get with polypropylene.
12 Q.  And is there data to support the use of
13 cadaver or porcine material for polypropylene?
14 A.  Yes.
15 Q.  And you haven't cited any?
16 A.  I haven't cited anything, but you know, it
17 exists.
18 Q.  It exists.
19 A.  Yes.  And I will tell you I have used porcine
20 tissue in the past.
21 Q.  Okay.
22 A.  And I abandoned it because I wasn't getting
23 any better results with that than I was with native
24 tissue.

Page 148

1  Q.  Okay.  But in your report, you haven't
2  provided any -- nothing in your report points to a study
3  for data suggesting that cadaver or porcine material is
4  superior to polypropylene products.  Is that fair to
5  say?
6  A.  No.  I will tell you that consensus opinion
7  here is that there's a lot less inflammatory response
8  with those products than there is with polypropylene.
9  Q.  Okay?  And can you can you -- since you
10 haven't pointed it to me in the report, is there
11 anything you can point to to support that?
12 A.  Yeah.  The concept is simple.  The porcine and
13 the cadaver material is not designed to be there
14 permanently.  It's understood when it's put in place
15 that it is just to hold the native tissue where you put
16 it with the graft material until it grows back together
17 on its own.  And if you were to go back and look at that
18 space where you put in cadaver tissue or porcine tissue
19 after six months to a year, you're not going to see any
20 evidence of it.
21 Q.  But you haven't in your report cited any data,
22 literature, or studies that support that opinion.
23 Correct?
24 A.  I have not.  I'm just telling you that's the

Page 149

1  way it is.
2  Q.  Okay.  Are there any other general opinions
3  concerning the Alyte that we haven't covered that you
4  feel we should address?
5  A.  From my standpoint, I don't think that we have
6  addressed the shrinkage issue nearly enough, but you're
7  the one conducting the deposition, so that's your call.
8  Q.  Okay.  Unfortunately, we've got one more --
9  one more half of this to go through, so...  Well, if
10 you -- before we go on, I'll let you, you know, give us
11 the opinion you feel is missing.
12 A.  Well, the studies have been done.  And I think
13 they're gorgeous studies because of what they do to show
14 what happens to mesh with a reproducible technology,
15 i.e., ultrasound, in women who have had mesh inserted in
16 the vagina.  And unequivocally the shrinkage is
17 demonstrated.  And how much varies from study to study
18 to study.  But at a minimum, the shrinkage is usually 10
19 to 15 percent up to a maximum of 50 percent.  And when
20 you've got that kind of shrinkage in the vagina, it's
21 not going to be a satisfactory anatomical or functional
22 result.  That's all I'm going to say.
23 Q.  Okay.  And that -- and you would measure that
24 through ultrasound?

Keith O. Reeves, M.D.

Page 150

1    A.  Yes.  And I don't think that I could be more
2  candid to tell you that the results are reproducible,
3  they're unequivocal, and they're solid.
4    Q.  And what do you mean by reproducible?
5    A.  I mean if you were to go back and -- if
6  another examiner were to do the same study and
7  duplicate -- and try to duplicate your findings
8  originally, he could do it with 99 percent accuracy.
9  Two people doing the same technique would get the same
10  results.
11    Q.  On the same patient or different patients?
12  Because we're talking about doing ultrasound on a
13  patient, are you -- are you -- so let me just -- let
14  me -- when you say replicate what -- do you mean in the
15  same patient, or do you mean just across patient
16  population?
17    A.  Either one.
18    Q.  Okay.  All right.  Now do you feel --
19    A.  Yes.  I wanted just to get that -- because I
20  think it's a critical concept as to why mesh has been
21  such a disaster.  Because the shrinkage is a major
22  component.  And the shrinkage is a representation of the
23  inflammatory response that occurs.  If you didn't have
24  the inflammatory response, you wouldn't have the

Page 151

1  shrinkage.
2    Q.  Okay.  Let's take a break, and then we can
3  move on to case specifics.
4    A.  Okay.
5        THE VIDEOGRAPHER:  We are off the record.
6  It is 2:48.
7        (Short recess.)
8        THE VIDEOGRAPHER:  Okay.  We are back on
9  the record.  It is 2:49, and this is a continuation of
10  media five.
11        EXAMINATION
12  BY MS. FILLMORE:
13    Q.  Good afternoon, Doctor.  My name is Katy
14  Fillmore, and I represent the defendants Johnson &
15  Johnson and Ethicon.  Do you understand that?
16    A.  Yes.
17    Q.  I just have a couple of questions for you.
18  All of the opinions you've given regarding your general
19  causation report relate to the C.R. Bard Alyte product.
20  Is that correct?
21    A.  I think that this probably applies to
22  polypropylene mesh in general, not just to Bard
23  specifically.
24    Q.  Doctor, the report that you produced, your

Page 152

1  general causation report, is specific to C.R. Bard Alyte
2  product.  Is that correct?
3    A.  That's what the title says, yes.
4    Q.  Okay.  And you didn't previously disclose a
5  general causation report regarding other polypropylene
6  meshes in this matter.  Is that correct?
7    A.  That is correct.
8    Q.  Okay.  To confirm, you're not offering any
9  opinions here today regarding the Ethicon Prolift
10  device.  Is that correct?
11    A.  There is nothing specific about Ethicon
12  Prolift in my report.
13    Q.  Okay.  And you are not offering an opinion
14  regarding Prolift here today.
15    A.  No.
16    Q.  Correct?
17    A.  Correct.
18    Q.  All right.  I'm going to ask you the same
19  question about the Johnson & Johnson and Ethicon TVT-O.
20  You are not offering any opinions here today regarding
21  the TVT-O device.  Is that correct?
22    A.  That is correct.
23    Q.  All right.  And your report does not address
24  anything about the TVT-O.  Is that correct?

Page 153

1    A.  That is correct.
2    Q.  Okay.  That's all I have.  Thank you, Doctor.
3    A.  You're welcome.
4        THE VIDEOGRAPHER:  We are off the record.
5  It is 2:51.
6        (Short recess.)
7        THE VIDEOGRAPHER:  Okay.  We are now on
8  the record.  It is 3:11, and this is the beginning of
9  media six.
10    Q.  (By Mr. Chillingworth)  Okay.  Dr. Reeves,
11  we're going to be focusing on your case-specific
12  opinions with respect to Ms. Hinnewinkel and her
13  experience with the Alyte.  And just to go over some
14  preliminary questions, in preparation for preparing
15  for -- in preparing your case-specific report, you have
16  produced a document today that indicates docs for a
17  case-specific opinion, or something to that effect?  Do
18  you recall?
19    A.  Docs?
20    Q.  Documents, but it's abbreviated docs.
21    A.  Oh, okay.  All right.
22    Q.  But in other words, you've prepared -- you've
23  produced a list of all the case-specific files that
24  you've reviewed for -- in preparing your opinion in this

Keith O. Reeves, M.D.

Page 154

1  case?
2      A.  Correct.  And there's nothing unique to
3  Hinnewinkel that you've not already seen in regards,
4  because that was all in the general report as well.  So
5  there's nothing new that I'm going to introduce except
6  the review of the medical records.
7      Q.  Right.
8      A.  Okay?  We're on the same page?
9      Q.  Yeah, on the same page, yeah.  And so now just
10  to be more specific, do you recall reviewing the records
11  of Dr. Hutchings, the implanting physician?
12      A.  I do.
13      Q.  Do you remember -- recall reviewing the
14  records of Dr. Kim, the -- the explant physician?
15      A.  She was -- well, she was one of them.  She
16  was -- the way I count, this woman has had six or eight
17  different procedures done, but Kim was the UCLA
18  urologist who operated on her.
19      Q.  Okay.  And did you review Dr. Hibner's medical
20  records?
21      A.  I can give a qualified maybe.  I think yes,
22  but I would -- yes, I do have that.
23      Q.  And as far as depositions that were specific
24  to this case, have you reviewed plaintiff's deposition?

Page 155

1      A.  Yes.
2      Q.  Have you reviewed Dr. Kim's deposition?
3      A.  Yes.
4      Q.  Have you reviewed Dr. Hutchings' deposition?
5      A.  I think, yes.
6      Q.  And finally, did you review Dr. Hibner's
7  deposition?
8      A.  I don't know that I saw that unless -- unless
9  you're looking at a reference that I'm making to it in
10  my report.
11      Q.  I'm not.  I'm just checking.
12      A.  I don't think so.
13      Q.  Okay.  Now, when we were talking about the
14  general report, you had indicated that you hadn't
15  reviewed any of the other expert reports in this case.
16  Is that -- is that a fair statement with respect to the
17  plaintiff's case-specific case too?
18      A.  Yes.
19      Q.  Okay.  And I'm going to refer to
20  Ms. Hinnewinkel as plaintiff because I'm afraid of
21  butchering the pronunciation of her name.  Is that fine?
22      A.  Sure.
23      Q.  Okay.  All right.  And again, with respect to
24  your case-specific report, does it -- does it completely

Page 156

1  state the bases for your opinions?
2      A.  I think so, yes.
3      Q.  And is it a complete statement of opinions you
4  hold with respect to plaintiff and her experience with
5  the Alyte device?
6      A.  Yes.
7      Q.  And can you describe your method in preparing
8  this report?
9      A.  I went through her medical records.  I took
10  notes on the medical records.  I read the depositions
11  from the surgeons that I have.  And I did not have --
12  for instance, she had procedures that were done remotely
13  prior to her seeing Dr. Hutchings, and I didn't have
14  those.  So there are some things that I simply have not
15  seen.  And everything that I've seen I reference.  She
16  had something done in 2002 by a Dr. Binette,
17  B-I-N-E-T-T-E.  I didn't have that operative report, but
18  I indicate specifically when I had something and when I
19  did not have something.
20      Q.  Okay.
21      A.  Okay?
22      Q.  Fair enough.
23          THE CHILLINGWORTH:  And can we go off the
24  record real fast just a few seconds?

Page 157

1          THE VIDEOGRAPHER:  We are off the record.
2  It's 3:17.
3          (Short recess.)
4          THE VIDEOGRAPHER:  Okay.  We are back on
5  the record.  It is 3:18.  This is the continuation of
6  media six.
7      Q.  (By Mr. Chillingworth)  And did you -- this is
8  a question I asked you for the general report also, but
9  did you collaborate with counsel in preparation of your
10  case-specific report?
11      A.  Actually, I just turned this in to them when I
12  was done with it.  And I don't think they had any
13  suggestions or corrections at all except for
14  typographical errors, and that sort of thing.  But this
15  is my report.
16      Q.  Okay.  And did you receive any preprepared
17  notes from counsel before or during the process of
18  drafting your report?
19      A.  Negative.
20      Q.  Okay.  In your report you reference
21  differential diagnosis.  And can you describe in your
22  words what a differential diagnosis is?
23      A.  When a patient comes in to see a physician,
24  he'll take a history and do a physical examination.  And

Keith O. Reeves, M.D.

Page 158

1  based on his history and physical examination, he or she
2  will come up with a list of possible diagnoses that
3  explain what's going on.  And the process, in completing
4  the differential diagnosis, is to look at everything on
5  his list -- hopefully, he hasn't left anything major
6  out -- and decide what's pertinent and what's not and
7  what's likely and what's not.  And he'll come up with
8  what he thinks is the most likely diagnosis.  And he
9  does that by ruling out the other diagnoses that he
10  listed as differential.
11     Q.  Okay.  And -- and in your opinions today you
12  attempted to apply differential diagnoses?
13     A.  Certainly.
14     Q.  Okay.  Did you have the opportunity to examine
15  the plaintiff in this case?
16     A.  Negative.
17     Q.  Okay.  And looking at your case-specific
18  report, page 11 --
19     A.  You're skipping 10 pages.  I'm impressed.
20     Q.  We're almost done.  So there's a paragraph
21  that says the specific problems which Ms. -- I'm going
22  to say plaintiff -- plaintiff experienced/experiences
23  are well documented in her medical history and
24  corroborated in her deposition.  Based upon my review of

Page 159

1  plaintiff's medical records, dot dot dot, it is my
2  opinion that Bard Alyte caused or significantly
3  contributed to causing or was a combining cause of the
4  following medical conditions experienced by plaintiff:
5  Vaginal stenosis, chronic vaginal pain, dyspareunia,
6  vaginal scarring and disfigurement, and fecal
7  incontinence.
8         My question is that list -- is that a full
9  and complete list of the medical conditions that you are
10  opining were caused or partially caused by the Alyte?
11     A.  Yeah.  She's got -- I forgot whose it was, but
12  one of the people who examined her had a list that was
13  probably three times this long of other entities that
14  she's had that she's complained of, including things
15  like gastroesophageal reflux disease, otherwise known as
16  GERD.  I didn't list GERD here, for instance, but this
17  woman has a lot of problems.  I think these five are
18  most likely the ones that have related to the use of the
19  Alyte mesh.
20     Q.  Okay.  And -- and so you're not going to, for
21  instance, opine that there are any other medical
22  conditions that may have been caused by the Alyte in
23  this case.  Correct?
24     A.  Correct.

Page 160

1     Q.  Okay.  So just to be -- and to be clear, there
2  are no -- you're not attributing any infections to the
3  Alyte.  Correct?
4     A.  Probably not.  And I'm hedging because I
5  recall that she had some groin infections, but that is
6  not at the focus where the Alyte would have been
7  implanted.  So I don't think that Alyte can be
8  attributed to causing any infections here.
9     Q.  Okay.  And are you going to be opining on
10  emotional distress?
11     A.  I -- I think that she's had emotional
12  distress.  I think that I make reference to a couple of
13  potential suicide attempts, but there's absolutely no
14  history that corroborates that, talks about that, goes
15  into that at all.  I think for people to attempt
16  suicide, there's got to be some emotional distress.  I
17  do not have an opinion as to what caused that in her
18  case.
19     Q.  Okay.  Okay.  Now, the term vaginal stenosis,
20  could you explain that to the jury?
21     A.  Show you graphically.  Vaginal stenosis is a
22  situation where the vaginal walls just constrict like
23  this.  And it can be a circumferential process, and
24  that's primarily what it refers to.  It can also

Page 161

1  refer -- we usually say vaginal shortening if the
2  vaginal apex or the vaginal length is reduced.  But
3  vaginal stenosis usually means, in general, just another
4  word tightening.  And that's a circumferential process.
5     Q.  Okay.  And are you going to be giving opinions
6  about the potential erosion in this case?
7     A.  Sure.
8     Q.  Okay.  And -- and is that related to any of
9  these symptoms that you are listing here on page 11?
10     A.  The vaginal stenosis, the vaginal pain, the
11  dyspareunia, and those -- yeah, those are all, I think,
12  part and parcel of the pain and the erosion that she
13  had.  But I've got to back up a little bit because Dr.
14  Kim never demonstrated erosion.  She -- she said it was
15  real close to penetrating into the bladder, and she had
16  to excise a portion of the bladder wall to get the mesh
17  out.  But the mesh had not completely eroded into the
18  bladder.
19     Q.  Okay.  Okay.
20     A.  Does that answer your question?
21     Q.  That actually does, yeah.
22     A.  Okay.
23     Q.  All right.  Let's -- I'm going to go back to
24  the beginning of your report and go step by step through

Keith O. Reeves, M.D.

Page 162

1  it?
2      A.  I thought we were already at 11.  Sorry.
3      Q.  Sorry to get your hopes up.  It says
4  Ms. Hinnewinkel is a white female whose date of birth is
5  August 29th, 1950.  She is a G3, P1021, whose only child
6  was born vaginally and who had no obstetrical
7  complications.  Could you explain the --
8      A.  The numbers?
9      Q.  -- the alphabetical thing?
10     A.  Okay.  Gravity - G3 means that she's been
11 pregnant three times.  She's -- the 1 stands for one
12 full-term vaginal delivery.  The zero means no premature
13 births. ████████████████████████████████████.  And the
14 ████████████████████████████████████
15 last one is the number of living children that she has.
16     Q.  Okay.  And you mention that her child was born
17 vaginally and had no obstetrical complications.  Did you
18 read in plaintiff's deposition where she indicated that
19 her baby was around 9 pounds and labor took about 20
20 hours?
21     A.  I did not see that.
22     Q.  Okay.  Does that have significance to you?
23     A.  Well, it was a big baby and a lengthy labor.
24 Okay?  And I also remember in another location that she

Page 163

1  thinks that forceps might have been used to deliver the
2  child.
3      Q.  Right.  Okay.
4      A.  I didn't see the nine hours -- or the 20 hours
5  or 9 pounds, though.
6      Q.  Okay.
7      A.  Okay?
8      Q.  Okay.  Did that -- so the nine hours and --
9  I'm sorry -- 9 pounds and 20 hours, did that factor at
10 all into your differential diagnosis?
11     A.  Well, I think it -- when a woman has that big
12 a baby after that long a time in labor, she certainly
13 probably has an increased chance for pelvic organ
14 prolapse.
15     Q.  And then the next sentence says her history
16 commences on October 15th, 2013, with an evaluation by
17 Timothy B. Hutchings, DO, in which she complains of
18 incomplete bladder emptying, urinary tract infection,
19 pelvic prolapse, rectocele, dyspareunia, fecal
20 incontinence, stress incontinence, postmenopausal
21 atrophic -- sorry.  I'm getting tired in the mouth
22 here -- vaginitis and pelvic pain.
23         So going back to this, when you say her
24 history commences on October 15th, 2013, what do you

Page 164

1  mean by her history -- are you saying that's when your
2  records began?
3      A.  Correct.
4      Q.  Okay.  Okay.  So you had mentioned that repair
5  -- that prolapse repair that she had by Dr. Binette,
6  many years ago.  Correct?
7      A.  Correct.
8      Q.  I do have a record for that.
9         (Discussion off the record.)
10        (Exhibit 14 marked.)
11     Q.  (By Mr. Chillingworth)  Okay.  I know you
12 haven't had a chance to look at this yet, so if you want
13 to take a second and have a look.
14     A.  Yes.
15     Q.  And when you're ready.  I'm not trying to rush
16 you, but when you're ready, just please go ahead and
17 describe the procedure as --
18     A.  He has done a -- as well as I can tell, a
19 standard anterior and posterior colporrhaphy.  In
20 English, she had hernias in the anterior and posterior
21 vaginal walls.  And he dissected the vaginal mucosa off
22 of the hernia, closed up the hernia defect with delayed
23 absorbable Vicryl suture excised, excess vaginal tissue,
24 and closed the vagina anteriorly and posteriorly.  And

Page 165

1  he was finished.  And he does not describe any
2  complications.
3      Q.  Okay.  And that procedure was vaginal.
4  Correct?
5      A.  Correct.
6      Q.  Okay.  And so as far as we know, from the
7  records, this is at least one of the vaginal procedures
8  that she's had in leading up to her implants that are
9  subject of the litigation.  Correct?
10     A.  Correct.
11     Q.  Okay.  Okay.  Okay.  Then --
12        (Exhibit 15 marked.)
13     Q.  (By Mr. Chillingworth)  Okay.  I believe
14 since -- given the timing of when you said the records
15 that you reviewed began, I presume you haven't seen this
16 record before.  Correct?
17     A.  Safe assumption.
18     Q.  Okay.  And it's dated March 18th, 2004.
19 Correct?
20     A.  Right.
21     Q.  Okay.  And on the second page of this report
22 under review of symptoms --
23     A.  Systems.
24     Q.  -- systems.  Thank you.  Did I say symptoms?

Keith O. Reeves, M.D.

1    A.   Yeah.

2    Q.   Okay. -- systems under GU indicates bladder

3  sx six months ago, continued dysruia and dyspareunia.

4  Do you know what the sx is meant to --

5    A.   I think that's supposed to mean surgery here.

6  It's either bladder symptoms or bladder surgery, and I'm

7  going to go with surgery, if the dates are right for

8  that.

9    Q.   Right.  Right.  Okay.  And you see that

10  there's a report of dysruia and dyspareunia in this

11  report.  Correct?

12    A.   Yes.

13    Q.   Okay.

14      MR. CHILLINGWORTH:  Actually, could you

15  hold off?  I skipped an important date here.  Thanks.

16    Q.   (By Mr. Chillingworth)  In your report on page

17  2 -- again, this is -- and this is following your

18  description of the procedure with Dr. Binette -- you

19  mention that she -- she also had a sling and posterior

20  repair in 2005 by Dr. Schroeder at RRMC2 with no

21  indication of the type of sling used.  Just -- again, so

22  that you can have a complete record here.

23      (Exhibit 16 marked.)

24    Q.   (By Mr. Chillingworth)  Okay.  And this

1  appears to be the operative report from that December --

2  that -- that other sling and posterior repair -- that

3  sling and posterior repair surgery you're referencing

4  there by Dr. Schroeder.  Correct?

5    A.   Right.

6    Q.   And you have not seen this before?

7    A.   Correct.

8    Q.   And, you know, take a look.  And again, when

9  you're ready, please describe the procedure as you see

10  it.

11    A.   All right.  He describes putting in a prolene

12  mesh Obtryx suburethral sling using the transobturator

13  route.  He then looked into the urethra and the bladder,

14  and then he did a posterior colporrhaphy and

15  perineoplasty.  In English, the rectocele, the hernia,

16  and the vaginal floor had recurred, so he repaired that

17  again and also did -- the perineoplasty is a plastic

18  surgery-type repair of the perineum, which is the space

19  between the vaginal floor and the opening to the rectum.

20    Q.   Okay.  So this is the second vaginal procedure

21  that we know from the records that she's had.  Correct?

22    A.   Correct.

23      (Exhibit 17 marked.)

24    Q.   (By Mr. Chillingworth)  Okay.  Okay.  This is

1  a record from June 2nd, 2009.  And that she indicates --

2  her chief complaint at the time indicates vaginal issues

3  and diarrhea.  And the history of present illness says

4  patient here today for vaginal issues and diarrhea.

5  States that she has been having pain with intercourse

6  for several months, vaginal dryness.  And her husband

7  states he can feel something inside her vagina that

8  shouldn't be there.  Noticed this last week.  States

9  it's near the cervix area, and that's where the pain is.

10      So this was about three and a half years

11  after her -- her second pelvic surgery that we know of

12  in which she received a transobturator sling.  Correct?

13    A.   Correct.

14    Q.   And she appears to reports feeling pain with

15  intercourse for a long time and vaginal dryness and

16  husband feeling something inside her vagina.  Correct?

17    A.   Correct.

18      (Exhibit 18 marked.)

19    Q.   (By Mr. Chillingworth)  Okay.  This is a

20  record from December 20th -- or excuse me -- the

21  appointment date was December 7th, 2012, and the chief

22  complaint is vaginal pain.  The problems that -- it

23  indicates that review of patient history as of November

24  28th, 2012 without any changes.  Dyspareunia is

1  mentioned first, and the onset was June 2nd, 2009.

2      And if you look at page -- the second

3  page, Bates number ending 562, under HPI, very bottom,

4  Katrina complains of vaginal discomfort with sex.  She

5  feels like something is wrong or, quote, has fallen

6  into, quote, her vagina but is not sure what.  The

7  vagina discomfort with sex has been going on for over

8  one year.  Did I read all that correctly?

9    A.   You did.

10    Q.   Okay.  And the purpose of this is just to

11  bring you up to speed with records with reference --

12    A.   Because I have not seen any of this.

13    Q.   Right.  Right.  You haven't seen this before.

14  Right?

15    A.   No, not at all.

16    Q.   Okay.

17      (Exhibit 19 marked.)

18    Q.   (By Mr. Chillingworth)  And I think this might

19  bring you up to speed.  This is the first record I have

20  for Dr. Hutchings.  And it's dated 10-15-2013, which is

21  when you indicate your -- the history you took of her

22  commences.  Is this where we start in terms of your

23  chronology?

24    A.   It is.  And I do not have this particular

Keith O. Reeves, M.D.

Page 170

1  piece of information right here.  That's -- the first
2  thing that I have relates to his doing urodynamic
3  studies on her.
4      Q.  Okay.  Okay.
5      A.  And I know that he's referred to his Pop-Q
6  examination, but here's the actual Pop-Q examination
7  that I'm looking at.  So the notes that I have refer to
8  this visit, but they are not as inclusive as this is, if
9  that helps.
10     Q.  Okay.  I see.  All right.  And do the -- in
11 the copy that you had, did it have the HPI section on
12 the second page?
13     A.  No.
14     Q.  Okay.  So it indicates that she's here to
15 establish care, and so this would suggest that this is
16 her first visit with Dr. Hutchings.  Correct?
17     A.  Correct.
18     Q.  And if you glance through it, she's
19 complaining of -- of incontinence.  Correct?
20     A.  Correct.
21     Q.  And then the second paragraph she describes
22 feeling pelvic pressure and discomfort all throughout
23 the day.  She feels especially when she's on her feet
24 and standing there's a pulling sensation in her pelvis.

Page 171

1  She denies vaginal bleeding.  She denies any trouble
2  with endometriosis in the past.  She does have
3  discomfort with intercourse, and she feels something is
4  being hit when she has intercourse.  She's also able to
5  digitally feel prolapse on her own.  She does notice
6  tissue a little bit dry.  I may have mis -- bumbled a
7  word or two in there, but that's generally what she was
8  reporting.  Correct?
9      A.  Right.
10     Q.  Okay.  And she also in the second -- the next
11 paragraph there, the third paragraph in that section,
12 she talks about having some rare episodes of fecal
13 incontinence as well.  Correct?
14     A.  Yes.
15     Q.  And then you looked at the -- you had seen the
16 PO Q exam.  Correct?
17     A.  Pop-Q.
18     Q.  Pop-Q.  Okay.  And what is that exam and what
19 is it telling us?
20     A.  It's telling us that she's got some pelvic
21 organ prolapse.  And it says -- I can show you a
22 diagram, but this just confirms with a reproducible
23 technique what degree of pelvic organ prolapse that she
24 has.

Page 172

1      Q.  Okay.
2      A.  Okay?
3      Q.  And above that under -- there's a bolded
4  section under objective physical exam.  It says pelvic
5  exam?
6      A.  Right.
7      Q.  And you notice that one of the things that's
8  recorded there is vaginally atrophic.  Correct?
9      A.  Vaginal atrophic.
10     Q.  Atrophic.
11     A.  Yes.
12     Q.  Sorry.
13     A.  It's all right.
14     Q.  Okay.  So we don't have any records here about
15 any discussions about surgery or sling or mesh or
16 anything in this record.  Correct?
17     A.  Correct.  The only thing that they're talking
18 about doing is urodynamic testing.
19     Q.  Okay.
20     A.  Well, actually, he did it that day.  I'm
21 sorry.  It says female stress incontinence, urodynamics
22 performed.
23     Q.  Okay.  All right.
24         (Exhibit 20 marked.)

Page 173

1      Q.  (By Mr. Chillingworth)  And do you recognize
2  this as the implant report --
3      A.  Correct.
4      Q.  -- from December 18th, 2013?
5      A.  Correct.
6      Q.  Okay.  Now, you described the procedure in
7  your -- in your actual case-specific report, but can
8  you -- can you describe it verbally in sort of a, you
9  know, layperson's terms?
10     A.  Okay.  Using a robot, she had a supracervical
11 hysterectomy, which means that the uterus was taken out
12 and the cervix was left in place.  And he also did
13 removal of both tubes and ovaries.  That's the bilateral
14 salpingo-oophorectomy.  And then using the Alyte graft,
15 he did a robotically-assisted laparoscopic
16 sacrocolpopexy, where he put the double portion of the
17 graft into the sacral promontory, and the Y portions
18 were placed appropriately on the anterior and posterior
19 aspects of the remaining vaginal tissue.
20     Q.  Okay.  And there's also --
21     A.  And he also placed an Obtryx sling.  Let's
22 see.  Yeah, an Obtryx sling.
23     Q.  And so in this -- the -- the hysterectomy --
24 the supra -- she had an abdominal procedure that was the

Keith O. Reeves, M.D.

Page 174

1 implantation of the Alyte, the hysterectomy, and removal
2 of her ovaries. And then she had a vaginal procedure to
3 remove the old sling and implant a new sling. Is that
4 correct?
5 A. I don't see anything about taking anything
6 out.
7 Q. Okay.
8 A. I think it was just implanting. He did the
9 hysterectomy, bilateral salpingo-oophorectomy, and the
10 laparoscopic sacrocolpopexy, and put in an Obtryx. And
11 then he looked into the bladder to make sure that he
12 hadn't created any problems. But there's no indication
13 here that he took anything out.
14 Q. Okay. My bad. But -- so this is the third
15 procedure -- third vaginal procedure that we have a
16 record of now in front of us. Correct?
17 A. Actually, there's nothing here that he did
18 vaginally. I think this is done robotically through the
19 abdomen. The supracervical hysterectomy is taking the
20 uterus out through the abdominal cavity with the robot.
21 He did the sacrocolpopexy robotically, and he did the
22 sling. But that's -- I guess you -- I'll give you the
23 Obtryx sling was a vaginal procedure.
24 Q. Yeah, that's what I was referring to.

Page 175

1 A. Okay. All right.
2 Q. So -- but it says essentially now we have
3 three vaginal procedures, one -- one pelvic procedure.
4 Can we call it that?
5 A. Sure. We need a white board up here.
6 Q. I know, yeah. Okay.
7 (Exhibit 21 marked.)
8 Q. (By Mr. Chillingworth) Okay. Now, this is
9 a -- on the top here it says office visit on 2-28-2004,
10 but if you actually look at the note, it says progress
11 notes encounter date 1-28-2014. Correct?
12 A. So there's a month gone somewhere.
13 Q. Month gone somewhere, but at least everything
14 underneath the doctor's name appears to be from January
15 28th, 2014. Is that right?
16 A. Right.
17 Q. Okay. And you had mentioned on page 2 in your
18 report that at two-week postoperative check she was
19 noting to do well except for some leaking with coughing
20 and sneezing. And I'm not sure I saw that record, but
21 except for leaking with coughing and sneezing, there was
22 nothing that you found noteworthy from that particular
23 record?
24 A. That's correct.

Page 176

1 Q. Okay. And -- and as you note in your
2 report -- and this appears to be the six-week report.
3 Correct?
4 A. Let's look at the dates. Yes, yeah. It says
5 she's six weeks post-robotically-assisted supracervical
6 hysterectomy. Says that in his HPI. So this visit is
7 for the six-week post-op visit.
8 Q. Oh, I see.
9 A. Look at that.
10 Q. Yeah, yeah. Okay. All right. But at six
11 weeks, looking at the second page here, Bates number
12 ending 45, under -- it says in bold excellent vaginal
13 support. There's some mild banding of the sling is
14 palpable, nontender vaginal exam, well estrogenized
15 tissue. Did I read all that correctly?
16 A. Yes.
17 Q. And excellent vaginal support indicates to
18 you -- what does that indicate to you?
19 A. Things are where he put them.
20 Q. Okay. And mild banding, sling is palpable,
21 that's -- that is not considered a -- that's not a
22 serious concern at six weeks. Correct?
23 A. Hard to know. I mean, you'd rather not feel
24 any banding at all; and he felt mild banding. And he

Page 177

1 was thorough enough to list it.
2 Q. Okay.
3 A. In the best of all possible worlds, he
4 wouldn't feel that.
5 Q. Okay. And the sling does not refer to the
6 Alyte. Correct?
7 A. It does not refer to what?
8 Q. The Alyte?
9 A. Probably not.
10 Q. Okay.
11 (Exhibit 22 marked.)
12 Q. (By Mr. Chillingworth) Okay. This is the
13 follow-up from February 28th. If you look halfway down,
14 that's where I'm looking. It is a record from February
15 28th, 2014. And this is a follow-up with Dr. Hutchings.
16 Correct?
17 A. Correct.
18 Q. Okay. And you mention this in your report.
19 Correct?
20 A. Yes.
21 Q. This -- the complaining of suprapubic and
22 groin shooting and penetrating pain?
23 A. Correct.
24 Q. And -- and she's also reporting dyspareunia.

Keith O. Reeves, M.D.

1  Correct?
2      A.  Correct.
3      Q.  Okay.  And so when it's -- when she's
4  referring to suprapubic and groin shooting penetrating
5  pain, where is that?  Where would that be located in the
6  vagina, based on that description, if you can tell?
7      A.  Well, suprapubic means in the very lower
8  abdomen just above -- just above the symphysis pubis.
9  If she were to -- if you were to stand up and feel the
10  pubic bone, she's having pain above that.  And groin
11  pain that she's referring to would be pain on -- and he
12  doesn't specify whether it's unilateral or bilateral or
13  both, but she's having both in both groin regions -- in
14  the groin regions.  He does not make anything more
15  specific than that.
16      Q.  Right.  Okay.  Okay.
17          (Exhibit 23 marked.)
18      Q.  (By Mr. Chillingworth)  Okay.  As you
19  indicate, you mention in your -- when we were talking,
20  the next record that you indicate is March 31st, 2004,
21  where she reported an attempted suicide attempt.  But we
22  don't know the details about that.  Correct?
23      A.  Correct.
24      Q.  Okay.  And this indicates that you were aware

1  that there was a procedure around April 9th, but you
2  hadn't seen the operative report.  Correct?
3      A.  Correct.
4      Q.  Okay.
5      A.  And this is it.
6      Q.  This is it.  Right.  So if you want to take a
7  look.
8      A.  All right.
9      Q.  Okay.  Again, in layman's terms, can you
10  explain what happened in this procedure?
11      A.  Well, he had a operative diagnosis of a
12  rectocele, a hernia in the vaginal floor.  She still had
13  urinary incontinence, and he makes a diagnosis of
14  mechanical complications with a previously placed graft.
15  And he says his procedure is to repair the hernia in the
16  vaginal floor, which is the rectocele.  He revised the
17  sling, he took out some vaginal mesh, and he did some
18  lysis of adhesions around the urethra.
19      Q.  Okay.  And you see --
20      A.  Then he put -- he then put in an Advantage Fit
21  suburethral sling and he looked in the bladder.
22      Q.  Okay.  So -- and do you see second page under
23  operative indications about halfway down -- the spacing
24  on this is kind of funny, but I guess where I'll direct

1  your eyes is you see where it says she also had a small
2  rectocele which was bothersome to the patient following
3  pelvic reconstruction?  And then the next sentence --
4      A.  Yes.
5      Q.  The next sentence I want to quickly just
6  highlight is the posterior mesh was in good position but
7  there was a small distal rectocele with perineal
8  deficits.  So when he's talking about the posterior
9  mesh, he's talking about the Alyte.  Correct?
10      A.  That's my assumption.
11      Q.  Okay.  And he is noticing a small rectocele,
12  but is there any indication that you can tell from these
13  records that that is a recurrence of -- of the defect
14  that -- well --
15      A.  You can't tell from this report whether this
16  is de novo, brand new, or whether this was a recurrence.
17  There's no way to know that.
18      Q.  Okay.  And you reviewed Dr. Hutchings'
19  deposition transcript.  Correct?  Dr. Hutchings is -- we
20  don't need to mark the transcripts.
21      A.  I don't know that I saw that.  All I've seen
22  is records, but I have not reviewed his -- I don't
23  think -- did I make a reference to having seen his
24  deposition, that you're aware?  I don't recall having

1  seen that.
2      Q.  Okay.
3      A.  I just saw medical records, as I recall.
4      Q.  Oh, okay.  Okay.  I guess -- I maybe forgot to
5  ask that at the beginning.  Have you read the
6  depositions of any of the treating physicians?
7      A.  No.  I've just seen medical records.
8      Q.  Medical records?  Okay.  I'm sorry.
9      A.  That's okay.  I just want you to know what
10  I've seen and what I haven't.
11      Q.  That's total fair, yeah.  Here's his
12  transcript.  I think I gave you two copies.  You don't
13  need to read two.
14      A.  Read this now?
15      Q.  I'll let you read it in the next 30 seconds.
16  What I'd like to do is point you to page 83.  And again,
17  this is a 2-by-2.
18      A.  I understand.  I understand.  Okay.  I'm
19  there.
20      Q.  And on line 15.
21      A.  Okay.
22      Q.  Says, then you note -- then you note, quote,
23  There was a small distal rectocele with peritoneal
24  defects, closed quote.  What does that mean exactly?

Keith O. Reeves, M.D.

Page 182

1    Answer:  So that means there is still some
2  rectum poking up into the vagina beyond the limits of
3  where the mesh is.  Perineum is the group of muscles
4  that attaches just below just between the vagina and the
5  anal opening.
6    Question:  So this was a different
7  prolapse, if you will, from the prolapse that had been
8  repaired as part of the December 2013 procedure with the
9  Bard Alyte product.  Is that correct?
10    Answer:  Yes.
11    A.  Can I interrupt you for a second?
12    Q.  Yes.
13    A.  You read it fine, but the Alyte product is not
14  going to be designed to repair a rectocele in that
15  location.
16    Q.  Okay.
17    A.  Okay?
18    Q.  But do you agree with his assessment that this
19  is a different --
20    A.  It is, yeah, I agree with that.
21    Q.  -- defect?  That was the only point I was
22  trying to make.
23    A.  Sure.  And I have not seen this deposition
24  before, by the way.

Page 183

1    Q.  Okay.  Fair enough.  Let's go back to your...
2  okay.  All right.  So in your -- your note -- so yes.
3  So looking through the history you give, she saw
4  Dr. Hutchings on April 25th, 2004 and then again on May
5  29th, 2000 -- I said 2004.  I meant 2014 -- May 29th of
6  2014.  And there doesn't seem to be anything remarkable
7  from those visits.  Correct?
8    A.  That's correct.
9    Q.  Okay.
10    (Exhibit 24 marked.)
11    Q.  (By Mr. Chillingworth) Okay.  Down at the
12  bottom third, it indicates that this is the beginning of
13  a note from March 29th, 2016.  Correct?
14    A.  Yes --
15    Q.  Okay.
16    A.  -- that's the right date.
17    Q.  And in your description of -- in the HPI on
18  the second page, this indicates it's a one-year surgical
19  check.  And her -- she's not having any voiding issues,
20  apparently.  And she does mention she's having pain with
21  intercourse and she's compliant with using vaginal
22  estrogen twice weekly, having no -- not having pain or
23  bleeding when not having intercourse.
24    Is this the record that you were referring

Page 184

1  to when you -- that you're referring to in your report
2  from March 29th, 2016?
3    A.  I have not seen -- I know that I never saw
4  anything that had Hutchings' picture on it, for what
5  it's worth.  Okay?  So I don't think that I'm seeing the
6  exact same records that you're relating to or referring
7  to, but some of the wording that I have in my report is
8  identical to what you're showing me where I copied
9  verbatim word for word from the history.  Okay.
10    Q.  Okay.
11    A.  Okay?
12    Q.  And that's -- and so one of the reasons why I
13  brought that up is because you have a long quote of her
14  medical summary noted.
15    A.  Yes.
16    Q.  And it lists a number of things.  And while I
17  think it's there -- that's mention -- those symptoms are
18  mentioned at different points in this record that I'm
19  showing you now --
20    A.  Yes --
21    Q.  -- I don't think it was listed like that.  So
22  that's why I just wanted to make sure that maybe it was
23  a different record that you were looking at.
24    A.  It probably was, but I think we're close.

Page 185

1    Q.  Okay.  And so if you go to Bates No. PSR 36 --
2    A.  Okay.
3    Q.  -- under objective, physical exam, and down
4  toward the bolded language, bladder/urethra, no
5  abnormalities upon palpation, adequate support, normal
6  urethral -- meatus or is that meatis?
7    A.  Meatus.
8    Q.  Meatus.  Okay.  And is there any significance
9  of that to you?
10    A.  Just that he didn't see anything wrong.  I
11  think he said good support and okay.
12    Q.  Okay.  And then underneath that is vagina,
13  good rugation.  Can you explain what that means?
14    A.  The skin folds in the vagina are normally
15  present.  A postmenopausal -- a woman who is
16  premenopausal who has normal vaginal rugae, the vaginal
17  floor and the anterior vaginal wall are not smooth.
18  They've got ridges in them.  And that's we -- what the
19  medical term for that is rugae, R-U-G-A-E.  So this is
20  typical of a woman, given her age, use who is using
21  estrogen topically in the vagina.
22    Q.  Okay.  And the next thing that's written is
23  webbing appreciated at fourchette; tenderness with
24  palpation.  And can you interpret that, please?

Keith O. Reeves, M.D.

Page 186

1     A. Yes. Again, I'm going to use my hands to
2 describe this. But webbing would be in the site where
3 she had the previous posterior colporrhaphy. And the
4 tissues, as opposed to being just perfectly smooth and
5 aligned, are like this. And it's because of the way it
6 healed. And it did not heal evenly and smoothly.
7         And I guess the best example I can give
8 you is to think about a baseball glove. In the web,
9 it's not perfectly smooth there. You've got a lot of
10 things going on, and there's webbing. And that's --
11 superficial scar tissue is another term I can use to
12 describe this. Webbing is not normally seen. That area
13 should be smooth.
14     Q. Okay. And again, can you repeat where in the
15 vagina --
16     A. Where that's occurring?
17     Q. Yeah.
18     A. The -- the fourchette is the region between
19 the entrance to the vagina and the top of the anus.
20     Q. Okay. Okay. And the -- and of course, he's
21 discovering tenderness with palpation. Correct?
22     A. Correct.
23     Q. Okay. And midline vaginal incision
24 well-healed. Then no mesh erosion or sling banding

Page 187

1 palpated or visualized. Did I read that correctly?
2     A. Yes.
3     Q. So at this point there's no indication of the
4 Alyte eroding into the tissue at this point?
5     A. Nor should it that far down.
6     Q. Right.
7     A. Okay.
8     Q. Now we've gone an hour. Do you want to take a
9 second?
10     A. I'm fine. Let's press.
11         THE WITNESS: How about you?
12         MS. BOYD: I'm fine.
13         THE WITNESS: Ladies? Bladder control is
14 impressive, ladies.
15         THE REPORTER: Just don't drink.
16         (Exhibit 25 marked.)
17     Q. (By Mr. Chillingworth) Okay. So this is a
18 record from June 3rd, 2016. And your report mentions a
19 preoperative visit with Dr. Hutchings on June 2016. But
20 as you told me before, you haven't seen a record with
21 the doctor's picture on it?
22     A. Correct.
23     Q. But does -- I know it's kind of a tough thing
24 to say, but does the language at least appear somewhat

Page 188

1 familiar to you?
2     A. Well, yeah, this is -- what you've handed me
3 is much more detailed than the little synopsis that I
4 had. But that's all. It's just amazing to me how much
5 disparity there is between what you've got and what I've
6 got. But I'm not seeing anything that surprises me.
7     Q. Okay. Okay. So -- and let's see. So you
8 mention in your -- in your report that this is -- on
9 June 3rd they scheduled -- can you pronounce the word
10 for me?
11     A. Perineoplasty.
12     Q. Okay. And could you explain what that is?
13     A. That's -- anytime you see plasty, that means
14 it's a plastic-type procedure. And he is operating on
15 the perineum to get rid of that webbing that we
16 discussed earlier.
17     Q. Okay.
18     A. And that's a relatively simple,
19 straightforward operative procedure.
20     Q. Okay. And then you note a June 28th, 2016
21 procedure. And I'll get that note for you.
22         (Exhibit 26 marked.)
23     Q. (By Mr. Chillingworth) Okay. So in your
24 report you indicate that you did not see an operative

Page 189

1 report associated with June 28th, 2016. If you'll take
2 a look at this report, the date is actually June 8th,
3 2016. Does that look right to you?
4     A. Yes.
5     Q. Okay. And you can go ahead and take a look at
6 the report. And I guess my question: This is pretty
7 much what they discuss doing in their prior visit. Is
8 that correct?
9     A. Yeah, he's describing here the perineoplasty
10 that he did at the time of surgery. It's essentially a
11 relatively superficial procedure where the scar tissue
12 is removed, supporting tissue is pulled together, and
13 then you do a neat plastic repair of the skin.
14     Q. Okay.
15     A. And that's all this is describing.
16     Q. And you mention this is -- this would not be
17 taking place in the location near where the placement of
18 the Alyte was. Correct?
19     A. Correct.
20     Q. Okay. And this was, according to the count
21 from the records we have, the fifth vaginal procedure.
22 Correct?
23     A. Where is that white board we were going to...
24     Q. Yeah.

Keith O. Reeves, M.D.

Page 190

1    A.   I think your math is probably correct.
2    Q.   Okay.  Thanks.  Yeah.  And then as you note in
3    your report, he -- their next encounter, Dr. Hutchings
4    and plaintiff, is August 9th, 2016.  And according to
5    Dr. Hutchings', excellent -- he goes, quote, excellent
6    anatomical results from surgery, will follow up as
7    necessary.  Is -- that's consistent with my reading of
8    the note as well.  So she's -- when he says excellent
9    anatomical results from surgery, what do you take that
10   to mean?
11   A.   He means that he's happy with the way he put
12   it back together, that it looks like normal anatomy to
13   him now.
14        (Exhibit 27 marked.)
15   Q.   (By Mr. Chillingworth) Okay.  And then he
16   goes on -- plaintiff goes on to see Dr. Kim.  And their
17   first encounter is on May 16th, 2017.  Correct?
18   A.   Right.
19   Q.   And as you note in your report, she was
20   diagnosed with stress incontinence, voiding dysfunction,
21   recurrent urinary tract infections, and possible foreign
22   body mass (mesh erosion).  And then Dr. -- Grade 1
23   cystocele, a Grade 1 rectocele, and a Grade zero
24   enterocele was noted upon physical exam.  And then --

Page 191

1    and plaintiff was scheduled for a cystoscopy on May 17th
2    of that year.  So the next day, essentially.  Is that
3    correct?
4    A.   Yes.
5    Q.   And so that report -- so first one is going to
6    be the -- I'm handing you is going to be the cystoscopy
7    report.
8        (Exhibit 27 marked.)
9    Q.   (By Mr. Chillingworth)  And then the second
10   one is going to be an ultrasound report.
11        (Exhibit 28 marked.)
12   Q.   (By Mr. Chillingworth)  So for 27 is this
13   cystoscopy report, and the second page details the
14   procedure.  And it describes the bladder -- on the third
15   line down kind of halfway across, the bladder had
16   several areas in midline -- mid-base where there may be
17   pending erosion of mesh - fibrotic irregular
18   protrusions.  No obvious through and through foreign
19   body were identified.  Did I read that correctly?
20   A.   Yes.
21   Q.   And on the ultrasound report, in the findings
22   it says mesh segments were noted posterior to the
23   mid-urethral bladder neck.  And then it says there's no
24   mesh erosion into the urethral wall.

Page 192

1        So basically, this is saying that there --
2    as we talked about, there's kind of the beginnings, but
3    not maybe -- this indicates maybe there's a beginning of
4    erosion but it hasn't -- but not obvious that it's
5    actually become officially --
6    A.   It's not through and through yet, if you will.
7    Okay?
8    Q.   Okay.  And on the ultrasound, when it says
9    mesh segments were noted posterior to the mid-urethral
10   and bladder neck, is that -- is there significant to
11   that?
12   A.   Yeah.  That's mentioned because that's not
13   where you want them.  The mesh has migrated some.
14   Q.   Okay.
15   A.   Okay?
16   Q.   And then it notes no erosion of mesh into the
17   urethral wall.  But we -- but there is -- as we note
18   from future, there wasn't anything like erosion into the
19   urethral wall?
20   A.   Correct.
21   Q.   So then we go to the first procedure that Dr.
22   Kim performed.
23        (Exhibit 29 marked.)
24   Q.   (By Mr. Chillingworth)  Okay.  Does this

Page 193

1    appear to be the operative report you reviewed from Dr.
2    Kim?
3    A.   Yes.
4    Q.   Okay.  And we've talked about this, that in
5    this procedure she noted, quote, unquote, impending
6    erosion at the posterior base.  But it wasn't -- it had
7    not -- it was not a complete erosion.  Correct?
8    A.   Correct.
9    Q.   But nonetheless, she indicates that the
10   removal was -- was difficult because of if -- if it's
11   embedded within the bladder wall.  Correct?
12   A.   And she could not take it out without doing
13   cystotomy, which means that she had to open up the
14   bladder to get the mesh out.
15   Q.   Okay.  And -- and what other procedures -- I
16   mean, so there was the mesh removal, the cystotomy.
17   Were there any other procedures done during this
18   provision operation?
19   A.   She had to essentially reconstruct the vagina
20   and she repaired an enterocele and she did a flap to
21   close the bladder entry.  If you look, she lists six
22   different procedures that she did under name of
23   operation.
24   Q.   Okay.  And when she did the -- to do this

Keith O. Reeves, M.D.

Page 194

1  removal, did she go abdominally or vaginally?
2  A. I think that this was probably -- well, let's
3  see. I think this was probably done abdominally.
4  Q. Okay.
5  A. And maybe both, as a matter of fact. She
6  probably operated both vaginally and abdominally.
7  Q. And would you in this -- to remove an Alyte,
8  would you approach it abdominally? Is it normal course
9  of practice?
10  A. Yes.
11  Q. Okay. And would there be disadvantages to
12  going vaginally?
13  A. You couldn't do it.
14  Q. Okay.
15  A. I'm looking at the operative report here.
16  Q. Sure.
17  A. I think she did this all vaginally.
18  Q. Okay.
19  A. Yeah, I think it was all done vaginally. I
20  wanted to make that that was correct.
21  Q. Okay. But -- and for a removal of an
22  abdominally placed mesh, you, as a surgeon, would
23  normally elect to go abdominally. Correct?
24  A. Correct. But she's not making an attempt

Page 195

1  here, I think we should specify this, to take out the
2  Alyte device. Okay? She's taking out the other things
3  that were done but not the Alyte. I don't see that the
4  Alyte is being removed here.
5  Q. You don't see the Alyte being removed?
6  A. I don't think so.
7  Q. Okay. So in the Modifier 22 Justification
8  note, it says this was a very challenging -- this was
9  very challenging due to severe vaginal stenosis that
10  limited the exposure and access. The mesh was embedded
11  in bladder wall and it was impossible to remove the
12  bladder mesh without causing cystomy [sic].
13  A. Cystotomy.
14  Q. Cystotomy. I'm sorry. So --
15  A. I will take -- I'll take that back. When
16  she's talking about taking it off of the cervix, that is
17  the Alyte device. So I stand corrected. She was taking
18  the bladder -- taking the Alyte device off of the
19  anterior surface of the cervix, because she had a
20  supracervical hysterectomy and the cervix was left in
21  place. And I will tell you that she talks about removal
22  of anterior mesh, but she doesn't say under name of
23  operation item No. 3, item No. 2. She doesn't specify
24  which mesh she's taking out. She just says removal of

Page 196

1  anterior mesh. But the more I look at this, the more I
2  am convinced that she's talking about the anterior
3  portion of the lye (phonetic) of the Alyte device.
4  Q. Okay.
5  A. Okay?
6  Q. And -- and is there any indication from your
7  read of the report if she made an attempt or was able to
8  remove any other portion of the Alyte?
9  A. There's no indication of that. When she did
10  the enterocele repair, she doesn't -- let me look at the
11  report in detail. Hold on a second.
12  Q. Sure.
13  A. We identified the mesh which appeared to be
14  almost contiguous with the bladder wall. The only mesh
15  that had been put down there was the Alyte.
16  Q. Okay.
17  A. Okay? But there's no indication that she did
18  anything to the portion of the Alyte that was placed
19  posteriorly.
20  Q. Okay. Okay. And in your report -- and if
21  you -- when you're describing this August 16th, 2017
22  operative report, it's a long paragraph here, but I'm
23  looking at the fourth from the bottom. And in the
24  sentence that says -- that starts intraoperative report,

Page 197

1  Dr. Kim also noted. Do you see where I am?
2  A. Yes.
3  Q. Says, quote, additional mesh around her
4  urethra, which required additional dissection and
5  excision. This particular mesh had the residual plastic
6  sheaths that was wrapped around it, which made it more
7  challenging to dissect and remove the mesh sling as well
8  as the plastic sheath.
9  A. And if I can stop you there, that sheath
10  should not have been there. Okay? That was something
11  that was put on one of the slings. And I think, as I
12  recall, that Hutchings was the only person who had put
13  any slings in place. And I don't know which sling that
14  was, but you're supposed to take those sheaths out when
15  you put slings in.
16  Q. Okay.
17  A. And the other thing I would say here is that
18  there is no sheath involved in the Alyte device, so the
19  sling is not due to Alyte.
20  Q. Okay. And just -- this isn't a criticism.
21  I'm just -- I just -- just to get the record straight, I
22  think you might have actually been quoting from the next
23  operative report. If you just want to take a quick look
24  to see if you see anything about a sheath in this

Keith O. Reeves, M.D.

Page 198

1 particular report.

2     A.  It happened twice.  There were two sheaths

3 encountered.

4     Q.  Okay.

5     A.  And the pathologist makes note of sheaths

6 because there were two separate operative procedures.

7     Q.  And did you review the -- let's see.  Yeah,

8 you did review the pathology report from after this

9 procedure.  Correct?

10     A.  Yes, indeed.

11     Q.  Okay.  Let me just take that.

12         MS. BOYD:  Oh, they just lost video feed.

13         (Discussion off the record.)

14         THE VIDEOGRAPHER:  We're off the record.

15 It's 4:33.

16         (Short recess.)

17         THE VIDEOGRAPHER:  Okay.  We are back on

18 the record.  It is 4:40, and this is the beginning of

19 media seven.

20     Q.  (By Mr. Chillingworth)  Okay.  So -- I'm

21 sorry.

22         THE CHILLINGWORTH:  I'll hand this to

23 you.

24         (Exhibit 30 marked.)

Page 199

1     Q.  (By Mr. Chillingworth)  Okay.  This is -- I

2 handed you the operative report from November 27th,

3 2017.  Looking at your report real quick, after your

4 description of the August 17th surgery, you say

5 following 2017 -- following the August 2017 surgery,

6 plaintiff's urinary -- stress urinary incontinence

7 persisted and she returned to Dr. Kim for treatment.

8 And then you describe the video urodynamics procedure

9 that she had on the 21st of 2017 demonstrating stress

10 urinary incontinence.  And that led to the procedure on

11 November 27th, 2017.  Correct?

12     A.  November the 21st?

13     Q.  Oh, I'm sorry.  I was reading off your report,

14 but you're right.

15     A.  It was on the 27th.  She had -- on November

16 the 27th, that's when she had the -- she had video

17 dynamics on the 21st and then she had surgery consistent

18 with fascia lata graft on the 27th.

19     Q.  And when you say fascia lata graft --

20     A.  That's where she took a strip of tissue out of

21 the lateral aspect of the thigh and used -- that's an

22 autologous graft or a transplant from one part of the

23 body to another.

24     Q.  Okay.  And so looking at her operative report

Page 200

1 from -- this is November 2017 --

2     A.  Oh, here it is.  After the second, we realized

3 it was another mesh sling with plastic sleeve wrapped

4 around it.  So there were two.

5     Q.  Yeah, there were.  Okay.

6     A.  Okay.  That's what I was saying.  I thought I

7 had seen it, and I had seen it.

8     Q.  Okay.  So can you -- have you seen this -- did

9 you receive this report before?

10     A.  I think probably yes because I described it

11 here.

12     Q.  And again in layman's terms, can you describe

13 what was done in this -- during this procedure?

14     A.  Okay.  She -- her operation is to harvest the

15 fascia out of the left thigh.  She then does lysis of

16 the urethra.  And she looks into the bladder, she

17 reconstructs the vagina, and she takes out mesh sling

18 and a foreign body.  And I'm assuming that the foreign

19 body is going to be the sling and the sheath.  And then

20 she does another sling procedure on her own using the

21 fascia lata, the graft.

22     Q.  Okay.  And this did not -- so tell me what

23 this is meant to treat and how the procedure would treat

24 the condition.

Page 201

1     A.  What she's trying to do here is to get the

2 mesh that was in there out.  And then she put the

3 anatomically -- or the -- she put her own tissue back in

4 using mainly tissue, the fascia lata, a strip of the

5 thigh muscle under the urethra to get rid of urinary

6 incontinence.  And she looked into the bladder.  And she

7 also had to reconstruct the vagina.

8     Q.  Okay.  And there's no removal of Alyte mesh

9 during this procedure.  Is that correct?

10     A.  I don't think so, no.

11     Q.  Okay.

12     A.  Because when she -- when she talked about

13 this, there's -- she had a sling that I mentioned

14 earlier.  There's no sling associated with the Alyte

15 device.

16     Q.  Right.

17     A.  Okay.

18     Q.  Okay.  And this was -- getting out the

19 imaginary white board, this was her --

20     A.  Sixth?

21     Q.  I forgot to say this on the last procedure.  I

22 think that we're on No. 7 right now, but six or seven.

23 We're at a lot.

24     A.  Sure.  We're close to each other here.

Keith O. Reeves, M.D.

Page 202

1    Q.  Yeah.

2    A.  Okay.

3    Q.  Okay.

4        (Exhibit 31 marked.)

5    Q.  (By Mr. Chillingworth)  Before we talk about

6    this record, I just want to quickly go back to that

7    November 2017 operative report for Dr. Kim.  One of the

8    things you mention in your report is that during the

9    procedure she encountered a -- I think that's supposed

10   to say tough but the letter T is missing, tough like

11   region?

12   A.  Yeah.

13   Q.  And that region is associated with the plastic

14   sleeve.  Correct?

15   A.  Yes.  No.  Wait a second.  It was both -- it

16   was a sling and the sheath.

17   Q.  Okay.

18   A.  It was two structures.  The sheath was left in

19   situ, and that was probably not intentional.  And then

20   inside the sheath was the urethral sling.

21   Q.  Okay.  And then going down to this record that

22   I handed you from October 9th, 2018, and you mention

23   this in your report.  Does this sound familiar to you,

24   this particular note from this visit?

Page 203

1    A.  Yeah, I think so.  I have seen this.

2    Q.  Okay.  And this is almost a year after her

3    prior surgery.  And now she's coming in and she's

4    complaining of bothersome urinary incontinence and

5    vaginal prolapse as well as vaginal pain from prior mesh

6    reconstruction.  And so from prior mesh reconstruction,

7    do you know -- what is that in reference to, if you can

8    interpret?

9    A.  I can't.  At this point she's had six, that we

10   can count, pelvic surgery procedures.  And to be

11   specific about what she's referring to here I cannot do.

12   Q.  Okay.  And so she's -- she has a cystoscopy

13   and she's diagnosed with -- she's prediagnosed with

14   stress incontinence and she's postdiagnosed with fecal

15   incontinence.  Correct?

16   A.  Correct.

17   Q.  And other than far early in her history

18   before, I think, her -- before she -- well, weeks before

19   her Alyte procedure, there was some report where she

20   talked about rare fecal incontinence.  And my read from

21   the records, this is the -- the -- this is the first

22   time in several years, including leading -- going back

23   before the Alyte procedure where she's reported fecal

24   incontinence, is that -- does that comport with your

Page 204

1    read of the records?

2    A.  I think that's correct.  It's hard to say if

3    this was -- if they asked the question to elicit this or

4    she's just now bringing it up.  And I can't speak to

5    that.  I know it was mentioned way back when, and now

6    she's mentioning it again.  Is it something that just

7    hasn't been talked about in the intervening years, or is

8    this a recurring problem or new problem?  But I don't

9    think the record answers that question.

10   Q.  Okay.  And -- and on the second page,

11   underneath the continuation of the progress notes, on

12   the first line indicates she now reports -- she now

13   reports new pelvic area and leg pain unlike any before.

14   Pain is constant and severe, not occasional.  Worsens

15   with walking.  Discussed that likely pain due to

16   multiple surgeries.  Would you agree with that

17   assessment?

18   A.  Yes.

19   Q.  And would it be possible to associate it with

20   any one of her six or seven procedures that she's had to

21   this point?

22   A.  You pays your money and you takes your choice.

23   I don't think that we can say specifically which

24   procedure with which device caused which symptomatology.

Page 205

1    Q.  Okay.

2        (Exhibit 32 marked.)

3    Q.  (By Mr. Chillingworth)  All right.  This -- so

4    this is a test -- what is a sigmoid -- sigmoid --

5    sigmoidoscopy?

6    A.  That means simply looking into the sigmoid

7    colon.

8    Q.  Okay.  And had you seen this record before?

9    A.  I don't -- I haven't seen this verbatim.  No,

10   I don't think so.

11   Q.  Okay.  And it indicates that she's here for

12   evaluation of fecal incontinence that she notes

13   developed -- it says after November.  And after November

14   2017 urinary incontinence surgery.  Did I read that

15   correctly?

16   A.  You did.

17   Q.  Okay.  And then under findings, it says the

18   EUS findings.  The bladder, vagina, and uterus were

19   unremarkable.  The external anal sphincter was

20   visualized and intact.  It did not appear to show a tear

21   but did have diminished squeeze when plaintiff was asked

22   to augment her rectal tone.  Accessory muscles were used

23   to enhance the squeeze.  There was no defect of the

24   external anal sphincter.  The internal anal sphincter

Keith O. Reeves, M.D.

Page 206

1 was seen and was 2 millimeters thick posteriorly and 1
2 millimeter thick anteriorly on the superior portion of
3 the IAS. The -- the asymmetry is --
4     A. That means consistent with.
5     Q. -- consistent with neurological injury. No
6 evidence of tear of the EAS was seen. The
7 distal/inferior part of the IAS appeared normal. The
8 wall of the rectum and the sigmoid appeared normal and
9 no perirectal or perisigmoid lesions were seen.
10         So -- so first of all, what is IAS?
11     A. That -- internal anal sphincter.
12     Q. Okay. That makes sense.
13     A. You've got an external sphincter and an
14 internal sphincter. And that's an internal anal
15 sphincter.
16     Q. Got it. So when the report says asymmetry is
17 consistent with neurological injury, is that consistent
18 with what your understanding would be, that if you saw
19 asymmetry in the internal anal sphincter, that that
20 would indicate maybe a neurological injury?
21     A. You're getting outside of my area of
22 expertise, sir.
23     Q. Okay.
24     A. Okay? But -- and the other thing that I think

Page 207

1 it's impossible to do -- I mean, I'm thinking back -- is
2 there any way that any -- anyone can cite what specific
3 operation or what specific event is responsible for the
4 neurological injury. And I don't think in good
5 conscious you could do. In fact, you could go so far as
6 to go back to her delivery and say, you know, she
7 delivered a big baby with forceps. Interestingly, the
8 anal -- the external sphincter -- and we don't know if
9 that was ever repaired. I don't think it ever was. She
10 had -- she's had a lot of posterior repair work done,
11 but nobody specifically mentioned working on the
12 external anal sphincter.
13         The only thing I can tell you, based on
14 the report of the endoscopist, is that he saw that there
15 was a defect and some asymmetry in the internal anal
16 sphincter. And he says this is consistent with
17 neurologic injury. But I don't think anybody is going
18 to be able to tell you with certainty what event caused
19 that. I don't think it's knowable.
20     Q. Fair enough. Okay. Before turning to this
21 next record, in your report on page 6 on the second full
22 paragraph, it talks about a self-completed questionnaire
23 on January 31st, 2019, complaining of frequent
24 urination. And she had mentioned that she had not

Page 208

1 had -- she had not had intercourse recently. And I have
2 not seen this record. Do you happen to have a copy of
3 this record with you?
4     A. Let me take the microphone off.
5     Q. Yeah.
6         THE CHILLINGWORTH: Let's go off record
7 real quick.
8         THE VIDEOGRAPHER: We are off the record.
9 It is 4:57.
10         (Short recess.)
11         THE VIDEOGRAPHER: Okay. We are back on
12 the record. It is 5 o'clock p.m., and it's the
13 continuation of media seven.
14     Q. (By Mr. Chillingworth) All right. So this
15 self-completed questionnaire of January 31st, 2019, from
16 your description of it, it is a self-completed
17 questionnaire. It seems like it was something she was
18 reporting as opposed to a doctor giving diagnosis, or
19 anything to that effect?
20         (Exhibit 33 marked.)
21     A. I would make the same assumption.
22     Q. Okay. And then so the record I handed you
23 just now from February 20th, 2019. As you noted in your
24 report, she had an MRI of the pelvis on February 19th,

Page 209

1 2019, showing linear susceptibility artifact extending
2 from the sacral promontory to the posterior urethra
3 consistent with sacral colpopexy mesh, additional linear
4 bands, susceptibility artifact anterior to the pubic
5 symphysis extending to the posterior mid-urethral --
6 mid-urethra. Excuse me.
7         (Exhibit 34 marked.)
8     Q. (By Mr. Chillingworth) Okay. Is this the MRI
9 report that you were referencing?
10     A. Yes.
11     Q. Okay. And so there's an indication at the
12 bottom of the first page that the MRI -- that this is a
13 radiologist's report. Correct?
14     A. Correct.
15     Q. And when your susceptibility artifact
16 extending from the sacral promontory to the posterior
17 urethra consistent with sacrocolpopexy mesh --
18     A. And that's -- that's Alyte they're talking
19 about.
20     Q. Right. Right.
21     A. Okay.
22     Q. And additional linear band susceptibility
23 artifact anterior to the pubic symphysis extending to
24 the posterior mid-urethra. Is that associated with

Keith O. Reeves, M.D.

Page 210

1  the --
2      A.  I think that is also associated with the
3  Alyte.
4      Q.  Okay.  And is that based on positioning --
5      A.  Yes.
6      Q.  -- the place where it's found in the body?
7  Okay.  Susceptibility artifact posterior to the urethra
8  with additional susceptibility artifact anterior to the
9  pubic bone likely representing residual mesh material.
10  Susceptibility artifact anchored at sacral promontory
11  extending to the vaginal -- vagina posterior urethral
12  region of susceptibility artifact.
13          And what is that referring to?
14      A.  I think that's all Alyte.
15      Q.  All Alyte.  Okay.  And so this is the first
16  record we're seeing of any sort of residual Alyte since
17  -- well, in any sort of form since the procedure where
18  it was partially -- at least partially excised.  Is that
19  correct?
20      A.  You know, I'm not sure that -- as I read the
21  operative reports, I don't think that anything of the
22  Alyte was ever excised.  I think they were taking out
23  slings and not Alyte.  So I think what you're seeing
24  here is a description of the Alyte as it was placed and

Page 211

1  as it remained in place throughout.  I think that
2  removal was removal of the mid urethral slings.
3      Q.  Okay.
4      A.  I don't think that this is referring to
5  anything other than Alyte, and I don't see any
6  indication previously when there was something in the
7  bladder wall.  It's hard to know what that was.
8      Q.  Okay.  Okay.  So --
9      A.  That would -- that's a better question for you
10  to be asking Dr. Kim.
11      Q.  And -- and it was asked of her.  And we won't
12  get -- necessarily get into her testimony.  If you're
13  not familiar with her testimony, we don't need to dwell
14  on it.
15      A.  Okay.
16      Q.  But just from your read of the record, to you,
17  it looks like what when Dr. Kim in her operative report
18  was -- was having a difficult dissection off of the
19  bladder, that that was one of the sling devices?
20      A.  I think, because it's in those dissections
21  that she talks about encountering the sheaths, if you'll
22  recall.  And there's no sheath around Alyte.
23      Q.  Okay.
24      A.  But I can't be certain about that.  The only

Page 212

1  way I could be certain would have been to have been
2  there and seen what she was taking out.
3      Q.  Okay.  Okay.
4      A.  And the only thing that you can be assured
5  that was not Alyte was the groin wounds that she had
6  that became infected and she had to be treated with
7  intensive antibiotic therapy.  Alyte was never in those
8  locations.
9          (Exhibit 35 marked.)
10      Q.  (By Mr. Chillingworth)  So this is an
11  operative report from Dr. Hibner from February 19th,
12  2019.  Sorry.  May 19th, 2019.  And I think you refer to
13  it in your report as -- oh, you're right.  That's a
14  mistake on my part.  It's -- the operative report is May
15  9th, 2019 of Dr. Hibner.  Do you recall reviewing this
16  record?
17      A.  Yes.
18      Q.  And can you describe the procedure?
19      A.  He's taking mesh out and he's taking out
20  Obtryx mesh and he's taking it out of the right and left
21  groin.  And it was adherent to the underside of the
22  pubic bone, so he actually had to take out some bone to
23  get all of the sling out.
24      Q.  Okay.

Page 213

1      A.  And that's the osteotomy procedure that he
2  did.
3      Q.  Okay.  And this is not related to the Alyte.
4  Am I correct?
5      A.  Correct.
6      Q.  And this is the seventh or eighth procedure
7  that she's -- pelvic or vaginal procedure that she's
8  had, according to our records.  Is that correct?
9      A.  I concur.
10      Q.  Okay.  Okay.  So in the -- in your report
11  starting on page 8, it's a review of the Hinnewinkel
12  deposition.  And that goes on until about three-fifths
13  of the way to page 10.  And this is just your -- your
14  recapping of her testimony.  Correct?
15      A.  Yes.
16      Q.  And it isn't with regard to her medical
17  records or her doctors' testimony.  It's simply -- it's
18  simply telling a narrative based on what the plaintiff
19  herself testified?
20      A.  Correct.
21      Q.  Okay.  All right.  Let's go to the expert
22  opinions section on page 10.  And some of these you list
23  seven opinions in this particular section, some of which
24  touch on the subject matters that we discussed earlier

Keith O. Reeves, M.D.

Page 214

1 today. But I want to talk about it with respect to the
2 plaintiff.
3        The Bard Alyte -- number one is Bard Alyte
4 is not suitable for use in the human body because it
5 does not maintain its shape after being implanted. It
6 can and usually does curl, cord, fray, or -- and lose
7 pore size once exposed to the natural pelvic forces
8 acting upon it after implantation.
9        Have you seen evidence that -- that the
10 plaintiff's Alyte curled?
11    A.   Unless or until it was visualized and/or taken
12 out, that is a supposition on my part. It said can, but
13 I didn't say it did because I don't know that.
14    Q.   Okay. And is that -- and would that be a fair
15 way of talking about the rest of these listed?
16    A.   Yes.
17    Q.   Okay. In No. 1?
18    A.   Yes.
19    Q.   Okay. No. 2, the chronic foreign body
20 reaction engendered by Alyte results in excess fibrotic
21 bridge, scar plate formation, mesh encapsulation, and
22 shrinkage of the mesh/scar tissue complex that is
23 created. These processes result in chronic pain.
24        When you use the term mesh encapsulation,

Page 215

1 I think that's the first time I've seen it in one of
2 your reports. Can you describe what you mean there?
3    A.   Well, I mentioned it earlier when I was
4 talking about there being a composite of mesh and scar
5 tissue. And the mesh stays in the center portion, and
6 the fibrotic tissue and the scarring builds a wall or a
7 complex around the mesh so that you have something that
8 looks not unlike -- what's a good -- a piece of hunk of
9 tissue, for lack of a better term, that is mostly scar
10 tissue. And if you were to cut into it, you would see
11 the mesh in the center with scar tissue on both sides of
12 the mesh.
13    Q.   And you have not examined the -- any part of
14 the Alyte that has been explanted. Is that correct?
15        THE REPORTER: That has been what?
16        THE CHILLINGWORTH: Explanted.
17    A.   No, I've not.
18    Q.   (By Mr. Chillingworth) Okay. And did you see
19 evidence of fibrotic bridging, scar plate formation,
20 mesh encapsulation, and shrinkage of the mesh? Before
21 we get to that question, the scar tissue complex, is
22 that different from mesh encapsulation?
23    A.   Same thing.
24    Q.   Same thing. Okay. So back to the question.

Page 216

1 From your review of the records and -- and -- the
2 medical records -- I didn't realize you didn't read the
3 doctors' deposition testimonies -- is there evidence of
4 fibrotic bridging, scar plate formation, mesh
5 encapsulation, and shrinkage of the mesh/scar tissue
6 complex with plaintiff's Alyte?
7    A.   The only way to confirm those suppositions is
8 to look at it grossly and microscopically. I have not
9 done that.
10    Q.   Okay. No. 3, Bard Alyte degrades over time.
11 In spite of Bard's protest to the contrary, this product
12 is not inert. Women may have decades of life expectancy
13 after mesh implantation, and the long-term implications
14 of this foreign body are simply unknown -- or simply not
15 known.
16        In Mrs. -- in plaintiff's Alyte, is there
17 indication of degradation, as far as you can see from
18 the medical records?
19    A.   That is not documented.
20    Q.   Okay. And is it fair to say that it's unknown
21 what the long-term implications might be if she has some
22 remaining Alyte remaining in her body?
23    A.   It's still there, and there's no way that I
24 can predict what will or will not happen with it.

Page 217

1    Q.   Okay. No. 4, it says Bard acknowledges that
2 it did not -- that it did no randomized, prospective,
3 long-term, blinded clinical trials before marketing it.
4 This is antithetical to the basic scientific concepts
5 and tenets that define medicine. How can any person or
6 business entity use or produce or implant an untested
7 product? That's a general opinion. Correct? It's not
8 specific to -- well, you're not commenting on something
9 specific to plaintiff's experience. Correct?
10    A.   I cannot tell you. And I say this in another
11 paragraph that I don't think we've come to yet. When a
12 patient has had seven or eight pelvic procedures, it's
13 very difficult to say with certainty what of those
14 procedures is responsible for her symptomatology. How
15 much of what she's going on is the result of the Alyte
16 product is very difficult to determine, especially
17 numerically.
18    Q.   Okay. No. 5 is also a general opinion that
19 we've seen before. No. 6, mesh results may result in
20 the need for more surgery.
21        At this time can you opine if whether or
22 not plaintiff will require more surgery?
23    A.   I cannot.
24    Q.   Okay.

Keith O. Reeves, M.D.

Page 218

1    A.  She may, but there's no way to know that.

2    Q.  Okay.  And then Bard did not use its IFU to

3  warn physician or patients about the above-listed

4  potential problems.  And we'll get back to the IFU in a

5  second.  But then we're -- now we're returning back to

6  the five conditions that you attribute to plaintiff's

7  Alyte implant.  So as you've just been saying, you know,

8  one of the difficulties in -- in diagnosing a cause is

9  that she's had so many vaginal and pelvic surgeries.

10 Correct?

11   A.  Correct.

12   Q.  Okay.  And is there a way -- have you

13 differentiated the Alyte from -- from any of the other

14 surgeries that she's had or other products that she's

15 had implanted in her vagina and any of the symptoms that

16 you list here?

17   A.  Yes.  And let me go through these one at a

18 time, if you'd like.

19   Q.  Sure.

20   A.  I think, if you look at the configuration of

21 the placement of the Y arms of the Alyte, that's the

22 only procedure that she's had that places something into

23 or onto the anterior and posterior vaginal walls.  More

24 than any other device that she's had implanted, that has

Page 219

1  the most potential for causing vaginal stenosis because

2  of the location of those arms.  I don't think any of the

3  other meshes were placed in that location.  Nothing that

4  she's had does that.  I think, more than likely -- more

5  likely than not, the Alyte device is responsible for the

6  vaginal stenosis.

7           I think for the same reasons it can be

8  responsible for a significant portion of the chronic

9  vaginal pain.  To the extent that she's had a shrunken,

10 or decreased, size of the vagina to result from what

11 she's had done, that will certainly result.

12          And number three, dyspareunia, or painful

13 intercourse, and I think the scarring that she's had,

14 can be attributed to some extent to the Alyte.  I don't

15 know about the fecal incontinence.

16   Q.  Okay.

17   A.  I think of all the things that she's had done,

18 I'm comfortable saying that Alyte is more likely than

19 not to have had a signature role in the etiology of

20 these problems, but there is no way that I can sit down

21 and say you get 20 percent, you get 13 percent, you get

22 6 percent.  That's just not possible.  I'm not about to

23 try to attempt to do that.

24   Q.  Okay.  And you had talked about not knowing

Page 220

1  whether the mesh had become embedded in -- in the

2  bladder was -- what mesh product that was.  Correct?

3    A.  I think it was probably Alyte, but I cannot

4  certainly -- I can't say that with certainty.

5    Q.  Okay.  And without saying -- being able to say

6  with certainty, does that -- is that one of the

7  difficulties you would identify in attributing vaginal

8  stenosis, chronic vaginal pain, dyspareunia, in

9  particular those three, to any one particular device?

10   A.  No.  I'm comfortable saying Alyte is probably

11 responsible for that because no other mesh products were

12 placed in the same location.

13   Q.  Okay.

14   A.  Okay?

15   Q.  But if you can't say if it had been partially

16 removed or not, it's difficult to attribute any

17 symptoms --

18   A.  No, that doesn't follow.

19   Q.  Okay.

20   A.  That does not follow.  We know where it was

21 put in to begin with.  Okay?  It was put on the anterior

22 and the posterior walls of the vagina.  No other sling

23 product that she had put in place, no other mesh product

24 that she had put in place, was placed in the same

Page 221

1  position that the Alyte was.

2    Q.  Did she ever report pain that -- that would be

3  associated with the placement -- the posterior/anterior

4  placement of the Alyte?

5    A.  Yeah.  Every time she attempted to have

6  intercourse she had dyspareunia.

7    Q.  And she -- you considered her -- we talked

8  earlier about her prior history of dyspareunia before

9  she received -- was implanted with Alyte.  Correct?

10   A.  Correct.

11   Q.  And she'd also had -- other than the Alyte

12 implant, she had six or seven additional vaginal

13 surgeries.  Correct?

14   A.  Correct.

15   Q.  And any one of those vaginal surgeries could

16 have resulted in anatomical issues that would be to

17 vaginal pain or dyspareunia.  Is that fair to say?

18   A.  I think that's a stretch.  I think the slings

19 are not usually considered to be a cause of dyspareunia.

20 The perineoplasty that she had, according to the

21 operating surgeon, relieved a lot of that pain.  But to

22 say exactly with numerical certainty what device caused

23 what degree of pain, it's very difficult to do.

24   Q.  It's difficult -- if it's difficult to do, are

Keith O. Reeves, M.D.

Page 222

1  you able to say to a reasonable degree of medical
2  certainty that these conditions were caused by the
3  Alyte?
4       A.   I can say that I think Alyte was contributory
5  to it.  But I think if you're asking me to say all or
6  none, I'm not doing that.  I've never attempted to do
7  that.
8       Q.   Okay.  And did you, by any chance, consider
9  other parts of her medical history that might have
10  contributed to symptoms that you're talking about now?
11 For instance, did you notice in the records that you
12 reviewed a -- a report that she fractured her pelvis
13 twice in connection with a -- or in two places in
14 connection with a plane accident?
15      A.   I saw that she had had chiropractic care from
16 being jostled in an airplane.  I don't recall that she
17 had sustained pelvic fractures.
18      Q.   Okay.
19      A.   Are you sure about that?  Does it say pelvic
20 fractures somewhere?  I'm not --
21      Q.   Yeah, yeah, it's fair enough.
22      A.   And I don't think a chiropractor would be --
23 at least the record that I saw said that she sought
24 chiropractic care after being, quote, jostled in an

Page 223

1  airplane flight.  But I don't think that a chiropractor
2  would attempt to set pelvic fractures.
3       Q.   Okay.
4            THE CHILLINGWORTH:  We can mark this as
5  next one.
6            (Exhibit 36 marked.)
7       Q.   (By Mr. Chillingworth)  Okay.  And I think
8  this is just part of the -- it's in kind of the history
9  intake.  And I think I handed you my own copy, so if I
10 could highlight real quick where I'm getting that for
11 you.
12      A.   Sure.
13      Q.   So -- so that's where I was drawing from
14 there, so that's the reference to -- yeah.
15      A.   I don't think this carries any weight.
16      Q.   Okay.
17      A.   Okay?  And we don't want to get into a
18 discussion of chiropractic care.  That's not what this
19 is about.  But I would need to see documented x-ray
20 history of a fractured pelvis times two before I would
21 agree that it's there.  Okay?
22      Q.   Okay.  If -- if -- depending on the severity
23 of -- obviously, I know you don't know --
24      A.   Sure.

Page 224

1       Q.   -- but could that have long-term implications
2  to -- on some of the symptoms that the plaintiff is
3  experiencing?
4       A.   The answer to your question is yes, it's
5  remotely possible.  But we don't know where these
6  fractures occurred.  I just think that's spurious.
7       Q.   Okay.  And then I also have a record of a
8  pelvic fracture surgery.  Let me pull it out.  Well, I
9  don't have the record with me, so I don't want to dwell
10 on it too much.
11      A.   Okay.
12      Q.   But it's the same sort of thing, I think,
13 where there's a reference to pelvic fracture surgery.  I
14 know without more it's hard to -- to --
15      A.   I can't opine on that.
16      Q.   Yeah, you can't opine.  I understand.  Okay.
17           Do you recall seeing -- you probably
18 didn't see this record because it was pretty early on --
19 in January 2003 falling down a set of 15 stairs and
20 coming away from it with bilateral pelvic pain.  Is that
21 something that --
22      A.   That's not anything I recall having seen.
23      Q.   Okay.  And then on the way back in 1998
24 falling off a horse and coming away from that with

Page 225

1  pelvic pain, is that something you saw?
2       A.   No.
3       Q.   Okay.  And then more -- and without chuckles
4  here, there are reports of her having been sexually
5  assaulted in her --
6       A.   I did see that.  And at some point she stated
7  specifically that there was no penetration on either of
8  those occasions.  I recall seeing that.  And I was -- I
9  was concerned about that too.  And I don't know exactly
10 how she defines sexual assault, but at one point in the
11 records she was asked or she volunteered that there was
12 no penetration.
13      Q.   And -- well, is it possible that even without
14 penetration some violence in that -- in that region of
15 her body could create some sort of vaginal trauma?
16      A.   The answer to your question is it possible,
17 the answer is yes.  Did it happen?  Is it likely?  I
18 don't know the answer to those questions.
19      Q.   Fair enough.  Oh, have you seen the reports in
20 the records of fibromyalgia?
21      A.   I've seen the word mentioned.  And she -- she
22 mentioned in one spot that she had a history of it but
23 that it was not a current problem.
24      Q.   Okay.

Keith O. Reeves, M.D.

Page 226

1     A.   And I know that historically that diagnosis
2  was mentioned.  And I'm ready for somebody to define
3  that for me.  We don't know what that is.
4     Q.   Okay.  Okay.
5     A.   It sounds good, but in terms of it being --
6  it's -- let me put it to you like this:  When I was in
7  medical school, we were not taught about the concept of
8  fibromyalgia.  And I never made that diagnosis.
9     Q.   She had reports -- and you mentioned this in
10 your report too -- history of vaginal atrophy.  Is that
11 correct?
12    A.   Yes.
13    Q.   And that can contribute to dyspareunia?
14    A.   Absolutely it can.
15    Q.   Okay.  And is that one of the factors that
16 makes it difficult to attribute, as you say,
17 numerically, you know, 10 percent to this, 5 percent to
18 this?
19    A.   Of course.  Now, the one thing that should be
20 said here is that she apparently responds very nicely to
21 vaginal estrogen cream.  And there are later
22 documentations that the vaginal mucosa looks healthy and
23 that she's got good rugae.  And that I think that as
24 long as she's on estrogen cream that causation for

Page 227

1  dyspareunia is not going to be there.
2     Q.   One thing I want to close out with is your
3  report discusses the instructions for use.  And I know
4  you're -- generally, I understand your opinion that you
5  generally find it inadequate.  Do you have any basis to
6  opine on whether Dr. Hutchings would have changed his
7  opinion had the -- the Alyte had a different or
8  additional warnings in the IFU?
9     A.   That's an impossible question to answer.
10    Q.   Okay.  If I told you that he testified that
11 prior to the implant surgery that he knew of the risk of
12 exposure erosion dyspareunia and chronic pain, would
13 that make it -- would that make it less likely to you
14 that he would -- he would change his implanting decision
15 without -- if it had a different -- if the IFU had
16 different or additional warnings?
17    A.   I think the better question to have asked him
18 would have been to say, Dr. Hutchings, would you --
19 knowing what Mrs. Hinnewinkel has been through
20 subsequent to your surgical procedure, if, given the
21 opportunity, would you put Alyte in a second time?  And
22 that question was not asked him.
23    Q.   You didn't review his deposition?
24    A.   Well, had -- had that question been asked, you

Page 228

1  would have asked it.
2     Q.   Okay.  But you don't -- you don't know the
3  answer to that question?
4     A.   No, I don't know the answer.  We can speculate
5  till the cows come home.
6     Q.   Okay.
7     A.   I think if you were to ask Ms. Hinnewinkel if
8  she were given the choice again would she have the Alyte
9  put in place, there's no way on God's green earth she'd
10 have that done.
11    Q.   And you haven't spoken with the plaintiff.
12 Correct?
13    A.   Never.
14    Q.   Okay.  And did you read her deposition
15 testimony?
16    A.   Yes.
17    Q.   Okay.  Did you -- do you recall where she
18 testified that Dr. Hutchings warned about future surgery
19 pain and pain with sex?
20    A.   I remotely recall that, yes.
21    Q.   Okay.  And she --
22    A.   But she also indicated, as well as she could
23 recall, that her informed consent was given to her by a
24 nurse and not Dr. Hutchings.

Page 229

1     Q.   Okay.  And whether -- whether a nurse -- the
2  fact that she had the informed consent procedure
3  performed by the nurse as opposed to the doctor, is that
4  something that is in Bard's control in this --
5     A.   Absolutely not.
6          MR. CHILLINGWORTH:  If I could take a
7  second to look over my notes, then I think I'm good.
8  Off the record real quick.
9          THE VIDEOGRAPHER:  We are off the record.
10 It is 5:34.
11         (Short recess.)
12         THE VIDEOGRAPHER:  Okay.  We are back on
13 the record.  It is 5:38, and this is the continuation of
14 media seven.
15    Q.   (By Mr. Chillingworth)  The last thing I want
16 to address with you, Dr. Reeves, is the sheathing that
17 was found.  And you said the sheath is not intended to
18 be left behind.  Correct?
19    A.   I did say that.
20    Q.   And the fact that it was left behind, could
21 that have clinical symptoms of -- could that lead to
22 clinical symptoms of the plaintiff?
23    A.   The interesting thing about that is I read the
24 operative reports, is that it did not seem to me that

Keith O. Reeves, M.D.

Page 230

1  there was a lot of fibrosis or scar tissue around the
2  sheaths themselves.  And they were only identified in
3  the pathology report grossly and not microscopically.
4  And Dr. Kim, who's an experienced urologic surgeon, was
5  able to easily recognize them for what they were.  So my
6  gut is is that, while they were not designed to be left
7  in place, I don't think they were of any clinical
8  significance in this case.
9     Q.  Okay.
10          MR. CHILLINGWORTH:  Hand it over to
11  anyone -- who else who wants to ask questions.
12          EXAMINATION
13  BY MR. NORTHRIP:
14     Q.  Yeah, this is William Northrip from Shook
15  Hardy & Bacon for Boston Scientific.  Doctor, I don't
16  know if you can see me on the video here, but I just
17  have a couple of quick questions that are going to be
18  very familiar to you from the questions that Ethicon's
19  counsel asked you earlier today.
20          Mr. Chillingworth did a very thorough job
21  of going through your report.  And when I get to the
22  opinion section of your report, from my review, the only
23  product that you discuss in your report is the Bard
24  Alyte.  Is that right, Doctor?

Page 231

1     A.  That is correct.
2     Q.  And is it fair to say that you're not planning
3  to offer any opinions at trial that Ms. Hinnewinkel's
4  complaints, to a reasonable degree of medical certainty,
5  were caused by her Obtryx device?
6     A.  Not going to say anything about Obtryx.
7     Q.  And the same thing for her Advantage Fit
8  device.  Are you going to say anything about that?
9     A.  No.
10     Q.  Okay.  Any -- any testimony -- do you plan to
11  give any testimony about the corporate conduct of Boston
12  Scientific?
13     A.  No.
14     Q.  And there's a couple of things I wanted to
15  just quickly clear up.  You made a couple of statements
16  when you were talking about your general report that all
17  pelvic mesh products are off the market.  I just want to
18  be clear.  Are you -- is it your testimony that
19  transvaginal mesh slings are off the market?
20     A.  No, it's not.  Thank you for noticing that.
21  The slings are still in widespread use.
22     Q.  Okay.  All right.  Those are all the questions
23  I have, Doctor.  Thank you.
24          MS. BOYD:  We're going to reserve our

Page 232

1  questions for trial.  We have no further questions.
2          THE VIDEOGRAPHER:  We are off the record.
3  It is 5:41.  This is the end of media seven.
4          (Proceeding ended.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 233

1          ERRATA PAGE
2  WITNESS NAME:  KEITH O. REEVES, M.D.  DATE: 01/16/2020
3  PAGE LINE CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____

Keith O. Reeves, M.D.

Page 234

```
 1  _____
 2  _____
 3        ACKNOWLEDGMENT OF DEPONENT
 4
 5      I, KEITH O. REEVES, M.D., do hereby certify that I
 6  have read the foregoing pages and that the same is a
 7  correct transcription of the answers given by me to the
 8  questions therein propounded, except for the corrections
 9  or changes in form or substance, if any, noted on the
10  attached errata page.
11
12      _____
         KEITH O. REEVES, M.D.         DATE
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 236

```
 1      I further certify that I am neither counsel for,
 2  related to, nor employed by any of the parties in the
 3  action in which this proceeding was taken, and further
 4  that I am not financially or otherwise interested in the
 5  outcome of the action.
 6      Certified to by me this 17th day of January, 2020.
 7
 8
 9      _____
         JANET G. HOFFMAN, CSR
10      My notary commission expires 03-14-20
11      Golkow Technologies, Inc.
        One Liberty Place, 51st Floor
12      1650 Market Street
        Philadelphia, Pennsylvania 19103
13      215. 586.4223
        877.370.DEPS
14
15
16
17
18
19
20
21
22
23
24
```

Page 235

```
 1       REPORTER'S CERTIFICATION
         DEPOSITION OF KEITH O. REEVES, M.D.
 2         TAKEN JANUARY 16, 2020
 3      I, JANET G. HOFFMAN, Certified Shorthand Reporter
 4  and Notary Public in and for the State of Texas, hereby
 5  certify to the following:
 6      That the witness, KEITH O. REEVES, M.D., was duly
 7  sworn by the officer and that the transcript of the oral
 8  deposition is a true record of the testimony given by
 9  the witness;
10      That the original deposition was delivered to MR.
11  COURTLAND C. CHILLINGWORTH;
12      That a copy of this certificate was served on all
13  parties and/or the witness shown herein on
14  _____.
15      I further certify that pursuant to FRCP No.
16  30(f)(i) that the signature of the deponent:
17      __x___ was requested by the deponent or a party
18  before the completion of the deposition and that the
19  signature is to be returned within 30 days from date of
20  receipt of the transcript.  If returned, the attached
21  Changes and Signature Page contains any changes and the
22  reasons therefor;
23      ____ was not requested by the deponent or a party
24  before the completion of the deposition.
```