```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                            AT HUNTINGTON



                     TRANSCRIPT OF PROCEEDINGS




------------------------------------------x

IN RE:   ETHICON, INC., PELVIC REPAIR      MDL NO.
SYSTEM PRODUCTS LIABILITY LITIGATION       2:12-MD-2327

------------------------------------------x

THIS DOCUMENT RELATES TO:

DAWNA MALLOW vs.                           CASE NO.
ETHICON, INC., ET AL.,                     2:16-cv-8013


------------------------------------------x



                  TELEPHONIC MOTIONS HEARING

                       January 24, 2020



           BEFORE THE HONORABLE CHERYL A. EIFERT
                UNITED STATES MAGISTRATE JUDGE




Court Reporter:                Lisa A. Cook
                               RPR-RMR-CRR-FCRR
                               (304)347-3198
                               lisa_cook@wvsd.uscourts.gov

Proceedings recorded by mechanical stenography; transcript
produced by computer.
```

1   **APPEARANCES** (**Telephonically**):

2

3   **COUNSEL FOR PLAINTIFFS:**

4

5   **MS. LAURA J. BAUGHMAN**
    Martin Baughman
6   Suite 1230
    3710 Rawlins Street
7   Dallas, TX   75219

8

9   **COUNSEL FOR DEFENDANT:**

10

11  **MS. ANITA MODAK-TRURAN**
    Butler Snow
12  Suite 1600
    150 Third Avenue South
13  Nashville, TN   37201

14

15  **MR. WILLIAM M. GAGE**
    Butler Snow
16  1020 Highland Colony Parkway
    Suite 1400
17  P.O. Box 6010
    Ridgeland, MS   39158-6010

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2           JUDICIAL ASSISTANT:  Hello, everyone.  This is
 3   Laura, Judge Eifert's Judicial Assistant.
 4       And I want to first confirm our court reporter today,
 5   Lisa Cook, is on the line.
 6           COURT REPORTER:  Hi, Laura.  Yes, I'm here.
 7           JUDICIAL ASSISTANT:  Thank you, Lisa.
 8       We're here in the matter of Mallow vs. Ethicon, Inc.,
 9   et al.  That's Case Number 2:16-cv-8013.  And this is
10   regarding Plaintiff's Motion to Compel, Document Number 62.
11       May I have plaintiff's counsel, please.
12           MS. BAUGHMAN:  Laura Baughman from Martin Baughman
13   for the plaintiff.
14           JUDICIAL ASSISTANT:  Thank you.
15       Counsel for Ethicon?
16           MS. MODAK-TRURAN:  Laura, we have two attorneys,
17   Anita Modak-Truran on behalf of Ethicon and Johnson &
18   Johnson.
19           JUDICIAL ASSISTANT:  Uh-huh.
20           MS. MODAK-TRURAN:  And I'll let William --
21           MR. GAGE:  And William Gage with Butler Snow.
22           JUDICIAL ASSISTANT:  All right.  And thanks to
23   everyone too for your patience in the delay in the start of
24   the hearing.
25       I will remind you to please identify yourself when
```

1  speaking, and if you will hold one moment for Judge Eifert.
2       (Pause)
3           THE COURT:  Good afternoon.
4           MS. MODAK-TRURAN:  Good afternoon, Your Honor.
5           MS. BAUGHMAN:  Good afternoon.
6           THE COURT:  I apologize for being a little bit
7  late here.  I had a hearing that ran a bit over.  But the
8  good news is that before I started that hearing I had an
9  opportunity to review your filings.
10      So I understand that we are here over a fee charged by
11 Dr. Ostergard for collecting information that Ethicon
12 requested in the attachment to his notice of deposition and
13 also from the Court.
14      So I realize that's what we're here for and I have
15 given this some thought.  I think Ms. Modak-Truran was on a
16 prior phone call where I had stated that I am not at all
17 inclined to ever award someone $600 an hour for searching
18 through your own financial records.  And, so, I'm obviously
19 not going to compel the defendant to pay the bill that was
20 issued by Dr. Ostergard.  So the $600, in my opinion, is off
21 the table.
22      Now, I'd like to hear what you all have to say about
23 what he ought to be reimbursed because that's the other
24 point of my thought process, and that's that Ethicon asked
25 for this information.  It's not the typical information that

1   he would have had to produce as part of his deposition per
2   the rule.
3        I don't care which rule you go under as to why Ethicon
4   should have to pay it.  There's a couple of options.  It
5   doesn't really matter to me.
6        I think the bottom line is Ethicon asked for it.  It
7   was beyond the norm.  And I'm going to make Ethicon pay a
8   fee for that to Dr. Ostergard.  So we're going to just
9   quibble at this point over how much that should be.
10       So who would like to go first?  The plaintiff?
11           MS. BAUGHMAN:  Yes, Your Honor.  This is Laura
12  Baughman from Martin Baughman for the plaintiff.  And I'll
13  be short on this.
14       Obviously, we initially asked Ethicon to pay the $600
15  because that is Dr. Ostergard's normal hourly rate.  And I'm
16  sure the Court saw his affidavit attached to our reply brief
17  that explains exactly what he did and why it took him that
18  amount of time and why someone else couldn't have done it
19  for him.
20       And, and, and just to make sure that this fact was
21  picked up in all the papers, when I was corresponding to try
22  to work this out with Ethicon's counsel, I misunderstood and
23  thought that they were offering to pay $300 an hour instead
24  of $600 an hour, half his normal rate.
25       And I would add -- the key thing here is it took

Dr. Ostergard almost 40 hours to do this, 36.7 hours I think, which is a week's worth of time that he could have spent doing work at his normal hourly rate of $600 an hour. So he -- anything less than $600 an hour means he's losing money on this proposition.

But I thought Ethicon offered to pay $300, half the hourly rate. I thought that was fair under the circumstances and agreed to that. And then they responded and said, "Oh, no, no, what we mean is we'll give you $300 total for the entire 36 or 37 hours," which is why we had to file the motion unfortunately.

I think that half of his hourly rate is fair. That is splitting the difference between what he could have made had he done his normal work and recognizing that this isn't his normal work.

So I would, I would ask that Ethicon pay half of the bill that's been submitted, or $300 an hour.

THE COURT: All right. Let me hear then from Ethicon.

MS. MODAK-TRURAN: Your Honor, I think you've said it in your prior decision very well on accepting the reasonableness of the fee. And I'm looking at your *Fulks* decision as well as *Fint* vs. *Brayman Construction* where the Court engages in an analysis of a number of factors including the witness's area of expertise; the education and

1    training; the prevailing rate; the nature, quality, and
2    complexity of the discovery responses; the cost of living in
3    a particular geographic area; the fee being charged by the
4    expert; fees traditionally charged by experts on related
5    matters; as well as any other factors likely to be of
6    assistance to the Court in balancing the interests.
7        And when looking at those interests, the reality is
8    that what Dr. Ostergard did was an administrative task.  It
9    is beyond the pale how it could have taken him as many hours
10   as he has said it took him.
11       And one of the most interesting things, Your Honor,
12   that I've found just to demonstrate how unreasonable this is
13   is that in the document production, there were two invoices.
14       There was an invoice from November the 14th, 2019, that
15   was for $15,858 similarly without any type of explanation of
16   what was done for that.  And then we get the November 21st,
17   2019, invoice, which is just a week later, and it's $21,942.
18       There is absolutely no relationship between the scope
19   of the work that the Court ordered Dr. Ostergard to do and
20   what we were charged.
21       As this Court noted at the hearing, what was requested
22   was information that Judge Ostergard (verbatim) was
23   required, he was required to keep in every case and produce
24   it in every case.  So this information should have been
25   readily accessible.

1 Now, instead of being efficient in the way he collected
2 this information, there was, there was no effort at
3 efficiency. I suspect that's because his own attorney was
4 not paying it. We were paying it. And it led to lots and
5 lots of time.
6 When I was looking through the invoices that were
7 produced, there is one document that says at the top
8 "Transaction Detail by Account." And it's from November
9 7th, 2014, through November 9th, 2019.
10 I know that the records, Your Honor, that were produced
11 by the plaintiffs were not Bates stamped, but we did Bates
12 stamp the number. And just to have it in the record, it's
13 Mallow 2676 to 2679. And let me tell you this summary would
14 have been fine.
15 The summary is what -- for every time he deposited a
16 check. It lists a total of $3,178,783.49. He includes in
17 there that there were certain deductions that he made for a
18 total of over $3 million.
19 I don't know who prepared this document. But it's the
20 type of document that could have been very quickly made
21 because it was taken from bank records.
22 So there was no reason for Judge Ostergard (verbatim)
23 to engage in this very lengthy and with no proportionate
24 relationship to the task that he was asked to perform.
25 I would suggest, Your Honor, based on the case law that

1   we have put into our response other courts looking at this
2   issue, looking at this type of administrative work have said
3   that $50 is more than reasonable under the circumstances.  I
4   mean, it's five times the minimum wage.
5          So we're giving the doctor -- if he chooses to do his
6   own administrative work, that's on the doctor.  But he could
7   have simply provided his banking records that we have and I
8   suspect it would have taken -- and I don't know, Your Honor,
9   but it looks like it was compiled pretty quickly, it's an
10  Excel spreadsheet -- you know, in maybe two hours.
11         The courts when they're looking at the
12  reasonableness -- and we would suggest that you do this --
13  look to how long is that deposition.  And we're not even
14  talking in this case about deposition preparation.
15         And I know Your Honor has already ruled that you do
16  believe that this is a compensable fee.  I'm not going to
17  argue that -- our position now because it's in our brief.
18         But when we're looking at this, and we calculated it,
19  the way -- if you look at his rate, he's charging us $78 per
20  page that was produced.  That's just simply not reasonable.
21  On its face it's not reasonable.  And then his invoices
22  don't provide enough detail for all of us to understand why
23  it took so long.
24         So we believe that the better rule here is to apply a
25  $50 rate and then take into account the amount of time that

1  should have been spent and could have been spent on
2  performing this task. And that would be the three-to-one
3  preparation to deposition time in a complex case. And the
4  case that we've cited was *LG Electronics USA* vs. *Whirlpool*
5  *Corporation*.
6       If we do that, if we -- and this is a good check on
7  making sure that both sides' experts don't do what
8  Dr. Ostergard did here, is that the parties have agreed in
9  this litigation that case-specific experts are at two hours.
10 That's a two-hour limit.
11      If we apply this three-to-one rule, then that would be
12 six hours of compensation for Dr. Ostergard to provide
13 information that he could certainly have easily accessed as
14 he did from his bank accounts where he put in the check. If
15 we multiply that out, that is $300.
16      Now, as to a misinterpretation about if it was $300 an
17 hour versus $300 in total, William Gage is on the line if
18 you have any specific questions and he can address that.
19 But we never agreed to do $300 an hour for an administrative
20 task.
21           MS. BAUGHMAN: If you're finished, I'd like to
22 respond. I don't want to interrupt, though.
23           MS. MODAK-TRURAN: I appreciate that, Laura.
24      William, do you want to chime in on that issue?
25           THE COURT: I -- you don't, you don't need to

1 worry about that. I don't think there was ever any
2 agreement to pay $300 an hour.
3       MS. MODAK-TRURAN: Oh, no, I was saying it was a
4 misunderstanding.
5       THE COURT: Right. There was clearly no
6 agreement.
7     So, Ms. Baughman, if you want to respond to the other
8 arguments.
9       MS. BAUGHMAN: Yes. Thank you, Your Honor.
10     I think the most important thing is to, is to look very
11 carefully at what was ordered for Dr. Ostergard to do and
12 what he explained in his affidavit he had to do in order to
13 comply.
14     And he was very clear that had he simply been asked how
15 much money had he made over those five years, that would
16 have been a simple task. But he was asked to do much more
17 than that. He was ordered, quote, to produce all invoices
18 of payment documents related to his services rendered in
19 generating a report, for testifying as an expert witness in
20 any pelvic mesh case during the past five years.
21     And he said that he was ordered to produce -- I mean,
22 the order says he had to at a minimum produce documents
23 demonstrating the party, the name of the lawyer or the law
24 firm that retained him, the rate charged, the total amount
25 billed, and the amount of any payments made.

1          So this wasn't just a simple, "Just tell us how much
2   money you made in the last five years."  If that had been
3   what was requested, it would have been much easier.
4          And to do it -- the case law that, that counsel is
5   citing is addressed in our response.  So they're all -- it's
6   all distinguishable because the cases that -- some of the
7   cases they're citing administrative staff could have done
8   the task.
9          Here because it was -- because two years of the records
10  had been shredded, it required Dr. Ostergard to go back and
11  piece things together in order to comply with the Court's
12  order.
13         This is not something that anyone could have done other
14  than him because nobody else understands his system and
15  where his papers are as he's explained in his affidavit.
16         This three-to-one ratio of course is unfair because the
17  Court -- Dr. Ostergard was ordered to provide this
18  information.  He could not have stopped at six hours because
19  the six hours were up because then he wouldn't have complied
20  with the Court's order and he would be in contempt.  So he
21  did what he needed to do.
22         And, by the way, he had no concept or idea that Ethicon
23  would be paying for this.  He didn't know that.  He sent the
24  bill to us.  He sent it to us.  And then we sent it to
25  Ethicon.  He had no idea who was paying for it.  He didn't

1  drag this out.
2        What he did was to try to do a complete, thorough job
3  of responding to the Court's order by the letter.  And if
4  Ethicon wanted something simpler, it would have taken a lot
5  less time.  But this was a very detailed order and he
6  complied with it to the best of his ability.  And this is
7  how much time it took.  And he --
8              THE COURT:  All right.
9              MS. MODAK-TRURAN:  Could I briefly respond?
10             THE COURT:  Yes, go ahead.
11             MS. MODAK-TRURAN:  Thank you, Your Honor.
12      I think it's somewhat problematic that this issue about
13 who was going to pay for the time was not raised at the
14 earlier hearing.
15       If Ms. Baughman thought that Ethicon should pay for the
16 time, it should have been brought up then so we're not in
17 this very challenging position where we have an astronomical
18 bill for excessive amounts of time.
19       As we've stated in our papers, Your Honor, I can recall
20 no case where we have ever had to do this, which is why I
21 didn't bring it up at that hearing.
22       Certainly when we have done it in the past, when we
23 talk to our experts we always tell them to collect the
24 information in the most efficient way, and they do.  They
25 also keep track of their invoices.

1      Now, when I look at this one document that has all of
2 the stuff and all of the information with bank payments, it
3 does provide a total.
4      When I compare the totals with what we have, our
5 records show that Dr. Ostergard, based on what he's provided
6 here, as well as some missing information -- and we're not
7 quibbling, Your Honor, about the missing information because
8 they're Ethicon cases and we have access to that.  But it's
9 over $4 million in fees.
10      The Federal Rules require him to produce that
11 information in every case.  And, so, to now say that it took
12 so much time to get that, I just don't find that persuasive.
13      I think if this was going to be an issue -- and I'll
14 tell you the way I would have handled it, Your Honor.  If I
15 had an expert and I said this is a court order and -- I
16 first would provide some guidance on how to do it in a cost
17 efficient way if we were paying what the other side was
18 paying.
19      I don't think that happened here.  I don't think it was
20 intentional.  I think it just -- it just wasn't explored
21 fully.  And what we have is this disproportionate request to
22 collect records that should already be maintained.  And the
23 Court at the last hearing provided guidance on how to do it.
24      Law firms always keep this information on their
25 experts.  And, so, it could have been a matter of emails to

1    the attorney to get this information which would have been
2    less.
3         We certainly would have worked with plaintiff's counsel
4    so we wouldn't be, you know, stuck with an invoice that
5    fluctuates from week to week by thousands and thousands of
6    dollars.
7         So we request, Your Honor, that, first, there's an
8    administrative fee and that, second, that the time used is
9    the six-to-one.  What counsel is asking about 36 hours or 37
10   hours is excessive with the task that was involved.
11        Thank you, Your Honor.
12             THE COURT:  All right.
13        And, and I do agree with one point that you make,
14   Ms. Modak-Truran.  And that's this hasn't come up before.
15   This was really the first one, the first motion that had
16   come before me where the defendants or any party wanted all
17   of this financial information about the witnesses'
18   involvement in other cases involving pelvic mesh.  And we
19   know that the pelvic mesh litigation across the country,
20   including the MDLs, is huge.
21        So I don't know that any of us sitting here at that
22   hearing really had a good sense of what it would take for
23   Dr. Ostergard to collect this information.  And, you know,
24   I, I could say that that's the plaintiff's fault because if
25   she was claiming that there was a burdensome issue, a

1   burdensomeness issue, then she should have provided that
2   information to me.
3          I could say that it's the defendant's fault for not
4   bringing up the issue because even though you've never had
5   anybody ask you to pay this kind of expense before, it's
6   pretty clear that experts get paid for their time.  And no
7   expert that I know of has ever done anything for free.  So
8   someone was going to be billed for the time it took to
9   collect this information.
10          So, you know, I think part of -- I don't know that it's
11  really anybody's fault is what I'm getting at.  I think part
12  of the problem is just that this was the first time any of
13  us were really looking at this.
14          And I still believe that this information is
15  producible, that it is relevant.  I still believe there has
16  to be some proportionality to it.  And I do still believe
17  that the person who's supposed to produce the discovery has
18  the burden of showing how it might be unduly expensive and
19  really not worth what the other party wants to pay for it.
20  And none of that was really done up front here.
21          So, you know, I guess either no one's to blame or we're
22  all to blame.  But, in any event, we are where we are at
23  this point.
24          And, so, I was trying to give this a lot of thought
25  about what would be a reasonable fee.  And I don't --

1   obviously do not believe that an expert ought to be paid
2   their maximum expert review rate or testimony rate for doing
3   work that they don't have to be an expert to do.  They don't
4   even have to be a doctor to do.  So clearly that's too much.
5           I think expecting someone who's a professional and has
6   a busy practice to spend time collecting records at $50 an
7   hour is not fair either.  That's too low.
8           Obviously, if Dr. Ostergard wasn't spending his time
9   collecting this information, he would have been able to
10  treat patients, for example, which I always understood was
11  his normal work, not expert work, but his normal work is he
12  is an OB/GYN.
13          So what I, what I did earlier today was I tried to get
14  an idea of what is the average hourly rate of an
15  obstetrician/gynecologist in the United States of America.
16  And what I found from the United States Bureau of Labor
17  Statistics is that the average OB makes $137 an hour.  Now,
18  of course, some make $164 and some make $115, but the
19  average is $137.
20          And that was sort of borne out by another article that
21  I read by a company called Salary.com that seems to have a
22  lot of support from the Better Business Bureau and other
23  organizations like that.  And that, that organization said
24  $136 is the average hourly rate.
25          So if we're looking at his average hourly rate for

Case 2:12-md-02327 Document 9086 Filed 01/28/20 Page 18 of 20 PageID #: 214280
18

1  being an obstetrician, which is what he wasn't able to do
2  while he was collecting these records, then I think he ought
3  to get $137 an hour, number one.
4       Number two, as far as the time that he spent, I -- you
5  know, maybe it was a lot of time, but I think he is fully
6  explained why he spent that much time.  I think he was most
7  likely trying to fully comply with the Court's order and
8  that was the only way he could gather that information.
9       I wish, as Ms. Modak-Truran had said, before he went to
10 that kind of a time commitment if he could have maybe come
11 back and told Ms. Baughman and then she could have contacted
12 Ms. Modak-Truran and maybe something could have been worked
13 out to where he didn't have to go to all of that trouble.
14      But, you know, I don't blame him for doing that.  He
15 was trying to do what he was told to do.  So he ought to be
16 reimbursed for it even if it is a lot of hours.
17      The good news is that he probably won't have to do this
18 again because all of this has been collected now up to this
19 date.  And, so, adding the two tour things and so adding the
20 future things on I don't think will probably cost as much
21 for the people that will benefit from that in the future.
22      But that's what I'm inclined to do is to multiply the
23 number of hours by $137 and pay him that amount, whatever
24 that turns out to be.
25      So let me hear what anyone has to say about that.

1       Ms. Baughman, I'll let you go first.

2               MS. BAUGHMAN:  Your Honor, that, that's acceptable
3    to plaintiff.  Thank you.

4               THE COURT:  All right.  And, Ms. Modak-Truran.

5               MS. MODAK-TRURAN:  Yes.  Your Honor, you have
6    always been very fair to try and work out situations.  And
7    while we would prefer a lower rate than 36 something hours,
8    we certainly understand your rationale.

9               THE COURT:  All right.  So I have not done the
10   math.  I'll leave that to you all.  But it will be his 36.57
11   hours times $137 an hour.  All right?

12              MS. BAUGHMAN:  Thank you, Your Honor.

13              MS. MODAK-TRURAN:  Thank you, Your Honor.

14              THE COURT:  Thank you.  Have a nice weekend.
15       Bye-bye.

16       (Proceedings concluded at 3:37 p.m.)

```
1         I, Lisa A. Cook, Official Reporter of the United
2    States District Court for the Southern District of West
3    Virginia, do hereby certify that the foregoing is a true and
4    correct transcript, to the best of my ability, from the
5    record of proceedings in the above-entitled matter.
6
7
8         s\Lisa A. Cook                    January 28, 2020
9             Reporter                              Date
```