```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON


_____x
                              :
IN RE:  ETHICON, INC.         :
        PELVIC REPAIR SYSTEMS : Civil Action
        PRODUCT LIABILITY     : No. 2:12-md-2327
        LITIGATION            :
_____
```

THIS DOCUMENT RELATES TO:

*Deborah G. Batson v. Ethicon, Inc., et al.*
Case No. 2:14-cv-06455
*Debra Westerfield v. Ethicon, Inc., et al.*
Case No. 2:14-cv-09748
*Donna Parks v. Ethicon, Inc., et al.*
Case No. 2:14-cv-10221

```
           TRANSCRIPT OF TELEPHONIC MOTIONS HEARING
          BEFORE THE HONORABLE CHERYL A. EIFERT
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
              IN HUNTINGTON, WEST VIRGINIA
                   JANUARY 14, 2020
```

```
              _____
                 Kimberly Kaufman, RMR, CRR, CRC
                 Federal Official Court Reporter
                 300 Virginia Street East, Room 6610
                      Charleston, WV 25301
```

Proceedings recorded by mechanical stenography; transcript produced by computer.

```
TELEPHONIC APPEARANCES:

For the Plaintiffs:        Christopher W. Cantrell, Esq.
                           Doyle Lowther
                           Suite 275
                           4400 NE 77th Avenue
                           Vancouver, WA 98662

                           James Robert Hail, Esq.
                           Law Office of James Hail
                           1113 Bow Willow Trail Way
                           Chula Vista, CA 91915


For the Defendants:        Anita Modak-Truran, Esq.
                           Butler Snow
                           The Pinnacle at Symphony Place
                           150 3rd Avenue South, Suite 1600
                           Nashville, TN 37201
```

1          PROCEEDINGS had before The Honorable Cheryl a.

2    Eifert, Magistrate Judge, United States District Court,

3    Southern District of West Virginia, in Huntington, West

4    Virginia, on January 14, 2020 at 2:59 p.m., as follows:

5          THE JUDICIAL ASSISTANT:  Hello, everyone.  This is

6    Laura, Judge Eifert's judicial assistant.  I would first

7    like to confirm our court reporter today, Kim Kaufman, is on

8    the line.

9          THE COURT REPORTER:  Yes, I am.

10         THE JUDICIAL ASSISTANT:  Hi.  Thank you, Kim.

11      We're here in regard to the following cases : *Batson v.*

12   *Ethicon, Inc., et al.*  That's Case No. 2:14-cv-6455.

13   *Westerfield v. Ethicon, Inc., et al.*, Case No. 2:14-cv-9748.

14   And *Parks v. Ethicon, Inc., et al.,* Case No 2:14-cv-10221.

15      This is a telephonic hearing concerning defendant's

16   motion to compel Dr. Daniel Elliot to produce compensation

17   records.

18      May I have plaintiffs' counsel, please.

19         MR. CANTRELL:  Certainly.  Chris Cantrell on

20   behalf of the plaintiffs.

21         MR. HAIL:  James Hail on behalf of the plaintiffs,

22   too.

23         THE COURT:  Could you repeat your last name again,

24   please.

25         MR. HAIL:  It's Hail, H-a-i-l.

```
 1              COURTROOM DEPUTY CLERK:  Thank you.

 2         Counsel for Ethicon, please.

 3              MS. MODAK-TRURAN:  Good afternoon, Laura.  This is

 4    Anita Modak-Truran on behalf of Ethicon.  I am the only one

 5    for defendants.

 6              COURTROOM DEPUTY CLERK:  Thank you very much.

 7         I will ask the plaintiffs to please say who you are

 8    when you're speaking since there's two of you if you would

 9    for the sake of the transcript.  And if you'll hold one

10    moment for Judge Eifert.

11              THE COURT:  Good afternoon.

12              MS. MODAK-TRURAN:  Good afternoon, Your Honor.

13              MR. CANTRELL:  Good afternoon, Your Honor.

14              THE COURT:  All right.

15         We are here on the three cases with the same issue

16    related to Dr. Elliot.  And let me ask you first:  I think

17    it's pretty clear, from my order in Ferrer, that I do think

18    that these kinds of records are relevant and therefore they

19    would be subject to disclosure unless they are privileged,

20    which they aren't privileged.  In any event, I think there

21    are protective orders in these cases.  The only other

22    exception I can see would be if it was a really burdensome

23    and terribly difficult for the physician to collect these

24    records.

25         So I believe they are produceable, but now we've got
```

```
 1    some other issues that have been raised by the plaintiffs

 2    and the first one has to do with the timeliness of the

 3    motion to compel.

 4        Am I correct in understanding that it was filed one day

 5    after the end of discovery?

 6              MS. MODAK-TRURAN:  Yes, Your Honor, you are

 7    correct.

 8              MR. CANTRELL:  Well, actually, Your Honor, I

 9    believe it was filed December 16 and discovery closed on the

10    13th, so it would be three days not that that's a huge

11    difference.

12              THE COURT REPORTER:  I'm sorry.  Who was speaking?

13              MR. CANTRELL:  I'm sorry.  This is Chris Cantrell

14    for the plaintiffs.

15              MS. MODAK-TRURAN:  Your Honor, what plaintiffs'

16    counsel didn't tell you, and it's been a problem throughout

17    this litigation with this firm, is the discovery cutoff was

18    on a Friday.  On a Monday we filed the motion, but before

19    that time we did everything we could to expedite the

20    transcript of Dr. Elliot because we wanted the court to be

21    able to review those transcripts and to show, one, that

22    plaintiffs' counsel instructed him not to answer; two, he

23    never provided a list of the cases where he has been deposed

24    or he has testified at trial, and we still don't have that

25    information; and, three, I specifically asked him questions
```

1     about where the information was and based on -- I took four

2     depositions, Your Honor, over the Thanksgiving weekend.  By

3     the fourth deposition, plaintiffs' counsel did not instruct

4     him to answer that question and he told me that that

5     information is with his accountant.  So it seems like there

6     isn't a burden issue here.

7             THE COURT:  All right.

8         Well, I'm not overly persuaded by the timeliness issue.

9     I realize that we try to keep, as best as possible, to the

10    deadlines that have been imposed, but there have been

11    certain circumstances where there have been exceptions made

12    and that's been for good reason.

13        In this case I don't think it's really too concerning

14    that there was one business day later that they filed their

15    motion to compel.  And obviously, as I've heard from Ms.

16    Modak-Truran, there are documents the expert was supposed to

17    produce per the Rule 26 disclosures that he hasn't done yet.

18    So I don't think that's a persuasive argument.

19        So we'll move on to the second one.  I think the second

20    argument is that they didn't make a proper showing to amend

21    the discovery schedule.  I don't see this as an amendment to

22    the discovery schedule.  This is an issue that arose before

23    the end of discovery and now loose ends are being tied up,

24    so I don't find that to be a reason to deny their motion.

25        There is an argument that it's not consistent with the

 1   federal Rules of Civil Procedure and I absolutely disagree

 2   with that.  I think it's clear that this kind of

 3   documentation is important on the issue of bias.  I don't

 4   agree with the decisions that have been produced here that

 5   there has to be some special showing in order for the

 6   defendants to collect this information.

 7        I do agree with some of these decisions that it

 8   wouldn't necessarily be documents you would require in every

 9   single case, but I think these MDLs are unique in the fact

10   that there are so many repetitive witnesses and they have

11   gone on for so long and people have become so entrenched in

12   their positions, not to mention that there have been

13   allegations of, not necessarily unethical behavior by

14   physicians involved in this, but perhaps they walk the line

15   in their role as a treater versus an expert and so forth.

16   So there's enough here that I don't find this to be

17   inconsistent with the federal rules for these documents to

18   be produced.

19        Now, there is something in here about an agreement that

20   was made by the parties early on that these sorts of records

21   would not be produced by specific-causation experts.  And I

22   need someone to tell me a little bit more about that.  So

23   I'll ask the plaintiffs to start.

24             MR. CANTRELL:  Yes, Your Honor.  This is Chris

25   Cantrell once again.

1          Throughout the litigation it was our understanding that

2     there was at least an informal agreement between plaintiffs'

3     leadership and Ethicon's counsel that the only thing that

4     these specific-causation experts would have to produce were

5     things required by the disclosures, the 26(a)(2)(B)

6     disclosures, which, in reference to compensation, would be

7     the compensation related to the case they're involved in.

8     That has been the standing operating procedure in all of the

9     prior waves and all of the cases that we've had with defense

10    counsel until this one.

11          THE COURT:  And you say this is an informal

12    agreement.  So there's nothing in writing, I take it?

13          MR. CANTRELL:  It's my understanding there's

14    nothing in writing.  This was just kind of a standing

15    informal agreement between plaintiffs' leadership and

16    defense counsel.

17          THE COURT:  So Ms. Modak-Truran --

18          MR. CANTRELL:  I'm sorry, Your Honor.  Go ahead.

19          THE COURT:  I'm sorry.  I didn't realize you

20    hadn't finished.

21          Let me ask you, Ms. Modak-Truran, what is your

22    understanding of this informal agreement?

23          MS. MODAK-TRURAN:  First of all, there is no

24    written agreement as the court has pointed out and Mr.

25    Cantrell has admitted.

1          There was an informal agreement, when we were doing the

2     Bellwether trials, that during the trial we would limit the

3     bias cross-examination to compensation paid for that

4     particular case.  And I think that's what Mr. Cantrell is

5     talking about.

6          So in the Lewis case and in Huskey and the other case

7     we -- during cross-examination we did not bring in other

8     compensation.

9          Since that time, since we've had remands back -- and I

10    tried one in Arizona, the Stone case -- that agreement is no

11    longer being enforced.  And I'm talking about now just about

12    trial.  I'm not aware of an agreement that was about

13    discovery.  I was aware about an agreement that at trial the

14    parties made on a case-by-case basis, but certainly for the

15    first Bellwether trial, that Ethicon tried to limit the

16    cross to case specific.

17         We're not doing that anymore, Your Honor, because

18    frankly we've been burned with that.  I had a case where we

19    followed that and then the other side came and asked our

20    expert about everything in the world.

21              THE COURT:  Okay.

22         And in any event, that agreement, to the best of your

23    understanding, applied only to trial examination and not to

24    discovery?

25              MS. MODAK-TRURAN:  Yes, Your Honor.

```
 1           THE COURT:  Mr. Cantrell, do you have anything at
 2   all that you can give to me that refutes what Ms.
 3   Modak-Truran just said that this had to do with the
 4   examination of experts at trial and not to the discovery
 5   process?
 6           MR. CANTRELL:  Well, Your Honor, again, this is
 7   Chris Cantrell.  Only as I've stated that has not been the
 8   operating procedure in all of the prior waves that we've had
 9   cases in until this one.
10      In all the prior waves, during the discovery process
11   for the experts, the only thing that was produced relating
12   to compensation were their invoices and they could testify
13   about the compensation that they received and expected to
14   receive in that specific case.
15           THE COURT:  So let me say this:  I can't really
16   make a decision based on what I've heard because your
17   recollections of this agreement are not the same and there's
18   no written agreement.  So I sort of have to throw that whole
19   agreement out of the equation.  But I do want to say this:
20   If this expert is required to produce his compensation
21   records, then that same ruling is going to apply to every
22   expert regardless of whose expert it is, whether it's a
23   defense expert or plaintiffs' expert.
24      I throw that out to you-all because my thought is this:
25   I don't know whether or not both sides want to go down that
```

 1   path because it's a lot of extra information.  Having said

 2   that, I think it's relevant.  It just kind of depends on

 3   whether you want to have to turn over all of your expert

 4   stuff if you get the other side's information.

 5        So I'm putting that out there.  That doesn't have

 6   anything to do with my ruling today, but I just wanted to

 7   make that point because we're kind of getting late in the

 8   game with these cases.  I mean, they've been pending for

 9   what, seven years?  Eight years?  And it seems to me that if

10   you're going to start now going back and trying to collect

11   all this information about the various experts, it's going

12   to be sort of a nightmare, but that's up to you.  It

13   certainly isn't my concern as far as that goes.

14                MR. CANTRELL:  Your Honor, may I --

15                THE COURT:  Yes.  I'm sorry.  Who is this?

16                MR. CANTRELL:  This is Chris Cantrell.

17        I was just going to mention one thing that you

18   mentioned about the difficulty.  And I think, as you pointed

19   out, because that has not been the operating procedure up to

20   this point, it would be difficult to go back and try to

21   recreate all that.

22        And I think also consistent with the cases that the

23   court noted in the Ferrer decision -- you know, for example,

24   the Bayler -- which I think is probably the most oft cited

25   case -- those cases didn't require the production of

1    documents like the defendants are seeking here, but rather

2    limit it to the expert testifying as to what percentage of

3    his or her gross income came from the expert work during

4    whatever period of time was at issue.

5              THE COURT:  Right.  And I don't know if that's

6    true because I've seen cases that talk about both

7    information and documents.  I do recall that at least in the

8    case you mentioned it had more to do with the information

9    itself than it had to do with producing a lot of documents,

10    but in each one of those cases, the parties seeking the

11    information or documents had very broad requests.

12         They wanted income tax returns and all of the

13    communications between the expert and the lawyers and

14    clearly things that just weren't necessary in order to

15    gather what you need on the issue of impeachment.  It was

16    just sort of overkill.

17         In this case the expert's already testified so I doubt

18    that he's going to want to come back for the limited purpose

19    of going through what percentage of his income is from these

20    MDL cases.

21         In those other cases, as well, they talked -- in some

22    instances they were talking about your work as an expert in

23    general and not just specific to a certain type of case.

24         What I've done -- what I did in Ferrer is I limited it

25    to transvaginal mesh cases and I didn't allow or require the

1     production of any communications, any tax returns.  It was

2     basically just the bare bones of here's what I billed.

3     Here's what I was paid and that was it.  If the expert had

4     that on an invoice that set out exactly what the expert did,

5     the expert was permitted to redact the portions that

6     described the activity because that really isn't important.

7     All that's important is what they billed, who they worked

8     for, what law firm they worked for, what side they worked

9     for and how much they were paid.

10         So I do feel the information or documents -- and in

11    this case it's going to be documents -- need to be limited

12    to that subject matters.

13         So in any event, I'm not also overly persuaded by the

14    lack of personal service on the expert because you've been

15    serving these notices on each other.  You've been turning

16    them over to the expert.  The expert knew that this

17    information was requested.  Apparently there was some

18    disagreement as to what would be done at the deposition, but

19    it's not as though the expert was just surprised -- is now

20    surprised, after the end of discovery, to find out that they

21    want these extra documents.  So I don't think it's anything

22    new to these experts.

23         You did say, however, Mr. Cantrell, that this is a moot

24    motion because they've already received Dr. Elliot's

25    information; is that correct?

```
 1            MR. CANTRELL:  Yes, Your Honor.  In large part,

 2      yes.  Dr. Elliot is not a professional expert.  He's a

 3      urologist at the Mayo Clinic.  The only expert work he's

 4      ever done, with the exception of I think one time he was

 5      involved with some proprietary issue with a patent on some

 6      product, has all been this transvaginal mesh work.

 7           And with the exception of a handful of Bared cases and

 8      maybe a couple of AMS cases, as he testified to in his

 9      deposition, all of his expert work has been done in Ethicon.

10      And as a matter of course, when he is deposed or when he

11      submits his report in the Ethicon litigation, he produces --

12      or is supposed to produce his invoice or invoices for that

13      case.

14           So they're going to have 99 percent of this.  The only

15      thing they wouldn't have is whatever very limited work he

16      did for the handful of our cases that he worked on and maybe

17      one or two AMS cases.

18            THE COURT:  That should make it easy for him to

19      collect the remaining information.

20           Now, Ms. Modak-Truran I guess you are going to disagree

21      that you haven't gotten everything?

22            MS. MODAK-TRURAN:  Your Honor, you're so good.

23      Yes, you have read my mind.

24           We have no idea how many cases he has testified either

25      at a deposition or at trial for the other manufacturers.  We
```

1    do know that he has been retained by AMS, Bared and others.

2    He's never provided us with a list, even at this late date,

3    so we can't assess that.

4        I disagree with plaintiffs' characterization that he is

5    not a professional witness.  I know how much, based on

6    Internet research and the fact that my brother is a

7    physician working in a very established health care

8    practice, how much he makes and he makes significantly more

9    in the pelvic mesh litigation, not only per hour, but per

10   year, on his expert work.

11       Also, Your Honor, this is an expert that has never told

12   the Mayo Clinic he's doing expert work.  So it's something

13   that he keeps to the side.  He has made a significant amount

14   of money on this.  We know it's in excess of $300,000 based

15   on limited information we have, but it's not complete.  We

16   do not have all the information.

17           THE COURT:  So I don't really care if he's a

18   professional witness or not.  I mean, that's really

19   irrelevant to my analysis.  I've seen some of those cases

20   where they talk about a professional witness and that might

21   give you then a reason to get these documents.

22       I don't even go that far because I think these

23   documents just fundamentally are relevant on somebody's

24   credibility.  Now, not all of the financial records are

25   relevant, but I think in this case records relating to how

1   much a physician has been paid, whether it's one time or 50

2   times, how much they've been paid in compensation for their

3   involvement as an expert in the MDL cases and so, you know,

4   I think that has to be produced.

5        Now, the best way I can go about this is, first of all,

6   Dr. Elliot needs to prepare the list of cases he has

7   testified in.  I think the list requires him to do it for

8   four years and maybe include every case and that's not my

9   issue today.  My issue is the list of cases that he has

10  participated in as an expert and either given a report or a

11  deposition, appeared at trial, or any combination of those,

12  in transvaginal mesh cases, in the MDL cases, and in any

13  state cases that have involved transvaginal mesh.

14       So he needs to prepare a list and give that to the

15  defendants.  And then he needs to provide them with the

16  bare-bones documents that I have described already related

17  to the amount of money he's made.  He doesn't need to give

18  percentages of his overall income.  He doesn't need to give

19  income tax returns or 1099s or any of that stuff.  He just

20  needs to produce his invoices and any payment records that

21  he has.  And it needs to be clear on those records in what

22  case he testified or participated, who the lawyer was that

23  retained him, what side he was testifying on behalf of, and

24  then how much he billed and how much he made.  That's what I

25  think he needs to give to them.

1        Now, if he's already given some of that to then, when

2    he's going down his list, he can mark that this was already

3    produced, produced, produced, produced, but to the extent he

4    hasn't, then he needs to get that together.

5        It sounds to me like it won't be overly burdensome for

6    him because you say he hasn't testified in a slew of cases

7    so that's good.  And Ms. Modak-Truran said the records are

8    with his accountant, according to him.  So it should be

9    fairly easy for him to gather those together.

10        Now, how much time --

11            MR. CANTRELL:  I just need a clarification on

12    something -- I'm sorry, Your Honor -- because this may

13    relate to the timing issues.  Forgive me for interrupting.

14        This is Chris Cantrell again.

15        I think Dr. Elliot testified, though, that he doesn't

16    keep his invoices after that deposition, that what he sends

17    to his accountant is the 1099 that he gets from the law

18    firms, which may or may not be broken down by case.  It may

19    just be a lump sum total of how much he was paid by a

20    specific law firm for all of the cases that he worked on for

21    that firm.

22            THE COURT:  All right.

23        Well, if that's all that's available, then obviously

24    I'm not going to require him to create documents that no

25    longer exist or to recreate them.  The only thing he does

```
 1   have to create is really what he would be required to create
 2   anyway and that's the list of cases and I would hope he
 3   would already have those.  But I don't think it matters that
 4   much to Ms. Modak-Truran to find out, you know, say the
 5   Smith firm paid him $300,000 in a period of four years.
 6   Well, that's what's important to know.  And the Smith firm
 7   is a plaintiffs' law firm and that's important to know.  And
 8   he's already testified on behalf of the plaintiffs, that's
 9   important to know.  But whether he still has an original
10   invoice or not, as long as she knows how much money he has
11   earned during the course of the MDLs, that's the important
12   thing.  Not necessarily just the MDLs.  Let me make sure I
13   make that clear.  It also includes state cases where he has
14   testified that involved the same sort of issues with the
15   transvaginal and pelvic meshes.
16            MR. CANTRELL:  Okay.  Certainly, Your Honor.
17   We're preparing the list of cases.  We intend to produce
18   that.
19            THE COURT:  All right.
20            MR. CANTRELL:  No dispute over that.
21            THE COURT:  How long do you think it will take Dr.
22   Elliot to get this information together?
23            MR. CANTRELL:  That's a good question, Your Honor.
24   And I would like 45 days.  Maybe he can do it within 30, but
25   I don't know what his process is for trying to go back and
```

```
 1   find what invoices he had.  That's the more concerning part
 2   for me.  Just requesting the 1099s from his accountant I
 3   think would be easy, but trying to ascertain all the
 4   invoices that he may or may not have, I don't know what kind
 5   of process that is for him.
 6            THE COURT:  Well, you and Ms. Modak-Truran can
 7   talk about that.  And what she -- if she wants something
 8   less than all the invoices, if she feels she can get what
 9   she needs with lesser documents, then by all means I would
10   hope you would discuss that and come to some agreement.
11       Is 45 days a problem for you, Ms. Modak-Truran?
12            MS. MODAK-TRURAN:  No, Your Honor.
13       I know that Dr. Elliot is an expert in a case that is
14   being tried in Wisconsin right now so he's probably out of
15   pocket for even doing this.
16       I do want to put on the record that we agree with you.
17   We do want to reach some sort of agreement with plaintiffs'
18   counsel on how we can streamline getting the information.
19   We do not need 1099s.  I really need the numbers, but they
20   have to be real numbers.  I don't have to see actual
21   invoices.  If the expert is saying and will say at trial
22   that these are the real numbers, we're fine with that, as
23   long as it's based in fact.  I will work with Mr. Cantrell
24   on that, Your Honor.
25            THE COURT:  Maybe what you would want to do is
```

1    have him do an affidavit just verifying that these are true

2    and correct figures so that there isn't any confusion over

3    what he's telling you.  You guys can work that out any way

4    you want.

5         I said, Mr. Cantrell, if you want that information from

6    Ms. Modak-Truran's experts, then you can also get it.  It's

7    up to you.  You just need to ask for it and try to work that

8    out on both sides.

9         One thing that nobody has brought up that I want to

10   raise, because I saw today on my desk that there's a motion

11   pending on this, and that has to do with the expenses

12   incurred in collecting this information.

13        I haven't had a chance to really go through all of the

14   law and I just saw the motion an hour ago.  It's apparently

15   been on my desk for a week or so.  But what came up in that

16   situation, and I think it does involve Ethicon, is that they

17   asked for these kind of records.  It might be in the  Ferrer

18   case.  And the records were produced.  It took the physician

19   32-odd hours to collect the information and he billed $600

20   per hour to do that.  So it's like a $22,000 bill.  And now

21   they're disagreeing over who should have to pay that and

22   also about the amount of the bill.

23        I think there's probably less concern about who pays it

24   or less quibbling, but there's certainly going to be a lot

25   of disagreement about whether that's a fair bill or not.  So

1      I would suggest that you talk about that upfront as well.

2          You know, my initial impression, and don't quote me on

3      this because, as I said, I haven't looked at the cases and I

4      haven't given it much thought, but I would think if the

5      defendant is asking the expert to do that task and it's not

6      something that's just in a normal course of discovery, that

7      the defendant would have to pay a reasonable fee for the

8      time the expert spends doing that.

9          However, I don't think the expert is entitled to charge

10     the same hourly rate that he or she would charge for a

11     review of the case or the deposition time or the trial time.

12     I mean, obviously it should be a much lesser rate than that

13     because all they're doing is collecting documents and to me

14     that's not -- doesn't require the same brain power as it

15     does to review these cases and write opinion letters and so

16     forth.

17         So that's sort of my initial impression.  And I just

18     throw that out there because maybe you two can talk about

19     that as well and agree on what you think would be a fair

20     way.

21         I understand Ethicon's argument would be that generally

22     the party who is producing the discovery bears the expense

23     of it, but I think this is just a little bit different.  I

24     don't even know why I think that.  It's just my initial

25     impression.  So, you know, it may be that Ethicon has put a

1    lot of very persuasive law in their brief that will convince

2    me otherwise.  I'm just telling you my initial impression.

3         What I would recommend is you have some discussion

4    about that.  Don't let that delay getting that information

5    collected, but while you're talking about what you want, you

6    might talk about how the expert's going to be compensated

7    for that time because obviously the expert is not going to

8    do it for free.

9              MR. CANTRELL:  Certainly, Your Honor.  Rule 26(e)

10   says that the party -- as it relates to experts and their

11   discovery says the party seeking discovery is supposed to

12   pay the reasonable fee for the time spent responding to

13   discovery under the rule, unless manifest justice would

14   result.

15             THE COURT:  Right.

16             MS. MODAK-TRURAN:  Your Honor, if the case that

17   you are referring to is the Mallow case, we have filed our

18   response.  You will see we talk about the cases and how that

19   rule is narrowly interpreted.  And I've got your gut check,

20   Your Honor, that you think there should be some sort of

21   compensation, but there is case law that supports that that

22   type of work is not compensable under the rule.

23             THE COURT:  You know, both sides are going to be

24   asking for that from their expert.  You may want to just

25   come up with some agreement upfront that you will each eat

```
 1    your own expenses or you'll agree on what would be a fair

 2    hourly rate and pay each other's expenses, but I would

 3    suggest that you talk about that a little bit and try to see

 4    if there's way to work it out before you have to come back

 5    with a motion.

 6              MR. CANTRELL:  Certainly, Your Honor.  I think we

 7    can work that out.  I don't anticipate that being a problem.

 8              THE COURT:  Okay.  Great.  Obviously I'm not going

 9    to make anybody pay $600 an hour to have a person collect

10    their own financial records.  I'm just not going to do that,

11    but we'll have to take that up at the hearing in the other

12    case.

13        Is there anything else we can do on these three cases

14    today?

15              MS. MODAK-TRURAN:  No, Your Honor.

16              MR. CANTRELL:  I don't think so.  Not from

17    plaintiffs, Your Honor.

18              THE COURT:  All right.  I will be doing just very

19    short orders.  That's been my practice in the MDL.  I just

20    don't have time to do big long orders on every one of these

21    discovery issues.  I'll be doing a short order that will say

22    what I said at the conference and that will be the end of

23    it.

24              MS. MODAK-TRURAN:  Your Honor, just so we have it

25    on the record, we would like to order a transcript.
```

1              THE COURT:  All right.  Great.

2        Anything else today then?

3        All right.  This matter is in recess.  Thank you.

4

5     (Proceedings concluded at 3:33 p.m., January 14, 2020.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CERTIFICATION:

2         I, Kimberly Kaufman, Official Court Reporter, certify

3    that the foregoing is a correct transcript from the record

4    of proceedings in the matter of Deborah G. Batson v.

5    Ethicon, Inc., et al., Plaintiffs v. Ethicon, Inc.,

6    Defendant, Civil Action No. 2:12-md-2327, as reported on

7    January 14, 2020.

8

9    s/Kimberly Kaufman, RMR, CRR, CRC          February 7, 2020

10   Kimberly Kaufman, RMR, CRR, CRC                 DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25