# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| IN RE: C.R. BARD, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL NO. 2187 |
| IN RE: AMERICAN MEDICAL SYSTEMS, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABIILITY LITIGATION | MDL No. 2325 |
| IN RE: BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2326 |
| IN RE: ETHICON, INC., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2327 |
| IN RE: COLOPLAST CORP., PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2387 |
| IN RE: COOK MEDICAL, INC, PELVIC REPAIR SYSTEM PRODUCTS LIABILITY LITIGATION | MDL No. 2440 |
| IN RE NEOMEDIC PELVIC REPAIR SYSTEM PRODUCT LIABILITY LITIGATION | MDL No. 2511 |

*This Document Relates To All Cases*

**Final Written Recommendation of the Common Benefit Fee and Cost Committee
Concerning the Allocation of Common Benefit Fees and the Reimbursement of Shared
Expenses and Held Costs**

COMES NOW, The Common Benefit Fee and Cost Committee ("FCC") and issues its Final Written Recommendation concerning the allocation of common benefit fees and the reimbursement of shared expenses and held costs.

**1. Formation of the FCC:**

The Court, on January 15, 2016, entered its Pretrial Order Establishing Criteria for Applications to the MDL Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee in MDL Nos. 2187, 2325, 2326, 2327, 2387, 2440, and 2511 (the "FCC Order").[1]  Much like the litigation had been conducted by a cross-MDL leadership team tasked with working across MDL lines, the FCC Order appointed nine individuals to serve as members of the Common Benefit Fee and Cost Committee for purposes of recommending an allocation of a singular common benefit fund. The nine members of the FCC are Chairperson Henry G. Garrard III (Blasingame, Burch, Garrard & Ashley), Renee Baggett (Aylstock, Witkin, Kreis & Overholtz), Riley L. Burnett, Jr. (Burnett Law Firm), Thomas P. Cartmell (Wagstaff & Cartmell), Clayton A. Clark (Clark, Love & Hutson), Yvonne M. Flaherty (Lockridge, Grindal, Nauen), Carl N. Frankovitch (Frankovitch, Anetakis, Colantonio & Simon), William H. McKee, Jr., and Joseph F. Rice (Motley Rice).[2]

On June 23, 2017, the Court entered its Pretrial Orders establishing the Fee Committee Protocol for the review and evaluation of time and expense for consideration by the FCC (the

---

[1] Bard MDL 2187 PTO 207, AMS MDL 2325 PTO 204, BSC MDL 2326 PTO 136, Ethicon MDL 2327 PTO 211, Cook MDL 2440 PTO 71, Coloplast MDL 2387 PTO 85, Neomedic MDL 2511 PTO 23.

[2] The FCC members have no financial arrangement with one another with regard to the payment of funds associated with common benefit awards. Each member's conduct is independent and guided by the Court's Orders.

"Protocol").[3]  Pursuant to the terms of the Protocol, on October 13, 2017, the Court entered its Order Granting Motion to Appoint the Honorable Daniel J. Stack, Retired, as External Review Specialist to work with the FCC in accomplishing the Court's directives under the FCC Order and the Protocol.[4]

## 2. History of the Litigation:

The pelvic mesh multi-district litigations ("MDLs") pending before this Court are unprecedented. What began with the Judicial Panel on Multidistrict Litigation's order consolidating 36 individual cases involving the Avaulta line of pelvic organ prolapse repair devices—sold by C.R. Bard, Inc. ("Bard")—in 2010, ultimately led to the consolidation of seven multidistrict litigations ("MDLs") in the Southern District of West Virginia.[5]

As pelvic mesh cases began to be filed against various pelvic mesh defendants in different federal courts, the firms involved in leadership came together to discuss potential MDL strategy. In light of the presence of numerous cases where a single plaintiff was implanted with multiple products, and the similar defects and complications associated with the various products, the firms involved in the leadership of the litigation decided to request the JPML to send all of the pelvic mesh cases to this Court for coordination pursuant to 28 U.S.C. § 1407. The JPML agreed, holding that the presence of several common fact issues shared by all MDLs, and the fact that many

---

[3] Bard MDL 2187 PTO 257, AMS MDL 2325 PTO 244, BSC MDL 2326 PTO 166, Ethicon MDL 2327 PTO 262, Cook MDL 2440 PTO 81, Coloplast MDL 2387 PTO 133, Neomedic MDL 2511 PTO 38.

[4] Bard MDL 2187 Doc. No. 4663, AMS MDL 2325 Doc. No 5112, BSC MDL 2326 Doc No. 4422, Ethicon MDL 2327 Doc. No. 4783, Cook MDL 2440 Doc. No. 592, Coloplast MDL 2387 Doc. No. 1572, Neomedic MDL 2511 Doc. No. 177.

[5] *In re Avaulta Pelvic Support Sys. Prods. Liab. Litig.* (later expanded to include a range of other pelvic repair mesh devices sold by Bard, and renamed the *C.R. Bard, Inc. Pelvic Repair Sys. Prod. Liab. Litig.*), 746 F.Supp.2d 1362, MDL No. 2187 (J.P.M.L. 2010).

individual cases involved the implantation of multiple products from different manufacturers, supported centralization of all of these products before the same Court. *In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.*, 844 F.Supp.2d 1359, 1360-61 (J.P.M.L. 2012) ("The actions in each MDL **share factual issues** arising from allegations of defects in pelvic surgical mesh products manufactured by AMS, Boston Scientific, and Ethicon, respectively. Centralization therefore will **eliminate duplicative discovery**; **prevent inconsistent pretrial rulings**; and **conserve the resources of the parties, their counsel and the judiciary**."; "Chief Judge Joseph R. Goodwin of that district is currently presiding over MDL No. 2187, which **involves claims of defects in similar pelvic surgical mesh products**, and is uniquely situated to preside over the **similar claims** in these three MDLs. The pelvic surgical mesh products at issue in MDL Nos. 2325, 2326, and 2327 are **used to treat similar conditions** as those at issue in MDL No. 2187, and they have allegedly **resulted in similar injuries**…. Finally, a number of these actions are brought by plaintiffs who were implanted with multiple products made by multiple manufacturers. **Centralization of the three MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions**.") (Emphasis added).

At the request of the Plaintiffs, the MDL Panel sent four additional MDLs to this Court in 2012, another in 2013, and a seventh MDL in 2014.[6] These seven (7) related pelvic mesh MDLs involved different medical device manufacturers along with other related defendants, and included

---

[6] *In re American Med. Sys., Inc., et al., Pelvic Repair Systems Prods. Liab. Litig.*, 844 F.Supp.2d 1359, MDLs Nos. 2325, 2326, 2327 (J.P.M.L. 2012) (3 separate MDLs); *In re Coloplast Corp. Pelvic Repair Support Sys. Prods. Liab. Litig.*, 883 F.Supp.2d 1348, MDL 2387 (J.P.M.L. 2012); *In re Cook Medical, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 949 F.Supp.2d 1373, MDL 2440 (J.P.M.L. 2013); *In re Neomedic Pelvic Repair Sys. Prods. Liab. Litig.*, 999 F.Supp.2d, MDL 2511 (J.P.M.L. 2014).

dozens of related pelvic mesh devices.[7] Never before in the history of MDL practice has the JPML sent multiple, large-scale product liability MDLs involving different products and manufacturers to a single MDL court for inter-MDL coordinated proceedings. The pelvic mesh litigation coordinated before this Court ultimately grew to include 104,836 filed cases, comprising one of the largest mass tort litigations in history.[8]

As explained in the Plaintiffs' Proposed Counsel Organizational Structure (a copy of which is attached hereto as **Exhibit 1**), which was submitted to the Court on March 17, 2012, the common medical, scientific and legal claims and theories, common defenses, and common experts, as well as the presence of numerous plaintiffs implanted with different defendants' products, called for a singular "cross-MDL" Plaintiffs' leadership structure. The Proposed Counsel Organizational Structure was vetted and agreed upon by every attorney who was included in the proposal. As stated in the Proposed Counsel Organizational Structure, "[t]his [singular leadership] structure is the product of numerous meetings and many more conversations by attorneys from across the country who have devoted a substantial amount of time, effort and resources into the investigation and development of these cases, and who are committed to **working together for the mutual interests of their respective clients**…. The serious health risks generally associated with these women's pelvic repair products also warrant legal inquiry that is **not confined to a single product or manufacturer**…. [T]he problems associated with transvaginal mesh products are inherent in the use of mesh in the female pelvic region, and thus are **not limited to any one product**. Instead, these are issues that **need to be explored and addressed globally**. Many experts for both

---

[7] For example, the Bard MDL 2187 involved claims against two international medical device companies (C.R. Bard, Inc. and subsidiaries of Covidien, PLC (now Medtronic)), both of which represented by different counsel.

[8] Illustrating the impact of this litigation, the filing fees ($450 per case) for this number of cases totals $47,176,200.

Plaintiffs and Defendants **will traverse company and product lines**.  The efficient conduct of these cases will require coordination by Plaintiffs' counsel **across MDL lines**, while still maintaining the [multiple] MDL's.  Additionally, discovery relating to corporate liability issues will involve **common themes**, and **coordination between the four MDL's will be beneficial**."

The Proposed Counsel Organizational Structure further stated as follows:

> The interrelationship between these products is but one significant issue that lends itself to coordinated investigation **across MDL lines**….

> In light of the interrelationship between the products, the serious health problems generally associated with these devices, and the commonality of the defenses anticipated in every case, **a coordinated and unified leadership that spans the four related pelvic repair product MDL's before this Court** is essential to the effective and efficient prosecution in these cases….

> Perhaps most importantly, **because of the interrelationship between these MDL's** in terms of common product defect allegations, similar injuries, and the prevalence of cases involving multiple products by the various defendants, the leadership structure in these MDL's should be composed of attorneys who have the ability and the expressed desire **to work with one another in a concerted effort** to seek a timely and just resolution of these cases….

> As set forth in more detail below, the undersigned propose a Coordinating Co-Lead Counsel, an Executive Committee made up of Co-Leads for each MDL, and a singular PSC all **to coordinate across MDL lines**. If such proposal is accepted by the Court, then the Coordinating Co-Lead Counsel in conjunction with the Executive Committee will be able **to work across MDL lines in conjunction with one PSC** to determine which lawyers are best suited to handle a given Task…. **Many of these tasks will not be MDL-specific, but rather will be common issues that will need a coordinated effort**. It is also the intent that the Coordinating Co-Lead Counsel will be in a position to determine when separate groups from the PSC should be designated to work on MDL-specific issues that do not cross MDL lines. However, **it is vital to this proposal that there be a cohesive and coordinated structure that spans these four related MDL's** so as to best achieve the efficiency and effectiveness of representation that will move this litigation forward.

> [T]his proposal calls for **a singular PSC to coordinate across MDL lines** in four separate MDL's, each of which involves a different manufacturer (and related defendants in some cases) and several different products….

> The undersigned submit that a PSC composed of a significant number of attorneys is necessary to accommodate the large amount of work that will be necessary to

prepare these cases effectively, and **with many coordinated litigation activities occurring simultaneously across MDL lines**.

At the Initial Case Management Conference in the first of the additional related pelvic mesh MDLs transferred to this Court, the Court made clear its intent to coordinate and consolidate across MDL lines to the fullest possible extent, stating "[i]n its most simplistic form, we have similar pelvic mesh products manufactured by different defendants that allegedly caused a variety of injuries to women. We suspect and we hope that there are commonalities among the four MDLs, and [Magistrate] Judge Stanley and **I believe that the most efficient way to handle the four MDLs, particularly for discovery purposes, is to coordinate them as much as possible**…. **I believe that the most efficient way to handle the four MDLs is to consolidate as much as possible**." (April 13, 2012 Hearing T., 33:1-15) (Emphasis added). The Court similarly observed that "**[a] coordinated and unified Plaintiffs' leadership team that spans the four related pelvic repair mesh MDLs before this Court is essential to the efficient, effective prosecution…of this case**." (*Id.*, 22:19-22).

The Plaintiffs' lawyers involved in the litigation from the outset foresaw the onerous task that lay ahead and assembled a Plaintiffs' Steering Committee ("PSC") of 61 attorneys from law firms across the country, who were ultimately appointed and assigned by the Court the responsibility of marshaling resources and leading this sprawling litigation under a unified leadership structure. The Court entered Orders in each of the MDLs stating that "[i]t shall be the responsibility of Coordinating Co-Lead Counsel **to work across MDL lines** in conjunction with the Executive Committee named below to determine which attorneys are best suited to handle a

given task….” and appointing “[a] singular PSC **to coordinate across MDL lines** in the [] separate pelvic mesh MDLs before this court….” (Emphasis added).[9]

As envisioned and directed by the Court, the Court-appointed PSC coordinated and collaborated across MDL lines to plan the litigation strategy, develop theories and confront legal issues, identify experts, and ultimately bear the cost and expended the labor necessary to develop the general liability cases against numerous products made and sold by a variety of corporate defendants. This singular PSC and leadership structure enabled such coordinated development of litigation strategy and theories and allowed the work product from one MDL to be utilized across product and manufacturer lines.  Important legal decisions by the Court and by counsel impacted all MDLs due to the commonality of the products and issues involved.  This single, unified leadership structure was also necessary to avoid potential conflicts and cross-purpose work.

As anticipated, the time, effort and expense of simultaneously pursuing and developing multiple legal theories against a range of products manufactured and sold by a disparate group of defendants, has been enormous.

The defendants in these MDLs are several of the largest medical device manufacturers in the world, and this litigation has been vigorously defended by this country's largest and most experienced medical device defense law firms. Prosecuting multiple MDLs simultaneously before one court presented unique logistical and procedural difficulties and taxed the resources of the firms leading this litigation.  To address the economic disparity between the parties, the PSC firms were required to expend tens of millions of dollars to prosecute this massive litigation.  The PSC firms contributed a total of $17,825,000 in common benefit assessments, which were used to fund the litigation generally.  "Held costs" in the amount of $28,986,811.38 were recognized by the

---

[9] Bard MDL 2187 PTO 33, AMS MDL 2325 PTO 4, BSC MDL 2326 PTO 4, Ethicon MDL 2327 PTO 4, Cook MDL 2440 PTO 4, Coloplast MDL 2387 PTO 2, Neomedic MDL 2511 PTO 7.

FCC as common benefit, which have not yet been reimbursed out of the MDL fund. An additional $12,037,448.66 has been paid from the common benefit fund as costs associated with general expert fees, special master fees, data warehousing and management fees, and to the Court-appointed accountant overseeing the MDL fund. These costs continue to be incurred and to be paid from the common benefit fund.

At the outset, Plaintiffs' leadership undertook to define the parameters of the litigation through Master Pleadings, Plaintiff Profile Forms and Plaintiff Fact Sheets, and pushed the litigation forward through a series of procedural and scheduling orders. After establishing these baseline documents and schedules, Plaintiffs' leadership undertook the onerous process of discovery.

Discovery in these cases was among the first areas to be tackled by leadership. Electronically-Stored Information protocols and search parameters, plaintiff and defendant fact sheets/profile forms, joint records collection, protective orders, and procedures for the collection and preservation of pathology were the subject of intense negotiation, and in several instances, disputes with defendants. Because certain of the Defendants had been involved in prior litigation relating to the same products, Plaintiffs' leadership undertook the motions practice necessary to obtain documents produced by those Defendants in those prior cases over their objection. The number of different products, defendants, and related third parties (materials processors, component or materials manufacturers), necessitated multiple rounds of written discovery and ESI term search requests to defendants related to a variety of subjects and from a number of non-party sources. Plaintiffs' leadership established and funded the shared electronic document depository (Crivella West) where all defense-produced documents and other important materials were made accessible to all MDL plaintiffs' counsel in searchable format. Plaintiffs' leadership identified the

important issues in these cases and created "issue codes" for purposes of document review, and documents were reviewed and "coded" according to their relevance. Plaintiffs' leadership and other Participating Counsel[10] reviewed and analyzed Defendants' discovery responses and objections and handled disputes regarding confidentiality, privilege and work product claims by the defense, typically by way of informal meet and confer, but occasionally necessitating motions practice before the Magistrate Judge or the Court. Other discovery disputes necessitated numerous meet and confers with defense counsel, discovery conferences with the Court's Magistrate Judge, and motions to compel or responses to motions for protective order or motions to quash. The production of documents in these cases was voluminous. To date, more than 21,504,590 documents totaling over 199,740,958 pages have been produced across the pelvic mesh MDLs, and production is on-going in some of the MDLs. Plaintiffs' leadership was responsible for the oversight and coordination of this massive review effort and bore responsibility for culling the thousands of documents used in expert preparation and the preparation of these cases for trial, and at trial, and identification of important documents for use by other attorneys with cases in these MDLs.

Depositions were taken in these MDLs by Plaintiffs' leadership and other Participating Counsel of a variety of former and current employees of the defendants, including representatives from sales and marketing, regulatory, post-market surveillance, manufacturing, research and development/product design, risk management, as well as managerial and executive employees. More than two-hundred (200) individual and 30(b)(6) corporate depositions were eventually taken of the Defendants in these MDLs. Plaintiffs fought multiple "apex" motions relative to depositions

---

[10] As used in this Petition, "Participating Counsel" has the same definition as that set forth in the Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues, to wit: "'Participating Counsel' are counsel who subsequently desire to be considered for common benefit compensation…."

sought of Defendants' executive employees. The cases also involved significant third-party depositions, including depositions of "key opinion leader physicians," representatives of medical organizations who issued "position statements" in support of the products at issue, and various individuals and entities that participated in the design or testing of the devices or that manufactured or processed components or materials used in the pelvic mesh products.

The scope and complexity of these MDLs also complicated expert discovery. Plaintiffs' leadership was required to identify and cultivate general experts from an array of scientific and medical fields, from biomaterials, pathology, physicians (including pathologists, pelvic pain specialists, urologists, gynecologists and Female Pelvic Reconstructive Surgeons) to regulatory.

The theories and concepts relating to the defective design of the TVM devices in these MDLs – what made these devices problematic in the female pelvis – required knowledge of the applicable anatomy, medicine, and the scientific principles and literature applicable to synthetic and biologic surgical mesh devices. Proving to a jury the complex scientific and medical reasons that these products caused the Plaintiffs' injuries required education. Plaintiffs' leadership developed and presented expert reports addressing the important scientific product defect principles, such as the *in vivo* degradation of polypropylene, chronic and excessive foreign body reaction to the mesh, inadequate pore size (scar-induced mesh contracture), mechanical instability, anatomical mismatch, mesh arm "sawing," and asymmetrical mesh contracture utilized across all MDLs.

Due to the number of products and defendants involved, as well as the number of cases that were ultimately worked up towards potential trial, the plaintiffs' leadership were required to develop numerous qualified experts from a relatively limited pool. Because much of the innovation related to these products occurred in Europe, several of the foremost plaintiffs' experts were in

Europe, which entailed additional expense and effort as a result of travel, translation and compliance with foreign applicable law regarding discovery. Several of these experts conducted extensive laboratory testing of the materials and products involved utilizing a variety of laboratory and scientific equipment, and plaintiffs' leadership oversaw the issuance of extensive reports outlining, in detail, these experts' medical and scientific findings and opinions. For example, biomaterials experts conducted testing to demonstrate scientifically the phenomenon of mesh degradation, showing through microscopic photographs actual images of degraded mesh that had been removed from the bodies of plaintiffs. The potential for mesh degradation, and the clinical effects, was vigorously disputed by the defense. Establishing this important theory through scientific testing (which was admitted despite repeated *Daubert* challenges) was key to conveying these matters to a jury. Pathology experts examined numerous explanted mesh samples and pathology slides from plaintiffs under electron microscopy to explain the chronic negative effects of body's reaction to the mesh and the results of scarification of tissue due to the mesh design. Plaintiffs' experts conducted testing and developed demonstrative exhibits, including 3D models, to show how the design of these products caused asymmetrical contracture, which pulled the mesh and caused chronic pain and sexual dysfunction. These tests and exhibits demonstrated the experts' theories and opinions in a tangible way.

Ultimately, Plaintiffs' leadership identified and served 84 Rule 26 Reports for 52 general plaintiffs' experts. As anticipated from the outset, many of Plaintiffs' experts designated by leadership to provide general testimony crossed MDL lines. Nineteen of Plaintiffs' 52 experts (36.5%) provided general expert testimony in more than one MDL, while nine (17.3%) provided testimony in more than three or more MDLs.

Defendants likewise had their own respective teams of experts, and Plaintiffs' leadership was responsible for preparing for and taking their depositions. One hundred nine (109) general experts were identified by the defense in these cases, and nearly all of them were deposed by Plaintiffs' leadership, some of them multiple times. Many of the defense experts issued voluminous reports, citing to reams of scientific testing and clinical and animal study results, all of which had to be meticulously reviewed and analyzed by Plaintiffs' leadership, and ultimately addressed by way of cross-examination, *Daubert* motions and testimony from Plaintiffs' experts.

While some of the MDL defendants undertook early efforts to attempt to compromise, most made clear that they had no interest in settlement, at least not without first trying multiple cases. This necessitated the preparation of numerous cases for trial across the MDLs, which process was handled and overseen by Plaintiffs' leadership. Some of the trial selection cases were resolved prior to trial, but only after all of the extensive pre-trial work had been done and the cases were ready for trial.[11]   Preparing a case for trial in these MDLs was an expensive and difficult undertaking in light of the complexity of the issues involved, and the number of fact and expert witnesses whose testimony is necessary to meet the burden of proof and to address the litany of defenses asserted.  Every MDL trial case entailed additional rounds of motions and briefing on procedural and substantive legal issues, arguments over deposition designations and other evidence to be offered at trial and a variety of other pre-trial issues.

Following initial "bellwether" trials, the Court ordered several successive "waves" of cases to be prepared for trial in several of the MDLs. Each of these waves consisted of dozens, if not hundreds, of individual plaintiffs. These trial waves required an extensive amount of orchestration and effort in a condensed time frame by Plaintiffs' leadership. These hundreds of wave cases

---

[11] The FCC also recognized as common benefit time expended preparing for and trying cases in certain state court venues, provided that the cases were the first involving the product at issue to be tried.

necessitated the identification and depositions of numerous general experts for both plaintiff and defense, and an intensive general motions practice that involved briefing of dozens of additional dispositive, *Daubert* and *in limine* motions. The same legal issues had to be addressed by Plaintiffs' leadership under numerous different states' substantive law. Responses to these motions prepared by leadership were then provided to other MDL counsel, and served as the template for responses in future trial selection or remanded cases.

Plaintiffs' leadership oversaw the preparation of case-specific discovery to be served by individual plaintiffs on the defendants in the wave process and led efforts to ensure consistent responses from the Defendants to this discovery. To assist the several firms outside of leadership who had cases included in the bellwether process and later in the trial waves, Plaintiffs' leadership conducted, and continue to conduct, in-person educational sessions in various locations throughout the country to help educate these attorneys about the liability case generally, as well as how to handle the individual case-specific issues in their cases, such as preparing for and taking plaintiff and treating physician depositions and responding to the motions anticipated from the defense. Educational materials, including legal and factual outlines, template response briefing, sample expert reports, collections of important documents, corporate deposition transcripts and exhibits, sample plaintiff and doctor depositions, deposition outlines, trial exhibits and trial transcripts, were prepared by leadership and provided to or made available to counsel for the MDL plaintiffs. Expert reports and expert depositions for both Plaintiffs' and Defendants' general experts, as well as all corporate and third-party depositions, were also made available to MDL Plaintiffs' counsel by way of the Crivella West shared document depository.

During the course of the pelvic mesh MDLs pending in this Court, volumes of pre-trial, trial and post-trial motions have been argued and decided and orders have been issued by the Court

pursuant to the laws of many different states, including: *Daubert* motions against nearly every expert (and other witnesses); summary judgment motions on issues relating to design defect, punitive damages, warnings sufficiency, the learned intermediary doctrine, preemption, statute of limitations, general causation and specific causation; and numerous motions *in limine* seeking to limit or exclude Plaintiffs' evidence.  Because certain of the defendants were affiliated corporate entities, Plaintiffs' leadership undertook the discovery and motions practice necessary to establish liability on the part of each the named defendants, which resulted in important stipulations regarding the liability of parent corporations for conduct of their subsidiaries.  Plaintiffs' leadership briefed important procedural issues related to joinder, remand, choice-of-law, jurisdiction, venue and *Lexecon*, and the Court's ability to try MDL cases upon remand to other federal jurisdictions.  Plaintiffs' leadership handled the *Daubert* and dispositive responsive briefing, as well as Plaintiffs' "offensive" summary judgment motions and reply briefing, and Plaintiffs' motions *in limine*.  Important legal issues regarding consolidation of multiple MDL plaintiffs for purposes of trial pursuant to Rule 42 were briefed and argued by leadership. Plaintiffs' leadership also handled the briefing regarding the exclusion of evidence regarding the FDA 510(k) clearance process.  The Court's ruling on this motion proved a seminal ruling that impacted all of the MDLs.  This critical evidentiary ruling spurred a litany of related motions for reconsideration, motions for new trial and evidentiary proffers across the MDLs, as well as grounds for appeal in multiple cases.  Leadership also prepared the briefing regarding the admissibility of important product-related evidence used by all Plaintiffs.  Hundreds of instructive opinions from the Court in these pelvic mesh MDLs are available through online legal research

sites, such as Westlaw, most of which were directly the result of the work of Plaintiffs' leadership.[12]

Several of the bellwether cases were resolved shortly before trial, but the pre-trial preparation for these cases was no different than the cases that ultimately went to verdict. When MDL bellwether cases were tried, the verdicts were subject to various post-trial motions and eventually appealed. The appeals often involved amicus briefing by multiple interested third parties due to the significance of the issues involved in this litigation. The extensive pre-trial briefing (pre-trial orders, jury charges, evidentiary motions), trial briefing (motion for directed verdict, evidentiary motions), and post-verdict briefing (motion for judgment as a matter of law, motion for new trial) in the bellwether cases were handled primarily by Plaintiffs' leadership. Plaintiffs' leadership also handled the appellate briefing in these cases, and these rulings helped shape the course of this litigation.

- *Lewis v. Johnson & Johnson*, 601 Fed. App'x 205 (4th Cir.2015) (affirming grant of motion for judgment as a matter of law for Defendants)
- *Cisson v. C.R. Bard, Inc.*, 810 F.3d 913 (4th Cir. 2016) (affirming $2 million verdict for plaintiffs)
- *Huskey v. Ethicon, Inc.*, 848 F.3d 151 (4th Cir.2017) (affirming $3.2 million verdict for plaintiffs)
- *Eghnayem v. Boston Scientific Corporation*, 873 F.3d 1304 (11th Cir. 2017) (affirming verdicts for four separate plaintiffs tried together in consolidated trial totaling $26.7 million)
- *Campbell v. Boston Scientific Corporation*, 882 F.3d 70 (4th Cir. 2018) (affirming verdicts for four separate plaintiffs tried together in consolidated trial totaling $18.5 million)

The results of these post-trial motions and appellate rulings have likewise provided instructive guidance for the participants in this MDL, as well as for future product liability MDLs.

---

[12] For example, a recent Westlaw search of the terms "pelvic OR transvaginal WITHIN THE SAME SENTENCE AS mesh AND goodwin" within the West Virginia Federal Courts database yields 1,970 results.

Disparate legal and factual issues such as the propriety of consolidated, multi-plaintiff trials, the admissibility of evidence related to FDA, statutes of limitations, gross negligence and punitive damages, and the sufficiency of the evidence to sustain multi-million dollar verdicts on design defect and failure to warn have been addressed and resolved in plaintiffs' favor by the Fourth and Eleventh Circuits, providing substantial benefit to all MDL claimants and further certainty across MDL lines.

Plaintiffs' leadership also coordinated efforts with attorneys who were handling related litigation against the same defendants in various State courts across the country.

Eventually, and due in large part to the continuing efforts of the plaintiffs' leadership and the Court's innovative approaches to move cases forward, the defendants, who had generally resisted settlement discussions, began to consider resolution. However, resolution in these MDLs has proven nearly as challenging as the litigation itself.  The range of products involved, the varying nature of the injuries or damages claimed by Plaintiffs, the "multi-product" issue, and the differing financial status and interest in resolution among the different Defendants presented difficulties in resolutions that required perseverance and creativity by Plaintiffs' leadership. Plaintiffs' leadership coordinated efforts to conduct "censuses" of thousands of MDL cases in order to inform the Court and the parties of the range of products and injuries involved.   At the request of the Court, certain Plaintiffs' leadership has been involved in attempting to facilitate the settlement process for other MDL firms.  The Court has conducted multiple mandatory settlement conferences with various Defendants in which Plaintiffs' leadership has played an important role.

Through December 21, 2016, ninety-four law firms submitted more than 900,000 hours of time for common benefit consideration, and the Court-appointed FCC has recognized a total of 679,191.20 of those hours as being for common benefit.

To date, over ninety percent of cases in these MDLs have reached resolution or otherwise been dismissed, which has resulted in approximately $366,500,000 in payments into the common benefit fund by Defendants. Based on the number of cases that have been resolved pursuant to a Master Settlement Agreement but not yet processed or that remain in the MDLs, it is anticipated that the common benefit fund will ultimately equal or exceed $550,000,000.

**3.  Process of Allocation of Funds for Common Benefit Fees and Expenses.**

On October 4, 2012, the Court entered its Pretrial Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues.[13]  In this Order, the Court set preliminary procedures for attorneys establishing standards for maintaining and submitting time and expenses for possible future consideration as common benefit and established the account to receive and disburse funds for the common benefit of the litigation. The Court directed attorneys to submit time and expense records to the Court-appointed accountant on a periodic basis of every six weeks beginning November 1, 2012.  As part of this Order, which was approved by all members of the PSC and signed and submitted by all members of the Plaintiffs' Executive Committee, counsel who desire to be considered for common benefit compensation acknowledged – as a condition for such consideration – that the Court will have "**final, non-appealable authority** regarding the award of fees, the allocation of those fees and awards for cost reimbursements in this matter" and they "have (or will have) agreed to and therefore **will be bound by the court's determination** on common benefit attorney fee awards, attorney fee allocations, and expense awards, and…**knowingly and expressly waive any right to appeal those decisions**

---

[13] Bard MDL 2187 PTO 54, AMS MDL 2325 PTO 20, BSC MDL 2326 PTO 17, Ethicon MDL 2327 PTO 18, Cook MDL 2440 PTO 11 (entered on 10/28/2013), Coloplast MDL 2387 PTO 6, Neomedic MDL 2511 PTO 20 (entered on 12/22/2015).

**or the ability to assert the lack of enforceability of this Agreed Order or to otherwise challenge its adequacy**." (Emphasis added).

Upon the entry of the FCC Order on January 15, 2016, the FCC began to meet for the purpose of performing the tasks required under the FCC Order so as to evaluate the common benefit work performed by applicant firms. The FCC met in Atlanta, Georgia on February 8, 9 and 10, 2016, along with members of the PSC for a portion of the time to discuss the entry of the FCC Order and to discuss the upcoming work of the FCC.  The FCC invited the PSC to provide input and feedback into the process during this meeting and after.  Several members of the PSC and Executive Committee met with the FCC and expressed thoughts and opinions about the process, including some concerns, that were considered by the FCC in establishing its review process.

The FCC met with the Court-appointed accountants on February 16 and 22, 2016 to discuss the time and expense submissions by firms and funds received into the MDL common benefit fund.  Thereafter, the FCC met to begin the process of proposing a set of policies and procedures for the review of time and expense submissions for common benefit funds.  During the period from March through October of 2016, the FCC consulted the Co-Lead Counsel for the MDLs regarding the appropriate policies and procedures for evaluating the common benefit contributions of applicant firms.  These meetings included a meeting with the PSC on April 4 and 5, 2016, in Charleston, West Virginia.  On November 3 and 4, 2016, the FCC met in Charleston, South Carolina to draft a proposed set of policies and procedures for the review of time and expense submissions for common benefit funds.  On December 1, 2016, FCC Chairperson Henry Garrard appeared before the Court for the purpose of addressing the entry of an order establishing policies and procedures for common benefit fund application review.  Thereafter, the FCC met via conference calls, virtual meetings, and in-person meetings to refine the proposed policies and

procedures. The FCC met in Atlanta, Georgia on May 17, 2017, regarding the contents of the proposed policies and procedures for the evaluation of common benefit contributions of firms to the litigation. On June 23, 2017, the Protocol was entered by the Court, which established the baseline policies and procedures to be utilized by the FCC in determining the value of the common benefit work performed by each applicant firm.

Shortly after the Court's entry of the Protocol, the FCC began preparations for the review of common benefit work and recommending an allocation to the Court in accordance with the Protocol. On June 26 and 27, 2017, the FCC met in Washington, DC, for the purpose of planning the process of review of time and expense submissions by firms seeking payment for common benefit work performed. The FCC focused its efforts and attention on how the time and expense submissions of firms would be evaluated for the purpose of determining the overall contribution of each applicant firm to the common benefit of the litigation. At the conclusion of the meeting, FCC members continued to discuss the timeframe and procedures that would be necessary within the requirements of the Protocol.

Pursuant to the Protocol, the CPA returned to each applicant firm the time and expense documentation received by the CPA through December 21, 2016. Thereafter, each firm had sixty days in which to audit its time and confirm that the time and expense submitted was true, accurate, clear, and for the common benefit of the litigation. Once complete, each firm was to resubmit its time and expense along with an affidavit from a senior member of the firm attesting that the time and expenses submitted were for common benefit. The required affidavit was also to designate whether the party billing time was a full-time or contract employee, and to provide an individual biography not exceeding two (2) pages for each attorney billing time. The FCC received the audited time and expense from firms and accompanying affidavits in September of 2017. The

FCC met on September 8, 19 and 20, 2017 in Atlanta, Georgia, and October 2 and 3, 2017 in Athens, Georgia, to plan the process of reviewing the time submissions received from applicant firms. The FCC Chairperson then met with The Honorable Daniel J. Stack, Retired, regarding his willingness and availability to serve as the External Review Specialist under the Protocol. The FCC Chairperson also interviewed another potential candidate for the External Review Specialist. Upon appointment by the Court on October 13, 2017, Judge Stack began serving as the External Review Specialist and attended almost all meetings of the FCC. The FCC met on October 16 and 17, 2017, to establish the procedure for review of all applicant firms.

The process of the Initial Review under the Protocol began in October of 2017. The FCC's methodology in evaluating the submissions of applicant firms follows the Protocol and the Court's prior common benefit orders. The FCC's review of the time and expense submissions and accompanying affidavits was conducted in accordance with the fifteen items enumerated in Section B of the Protocol, the ten factors identified in Section C of the Protocol (which are the same as the items in Section B of the FCC Order), as well as the factors enumerated in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978). The FCC assigned each firm seeking payment of common benefit funds to two members of the FCC for initial review. Those two FCC members worked together to review every time and expense entry received from the applicant firm. In reviewing the time and expense submissions and affidavits, the reviewers were guided by the Protocol and the FCC Order in determining the firm's contribution to the common benefit of the overall litigation. The FCC continued to meet during the process of review to discuss and ensure the consistent application of the review for each applicant firm's submission. The FCC was assisted in its review process by certain other attorneys who were requested to assist the FCC pursuant to Section A of the FCC Order. Those attorneys were Amy Collins (Burnett Law Firm),

Thomas Hollingsworth (Blasingame, Burch, Garrard & Ashley), Jeff Kuntz (Wagstaff & Cartmell), Don Migliori (Motley Rice), and Mike Moreland (Clark, Love & Hutson). These attorneys assisted the FCC in the preparation of materials for FCC meetings.

Upon commencement of the Initial Review of the time submission by applicant firms, the FCC recognized that some firms diligently self-audited their time entries and submitted time for review that was substantially compliant with the instructions from the Court regarding hours that would be considered as contributing to the common benefit of the litigation. However, other firms made little or no changes to their time submission during the Court-ordered self-audit process, which resulted in submissions for time that did not satisfy the Court's instructions. The elimination of time that clearly did not satisfy the Court's criteria for common benefit consideration, which should have been identified in the self-audit process, resulted in the FCC's recognition of a relatively lower percentage of submitted hours as common benefit for firms that failed to adequately self-audit. Conversely, firms that made a good-faith effort to review their time submission during the self-audit period had a higher percentage of submitted time recognized as contributing to the common benefit.

The FCC met on November 16 and 17, 2017 in Atlanta, Georgia to discuss ongoing reviews and ensure that all firms were receiving consistent evaluations pursuant to the Protocol. The FCC met again on December 4 and 5, 2017, in Houston, Texas, for the purpose of discussing firms whose review had been completed by the two FCC members primarily assigned the task of reviewing time submissions. The FCC met again on December 12, 13 and 14, 2017, and continued to discuss those firms whose review had been completed by the two FCC members primarily assigned the task of reviewing time submissions. Finally, the FCC met on January 5 (by telephone), 10, 23 and 24, and February 1, 2018 in Atlanta, Georgia, to complete the process of

discussing those firms whose review had been completed by the two FCC members primarily assigned the task of reviewing time submissions. During these meetings, each firm was thoroughly discussed by the entire FCC. While the number of FCC meetings was significant, far greater time was invested by FCC members between meetings.  FCC members routinely worked on matters in preparation for the next FCC meeting.

During its meetings from November 16, 2017 through February 1, 2018, the FCC received detailed presentations about each firm seeking common benefit compensation. As discussed above, except for the telephonic meeting on January 5, 2018, the FCC meetings were conducted in-person. With the exception of a single instance where an FCC member was participating in a jury trial, all members of the FCC were in attendance at the FCC meetings. The FCC also consulted with the Co-Leads of the MDLs, including an in-person meeting with the MDL Co-Leads in Houston, Texas on December 5, 2017, and discussed the quality and value of the contribution of applicant firms to the common benefit of the litigation.  The work of the FCC during this period was not simply to determine the number of hours that might be considered compensable, but also (and more significantly to the FCC) the quality of those hours and the extent such time was of benefit to the litigation.  As each firm was discussed, the FCC decided which time entries would (at that stage) be considered as common benefit, which time entries were deemed of no compensable value, and which entries required additional information in order for the FCC to properly evaluate the submission.

Simultaneously, the FCC evaluated the nature of the legal work reflected in the time submissions.  The FCC considered for each firm whether the work for which time was submitted was performed by attorneys or non-attorney staff, and the experience and seniority of the attorney performing work, as well as whether multiple lawyers or firm members were performing the same

or similar tasks that could appropriately be handled by a single attorney The FCC discussed the nature of the work and the role of the applicant firm as reflected in the time submissions, including for example whether the firm was engaged in document review, expert identification and preparation, written discovery, depositions, trials, briefing or appellate work, or settlement negotiation. With regard to the venue of cases, and in accordance with the Court's instruction in the FCC Protocol, the FCC considered whether trial work was performed within the MDLs or in various state courts, and the extent to which it contributed to the outcome of the litigation and benefited the MDL. In addressing trials, the FCC considered whether a trial was the first successful trial of a particular mesh product, whether the trial attorneys created common benefit materials and shared such materials with other plaintiffs' firms within the litigation without compensation (and at what point in time that material was shared), and whether the trial attorneys consulted with MDL leadership in case selection, trial preparation and trial strategy. Further, the FCC considered whether a firm participated in a lead role, a back-up role, or was simply an observer of the activity in the litigation. As directed in the Protocol, emphasis was placed on work product and materials that were provided to Plaintiffs' counsel to prepare for trial. In some instances, the low quality of information delivered to the FCC by the applicant firm made it impossible for the FCC to identify any common benefit derived from the submitted time. The foregoing examples are not meant to be exhaustive but are meant to be illustrative of the attention given to each firm during the Initial Review. Throughout the Initial Review, the FCC was mindful of the Court's instruction that "the over-arching guideline that the FCC must consider is the contribution of each common benefit attorney to the outcome of the litigation." The FCC received time entries totaling more than nine hundred thousand (900,000) hours. The FCC reviewed every time entry from every firm in conducting its Initial Review. Where the FCC had questions requiring further evaluation of

applicant firms, the FCC members continued their review and returned at subsequent meetings to respond.  No applicant firm's time was approved for distribution to the firm until the FCC unanimously approved the time.

On February 16, 2018, the FCC provided its Initial Review to the applicant firms.  Each firm received a letter detailing the process utilized by the FCC along with four exhibits. Exhibit A identified those time entries where the FCC found that there was no compensable basis for the time. Exhibit B identified those time entries requiring more information from the applicant firm. Exhibit C identified the dates beyond which the FCC determined that time did not contribute to the common benefit of the litigation. Exhibit D set forth categories of expenses which applicant firms were to remove from their submission.  The letter to each firm instructed the applicant firm how and when to respond and also provided the reasons why time was placed on Exhibits A and B for that firm.  Each letter was unique and tailored to the specific firm providing only those reasons that were applicable to the particular firm's time. Firms were required to provide an affidavit in the format provided in the Protocol signed by a senior firm member setting forth the reasons, grounds and explanation for the Firm's entitlement to common benefit fees under the factors outlined in the FCC Order and in the FCC Protocol.  Firms were also given the opportunity to provide a response for each time entry that the firm believed was placed on Exhibit A or B in error, and to provide revised expenses in accordance with the instructions given. For any firm that did not provide a complete response, the FCC sent letters on April 18, 2018, requesting that the applicant firm complete its response.

After receipt of the affidavits and responsive materials from the firms, the FCC once again reviewed each time entry for which the applicant firm sought reimbursement, as well as their affidavits, in order to further evaluate the contribution made by each firm to the common benefit

of the litigation. The FCC met on March 29 and 30, 2018 in Atlanta Georgia. During the meeting the FCC received presentations from its members regarding the responses received from applicant firms. The FCC discussed and decided on whether time submissions placed on Exhibits A and B delivered to the firms should be considered as compensable. Revised expenses were reviewed by FCC members in the same manner as had previously been used for the evaluation of time entries. The FCC also heard reports and discussed the amount of expenses for consideration for each applicant firm. The meetings of the FCC continued and were conducted on April 23, 24 and 25, 2018 and May 7, 2018 in Atlanta, Georgia. In addition, there was an FCC conference call conducted on May 2, 2019, to address firms' time and expense and affidavit review. As discussed above, the FCC's focus during its review of responses of applicant firms was not directed toward a mechanical calculation of the numbers reflected in time and expense entries. Rather, the FCC endeavored to analyze the benefit and value of the work reflected in these submissions in light of each firm's role in the litigation and in accordance with the Court's directives set forth in the common benefit orders, based on the FCC's experience in the litigation and the materials and information submitted by each Firm. Specifically, the FCC considered the final time and expense submissions and affidavits of each firm in light of the items enumerated in Section B of the Protocol, the factors enumerated in Section C of the Protocol, and the factors set forth in *Barber v. Kimbrell's, Inc.*

On May 18, 2018, the FCC delivered to each applicant firm the results of the FCC's evaluation of the firm's affidavit and materials in response to the Initial Review. At that time, the FCC notified each firm of the hours and expenses that the FCC found to be eligible for consideration as common benefit. In accordance with Section D of the Protocol, each firm was given notice of the opportunity to be heard by the FCC. The letter provided to each firm was

accompanied by a revised version of Exhibits A and B reflecting the FCC's decision to allow or disallow each entry based upon the information provided by the applicant firm in its final submission of time, expense and its affidavit. The letter provided instructions on how to request an opportunity to be heard by the FCC. Of the ninety-four firms whose time was reviewed, twenty-seven elected to be heard by the FCC. The FCC conducted in-person meetings with representatives of each firm who made a request. The FCC conducted in-person meetings in Charleston, West Virginia on June 12, 13, 14 and 15, 2018, and in Atlanta, Georgia on July 17, 18 and 19, 2018. In accordance with Section C. of the FCC Order, each firm was permitted to "present the reasons, grounds, and explanation for their entitlement to common benefit," and was generally allowed to be heard by and to discuss with the FCC any matter of its choosing during these in-person meetings. The FCC received and considered all of the oral presentations of all applicant firms who availed themselves of this opportunity. Based on the presentations of firms, the FCC reviewed, and where appropriate, revised the hours or expenses considered for common benefit. Additionally, the FCC met and discussed the presentation of firms in light of the value that each firm contributed to the litigation. At the conclusion of the in-person meetings, the FCC finalized the number of hours and amount of expenses for its preliminary recommendation.

The FCC met on August 1 and 2, 2018 in Atlanta, Georgia for the purpose of finalizing its allocation of funds available for compensation of common benefit. In so doing, the FCC relied upon its detailed knowledge and understanding of the work performed accumulated throughout the process of thoroughly reviewing each firm's time and expense submissions, affidavits, written materials accompanying affidavits, and in-person meetings. The FCC also relied upon the collective personal knowledge and experience of its members in this litigation and the input received from other leadership within the litigation. The process of allocating the potential fund

was not a new process for the FCC, rather it was the continuation of the process that began with the entry of the FCC Order. Members of the FCC continued to meet on August 15, 2018 in Washington, DC and discussed the allocation of the potential fund for common benefit. The FCC met again on August 21, 2018, in Atlanta, Georgia to continue its discussion of the allocation of potential funds for common benefit awards. At the request of the FCC, the Chairperson proposed a series of awards utilizing a percentage of the funds for each of the applicant firms. The FCC then addressed each of the firms individually and discussed whether the proposed percentage award was appropriate. The percentage value assigned to each firm was then adjusted to reflect the decision of the FCC for each firm. Some adjustments were upwards, some downwards and some remained unchanged. In discussing an appropriate percentage for the applicant firms, the FCC was again guided by their experience and familiarity with the litigation, the nature and value of the work performed, the FCC Order and the FCC Protocol with focus being given to the items enumerated in Section C of the Protocol and the *Barber* factors. Only FCC members participated in the discussion and decision regarding the allocation of common benefit funds. Attorneys who assisted the FCC in its review process did not participate in the decision by the FCC regarding allocation of funds to applicant firms.

The FCC did not request any information regarding billing rates utilized by applicant firms. The FCC did not apply a formulaic or grid approach whereby an applicant's recommended common benefit award was the sum of points or the product of an "hours x rate x multiplier" equation. The FCC observed that the hours submitted by firms varied widely in quality, with some applicants submitting significant numbers of hours of limited value, while others submitted fewer hours that provided substantial benefit to the litigation. The FCC identified its directive under the

Protocol to focus on (and reward) firms based on their substantive contributions rather than the bulk submission of hours.

Upon the completion of the allocation process, the FCC was unanimous in its agreement that the process used throughout the review of time and expense was performed in accordance with the Court's Orders and the applicable legal authority, and the FCC was unanimous in its agreement to the amounts allocated to each firm in the Preliminary Written Recommendation. The FCC met and collectively prepared the materials for distribution of the FCC's Preliminary Written Recommendation on September 11, 2018.  The FCC reviewed the information being delivered to each applicant firm and discussed the Protocol with regard to the Preliminary Written Recommendation, the opportunity for objections thereto and the Final Written Recommendation. The FCC's Preliminary Written Recommendation was delivered to all applicant firms on September 13, 2018.

Applicant firms were permitted to make any objection to the Preliminary Written Recommendation on or before September 28, 2018.  Of the ninety-four firms receiving the Preliminary Written Recommendation, the FCC received objections from twenty-four firms. The FCC considered the written objections of firms and met on October 22 and 23, 2018, in Athens, Georgia to deliberate and discuss the objections. The FCC then continued to confer regarding objections, and on November 16, 2018, the FCC met to approve the form and content of this Final Written Recommendation.  Of the twenty-four objections eleven have now been resolved.  After due consideration of the remaining objections, the FCC unanimously agreed to its proposed allocation of funds for compensation of common benefit to each applicant firm as set forth in this Final Written Recommendation.

The FCC received certain objections from counsel to its Preliminary Written Recommendation, which remain unresolved. Some of the remaining objectors argue that their awards are insufficient in light of their contribution, while others objected that those same firms' award was excessive in light of the same factors. Some objectors took umbrage with the FCC's stated intention of requesting the Court set aside 30% of future common benefit funds for work completed post-December 21, 2016 as too much, while others argued the percentage set aside should be significantly more than 30% to prevent firms that did less work after that date from being overcompensated. Some objectors took the position that the FCC's recommendations for the members of the FCC were too high, while others commended the FCC members for their hard work, dedication, and the value they added to the litigation. Often, objectors claimed to have performed the same work as was performed by other applicant firms. In summary, the objections raised generally took both sides of virtually any given issue. Accordingly, the FCC revisited its preliminary recommendations with an eye toward ensuring compliance with the Courts directives in the applicable pretrial orders, with careful attention paid to recommending awards on a firm-by-firm basis that reflected as accurately as possible the value provided by that firm to MDL claimants.

The FCC notes that certain of the remaining objections received focus upon the "implied" or "effective" hourly rates that objecting firms calculated in order to subjectively compare themselves to other firms. These objections necessarily substitute the objecting firm's subjective evaluation of the firm's contribution to the common benefit of the litigation in place of the analysis performed by the FCC. The essential crux of each such objection is that the firm seeks an increase in its award based on its self-evaluation in comparison to other firms. The FCC reviewed the objections and determined that no new factual information was provided by the objectors beyond

that already received and considered by the FCC in making its recommended percentage allocation. The FCC, as discussed in detail in this Final Written Recommendation, did not use an hourly rate method in arriving at its percent allocation for each applicant firm. However, in an effort to ensure that the method employed by the FCC delivered a fair result, the FCC performed a review of the effective hourly rates resulting from its percentage award set forth in its Preliminary Written Recommendation.  The FCC reviewed and considered each of the effective hourly rates for the applicant firms and determined that the result was consistent with the FCC's determination of the appropriate percentage award, which was determined in accordance with the factors and instructions set forth in the FCC Protocol and the Court's prior common benefit orders.  Further, the range of effective hourly rates was within the range of other MDL litigations.[14]  Having conducted this additional crosscheck of its recommended allocations, the FCC unanimously agreed to its proposed allocation of funds for compensation of common benefit to each applicant firm as set forth in this Final Written Recommendation.

The overarching theme of the unresolved objections received can be summarized as follows: my firm did not receive enough money and/or another firm (or other firms) received too much money.  However, the subjective comparisons proffered by the objecting firms are often contradictory, if not self-defeating.   For example, certain of the objecting firms seek the lion's share of credit for the same litigation, but in varying State Court venues and in MDL.  As a specific example, one firm claims that its work in a specific State Court trial was of significant benefit to the litigation while another firm contends that same trial was only of limited value compared to a

---

[14] *See, e.g., In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485 (W.D. La. Jul. 17, 2017) (Order adopting Special Masters Report and Recommendation which awarded effective hourly rates ranging from $270.00 to $1,305.00); *see also In re Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on April 20, 2010*, Case No. 2:10-md-02179, Doc. 23574 (E.D. La. Oct. 24, 2017) (Order adopting Special Master's Recommendations which awarded effective hourly rates ranging from $60.89 to $2,162.41).

subsequent trial(s) in which their firm was involved (for example, the verdict addressed only failure to warn and not design defect). Certain of the same objecting firms claim to have developed the same experts for the same litigation. These varying proposals with disparate accounts only serves to underscore the inherent subjectivity of the allocation process, and the difficulty in reaching a recommendation that matches every firm's own subjective expectation and view of their self-worth. Stated otherwise, it readily appears that the objecting firms' true intent is to substitute their own subjective judgment for that of the FCC with respect to the value of their and other firms' work in the allocation process.

It was further noted that the remaining objecting firms generally sought to compare their effective hourly rate to that which they calculated for other firms (typically those whose rates they calculated as being higher than their own). However, in challenging why another firm (or other firms) received a higher rate than theirs, several of the objecting firms focused primarily on their subjective views regarding the quality or value of the work of *only one member* of their firm (typically the one lawyer from the firm who served in a Court-appointed leadership position). This analysis is fundamentally flawed. The FCC did not base its analysis solely on whether or not the firm had a member who was appointed to a leadership position, or whether any of the firm's members contributed value to the litigation, but instead necessarily focused on the value contributed to the litigation *by the firm as a whole*. As required under the FCC Protocol, the FCC considered the skill, reputation and experience of each of the individuals who submitted time for each firm, as well as the nature and quality of work being performed by each of those individuals. It is impossible to make a side-by-side comparison between applicant firms without considering the nature, quality and value of the work of the firm as a whole versus just one person within that firm. For example, a law firm may have one attorney who served in a leadership position and

whose work contributed value to the litigation, but that attorney's time may only account for a small fraction of the firm's overall time submitted as common benefit.  The firm's other time may have been performed primarily by young associates, paralegals, or other lawyers or staff who did routine work that did not add significant value to the litigation.  In that situation, such firm should not be heard to object on the basis that the firm's "effective hourly rate" was less than another firm who had multiple partner-level attorneys who submitted consistent and substantial time that provided significant value to the litigation.

Furthermore, all hours are not created equal. One common example is that hours spent actively trying an MDL case are considered more valuable than hours on other tasks, such as document review or administrative tasks. This analysis may also be true, however, *even between hours spent on the same task by similarly skilled or experienced lawyers*. For example, not all hours spent on "document review" are equivalent in value.  Time spent identifying the documents that were later used in significant motions or briefing, provided to general experts, used during important corporate depositions or at trial, or made part of "trial packages" provided to other lawyers is necessarily more valuable than hours submitted for document review with no tangible work product.  Firms that consistently billed time for "document review" with little or no tangible work product to show for that time provided less of a benefit, and more of a detriment.  Likewise, not all "trial" hours are the same.  Some firms shouldered the brunt of the trial work from the day the trial setting was obtained through the day the appellate court issued its opinion affirming the verdict. Others may have provided valuable support prior to or during the trial, and others may have participated in the trial itself, but each to varying degrees. It is not practicable, nor equitable, to declare that all attorney hours are of the same value or that all "trial" time is deserving of equal weight.  Variances in consistency, duration, skill, responsibility, role, and task all must be taken

into account in determining the firm's collective value to the litigation. To evaluate the efforts of counsel otherwise is to reward the professional biller or the inefficient worker.

### 4.   Legal analysis of common benefit fee allocation process.

"It is beyond dispute that a court may 'appoint a committee of plaintiffs' counsel to recommend how to divide up an aggregate fee award.'" *In re Vioxx Prods. Liab. Litig.*, 802 F. Supp. 2d 740, 773 (E.D. La. 2011).  As recognized in *In re Diet Drugs Prods. Liab. Litig.*, 2003 WL 21641958, *6 (E.D. Pa. 2003), a committee allocating attorneys' fees is "well suited" for that task where it is "comprised of respected attorneys with in-depth knowledge of the work performed throughout the course of . . . the litigation."; *see also*, *In re Diet Drugs Prods. Liab. Litig.*, 2002 WL 32154197, at *23 (E.D. Pa. 2002) (finding it "both more efficient and fairer" to permit a committee of counsel involved in the litigation to make an initial attempt at allocating a fee award among the applicant counsel, rather than having the court make those determinations in the first instance); *Vioxx*, 802 F. Supp. 2d at 764 (observing that fee committee appointees were "heavily involved" in the litigation and thus "had firsthand knowledge of the nature and extent of the common benefit work which was done and who did it"); *Victor v. Argent Classic Convertible Arbitrage Fund L.P.*, 623 F.3d 82, 90 (2d Cir. 2010) ("Since lead counsel is typically well-positioned to weigh the relative merit of other counsel's contributions, it is neither unusual nor inappropriate for courts to consider lead counsel's proposed allocation of attorneys fees, particularly…where the district court retains the ultimate power to review applications and allocations and to adjust them where appropriate."); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 6909680, *2 (N.D.Ca.2016) ("In class actions lead counsel commonly propose the initial plan of fee allocation since 'class counsel are the most familiar with the amount of work actually contributed by each of the…firms,' and can assess 'in a manner that they believe, in good faith,

reflects the contributions of counsel to the prosecution and settlement of the claims.'") (Cits. omitted).

"As a general principle, . . . [attorneys'] fees are to be allocated in a manner that reflects the relative contribution of the individual firms and attorneys to the overall outcome of the litigation." *Diet Drugs*, 2003 WL 21641958, at *6. *See also*, *In re Copley Pharmaceutical, Inc., Albuterol Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1149-50 (D.Wyo.1999) ("The Court's research reveals that courts unanimously make allocations based 'upon the quantity and quality of effort expended by the attorneys in obtaining the common fund.'") (Internal cits. omitted); *Turner v. Murphy Oil USA, Inc.*, 582 F.Supp.2d 797, 812 (E.D.La.2008) ("This apportionment [of common benefit funds among counsel] is largely dependent on an analysis of the amount, nature, and significance of the work of each counsel and how it relates to the work of the other counsel."). Consistent with such authority, and as discussed above, the Court instructed in its Order Establishing Criteria for Applications to MDL Common Benefit Fund that "the over-arching guideline that the FCC must consider [in allocating common benefit attorney's fees] is the contribution of each common benefit attorney to the outcome of the litigation." (Order Establishing Criteria for Applications to MDL Common Benefit Fund, p. 5).

Stated plainly, the "allocation of fees is not an exact science," and the methodology used may vary, so long as it is designed to produce results that are both fair and reasonable. *See Diet Drugs*, 2003 WL 21641958, at *7, *11. *See also*, *In re Motor Fuel Temperature Sales Practices Litig.*, 2016 WL 4445438, *13 (D.Kan.2016) ("In determining reasonable attorneys' fees, the essential goal 'is to do rough justice, not to achieve auditing perfection.'"). Because subjective factors, such as the nature of the work performed, the skill and experience of the counsel doing it, and the results achieved are relevant considerations, "some subjectivity is unavoidable in allotting

common benefit fees." *Vioxx*, 802 F. Supp. 2d at 774. "[I]n the real and imperfect world of litigation it is an accepted fact that not all work hours are entitled to the same compensation rate. The nature of the work, the skill and experience of the party doing the work, and the result achieved all factor into the appropriate allocation. How these factors are weighed injects an unavoidable amount of subjectivity in the analysis. **The best that can be done to assure the validity of the analysis is to base the subjectivity quotient on sufficient facts and experience, and to invite input from those affected**." *Id.* (Emphasis added). "With so much money at stake and so much time invested by skilled attorneys on valuable common benefit work, it is not surprising that disputes exist concerning the proper method and dollar amount of the individual allocations. We emphasize, however, that the allocation of fees is not an exact science." *Diet Drugs*, 2003 WL 21641958 at *10-*11.

The process used in allocating attorneys' fees generally should also offer the opportunity for meaningful input by the fee applicants. *Diet Drugs*, 2003 WL 21641958 at *6 (noting that applicants had the opportunity to object to their proposed fee allocation, meet with the fee committee and discuss their objections, suggest revisions before a final recommended allocation was determined, and, if still dissatisfied, seek relief from the court).

The proposed fee allocation in this case plainly satisfies all of the necessary criteria discussed in the applicable legal authority, as well as the protocols and procedures established by the Court. In their objections to the FCC's preliminary recommendation, certain of the applicant firms have suggested that the FCC was required to utilize a "lodestar" methodology, where the hours credited to the firm are multiplied by an hourly rate. Several courts have considered and rejected similar arguments, and to be clear, the FCC was not required to and did not attempt to employ any "lodestar" calculation. *See, In re Thirteen Appeals Arising Out of San Juan Dupont*

*Plaza Hotel Fire Litig.*, 56 F.3d 295, 307-08 (1st Cir.1995) (rejecting argument that common fund must be allocated among counsel using lodestar method, stating "[W]e hold that in a common fund case the district court, in the exercise of discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar…. [W]e rule the court below did not err in purposing to allocate fees based on the [percentage of fund] method, emphasizing the attorneys' 'relative contribution' to the creation of the Fund."); *Glaberson v. Comcast Corp.*, 2016 WL 6276233 (E.D.Pa. 2016) (observing that in allocation of common fund attorneys' fees, "a mathematical application of a ratio of the firms' lodestars is not mandated.")  Here, the FCC considered the submitted time of counsel for common benefit fee purposes as entitled to allocation weight only in relationship to outcome contribution. Not simply how much time an attorney has spent and submitted, but whether and how an attorney's time contributed to the outcome of the litigation, has been a consistent, and even primary, focus of the FCC in its analysis and recommendation.

In a similar vein, the dollar-specific allocations recommended by the FCC are not driven by mathematical formulation, any more than they are based upon the mere counting of attorney hours.  The FCC was charged by the Court with the task of reviewing time and expense submissions and accompanying affidavits from ninety-four different law firms.  As described above, a painstaking, detailed review by the FCC of submitted time records was conducted over several months. The Initial Review, along with the required affidavits and other materials submitted from the applicant firms, and the feedback and input from objecting firms, assisted the FCC in analyzing *inter alia* the nature, quantity and duration of the work performed, the identity of the attorneys performing the work and their respective experience and abilities, and generally how the work contributed (or did not contribute) to the overall common benefit of the MDL

plaintiffs.  As outlined in detail above, this review and allocation process that involved hundreds of hours over several months was thorough.  Each applicant firm was allowed to provide substantive input to the process, and to receive feedback from the FCC.  While the FCC extensively reviewed the hours submitted by every firm and took the approved time into consideration in making its proposed allocation, the FCC did not request hourly rates from any firm or attempt to mechanically apply any "hours x rate" analysis. *See*, *Vioxx*, 802 F.Supp.2d at 773 ("To simply total the hours spent, apply an appropriate lodestar factor, and allocate the fee on that basis alone would not be appropriate in this case.").  Instead, the FCC reviewed the submitted time and applicant input in light of the Court's directives set forth in the Fee Committee Protocol and prior common benefit orders, the ultimate purpose of which is to "evaluat[e] what work and expenses furthered the common benefit of the litigation." (Fee Committee Protocol, p. 10). *See*, *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir.1995) ("While the time logged is still relevant to the court's inquiry – even under the [percentage of fund] method, time records tend to illuminate the attorney's role in the creation of the fund, and, thus, inform the court's inquiry into the reasonableness of a particular percentage…."); *In re Copley Pharmaceutical, Inc., Albuterol Prods. Liab. Litig.*, 50 F.Supp.2d 1141, 1149-50 (D.Wyo.1999) ("[t]he value of time expended with appropriate adjustments may provide a rough starting point for assessing the respective roles of counsel, but it should not be used rigidly as a precise measure to the exclusion of other intangible factors.").

The FCC's approach in making this proposed allocation is consistent with the allocation methodology applied in similar multi-plaintiff product liability settlements. Recently, in *In re Fresenius Granuflo/Naturalyte Dialysate Prods. Liab. Litig.*, MDL 2428 ("*Granuflo*"), the court-appointed fee committee recommended an allocation to each applicant firm of a percentage of the

total fee award based on the committee's experience and the facts submitted, and after receiving input from the interested firms. *Granuflo*, 1:13-md-2428, Doc. 1983 (Memorandum in Support of Plaintiff Leadership's Petition for Award and Allocation of Common Benefit Fees) (D.Mass. Dec. 12, 2017). The fee committee in *Granuflo* emphasized in its petition that it did not undertake to apply "an unyielding mathematical formula," which it noted could not account for the multitude of subjective differences that must be considered in making such an award, such as the differing skills and contributions of the attorneys and varying nature and complexity of the tasks involved. (*Id.*, p. 22). The MDL court approved the fee committee's recommendation. *Granuflo*, 2018 WL 2163627 (D.Mass.2018). Similarly, in *In re Nuvaring Prods. Liab. Litig.*, 2014 WL 7271959, *2 (E.D.Mo.2014) (Order approving recommendation of Special Master's Recommendation Regarding Allocation and Distribution of Common Benefit Fees and Expenses), the Court affirmed the Special Master's recommended allocation of common benefit fees. As noted there, the recommended allocations were based on the quality and value of the work performed, not on a "lodestar" analysis of rates multiplied by hours. *Id.* at *6. Likewise, in the *In re Yasmin and Yaz Prods. Liab. Litig.* MDL, the Special Master recommended an allocation based on the quality and value of the work to the litigation and resolution and expressly rejected the "lodestar" approach as both arbitrary and inappropriate because it would not properly consider the value and quality of the work involved. *In re Yasmin and Yaz Prods. Liab. Litig.*, 3:09-md-02100, Doc. 3843 (Special Master's Report and Recommendation Regarding the Allocation and Distribution of Common Benefit Fees and Expenses) (S.D.Ill. Nov. 6, 2015), pp. 7-8. The *Yaz* MDL Judge, the Hon. David R. Herndon, adopted the Special Master's allocation recommendation in its entirety. *Id.*, Doc. 3856 (Minute Order adopting Special Master's recommended allocation in its entirety) (S.D. Ill. Nov. 20, 2015).

In its Recommendation for Fee Allocation filed in *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, MDL 2179, the court-appointed Fee Committee stated that it "did not employ a 'lodestar' or 'hourly rate' approach…. Nor did the FCC interpret its task to simply apply a single blended hourly rate to all hours that had been submitted in the case." (*In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*,2:10-md-2179, Doc. 22628 (Fee and Cost Committee Recommendation for Proposed Cost Reimbursements and Fee Allocation) (E.D. La. Apr. 11, 2017), p. 5). The *Deepwater Horizon* committee further explained that it "did not, at any time, assign particular 'rates', or 'multipliers', to a firm's accepted hours, and then use that to derive the ultimate fee recommendation." *Id.*, p. 7. Instead, "[t]he overarching guideline for the FCC to consider was the relative common benefit contribution of each Fee Applicant to the outcome of the litigation…." *Id.*, p. 6. Likewise, the *Deepwater Horizon* Special Master cited to Judge Fallon's *Vioxx* opinion, noting that **"[m]echanically calculating hours and allocating fees solely on that basis would incentivize padded hours and diminish the work that truly moved the litigation towards its conclusion**." (*Deepwater Horizon*, Doc. 23574-1 (Special Master's Recommendation Concerning the Allocation of Common Benefit Fees) (Oct. 24, 2017), p. 8 (emphasis added)). The court in *Deepwater Horizon* adopted the Special Master's recommended allocation. (*Id.*, Doc. 23574 (Order Adopting Special Master's Recommendation Concerning the Allocation of Common Benefit Fees) ()). *See also*, *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2013 WL 1867117, *4-*15 (E.D.La.2013) (approving MDL fee allocation proposed by PSC and by Special Master by percentage of available common benefit fees); *In re Prempro Prods. Liab. Litig.*, 2014 WL 3809101, *1-*2 (E.D. Ark. 2014) (adopting percentage-based common benefit allocation recommended by Common Benefit Fee Committee and proposed by Special Master).

**5. Objections claiming lack of "discovery" from FCC.**

Certain of the objecting firms have sought to conduct discovery regarding the FCC's deliberations, and complain generally about an alleged lack of "transparency" about the process. Initially, as all applicant firms are aware, the Court charged the FCC "with engaging in **confidential** discussions as part of the FCC's function." (FCC Order, Section A) (Emphasis added). As the Court's Order recognizes, confidentiality is necessary for the FCC to have candid and frank discussions and deliberations about the value and benefit of the contribution of the firms involved.

In *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir. 2014), the Eighth Circuit considered and rejected a similar objection to a common fund allocation for lack of discovery, observing as follows:

> Although the court did not appoint an external auditor or permit discovery, *cf. In re Diet Drugs,* 582 F.3d at 533–34, discovery in connection with fee motions is rarely permitted, *In re Prudential Ins. Co. Am. Sales Practice Litig.,* 148 F.3d 283, 338 (3d Cir.1998), and a "request for attorney's fees should not result in a second major litigation." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

In *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, C.A. No. 3:12-md-02385, Doc. 613 (Case Management Order No. 89 - Denying Motion to Stay and Prohibiting Discovery Relating to Common Benefit Fee Determination) (S.D.Ill. Jan. 8, 2015), the Hon. David R. Herndon, an experienced MDL Judge, similarly rejected a firm's ("CDL") request for discovery regarding a common benefit fee allocation. Instructively, Judge Herndon stated there "The Court finds that it has imposed appropriate guidelines and ground rules with regard to the common benefit fee determination. [The law firm seeking discovery] has not presented the Court with any reason to doubt the methodology that has been employed, conclude that informal or formal discovery is genuinely needed, or doubt the billing information that has been provided to date. Accordingly,

the Court sees no reason to depart from the principle that discovery in connection with fee motions should rarely be permitted."

Here, the Court provided detailed guidance and established rules and criteria that have governed the FCC's common benefit allocation process. The facts and information considered by the FCC have been provided and explained in detail to every firm that applied for common benefit. As detailed above, every applicant firm has been provided substantial information about how their work was evaluated, including written explanations regarding the applicant firm's submitted time considered – or not considered – as common benefit, and an opportunity to respond in writing and in-person. Each firm also has now received information about each of the other applicant firms' submitted time considered for common benefit (total hours submitted, and number of hours and amount of expenses recognized as common benefit).

As the Court-Ordered Protocol and this Final Written Recommendation reflect, applicant firms were given several opportunities to receive feedback from the FCC about the review and allocation process, both in writing and in-person. All applicant firms were allowed to make a presentation and/or provide a written submission to the FCC which they felt would establish the value of their work and/or their contribution to the common benefit of this MDL. (*See, e.g.*, FCC Protocol, Section C (each applicant firm must submit affidavit that "shall forth the reasons, grounds and explanation for the firm's entitlement to common benefit fees."); FCC Order, Section C ("It is the responsibility of the FCC to conduct meetings, at the appropriate time, during which any counsel who has submitted an application for common benefit compensation may, at his or her discretion, separately appear and present the reasons, grounds, and explanation for their entitlement to common benefit fees."). Likewise, pursuant to Court's Protocol, the FCC provided ample opportunity for applicant firms to provide substantive feedback and input regarding the

process – again, both in-person and in writing – including any input regarding the relative contributions or benefit provided by any applicant firm.  Not only has every applicant firm had multiple opportunities to both provide and receive information and feedback to and from the FCC, the Court's Protocol provides additional opportunities to present objections to the Court-appointed External Review Specialist and to the Court.  Any complaint about an alleged lack of information here is unfounded.

**6.  Final Recommended Allocation of Funds:**

Comprised of attorneys whose work spanned the entire litigation, the FCC was well-informed of the substantive contributions made by each applicant firm and endeavored to appropriately recognize those contributions. The FCC has exhaustively reviewed all of the facts and information provided by common benefit applicant firms, has applied the principles and complied with the directives established in the Court's protocol, and relied upon its experience and familiarity with the litigation and with the facts, providing multiple opportunities to provide and receive input by common benefit applicant firms in writing and in person.  After several months of deliberations regarding the applications, the FCC reached its recommendations.

Based on the foregoing, the FCC makes the following observations regarding the contribution of each common benefit applicant to the outcome of the litigation and recommends the following awards. In making its Final Recommendation, the FCC utilized the following method.  First, the FCC considered the total anticipated funds available in the MDL common benefit fund at the time of the first anticipated distribution by the Court to be approximately $400,000,000.00 (specifically the assumption of $396,811,811.38 was utilized). Next, the FCC deducted the total of $17,825,000.00 for repayment of MDL PSC assessments paid by firms for the purpose of funding the initial work of plaintiffs' counsel in the litigation.  The FCC then

deducted the total of $28,986,811.38 for the purpose of reimbursing applicant firms for held costs which were for the common benefit of the litigation. After the total deduction of $46,811,811.38 (the sum of $17,825,000.00 and $28,986,811.38), the remaining anticipated funds in the MDL common benefit fund at the time of the first distribution total $350,000,000.00. Using the percentage method discussed previously in this Final Written Recommendation, the FCC recommends that upon application of the recommended percentages for each applicant firm, the following amounts should be distributed to each firm.[15] The FCC further anticipates that additional funds will continue to be received by the MDL common benefit fund. The Protocol limits the temporal scope of the FCC's review and recommendation regarding the award of funds for common benefit to those activities occurring on or before December 21, 2016. The FCC is aware of work that has been performed and continues to be performed beyond December 21, 2016, which the FCC believes would merit consideration as common benefit. In order to discharge its assigned duties while also providing adequate funds to address work performed beyond December 21, 2016, the FCC recommends that with regard to future funds, the Court (1) allocate thirty percent (30%) of future funds received in the MDL common benefit fund as being subject to future orders of the Court regarding payment; and (2) allocate seventy percent (70%) of future funds received in the MDL common benefit fund amongst applicant firms utilizing the same percentages as set forth herein below. Some objecting firms have urged that the percentage of funds recommended by the FCC to be retained for distribution pursuant to a future order of the Court (30% of funds received in the future) is too high, while other objectors contend that the percentage is not high enough. The FCC recommends that the sum is adequate to address future payment needs, though any

---

[15] The FCC's Final Written Recommendation is premised upon the Court's grant of the FCC's Petition for an Award of Common Benefit Attorneys' Fees filed November 12, 2018.

recommendation regarding the allocation of such funds is beyond the scope of the FCC pursuant to the Court's Protocol.

The FCC recommends that allocation of funds for common benefit be paid as follows:[16]

**Anapol Weiss.** Anapol Weiss partner Tom Anapol is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the MDLs through its payment of the MDL assessment. The firm contributed $100,000.00 in assessments. The Fee Committee recommends reimbursement of the firm's $100,000.00 in assessments.

**Anderson Law Office.** Anderson Law Office partner Ben Anderson is a member of the Plaintiffs' Steering Committee and served as Co-Lead of the Cook MDL. The firm's work in Cook with Co-Lead Counsel resulted in a global settlement, although there were issues with the terms of the settlement. The firm contributed to the MDLs, with an emphasis on work with experts. The firm worked with experts in science and medicine, and Ben Anderson was a member of the Science Committee. The firm participated in some trials. All of the firm's work was performed by one attorney and two paralegals, with more than 40% of the total approved time coming from paralegal hours. The firm's work ultimately resulted—in targeted areas—in expert witnesses, although the Fee Committee takes note that the work was often done in an inefficient manner. The firm submitted 33,220.93 hours for review by the FCC. The Fee Committee recognized a total of 22,209.68 hours and $666,993.81 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $7,210,000.00 (2.0600000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $666,993.81 in expenses.

**Andrus Wagstaff.** Andrus Wagstaff partner Amy Wagstaff is a member of the Plaintiffs' Steering Committee, was appointed to serve as Co-Lead Counsel for the Boston Scientific MDL, and was appointed as a member of the Executive Committee. In her role as Co-Lead Counsel, Ms. Wagstaff participated in Executive Committee and Plaintiffs' Steering Committee conferences, attended hearings and status conferences, managed BSC discovery, assisted in motion practice and also participated in a BSC MDL trial. Ms. Wagstaff and her colleagues also prepared annotated work product which was made available to lawyers with BSC cases. The firm also had wave work, document review and travel. The firm submitted 31,549.55 hours for review by the FCC. The Fee Committee recognized a total of 29,563.85 hours and $505,275.50 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense

---

[16] In *Vioxx*, 802 F. Supp.2d at 774-825, Judge Fallon similarly recited the total hours logged by each applicant, as well as the relevant factors applicable to that counsel's or law firm's service. *See also*, *Turner v. Murphy Oil*, *supra* at 812-827 (J. Fallon) (similar synopses of firms' allocations).

records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the BSC MDL, the Fee Committee recommends an allocation of $8,715,000.00 (2.4900000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $505,275.50 in expenses.

**Ashcraft Gerel.** Ashcraft Gerel partner Michelle Parfitt is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS, BSC, Bard, and Ethicon MDLs. The firm participated primarily in limited expert development and also performed document review for the BSC and AMS MDLs. The firm submitted 846.76 hours for review by the FCC. The Fee Committee recognized a total of 773.40 hours and $7,200.40 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $174,667.50 (0.0499050%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $7,200.40 in expenses.

**Aylstock, Witkin, Kries & Overholtz, PLLC.** Aylstock, Witkin, Kreis & Overholtz, PLLC ("AWKO") was an early participant in the TVM litigation. AWKO began its work in TVM litigation in New Jersey as part of the New Jersey Consolidation. Upon formation of the Federal MDL, AWKO partner Bryan Aylstock was assigned as one of the three Coordinating Co-Leads in the overall TVM MDLs, was a member of the Executive Committee and the Plaintiffs' Steering Committee; and AWKO partner Renee Baggett was assigned to a Co-Lead position in the Ethicon MDL and is a member of the Plaintiffs' Steering Committee. AWKO briefed and argued discovery hearings, took corporate depositions, fact witness depositions, expert depositions and managed the Ethicon litigation. AWKO was also involved in trials that the Committee recognized. AWKO participated in the development of the material science and experts in the Ethicon MDL. AWKO worked to coordinate the efforts of plaintiffs' counsel and provided information to plaintiffs' counsel regarding developments in the litigation. AWKO participated in bringing a large number of cases to an AMS settlement. The firm submitted 55,031.00 hours for review by the FCC. The Fee Committee recognized a total of 43,932.50 hours and $1,108,942.51 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $27,125,000.00 (7.7500000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $1,108,942.51 in expenses.

**Babbitt Johnson Osborne & LaClainche, P.A.** Babbitt Johnson Osborne & LaClainche, P.A. partner Joseph Osborne is a member of the Plaintiffs' Steering Committee. The firm contributed to the BSC and Ethicon MDLs. The firm participated in bellwether cases for the BSC and Ethicon MDLs. The firm also participated in document review for the BSC MDL. The firm submitted

6,002.55 hours for review by the FCC. The Fee Committee recognized 4,308.80 hours and $200,816.91 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $1,355,000.50 (0.3871430%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $200,816.91 in expenses.

**Baron and Blue.** Baron and Blue partner Lisa Blue is a member of the Plaintiffs' Steering Committee. The firm contributed to the Bard MDL. The firm participated in the development of damages theories and bellwether trial preparation for Bard MDL cases through jury selection in two cases. The firm submitted 439.30 hours for review by the FCC. The Fee Committee recognized 436.05 hours and $33,687.74 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $137,375.00 (0.0392500%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $33,687.74 in expenses.

**Baron & Budd, P.C.** Baron & Budd partner Russell Budd is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the MDLs through its payment of the MDL assessment. The firm contributed $350,000.00 in assessments. The Fee Committee recommends reimbursement of the firm's $350,000.00 in assessments.

**Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.** Beasley, Allen, Crow, Methvin, Portis & Miles, P.C. partner Leigh O'Dell was appointed to the Plaintiffs' Steering Committee and contributed to the discovery process by taking the depositions of some corporate witnesses, as well as conducting third-party discovery. Beasley Allen worked on science and Bellwether cases in the AMS MDL. The firm's members assisted with MDL briefing in the Boston Scientific MDL, and worked up general causation experts for the AMS, Bard, BSC and Ethicon MDLs. The firm also performed document review and had more than 50 wave cases that required significant pre-trial discovery and briefing resulting in a large number of the firm's hours relating to its wave cases. The firm submitted 24,097.70 hours for review by the FCC. The Fee Committee recognized a total of 22,295.45 hours and $308,978.75 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $5,250,000.00 (1.5000000%), plus reimbursement of the firm's outstanding $350,000.00 in assessments, and reimbursement of $308,978.75 in expenses.

**Bell Law Firm.** Bell Law Firm partner Harry Bell was appointed as Plaintiffs' Co-Liaison Counsel and is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit

of all the mesh MDLs, with its greatest benefit occurring in the AMS and Ethicon MDLs. As Co-Liaison counsel, Mr. Bell worked with John Jenkins, the PSC, and the Executive Committee in the initial phases of the litigation. The firm also performed document review. The firm submitted 4,208.49 hours for review by the FCC. The Fee Committee recognized a total of 3,724.59 hours and $6,253.68 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $814,159.50 (0.2326170%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $6,253.68 in expenses.

**Bernstein Liebhard, LLP.**   Bernstein Liebhard former partner Jeffrey Grand is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Ethicon MDL, but their work was primarily for the New Jersey litigation as they served as co-liaison counsel in New Jersey. The firm participated in depositions and worked up state bellwether trial candidates in the New Jersey litigation. The firm served on the trial team for *Gross v. Ethicon*. The firm performed document review for the Ethicon MDL. The firm submitted 4,407.00 hours for review by the FCC. The Fee Committee recognized a total of 3,951.50 hours and $102,445.59 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and analysis of the firm's contribution to the common benefit of the Ethicon MDL, the Fee Committee recommends an allocation of $942,331.25 (0.2692375%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $102,445.59 in expenses.

**Bertram & Graf.** The firm contributed to the Bard and BSC MDLs.  The firm participated in the discovery and workup of wave cases for the Bard MDL and BSC MDL.  The firm submitted 469.50 hours for review by the FCC. The Fee Committee recognized a total of 401.50 hours and $12,404.24 in expenses.  The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $83,580.00 (0.0238800%), plus reimbursement of the firm's $12,404.24 in expenses.

**Blasingame, Burch, Garrard & Ashley, PC.** Blasingame, Burch, Garrard & Ashley, PC ("BBGA") helped start the Pelvic Mesh litigation.  BBGA partner Henry Garrard was appointed by Judge Goodwin to numerous positions, including Coordinating Co-Lead Counsel for all of the transvaginal mesh MDLs, Co-Lead Counsel for the Bard MDL, a member of the Executive Committee, as well as a member of the Plaintiffs' Steering Committee. BBGA partner Josh Wages was also appointed to the Plaintiffs' Steering Committee. BBGA started the TVM litigation that resulted in creating all the MDLs.  BBGA brought considerable experience in developing TVM liability theories to the MDLs, and, as a result of having successfully lead the Mentor Obtape MDL and trying cases in it, BBGA's insight advanced the common benefit of the MDLs.  BBGA lead

the Bard MDL and participated from the early stages of discovery, document review, motion practice, depositions of corporate witnesses, consulting and obtaining experts and trial preparation. BBGA was lead counsel in the first four MDL bellwether cases and was lead counsel in the first MDL case tried to a verdict for the Plaintiff. BBGA managed and coordinated the ongoing activities of the MDLs and assisted attorneys across the country in handling their cases. BBGA led in the preparation of briefs in the MDLs, the Fourth Circuit Court of Appeals and the Eleventh Circuit Court of Appeals. BBGA played a role in helping shape legal issues and obtaining rulings regarding the admissibility of FDA evidence and evidence regarding the MSDS. BBGA handled dozens of experts including drafting reports, defending depositions and defending Daubert motions. The firm contributed significantly to the initial funding of the litigation. At the direction of the Court beginning in August of 2013, Henry Garrard focused on the resolution and settlement of cases for MDL firms which helped move the litigation to resolution. Henry Garrard helped others resolve more than 52,000 of their cases. This work was undertaken without compensation from those cases. The firm submitted 69,685.30 hours for review by the FCC. The Fee Committee recognized a total of 63,719.30 hours and $9,545,824.63 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $56,634,392.50 (16.1812550%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $9,545,824.63 in expenses.

**Blizzard & Nabers, LLP.** Blizzard & Nabers partner Ed Blizzard is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS, BSC, Bard, and Ethicon MDLs. The firm participated in corporate depositions in Ethicon and BSC and aided in preparation of the first AMS Bellwether defense pick. The firm also performed document review for the BSC and Ethicon MDLs, and Holly Gibson was co-chair of the sales/marketing document review. The firm submitted 3,905.67 hours for review by the FCC. The Fee Committee recognized a total of 3,693.90 hours and $241,576.56 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $1,435,000.00 (0.4100000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $241,576.56 in expenses.

**Burke Harvey, LLC.** Burke Harvey partner Todd Harvey is a member of the Plaintiffs' Steering Committee. The firm worked at the direction of and with members of the Executive Committee and on the Bard and Ethicon MDLs. The firm participated in discovery and workup of wave cases for the Ethicon MDL. The firm also participated in research and briefing in the Bard MDL. The firm submitted 364.30 hours for review by the FCC. The Fee Committee recognized a total of 349.40 hours and $14,197.66 in expenses. The firm contributed $300,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of

the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $96,915.00 (0.0276900%), plus reimbursement of the firm's $300,000.00 in assessments, and reimbursement of $14,197.66 in expenses.

**Burnett Law Firm.** Burnett Law Firm partner Riley Burnett is a Co-lead in the Coloplast and Neomedic MDLs and a member of the Plaintiffs' Steering Committee. In reviewing the firms' time submission, the FCC notes that 9,004.1 hours submitted by Burnett Law Firm were originally submitted jointly by the Potts Law Firm and the Burnett Law Firm for the time period of June 2012 through December 2013. The joint time submitted was originally credited solely to Potts Law Firm. During the self-auditing time period, Potts Law Firm and Burnett Law Firm agreed to transfer 9,004.1 hours of the jointly-submitted time from Potts Law Firm to Burnett Law Firm with a corresponding reduction of time by Potts Law Firm. The firm contributed to the common benefit of the Coloplast, Neomedic, AMS and Bard MDLs. The firm negotiated settlements in these MDLs. Riley Burnett played a major role in developing a complex settlement program with AMS at the request of the Court that benefitted many firms and resolved thousands of cases. The firm also reviewed documents in the Bard, AMS and Coloplast MDLs. The firm continues to work as the main lead in the Coloplast MDL. The firm submitted 10,763.15 hours for review by the FCC. The Fee Committee recognized a total of 10,490.35 hours and $10,941.33 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $5,075,000.00 (1.4500000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $10,941.33 in expenses.

**Carey Danis & Lowe, LLP.** Carey Danis & Lowe contributed to the common benefit of the Boston Scientific, Bard, and Cook MDLs. The firm performed document review, prepared experts for depositions, and attended depositions of experts. The firm submitted 10,474.25 hours for review by the FCC. The Fee Committee recognized a total of 8,840.80 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $700,000.00 (0.2000000%).

**Chaffin Luhana, LLP.** Chaffin Luhana partner Eric Chaffin is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Ethicon MDL. The firm performed document review and assisted in developing the Plaintiff Profile Form. The firm submitted 382.87 hours for review by the FCC. The Fee Committee recognized a total of 301.57 hours and $1,578.10 in expenses. The firm contributed $50,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an

allocation of $58,170.00 (0.0166200%), plus reimbursement of the firm's $50,000.00 in assessments, and reimbursement of $1,578.10 in expenses.

**Clark, Love & Hutson, G.P.** Clark, Love & Hutson, G.P. ("CLH") performed a leadership role in the state and federal transvaginal mesh litigation from its inception. CLH partner Clayton Clark was appointed to serve as Co-Lead Counsel for the Boston Scientific MDL, is a member of the Executive Committee and the Plaintiffs' Steering Committee. CLH partner Scott Love is a member of the Plaintiffs' Steering Committee. Mr. Clark participated in Executive Committee and Plaintiffs Steering Committee conferences, and developed litigation strategies applied across MDLs. In his role as Co-Lead Counsel of the BSC MDL, Mr. Clark attended hearings and status conferences, managed BSC discovery, experts, motion practice and trials. CLH developed experts and defended those experts through Daubert challenges, deposed liability witnesses, and negotiated resolution structures. CLH was lead counsel for three MDL trials, including two consolidated trials for eight plaintiffs, despite not having a fee interest in the outcome of the majority of those plaintiffs. Additionally, CLH tried a remanded bellwether case. The firm participated in two separate appeals to the Fourth and Eleventh Circuits, successfully affirming jury verdicts on the consolidated trials in both. The firm also performed wave work, document review and travel associated with its pursuit of MDL litigation. CLH managed and coordinated the ongoing activities of the Boston Scientific MDL and assisted attorneys in handling their cases. The firm had common benefit work recognized in each of the major MDLs. The firm submitted 50,268.00 hours for review by the FCC. The Fee Committee recognized a total of 47,226.50 hours and $4,230,319.61 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $45,500,000.00 (13.0000000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $4,230,319.61 in expenses.

**Cohen, Placitella & Roth, PC.** Cohen, Placitella & Roth partner Chris Placitella is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Ethicon and Bard MDLs, but their work was primarily for the New Jersey litigation as they served as co-liaison counsel. They attended CMCs and participated in the preparation of depositions as well as document review for the Ethicon MDL. The firm submitted 865.40 hours for review by the FCC. The Fee Committee recognized a total of 614.50 hours and $71,444.10 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $343,105.00 (0.0980300%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $71,444.10 in expenses.

**Davis & Crump, L.L.P.** Davis & Crump partner Martin Crump is a member of the Plaintiffs' Steering Committee and served as Co-Lead of the Cook MDL. The firm developed experts, obtained *Daubert* orders, and later reached a global settlement with the defendant in the Cook MDL. The firm's work in Cook with Co-Lead Counsel resulted in a global settlement, although there were issues with the terms of the settlement. The firm was very active in document review—predominantly in AMS and Cook—which comprised more than half of the firm's time. Although the firm was active in wave work in the MDLs and worked on a bellwether case in BSC, the firm obtained no verdicts and the firm's sole BSC bellwether was dismissed prior to trial on summary judgment. The firm was played an important supportive role across multiple MDLs, including AMS, Boston Scientific, and Bard. The firm submitted 12,751.95 hours for review by the FCC. The Fee Committee recognized a total of 11,381.65 hours and $120,902.90 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $2,695,000.00 (0.7700000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $120,902.90 in expenses.

**Davis, Bethune & Jones, L.L.C.** The firm contributed to the common benefit of the Bard and BSC MDLs. The firm participated in discovery, briefing, expert development, trial preparation and the joint trial of a Bard and BSC product.  The firm submitted 2,968.70 hours for review by the FCC. The Fee Committee recognized a total of 1,397.80 hours and $346,652.48 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $551,845.00 (0.1576700%), plus reimbursement of the firm's $346,652.48 in expenses.

**Doyle Lowther, LLP.** The firm contributed to the common benefit of the BSC and Cook MDLs. The firm participated in discovery for both the Cook MDL and for a BSC Wave One case. The firm submitted 1,409.35 hours for review by the FCC. The Fee Committee recognized a total of 1,150.90 hours and $2,751.93 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $210,026.25 (0.0600075%), plus reimbursement of the firm's $2,751.93 in expenses.

**Edwards Kirby, LLP.** The firm contributed to the common benefit of the Bard MDL. The firm participated in preparation of a Bard bellwether case for trial. The firm submitted 577.90 hours for review by the FCC. The Fee Committee recognized a total of 499.50 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit,

and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $157,360.00 (0.0449600%).

**Evers & Preston.** The firm contributed to the common benefit of the Ethicon MDL. The firm participated in document review in the Ethicon MDL. The firm submitted 2,579.65 hours for review by the FCC. The Fee Committee recognized a total of 2,512.35 hours and the firm did not submit expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $472,500.00 (0.1350000%).

**Fibich, Leebron, Copeland & Briggs.** Fibich, Leebron, Copeland & Briggs partner Erin Copeland is a member of the Plaintiffs' Steering Committee. The firm worked with Co-Leads in the BSC, AMS, Bard and Cook MDLs, providing deposition support and assisting with discovery. The firm submitted 11,888.76 hours for review by the FCC. The Fee Committee recognized a total of 10,124.26 hours and $155,301.31 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $4,000,003.00 (1.1428580%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $155,301.31 in expenses.

**Fleming Nolen Jez, LLP.** Fleming Nolen Jez's former partner Laura Yaeger was a member of the Plaintiffs' Steering Committee and her seat was replaced by Karen Beyea-Schroeder in 2013 when Yaeger left the firm. Ms. Beyea-Schroeder was also Co-Lead in the Neomedic MDL. The firm contributed to the common benefit of the AMS, BSC, Bard, Cook, and Ethicon MDLs. The firm participated in discovery related to wave cases as well as the preparation of depositions in the BSC, Bard, and Ethicon MDLs. The firm also performed document review for all MDLs. The firm submitted 9,843.86 hours for review by the FCC. The Fee Committee recognized a total of 8,378.07 hours and $15,862.79 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $1,435,000.00 (0.4100000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $15,862.79 in expenses.

**Frankovitch, Anetakis, Simon, Decapio & Pearl, LLP.** Frankovitch, Anetakis, Simon, Decapio & Pearl partner Carl Frankovitch serves as Plaintiffs' Co-Liaison Counsel and is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of all the MDLs through his role in leadership. Carl Frankovitch was important to the MDLs as a member of the West Virginia bar and a trusted liaison in the litigation. The firm also reviewed a large number of documents in the Cook MDL. The firm submitted 1,622.90 hours for review by the FCC. The Fee Committee recognized a total of 1,524.75 hours and $28,892.78 in expenses. The firm contributed

$350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $1,610,000.00 (0.4600000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $28,892.78 in expenses.

**Freese & Goss, PLLC.** Freese & Goss partner Tim Goss is a member of the Plaintiffs' Steering Committee. In reviewing the firm, the Committee notes the close working relationship between Freese & Goss and Matthews and Associates. The firm performed common benefit work in the AMS, Boston Scientific and Ethicon MDLs. The firm's contribution to common benefit was principally through the trial of cases in state and federal court, including a bellwether MDL trial (*Lewis)* which resulted in a directed verdict for the Defendant. The firm tried six cases and resolved an additional two shortly before trial. The firm also participated in depositions and document review, primarily related to its state court and wave cases. The trial efforts of the firm assisted the overall progress of the MDL through continued pressure upon the defendants with focus on BSC and Ethicon. The firm made contributions to the common benefit of the MDLs through its state court work. The firm submitted 49,788.99 hours for review by the FCC. The FCC recognized a total of 38,744.48 hours and $910,588.03 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $14,097,828.50 (4.0279510%), plus reimbursement of the firms' $350,000.00 in assessments, and reimbursement of $910,588.03 in expenses.

**Girard Gibbs.** Girard Gibbs partner AJ De Bartolomeo is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS, BSC, Coloplast, and Ethicon MDLs. The firm participated in the development of the Plaintiff Fact Sheet and attended Science Day. The firm submitted 132.08 hours for review by the FCC. The Fee Committee recognized a total of 67.26 hours and $4,337.32 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $15,907.50 (0.0045450%), plus reimbursement of the firm's $4,337.32 in expenses.

**Goza Honnold.** The firm contributed to the common benefit of the Ethicon MDL. The firm participated in discovery, expert development and document review in the Ethicon MDL. The firm submitted 1,483.35 hours for review by the FCC. The Fee Committee recognized 1,305.60 hours and $17,629.76 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $410,655.00 (0.1173300%), plus reimbursement of the firm's $17,629.76 in expenses.

**Greene Ketchum Farrell Bailey & Tweel, L.L.P.** Greene Ketchum Farrell Bailey & Tweel partner Paul T. Farrell, Jr. serves as Co-Liaison Counsel for the MDLs and is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Bard and BSC MDLs. The firm contributed to bellwether trials and performed wave discovery. The firm submitted 4,912.20 hours for review by the FCC. The Fee Committee recognized a total of 4,392.40 hours and $26,653.16 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $2,415,000.00 (0.6900000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $26,653.16 in expenses.

**Gustafson Gluek.** Gustafson Gluek contributed to the common benefit of the AMS MDL. The firm performed discovery work and briefed issues at the request of leadership. The firm submitted 1,075.50 hours for review by the FCC. The Fee Committee recognized a total of 725.00 hours and $1,707.61 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $158,900.00 (0.0454000%), plus reimbursement of the firm's $1,707.61 in expenses.

**Heninger Garrison Davis, LLC.** The firm contributed to the BSC MDL. The firm performed document review for the BSC MDL. The firm submitted 895.85 hours for review by the FCC. The Fee Committee recognized 784.6 hours and $3,639.07 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $177,292.50 (0.0506550%), plus reimbursement of the firm's $3,639.07 in expenses.

**Herman Gerel.** The firm contributed to the AMS and BSC MDLs. The firm participated in the preparation and taking of corporate representative depositions for the AMS MDL. The firm also performed document review for the BSC MDL. The firm submitted 1,169.05 hours for review by the FCC. The Fee Committee recognized 907.45 hours and $25,861.53 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $173,670.00 (0.0496200%), plus reimbursement of the firm's $25,861.53 in expenses.

**Herman & Katz.** The firm contributed to the common benefit of the AMS MDL. The firm participated in document review and preparation for corporate representative depositions for the AMS MDL. The firm submitted 837.80 hours for review by the FCC. The Fee Committee

recognized 699.00 hours and $15,810.91 in expenses.  The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $119,175.00 (0.0340500%), plus reimbursement of the firm's $15,810.91 in expenses.

**Hersh and Hersh.** Hersh and Hersh former partner Amy Eskin is a member of the Plaintiffs' Steering Committee, the Executive Committee, and Co-Lead of the AMS MDL.  The firm contributed to the common benefit of the AMS MDL.  While employed by Hersh and Hersh, Ms. Eskin appeared at status conferences, attended Executive Committee meetings, and drafted pleadings and discovery motions.  The firm contributed to the Delaware Consolidated AMS litigation, performed document review, and prepared for and contributed to Science Day.  The firm submitted 2,448.15 hours for review by the FCC. The Fee Committee recognized a total of 1,005.60 hours and $5,114.80 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $266,255.50 (0.0760730%), plus reimbursement of the firm's $5,114.80 in expenses.

**Hissey Kientz.** Hissey Kientz partner Erik Walker is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Cook and Ethicon MDLs. The firm participated in the preparation of the Ethicon Bellwether case, Bellew. The firm submitted 1,266.10 hours for review by the FCC. The Fee Committee recognized a total of 1,145.90 hours and $2,619.91 in expenses.  The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $306,978.00 (0.0877080%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $2,619.91 in expenses.

**Hunt & Lees, L.C.** Hunt & Lees contributed to the common benefit of the Bard MDL.  The firm conducted a focus group, performed document review, and assisted with trial preparation for a Bard bellwether case.  The firm submitted 278.40 hours for review by the FCC. The Fee Committee recognized a total of 261.70 hours and $14,895.21 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $82,425.00 (0.0235500%), plus reimbursement of the firm's $14,895.21 in expenses.

**Irpino Avin & Hawkins Law Firm.** The firm contributed to the Bard, Cook and Ethicon MDLs. The firm participated in discovery, specifically privilege matters, in the Bard, Cook and Ethicon

MDLs.  The firm submitted 3,286.90 hours for review by the FCC. The Fee Committee recognized a total of 3,285.80 hours and a total of $6,999.14 in expenses.  The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $785,074.50 (0.2243070%), plus reimbursement of the firm's $6,999.14 in expenses.

**Johnson Becker, PLLC.** Johnson Becker partner Lisa Gorshe is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS and BSC MDLs. The firm participated in discovery, law and briefing and conducted depositions for the AMS MDL. The firm submitted 3,243.40 hours for review by the FCC. The Fee Committee recognized a total 3,126.40 hours and a total of $34,897.65 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $715,102.50 (0.2043150%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $34,897.65 in expenses.

**Junell & Associates.** Junell & Associates contributed to the common benefit of the AMS MDL. The firm participated in settlement negotiations with AMS with implications for all cases in the MDL and assisted with drafting a Master Settlement Agreement. The firm submitted 2,249.76 hours for review by the FCC. The Fee Committee recognized a total of 526.90 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $165,970.00 (0.0474200%).

**Keith Miller Butler.**  Keith Miller Butler contributed to the common benefit of the Ethicon MDL. The firm performed document review, participated in general discovery work, prepared for and conducted depositions, and drafted motions.  The firm submitted 4,130.00 hours for review by the FCC. The Fee Committee recognized a total of 3,926.30 hours and $17,151.53 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $904,638.00 (0.2584680%), plus reimbursement of the firm's $17,151.53 in expenses.

**Kell Lampin, L.L.C.** Kell Lampin contributed to the common benefit of the AMS, Bard, and Ethicon MDLs.   The firm performed general Ethicon discovery, including preparing for depositions, conducting depositions, and document review.  Additionally, the firm deposed plaintiffs and case-specific witnesses for a Bard Wave case, an Ethicon bellwether case, and a compensable AMS state court case.  The firm submitted 1,714.60 hours for review by the FCC. The Fee Committee recognized a total of 1,609.90 hours and $43,541.16 in expenses. The firm did

not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $327,101.25 (0.0934575%), plus reimbursement of the firm's $43,541.16 in expenses.

**Kline & Specter, P.C.** Kline & Specter partner Lee B. Balefsky is a member of the Plaintiffs' Steering Committee. Although in a position of leadership in the MDL, the firm generally preferred to work in state court in their home venue of Philadelphia, Pennsylvania, and expended significant hours fighting removal of Ethicon cases from state court there. This effort included thousands of hours of document review on the discrete issue of whether remand was appropriate. The Mass Tort Program in Philadelphia was an additional pressure point in the Ethicon litigation. The firm participated in early Ethicon document review as well. However, the firm's efforts often conflicted with the cooperative efforts in the MDL, and the firm mandamused the Court, which the Fourth Circuit denied in turn. In the Philadelphia Mass Tort Program in Pennsylvania State Court, the firm assisted in obtaining several successful verdicts against Ethicon, although most of those verdicts came on products where Plaintiffs' verdicts were already obtained either in the MDL or in prior state courts. The firm acknowledges that much of the work product used in their state court trials was obtained from the MDL, and MDL attorneys – including leadership in the Ethicon MDL, BSC MDL and others –also participated in the work-up and trial of those cases. The firm appeared at a number of MDL corporate witness liability depositions by telephone but asked no questions at most of them. The firm tried no cases in the MDL and was not an active participant in the overall strategy and decision-making of the PSC. The Fee Committee notes that the firm declined to participate meaningfully in the fee allocation process, declining to provide additional information to specific entries whose appropriateness was questioned. The firm has ultimately performed good work in representing their individual clients in state court in Pennsylvania. The firm's efforts largely consisted of utilizing common benefit work from the MDL rather than working to create common benefit to share with and make available to MDL claimants. The firm submitted 32,270.19 hours for review by the FCC. The Fee Committee recognized a total of 9,402.19 hours and $667,584.48 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $3,745,000.00 (1.0700000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $667,584.48 in expenses.

**Laminack, Pirtle & Martines, L.L.P.** Laminack, Pirtle & Martines contributed to the common benefit of the BSC MDL.  The firm prepared for and conducted the depositions of corporate witnesses and defense experts for the BSC MDL. The firm submitted 756.75 hours for review by the FCC.  The Fee Committee recognized a total of 756.75 hours and $37,286.70 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the

Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $639,037.00 (0.1825820%), plus reimbursement of the firm's $37,286.70 in expenses.

**The Lanier Law Firm.** Lanier Law Firm partner Rick Meadow is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS, BSC, Bard, and Ethicon MDLs. The firm participated in discovery for wave cases in the Bard, BSC, and Ethicon MDLs. The firm also performed document review for the BSC MDL. The firm submitted 3,847.04 hours for review by the FCC. The Fee Committee recognized a total of 3,660.64 hours and $15,671.35 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $654,228.75 (0.1869225%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $15,671.35 in expenses.

**Levin, Papantonio, Thomas, Mitchell, Rafferty, Proctor, P.A.** Levin, Papantonio, Thomas, Mitchell, Rafferty, Proctor partner Robert Price is a member of the Plaintiffs' Steering Committee. The firm contributed to the AMS, Bard, BSC and Ethicon MDLs. The firm participated in discovery for wave cases for the Ethicon MDL. The firm appeared to have excessive time for many of the work assignments. The firm also performed document review and research and briefing for the Bard MDL.  The firm submitted 2,938.50 hours for review by the FCC. The Fee Committee recognized a total of 1,975.08 hours and $41,058.32 in expenses.   The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $383,643.75 (0.1096125%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $41,058.32 in expenses.

**Levin Simes, LLP.** Levin Simes partner Amy Eskin started litigation against AMS before the creation of the MDL and was named Co-Lead of the AMS MDL upon its creation as well as a member of the Executive Committee and the Plaintiffs' Steering Committee. The firm participated in the preparation of the strategy for proving liability in the AMS MDL.  The firm also participated in depositions and document review in the AMS MDL. Despite the firm's leadership position in AMS, Levin Simes' commitment to the litigation waned at times and other firms were forced to increase their participation. There were depositions taken by the firm which had to be re-taken in the MDL because the original deposition was taken for specific cases and not for MDL purposes. There were no trials in the AMS MDL, and the firm had limited work in the other MDLs. The firm submitted 26,072.65 hours for review by the FCC. The Fee Committee recognized a total of 14,298.14 hours and $484,095.89 in expenses. The firm contributed $400,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the

common benefit of the MDLs, the Fee Committee recommends an allocation of $5,510,001.00 (1.5742860%), plus reimbursement of the firm's $400,000.00 in assessments, and reimbursement of $484,095.89 in expenses.

**Lockridge Grindal Nauen.** Lockridge Grindal Nauen partner Yvonne Flaherty was appointed to the Plaintiffs' Steering Committee. The firm primarily contributed to the AMS litigation. The firm conducted document review, took AMS liability depositions, worked up experts, and worked with leadership and the AMS team to develop and implement a bellwether strategy. As the AMS litigation moved towards trial, the firm assisted with deposition designations. The firm was also responsible for managing the Minnesota State court litigation as Co-Lead Counsel and briefed and argued issues related to release of the Ambroff documents, a motion which occurred prior to the MDL hearing and provided motion papers and transcripts to MDL leadership in advance of a comparable MDL hearing. In the BSC litigation, the firm assisted the development of expert witnesses. In Ethicon, the firm responded to calls for assistance in managing the volume of production and deposition preparation. The firm submitted 17,487.30 hours for review by the FCC. The Fee Committee recognized 15,871.50 hours and $79,703.00 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $6,405,000.00 (1.8300000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $79,703.00 in expenses.

**Lopez McHugh.** The firm contributed to the common benefit of the BSC, Bard, and AMS MDLs. The firm primarily participated in the workup of two early BSC potential bellwethers, Simmons and Meadows. The firm submitted 264.78 hours for review by the FCC. The Fee Committee recognized a total of 255.58 hours and $3,293.31 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $43,601.25 (0.0124575%), plus reimbursement of the firm's $3,293.31 in expenses.

**Lyon Firm.** The firm contributed to the common benefit of the Ethicon MDL. The firm performed document review for the Ethicon MDL. The firm submitted 307.00 hours for review by the FCC. The Fee Committee recognized a total of 232.00 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $43,601.25 (0.0124575%).

**Matthews & Associates.** Matthews & Associates partner David Matthews is a member of the Plaintiffs' Steering Committee. In reviewing the firm, the Committee notes the close working

relationship between Freese & Goss and Matthews and Associates. The firm performed common benefit work in the AMS, Boston Scientific and Ethicon MDLs. The firm's contribution to common benefit was principally through the trial of cases in state and federal court, including a bellwether MDL trial (*Lewis*) which resulted in a directed verdict for the Defendant. The firm tried six cases and resolved an additional two shortly before trial. The firm also participated in depositions and document review, primarily related to its state court and wave cases. The trial efforts of the firm assisted the overall progress of the MDL through continued pressure upon the defendants with focus on BSC and Ethicon. The firm made contributions to the common benefit of the MDLs through its state court work. The firm submitted 8,140.00 hours for review by the FCC. The FCC recognizes a total of 6,602.00 hours and $376,254.76 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $4,122,174.00 (1.1777640%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $376,254.76 in expenses.

**Mazie Slater Katz & Freeman.** Mazie Slater Katz & Freeman contributed to the common benefit of the Ethicon MDL. The firm was one of the first to bring TVM lawsuits and focused almost entirely upon litigation in New Jersey state court. In pursuit of the New Jersey litigation, the firm undertook discovery, document review, trial preparation and trial. The firm tried the Gross case in New Jersey and that work has been recognized. The Fee Committee notes that multiple firms submitted substantial time related to the trial of the Gross case. The firm's work contributed to the common benefit of the MDL in the pursuit of claims against Ethicon and in the availability of documents discovered in the New Jersey litigation. For a period of time there was reluctance by the firm to make expert witnesses available for the common benefit of the MDL without seeking a personal financial arrangement with the specific plaintiff's firm involved in the request. The firm submitted 29,752.27 hours for review by the FCC. The Fee Committee recognized a total of 19,482.75 hours and $1,815,034.41 in expenses. The fee and expense submission of the firm were very difficult for the committee to examine and much effort was expended by the Fee Committee in evaluating the submission of the firm. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $6,020,000.00 (1.7200000%), plus reimbursement of the firm's $1,815,034.41 in expenses.

**Meyers & Flowers, LLC.** Meyers & Flowers partner Pete Flowers is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Bard, BSC and Ethicon MDLs. The firm participated in discovery for wave cases in the Bard, BSC and Ethicon MDLs. The firm also performed document review for the Bard, BSC and Ethicon MDLs. The firm submitted 2,633.38 hours for review by the FCC. The Fee Committee recognized 1,924.80 hours

and $32,328.06 in expenses. The firm contributed $100,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $454,728.75 (0.1299225%), plus reimbursement of the firm's $100,000.00 in assessments, and reimbursement of $32,328.06 in expenses.

**Miller Firm, LLC.** Miller Firm partner Michael Miller is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the MDLs through its payment of the MDL assessment. The firm contributed $350,000.00 in assessments. The Fee Committee recommends reimbursement of the firm's $350,000.00 in assessments.

**The Monsour Law Firm.** Monsour Law Firm partner Douglas Monsour is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the MDLs, with a focus in the Ethicon and Boston Scientific MDLs. The firm was trial counsel in two Boston Scientific cases—the first in Massachusetts state court which resulted in a defense verdict, and then as co-lead counsel in the first consolidated sling trial in the MDL in Boston Scientific in the Southern District of West Virginia, Judge Berger presiding, which resulted in a verdict for plaintiffs that was affirmed on appeal by the Fourth Circuit. The firm also contributed to the strategic development of the cases against BSC and Ethicon, assisting in training meetings for wave counsel that often had less exposure and experience in these cases. The firm also conducted corporate liability witness depositions in Boston Scientific and Ethicon, some of which were important to the overall litigation. The firm provided leadership in the area of expert witnesses for Plaintiffs across MDLs. The firm submitted 14,144.85 hours for review by the FCC. The Fee Committee recognized a total of 13,267.75 hours and $232,499.22 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $4,965,002.00 (1.4185720%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $232,499.22 in expenses.

**Moody Law Firm, Inc.** Moody Law Firm partner Willard J. Moody, Jr. is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS and BSC MDLs. The firm performed document review. The firm also deposed AMS and BSC witnesses. The firm submitted 4,618.06 hours for review by the FCC. The Fee Committee recognized a total of 4,125.97 hours and $10,555.33 in expenses. The firm contributed $250,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $844,312.00 (0.2412320%), plus reimbursement of the firm's $250,000.00 in assessments, and reimbursement of $10,555.33 in expenses.

**Morgan & Morgan, PA.** Morgan & Morgan partner Michael Goetz is a member of the Plaintiffs' Steering Committee.  The firm contributed to the Bard MDL. The firm participated in the depositions of plaintiffs and treating physicians in the Bard MDL. The firm submitted 521.54 hours for review by the FCC. The Fee Committee recognized 513.54 hours and $961.36 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $101,771.25 (0.0290775%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $961.36 in expenses.

**Mostyn Law Firm P.C.** Mostyn Law Firm partner Steve Mostyn was a Co-lead in the Coloplast MDL and a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the BSC and Coloplast MDLs. The firm conducted discovery and liability work-up for the BSC MDL. The firm also helped negotiate settlements in the Coloplast MDL that benefitted other firms in the MDL.  The firm submitted 3,058.05 hours for review by the FCC. The Fee Committee recognized a total of 677.65 hours and $4,531.84 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $213,465.00 (0.0609900%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $4,531.84 in expenses.

**Motley Rice, LLC.** Motley Rice, LLC played an active role in the state and federal litigation of transvaginal mesh from its inception.  Motley Rice partner Fred Thompson was appointed by Judge Goodwin Coordinating Co-Lead for all transvaginal mesh MDLs and as a member of the Plaintiffs' Steering Committee and Executive Committee.  Motley Rice partner Fidelma Fitzpatrick was appointed as Co-Lead Counsel for the AMS MDL and as a member of the Plaintiffs' Steering Committee. The firm managed litigation in state and federal court, conducted discovery, tried cases, coordinated work among the MDLs, briefed and argued appeals, and negotiated and resolved cases.  The firm also had wave cases. Prior to formation of the MDL litigation, Motley Rice engaged in investigation and litigation of Boston Scientific cases in Massachusetts state court and AMS cases in Delaware and Minnesota.  Motley Rice developed and managed general liability experts, including reports, depositions, and briefing.  Motley Rice secured the first MDL verdict against Ethicon on a TVT-O product. The firm had common benefit work recognized in each of the major MDLs. The firm submitted 87,731.44 hours for review by the FCC. The Fee Committee recognized a total of 60,253.34 hours and $2,927,113.91 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $49,000,000.00 (14.0000000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $2,927,113.91 in expenses.

**Mueller Law Firm.** Mueller Law Firm partner Mark Mueller is a member of the Plaintiffs' Steering Committee and was Co-Lead of the Coloplast MDL.   The firm was Co-chair of the Science and Experts Committee which was functioning in the early stages of the litigation.  The firm devoted time and resources to science and expert projects, principally in the Bard and AMS MDLs.  The firm pursued and obtained experts for the litigation, and was involved in developing such experts and preparing reports for substantial numbers of experts.  The firm is credited with the discovery and work up of the MSDS related to Bard polypropylene and helped pursue its use in the litigation. This piece of evidence contributed to the success of the litigation. The firm's time submission to the Committee was of poor quality and posed a challenge for the Committee which required investigation by the Committee to determine the common benefit time and expense. The firm submitted 35,922.39 hours for review by the FCC. The Fee Committee recognized 11,846.40 hours and $263,115.43 in expenses.  The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $4,760,000.00 (1.3600000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $263,115.43 in expenses.

**NastLaw, L.L.C.** NastLaw partner Dianne Nast is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS, BSC, Coloplast, and Ethicon MDLs. The firm performed document review, research, and deposition work for the Ethicon MDL. The firm submitted 2,165.10 hours for review by the FCC. The Fee Committee recognized a total of 2,102.30 hours and $20,515.89 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $399,813.75 (0.1142325%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $20,515.89 in expenses.

**Nations Law Firm.** The firm contributed to the common benefit of the BSC MDL. The firm participated in the deposition of a BSC bellwether plaintiff. The firm submitted 98.60 hours for review by the FCC. The Fee Committee recognized a total of 65.50 hours and $30,231.86 in expenses.  The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $15,487.50 (0.0044250%), plus reimbursement of the firm's $30,231.86 in expenses.

**Neblett, Beard & Arsenault.** Neblett, Beard & Arsenault partner Richard Arsenault is a member of the Plaintiffs' Steering Committee.  The firm contributed to the common benefit of the AMS, Bard, BSC, Cook and Ethicon MDLs.  The firm participated in discovery and document review

for the Cook and Ethicon MDLs.  The firm submitted 837.27 hours for review by the FCC. The Fee Committee recognized 765.12 hours and $8,523.52 in expenses.  The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $137,340.00 (0.0392400%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $8,523.52 in expenses.

**The Oliver Law Group, P.C.** Oliver Law Group partner Alyson Oliver is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the AMS, Cook, and Ethicon MDLs. The firm completed discovery for Ethicon wave cases and performed document review. The firm submitted 2,510.10 hours for review by the FCC. The Fee Committee recognized a total of 2,259.30 hours and $17,040.78 in expenses. The firm contributed $175,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $436,170.00 (0.1246200%), plus reimbursement of the firm's $175,000.00 in assessments, and reimbursement of $17,040.78 in expenses.

**Osborne & Associates.** Osborne & Associates partner Joseph Osborne is a member of the Plaintiffs' Steering Committee.  The firm contributed to the BSC and Ethicon MDLs.  The firm participated in bellwether cases for the BSC and Ethicon MDLs.  The firm also participated in document review for the BSC MDL.  The firm submitted 1,247.20 hours for review by the FCC. The Fee Committee recognized 740.80 hours.  The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $533,347.50 (0.1523850%).

**Paul Sadler Law Firm.** The firm performed common benefit work in the CR Bard MDL.  The firm's contribution to common benefit focused upon the taking of depositions in MDL wave cases and the taking of expert depositions in the MDL. The firm also took the lead in the deposition of the Chief Operating Officer of Bard. The firm submitted 315.10 hours for review by the FCC. The Fee Committee recognized a total of 211.10 hours and $2,332.07 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $130,704.00 (0.0373440%), plus reimbursement of the firm's $2,332.07 in expenses.

**Perdue & Kidd.** Perdue & Kidd contributed to the common benefit of the AMS, Bard, Boston Scientific and Ethicon MDLs. The firm performed discovery, deposition and bellwether trial work in the MDLs. The firm took the deposition of Chevron Phillips Sumika in furtherance of issues regarding the Material Safety Data Sheet for Marlex Polypropylene. The firm submitted 3,337.05

hours for review by the FCC. The Fee Committee recognized a total of 3,295.80 hours and $68,707.62 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $1,785,000.00 (0.5100000%), plus reimbursement of the firm's $68,707.62 in expenses.

**Piscitelli Law Firm.** The Piscitelli Law Firm contributed to the common benefit of the Ethicon MDL. The firm performed document review, prepared for depositions, and deposed Ethicon sales representatives for two wave cases. The firm submitted 58.10 hours for review by the FCC. The Fee Committee recognized a total of 54.30 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $12,836.25 (0.0036675%).

**Potts Law Firm.** Potts Law Firm partner Derek Potts is a member of the Plaintiffs' Steering Committee, Executive Committee, and is a Co-Lead Plaintiff's Counsel in the Bard and Neomedic MDLs. Potts Law Firm was an active participant early in the formation of the TVM MDL. This early work included time in document review and work in anticipation of Bard sling trials. The firm also took Bard corporate depositions. Further, the firm, in connection with several other firms, gathered cases at the request on AMS to assist in resolution under AMS's resolution program. In the Neomedic MDL, the firm identified the limited financial resources of the defendant and worked to pursue settlement opportunities for plaintiffs. Most recently, the firm worked at the Court's request in resolving cases with pro se plaintiffs or where plaintiff's counsel has few filings. Mr. Potts' work in resolving cases has aided in reducing the number of pending cases on the active docket. The firm submitted 29,172.24 hours for review by the FCC. The Fee Committee recognized a total of 19,287.84 hours and $210,083.09 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $6,975,003.00 (1.9928580%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $210,083.09 in expenses.

**Pritzker Hageman, P.A.** The firm contributed to the common benefit of the Cook and AMS MDLs. The firm primarily participated in the AMS Minnesota Consolation and performed document review for the Cook MDL. The firm submitted 178.10 hours for review by the FCC. The Fee Committee recognized a total of 116.10 hours and $6,455.24 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's

overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $25,436.25 (0.0072675%), plus reimbursement of the firm's $6,455.24 in expenses.

**Reilly Pozner.** Reilly Pozner former partner Joseph Zonies is a member of the Plaintiffs' Steering Committee. The firm participated in discovery, briefing, expert matters, document review and bellwether and consolidated cases in the Ethicon MDL. The firm submitted 6,390.30 hours for review by the FCC. The Fee Committee recognized 7,148.30 hours and $225,913.39 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $2,920,001.00 (0.8342860%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $225,913.39 in expenses.

**Restaino Law, LLC.** The firm performed common benefit work in the Ethicon MDL. The firm participated in the review of medical literature and assisted in the taking of expert depositions. The firm submitted 1,913.60 hours for review by the FCC. The Fee Committee recognized 1,323.60 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $264,521.25 (0.0755775%).

**Robins Cloud, LLP.** Robins Cloud partner Bill Robins is a member of the Plaintiffs' Steering Committee. The firm performed common benefit work in the Ethicon MDL. The firm participated in discovery and depositions of Ethicon corporate witnesses. The firm submitted 522.60 hours for review by the FCC. The Fee Committee recognized 502.90 hours and $33,552.71 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $145,390.00 (0.0415400%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $33,552.71 in expenses.

**Robinson Calcagnie, Inc.** Robinson Calcagnie former partner Karen Menzies is a member of the Plaintiffs' Steering Committee. The firm performed common benefit work in MDLs. The firm participated in meetings of the Plaintiffs' Steering Committee. The firm submitted 278.20 hours for review by the FCC. The Fee Committee recognized 32.00 hours and $13,518.39 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $7,560.00 (0.0021600%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $13,518.39 in expenses.

**Salim Beasley, L.L.C.** Salim Beasley partner Robert Salim is a member of the Plaintiffs' Steering Committee and serves as Co-Lead for the Coloplast MDL. The firm contributed to the common benefit of all the pelvic mesh MDLs, with particular focus in Coloplast and Ethicon MDLs. As Co-Lead for the Coloplast MDL, the firm also worked on an early settlement resolution program. The firm conducted Coloplast discovery and briefing. The firm submitted 7,102.72 hours for review by the FCC. The Fee Committee recognized a total of 5,729.07 hours and $107,219.58 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $2,170,000.00 (0.6200000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $107,219.58 in expenses.

**The Sanders Firm.** Sanders Firm partner Victoria Maniatis is a member of Plaintiffs' Steering Committee. The firm participated in discovery in the AMS and Ethicon MDLs, science and expert matters in the AMS MDL, and document review in the AMS, Ethicon and BSC MDLs. The firm submitted 1,454.70 hours for review by the FCC. The Fee Committee recognized a total of 672.30 hours and $102,554.64 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $101,773.00 (0.0290780%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $102,554.64 in expenses.

**Saunders & Walker, PA.** Saunders & Walker partner Joseph Saunders is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Ethicon MDL. The firm worked in obtaining and reviewed documents from the Food and Drug Administration. The firm submitted 190.05 hours for review by the FCC. The Fee Committee recognized a total of 125.45 hours and $134.64 in expenses. The firm contributed $100,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $29,662.50 (0.0084750%), plus reimbursement of the firm's $100,000.00 in assessments, and reimbursement of $134.64 in expenses.

**Schroeder Law Office.** Schroeder Law Office partner Karen H. Beyea-Schroeder is a member of the Plaintiffs' Steering Committee and Co-Lead of the Neomedic MDL. As a Co-Lead for the Neomedic MDL, she investigated distributor liability causes of action and distributor policies, negotiated lien waivers with Medicare and Rawlings, and negotiated lien resolution services to be provided at no expense. Schroeder Law Office also contributed to negotiating the Neomedic settlement release and substitution process to increase settlement participation. The firm submitted 20.40 hours for review by the FCC. The Fee Committee recognized a total of 20.40 hours (the

majority of Ms. Schroeder's time was submitted while she was an attorney at Fleming, Nolen & Jez). The firm did not pay an assessment. Based on a complete review of the time, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $4,830.00 (0.0013800%).

**Seeger Weiss, LLP.** Seeger Weiss partner Jeffrey Grand is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Ethicon and Bard MDLs, but their work was primarily for the New Jersey litigation as they served as co-liaison counsel. The firm participated in depositions and worked up bellwether trial candidates in the New Jersey litigation. The firm submitted 608.50 hours for review by the FCC. The Fee Committee recognized a total of 543.25 hours and $98,011.34 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $101,771.25 (0.0290775%), plus reimbursement of the firm's $98,011.34 in expenses.

**Simmons Browder Gianaris Angelides & Barnerd, L.L.C.** Simmons Browder Gianaris Angelides & Barnerd partner John Foley is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Cook and Ethicon MDLs. The firm performed document review and deposition work for the Ethicon MDL. The firm submitted 3,405.65 hours for review by the FCC. The Fee Committee recognized a total of 2,987.67 hours and $23,049.47 in expenses. The firm contributed $250,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $393,498.00 (0.1124280%), plus reimbursement of the firm's $250,000.00 in assessments, and reimbursement of $23,049.47 in expenses.

**Simmons Hanly Conroy, L.L.C.** Simmons Hanly Conroy partner Jayne Conroy is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Cook MDL. The firm performed document review.  The firm submitted 4,907.05 hours for review by the FCC. The Fee Committee recognized a total of 351.90 hours and $18,754.07 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $100,100.00 (0.0286000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $18,754.07 in expenses.

**Sommers Schwartz, P.C.** Sommers Schwartz contributed to the common benefit of the Ethicon MDL.  The firm performed document review, prepared for depositions, and deposed plaintiffs and case-specific witnesses for an Ethicon bellwether case. The firm submitted 267.15 hours for review

by the FCC. The Fee Committee recognized a total of 214.90 hours and $5,042.70 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $36,330.00 (0.0103800%) and reimbursement of $5,042.70 in expenses.

**Taylor Martino.** The firm contributed to the common benefit of the AMS, BSC, and Ethicon MDLs. The firm participated in document review in the AMS, BSC, and Ethicon MDLs. The firm submitted 83.30 hours for review by the FCC. The Fee Committee recognized a total of 17.00 hours and $49,903.58 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $4,016.25 (0.0011475%), plus reimbursement of the firm's $49,903.58 in expenses.

**Turning Point Litigation – Mullins Duncan Harrell & Russell PLLC.** The firm contributed to the common benefit of the Bard MDL by providing trial support for the first bellwether trials. The firm also participated in discovery work-up for wave cases in the Bard MDL. The firm submitted 10,620.50 hours for review by the FCC. The Fee Committee recognized a total of 5,775.10 hours and $10,799.05 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $401,544.50 (0.1147270%), plus reimbursement of the firm's $10,799.05 in expenses.

**Verhine & Verhine.** The firm contributed to the common benefit of the Bard and BSC MDLs. The firm participated in the workup of wave cases in the Bard and BSC MDLs. The firm submitted 182.35 hours for review by the FCC. The Fee Committee recognized a total of 119.35. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $25,436.25 (0.0072675%).

**Wagstaff & Cartmell, LLP.** Wagstaff & Cartmell, LLP's initial work on transvaginal mesh litigation pre-dated the formation of the MDLs and continues to date. Wagstaff & Cartmell partner Tom Cartmell was appointed as member of the Executive Committee, the Plaintiffs' Steering Committee and Co-Lead Counsel for the Ethicon litigation. Wagstaff & Cartmell partner Jeff Kuntz served as the leader of the Ethicon Expert and Bellwether Committees during the Ethicon MDL. The Firm worked up experts for the Ethicon MDL and other manufacturers. The Firm also successfully defended those experts from *Daubert* challenges. Wagstaff & Cartmell took depositions of opposing experts, corporate representatives, and sales representatives in the Ethicon, Bard and AMS litigation. The Firm organized and led teams of document reviewers.

Wagstaff & Cartmell tried more cases to verdict as lead or co-lead counsel than any other plaintiff's firm involved in the MDL. The Firm tried the first Ethicon bellwether case and participated in the first bellwether trial resulting in a plaintiffs' verdict in the MDL in a sling case. The firm submitted 64,801.00 hours for review by the FCC. The Fee Committee recognized a total of 56,621.10 hours and $1,634,637.93 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $38,500,000.00 (11.0000000%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $1,634,637.93 in expenses.

**Waters & Kraus, L.L.P.** Waters & Kraus contributed to the common benefit of the Bard MDL. The firm completed a *Daubert* briefing project at the request of leadership. Additionally, the firm performed document review and legal research for the Bard MDL. The firm submitted 506.00 hours for review by the FCC. The Fee Committee recognized a total of 414.60 hours. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $111,440.00 (0.0318400%).

**Watts Guerra, LLP.** The firm contributed to the AMS, BSC Bard and Ethicon MDLs. The firm participated in discovery for wave cases in the BSC, Bard and Ethicon MDLs. The firm submitted 2,985.75 hours for review by the FCC. The Fee Committee recognized 2,837.70 hours and $16,457.55 in expenses. The firm did not pay an assessment. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $484,627.50 (0.1384650%), plus reimbursement of the firm's $16,457.55 in expenses.

**Wexler Wallace, LLP.** Wexler Wallace partner Ed Wallace is a member of the Plaintiffs' Steering Committee. Out of necessity during the course of the AMS MDL, the firm undertook an increasing role in the management of the MDL, acted as a lead of the MDL. The firm participated and was relied on by AMS leadership in the MDL. The firm also participated in spoliation briefing to the Court. Wexler Wallace was involved with the TVM litigation from its inception and contributed in early discovery, document review, corporate witness depositions, expert development and was co-lead counsel on two early bellwether trials for two manufacturers. The firm performed tasks across all of the manufacturer MDLs as requested by leadership. The firm submitted 40,763.29 hours for review by the FCC. The Fee Committee recognized a total of 33,079.96 hours and $420,171.37 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, the firm's in-person presentation to the Fee Committee, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $11,830,000.00 (3.3800000%), plus

reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $420,171.37 in expenses.

**Wilson Law, PA.** Wilson Law partner Kimberly Wilson is a member of the Plaintiffs' Steering Committee. The firm contributed to the common benefit of the Ethicon and Cook MDLs. The firm participated in discovery for wave cases in the Ethicon MDL. The firm submitted 344.01 hours for review by the FCC. The Fee Committee recognized a total of 313.20 hours and $1,421.43 in expenses. The firm contributed $350,000.00 in assessments. Based on a complete review of the time and expense records, the Fee Affidavit, and evaluation of the firm's overall contribution to the common benefit of the MDLs, the Fee Committee recommends an allocation of $107,390.50 (0.0306830%), plus reimbursement of the firm's $350,000.00 in assessments, and reimbursement of $1,421.43 in expenses.

Thank you for your prompt attention to the matters addressed herein.

Very truly yours,

_____
Henry G. Garrard, III
Chairperson

Renee Baggett

Riley L. Burnett, Jr.

Thomas P. Cartmell

Clayton A. Clark

Yvonne M. Flaherty

Carl N. Frankovitch

William H. McKee, Jr.

Joseph F. Rice

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

In re American Medical Systems, Inc. Pelvic Repair System                    MDL No. 2325
Products Liability Litigation

THIS DOCUMENT RELATES TO ALL CASES

_____

<u>**PLAINTIFFS' PROPOSED COUNSEL ORGANIZATIONAL STRUCTURE**</u>

COME NOW, the Plaintiffs represented by the undersigned counsel, with the unanimous

support of the counsel listed hereinbelow, and filed their proposed their Proposed Counsel

Organizational Structure in accordance with Paragraph 3 of the Initial Conference and Case

Management Order (Pretrial Order No. 1).

<u>**Proposed Organizational Structure**</u>

As discussed in Section 14.211 of the Manual for Complex Litigation (Fourth), "private

ordering" is the recommendation of attorneys with related actions for a particular organizational

structure to manage and conduct the litigation, and if adequate to represent the interests of the

litigants involved in the proceeding, is one of the methods that Courts have generally used to

appoint common benefit counsel in mass tort litigations.  In the related context of class action

counsel selection, the Third Circuit Task Force on the Selection of Class Counsel observed in its

Final Report that "[m]uch of the time [class action plaintiffs' counsel] work out among

themselves a voluntary plan to allocate responsibility, often referred to as 'private ordering.'"

*Selection of Class Counsel*, Final Report, Section I.D., p. 6.[1]  As the Task Force recognized,

_____

[1]  This Report is available on-line at:
http://www.ca3.uscourts.gov/classcounsel/final%20report%20of%20third%20circuit%20task%20force.pdf (last viewed 3/8/12).

"[c]ase law and experience indicates that the dominant scenario for appointing class counsel is deference to private ordering," further noting that there is generally no reason to consider alternatives to this structure "when the court is presented with qualified counsel who have been chosen through private ordering." Id., Section XII, p. 95.

Private ordering of a proposed organizational structure for the Plaintiffs in these related MDL's is necessary to allow the Plaintiffs to compete on a more level playing field with the Defendants, some of the largest medical device manufacturers in the world.  Unlike the Defendants and their counsel, counsel for the Plaintiffs in this litigation must merge quickly to create strategic alliances amongst themselves in order to litigate against several of the world's largest law firms.  Without private ordering of counsel structure, the Court is faced with the challenge of selecting from plaintiffs' law firms who are often competing with each other for "market share," and for leadership positions.  While it is the Court's obligation to appoint the leadership in these MDL's, the undersigned submit this suggested organizational structure that is being proffered by coordinating and cooperating counsel for Plaintiffs as a proposal to aid the Court.  The proposal comes as a result of meetings and much discussion among various counsel representing plaintiffs in these related women's pelvic repair product liability MDLs (MDL 2187; 2325; 2326; and 2327).  In circumstances like these related MDL's where a large number of Plaintiffs' counsel have made extensive efforts to organize themselves, the Court's role in the appointment-of-counsel process is hopefully assisted, and perhaps guided by that cooperative effort.  The structure proposed herein will avoid the potentially disorganized and inefficient leadership that can result from an organizational structure composed of competing applications.

The undersigned have met and conferred extensively with many of the attorneys who represent or who will represent Plaintiffs in this MDL in an effort to reach a consensus as to a

proposed counsel structure for purposes of this MDL, and for the related MDL's involving similar products (MDL No. 2326 (In re: Boston Scientific Corp. Pelvic Repair Systems Products Liability Litigation) and MDL No. 2327 (In re: Ethicon Pelvic Repair System Products Liability Litigation)).[2]  Much thought and work has gone into the organizational structure proposed herein.   This structure is the product of numerous meetings and many more conversations by attorneys from across the country who have devoted a substantial amount of time, effort and resources into the investigation and development of these cases, and who are committed to working together for the mutual interests of their respective clients.  Counsel who have led these discussions have been actively involved in the leadership of MDL 2187, and also have had extensive experience with mesh litigation pending elsewhere.  In crafting these proposals, the experience in managing existing MDL's involving mesh products both in this Court and other courts has been a guide.

Several months ago, a group of attorneys who have been actively involved in the litigation relating to these products began discussing how to address the many problems inherent in having a case involving a single plaintiff implanted with multiple pelvic repair products manufactured by different companies (including the counsel signing this petition, Henry G. Garrard, III, Fred Thompson and Bryan Aylstock).  Because of this one-plaintiff/multi-defendant factor, and the multiple factual and legal commonalities in these cases that transcend company lines, it was recognized that having these cases before a singular tribunal made practical sense.[3] Counsel for several women implanted with pelvic repair products sold by AMS, Boston Scientific, and Ethicon/Johnson & Johnson, including the counsel making this proposal,

---

[2] This proposal also will suggest changes to the leadership structure in the existing MDL 2187 to have all four (4) MDLs operate under a cohesive and consistent structure.

[3] Many of the common factual and legal issues that span these four related MDL's are outlined in the Plaintiffs' Preliminary Position Statement, which is being filed contemporaneously herewith.

ultimately filed separate motions for MDL treatment of those cases seeking transfer to this Court

for coordination with the related Bard cases already pending here.  In its Transfer Order, the

MDL Panel agreed that "[t]he actions in each MDL share factual issues that arise from the

allegations of defects in pelvic surgical mesh products manufactured by AMS, Boston Scientific

and Ethicon/Johnson & Johnson, respectively," and that this Court "is currently presiding over

MDL No. 2187, which involves claims of defects in similar pelvic surgical mesh products."

(MDL Transfer Order, p. 2).  The Panel further noted that "a number of these actions are brought

by plaintiffs who were implanted with multiple products made by multiple manufacturers.

Centralization of these three MDLs in one court will allow for coordination of any overlapping

issues of fact in such multi-product, multi-defendant actions." Id.   For the same reasons that

MDL centralization for these three MDL's before this Court was deemed appropriate, these

MDL's should have an organizational structure that is cohesive and coordinated across MDL

lines.

Each of these MDL's will involve common questions of fact and law that will need to be

addressed.  For example, all of the devices share a common regulatory lineage, and many of the

products at issue in these MDL's are fruit of the same cross-pollinated "family tree" of products.

As explained in Plaintiffs' motion filed with the Panel, each of these four manufacturers sought

FDA clearance for their respective pelvic repair devices through the FDA's § 510(k) application

process, wherein a device is allowed to be marketed if it is deemed "substantially equivalent" to

a previously cleared "predicate device" – even if the prior device was marketed by a

manufacturer other than the applicant.[4]  Several of the AMS, Bard, Boston Scientific, and

---

[4] A device is "substantially equivalent" to a predicate device if it: "(i) has the same technological
characteristics as the predicate device, or (ii) (I) has different technological characteristics and
the information submitted that the device is substantially equivalent to the predicate device

Ethicon/Johnson & Johnson pelvic repair products were represented to the FDA to be "substantially equivalent" to products sold by one or more of these other defendants. The interrelationship between these products is but one significant issue that lends itself to coordinated investigation across MDL lines.

The serious health risks generally associated with these women's pelvic repair products also warrant legal inquiry that is not confined to a single product or manufacturer. As discussed in Plaintiffs' MDL motions, the FDA issued public health warnings in 2011 wherein it observed that the serious complications generally associated with these products are not unique to any particular device or company, stating that "[t]he complications associated with the use of surgical mesh for POP repair have not been linked to a single brand of mesh." (See, e.g., Case 2:10-md-02187, Dkt. No. 73-1, p. 1). Plaintiffs submit that the problems associated with transvaginal mesh products are inherent in the use of mesh in the female pelvic region, and thus are not limited to any one product. Instead, these are issues that need to be explored and addressed globally. Many experts for both Plaintiffs and Defendants will traverse company and product lines. The efficient conduct of these cases will require coordination by Plaintiffs' counsel across MDL lines, while still maintaining the four MDL's. Additionally, discovery relating to corporate liability issues will involve common themes, and coordination between the four MDL's will be beneficial.

Finally, the defenses will largely be the same in each MDL, regardless of the product or manufacturer, specifically the "blame the doctor/blame the plaintiff" defense. In September

---

contains information, including appropriate clinical or scientific data if deemed necessary by the Secretary…, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device." 21 U.S.C. § 360c(i)(1)(A).

2011, the FDA convened a hearing to discuss safety concerns relating to pelvic repair products. [5] At that hearing, the manufacturers of transvaginal mesh products (including each of the defendants in the respective MDL's now before this Court) were represented by AdvaMed, the world's largest medical technology association representing medical device manufacturers. (See, Excerpt of Transcript of FDA hearing attached hereto as "**Exhibit 1**," p. 132).  At the hearing, these manufacturers did not try and differentiate between their respective products – or the reasons that women were experiencing problems.  Instead, they asserted the same explanation that the Court can expect to hear in every case in this litigation: "it is the doctor's and/or patient's fault."  AdvaMed took the position at the hearing that complications generally associated with all pelvic repair products are the result of patient-related factors and/or factors relating to the doctors who implanted the devices – rather than the products themselves.  Dr. Piet Hinoul, Ethicon/Johnson & Johnson's Medical Director for Women's Health and Urology, addressed the Panel on behalf of AdvaMed, Id. at 133 and 140-149, and stated:

> One of the most important questions we need to ask ourselves is also why these adverse events [associated with pelvic repair mesh devices generally] are occurring.  And the risk factors for mesh exposures are becoming more and more apparent.  Several studies published this year show that hysterectomy, patient age, smoking, diabetes, and surgeon experience predispose patients to mesh exposure.

> In light of the interrelationship between the products, the serious health problems

generally associated with these devices, and the commonality of the defenses anticipated in every case, a coordinated and unified leadership that spans the four related pelvic repair product MDL's before this Court is essential to the effective and efficient prosecution in these cases.

---

[5] The legal implications of the FDA Committee's findings and proposals, and the FDA's actions with respect thereto – including the potential reclassification of POP mesh devices, the institution of studies to assess the risks and benefits of vaginal mesh products, as well as expanded post-market monitoring of the performance of these devices – are common issues that will be presented in every case, irrespective of manufacturer.

Several issues relating to damages, causation, and defectiveness of design and manufacturing will be similar as to each MDL defendant for the pelvic organ prolapse products, and likewise with respect to the stress urinary incontinence devices, irrespective of manufacturer. Consequently, cross-MDL coordination will again lead to efficiency.

While it cannot be represented that the proposal herein has the unanimous support of every attorney representing every plaintiff in this MDL or that may become a part of this MDL, the undersigned can represent to the Court that this proposal enjoys a broad consensus among many law firms throughout the country that have participated in the efforts to organize this litigation for several months. The undersigned, as well as the individual counsel listed hereinbelow, unanimously support this proposal.[6] The expeditious, economical and just resolution of these MDL's can best be achieved by a leadership structure composed of counsel who collectively have the willingness and availability to commit to this time-consuming and expensive litigation, and who have the requisite professional experience in handling complex medical device mass tort litigation. Perhaps most importantly, because of the interrelationship between these MDL's in terms of common product defect allegations, similar injuries, and the prevalence of cases involving multiple products by the various defendants, the leadership structure in these MDL's should be composed of attorneys who have the ability and the expressed desire to work with one another in a concerted effort to seek a timely and just resolution of these cases.

As set forth in more detail below, the undersigned propose a Coordinating Co-Lead Counsel, an Executive Committee made up of Co-Leads for each MDL, and a singular PSC all to

---

[6] The individual attorneys listed in the proposed organizational structure hereinbelow will be filing separate applications in accordance with Paragraphs 18 and 19 of the Initial Conference and Case Management Order (Pretrial Order No. 1).

coordinate across MDL lines.  If such proposal is accepted by the Court, then the Coordinating

Co-Lead Counsel in conjunction with the Executive Committee will be able to work across MDL

lines in conjunction with one PSC to determine which lawyers are best suited to handle a given

task, be it common corporate discovery, expert identification, deposition preparation, motions

practice and brief drafting, trial teams, and other similar matters that will develop as this

litigation progresses.  Many of these tasks will not be MDL-specific, but rather will be common

issues that will need a coordinated effort.  It is also the intent that the Coordinating Co-Lead

Counsel will be in a position to determine when separate groups from the PSC should be

designated to work on MDL-specific issues that do not cross MDL lines.  However, it is vital to

this proposal that there be a cohesive and coordinated structure that spans these four related

MDL's so as to best achieve the efficiency and effectiveness of representation that will move this

litigation forward.

While the size of the proposed Plaintiffs' Steering Committee is large for a typical single

MDL, this proposal calls for a singular PSC to coordinate across MDL lines in four separate

MDL's, each of which involves a different manufacturer (and related defendants in some cases)

and several different products.[7]  In light of the number of defendants[8] and products involved in

these four MDL's, the size of this PSC is both appropriate and necessary.  The undersigned

submit that a PSC composed of a significant number of attorneys is necessary to accommodate

---

[7] Recent product liability MDL's have had large PSC's, such as DePuy ASR (MDL 2197) with
34 attorneys, and DePuy Pinnacle (MDL 2244) with 42 attorneys.  These two DePuy hip
replacement MDL's both involved a single product and a single manufacturer whereas the four
MDL's at issue herein involve multiple different manufacturers (and related defendants), and
dozens of related pelvic repair devices.  It is anticipated that the number of cases to be filed in
the four MDL's will be significantly greater than in both of the hip replacement MDL's
combined.

[8] All of these Defendants are represented by large national defense law firms with hundreds, if
not thousands of attorneys, all of whom will be coordinating their defense efforts in this
litigation.

the large amount of work that will be necessary to prepare these cases effectively, and with many coordinated litigation activities occurring simultaneously across MDL lines.  The manpower and womanpower will be essential.  The Coordinating Co-Lead Counsel in conjunction with the Executive Committee will be responsible for coordinating the efforts of the members of the PSC.

Based on the foregoing, the undersigned respectfully submit the following proposed counsel structure for the Plaintiffs in this litigation: [9]

## COORDINATING CO-LEAD COUNSEL

Bryan F. Aylstock; Henry G. Garrard, III; Fred Thompson, III.

## EXECUTIVE COMMITTEE

Bryan F. Aylstock; Tom Cartmell; Clayton Clark; Amy Eskin; Henry G. Garrard, III; Derek Potts; Fred Thompson, III; Aimee Wagstaff.

## CO-LEAD COUNSEL, *IN RE: C.R. BARD, INC. PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION* (MDL 2187)

Henry G. Garrard, III; Derek Potts.

## CO-LEAD COUNSEL, *IN RE: AMERICAL MEDICAL SYSTEMS, INC., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION* (MDL 2325)

Amy Eskin; Fidelma Fitzpatrick.

## CO-LEAD COUNSEL, *IN RE: BOSTON SCIENTIFIC CORP., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION* (MDL 2326)

Clayton Clark; Aimee Wagstaff.

## CO-LEAD COUNSEL, *IN RE: ETHICON, INC., PELVIC REPAIR SYSTEMS PRODUCTS LIABILITY LITIGATION*  (MDL 2327)

Renee Baggett; Tom Cartmell.

## CO-LIAISON COUNSEL

Harry Bell; Paul Farrell; Carl Frankovitch.

---

[9] The following counsel are listed in alphabetical order.

**SINGULAR PLAINTIFFS' STEERING COMMITTEE**

David Allen; Tom Anapol; Ben Anderson; Richard Arsenault; Bryan Aylstock; Renee Baggett
Lee Balefsky; Harry Bell; Ed Blizzard; Lisa Blue; Riley Burnett; Tom Cartmell; Clayton Clark;
Jayne Conroy; Erin Copeland; Martin Crump; A. J. De Bartolomeo; Amy Eskin; Paul Farrell, Jr.;
Fidelma Fitzpatrick; Yvonne Flaherty; Wendy Fleishman; Pete Flowers; Carl Frankovitch;
Henry G. Garrard, III; Michael Goetz; Tim Goss; Jeff Grand; Todd Harvey; Stacy Hauer; Scott
Love; Victoria Maniatis; Dave Matthews; Rick Meadow; Karen Menzies; Mike Miller; Doug
Monsour; Mark Mueller; Dianne Nast; Leigh O'Dell; Joe Osborne; Michelle Parfitt; Jerry Parker;
Chris Placitella; Derek Potts; Robert Price; John Restaino; Bill Robins; J.R. Rogers; Robert
Salim; Joe Saunders; Laurel Simes; Hunter Shkolnik; Fred Thompson, III; Josh B. Wages;
Aimee Wagstaff; Ed Wallace; Kim Wilson; Laura Yaeger; Joe Zonies.

This 19th day of March, 2012.

By: /s/ Henry G. Garrard, III
   Henry G. Garrard, III
   hgg@bbgbalaw.com
   Georgia Bar No. 286300

Blasingame, Burch, Garrard & Ashley, P.C.
P.O. Box 832
Athens, GA  30603
 (706) 354-4000
(706) 549-3545 (fax)

By: /s/ Fred Thompson, III
   Fred Thompson, III
   fthompson@motleyrice.com
   South Carolina Bar No. 5548

Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
(843) 216-9118

By: /s/ Bryan F. Aylstock
   Bryan F. Aylstock
   BAylstock@awkolaw.com
   Florida Bar No.: 078263

Aylstock, Witkin, Kreis & Overholtz
17 E. Main Street, Suite 200

Pensacola, Florida 32502
(877)810-4808
(850)916-7449 (fax)