Exhibit 1

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DOCKETING STATEMENT--CIVIL/AGENCY CASES**

**Directions:** Counsel must make a **docketing statement (civil/agency) filed** entry in CM/ECF within 14 days of docketing of the appeal, or within the due date set by the clerk's docketing notice, whichever is later.  File with the entry the (1) docketing statement form with any extended answers and (2) any transcript order form.  Parties proceeding pro se are not required to file a docketing statement.  Opposing counsel who finds a docketing statement inaccurate or incomplete may file any objections within 10 days of service of the docketing statement using the ECF event-**docketing statement objection/correction filed**.

| Appeal No. & Caption | Please see Attachment No. 1 |
|---|---|
| **Originating No. & Caption** | Please see Attachment No. 2 |
| **Originating Court/Agency** | U.S.D.C for the S.D.W.V. |

| **Jurisdiction** (answer any that apply) | | |
|---|---|---|
| Statute establishing jurisdiction in Court of Appeals | 28 U.S.C. § 1291 | |
| Time allowed for filing in Court of Appeals | 30 days | |
| Date of entry of order or judgment appealed | January 30, 2019 | |
| Date notice of appeal or petition for review filed | February 28, 2019 | |
| If cross appeal, date first appeal filed | N/A | |
| Date of filing any post-judgment motion | N/A | |
| Date order entered disposing of any post-judgment motion | N/A | |
| Date of filing any motion to extend appeal period | N/A | |
| Time for filing appeal extended to | N/A | |
| Is appeal from final judgment or order? | ⦿ Yes | ○ No |
| If appeal is not from final judgment, why is order appealable? | | |

| **Settlement** (The docketing statement is used by the circuit mediator in pre-briefing review and mediation conducted under Local Rule 33.  Counsel may make a confidential request for mediation by calling the Office of the Circuit Mediator at 843-731-9099.) | | |
|---|---|---|
| Is settlement being discussed? | ○ Yes | ⦿ No |

11/21/2016  SCC

| **Transcript** (transcript order must be attached if transcript is needed and not yet on file) | | |
|---|---|---|
| Is transcript needed for this appeal? | ○ Yes | ⊙ No |
| Has transcript been filed in district court? | ○ Yes | ⊙ No |
| Is transcript order attached? | ○ Yes | ⊙ No |

| **Case Handling Requirements** (answer any that apply) | | |
|---|---|---|
| Case number of any prior appeal in same case | No. 16-2333 | |
| Case number of any pending appeal in same case | N/A | |
| Identification of any case pending in this Court or Supreme Court raising similar issue | N/A | |
| | If abeyance or consolidation is warranted, counsel must file an appropriate motion. | |
| Is expedited disposition necessary? | ○ Yes | ⊙ No |
| | If yes, motion to expedite must be filed. | |
| Is oral argument necessary? | ⊙ Yes | ○ No |
| Does case involve question of first impression? | ⊙ Yes | ○ No |
| Does appeal challenge constitutionality of federal or state statute in case to which federal or state government is not a party | ○ Yes | ⊙ No |
| | If yes, notice re: challenge to constitutionality of law must be filed. | |

| **Nature of Case** (Nature of case and disposition below. Attach additional page if necessary.) |
|---|
| Please see Attachment No. 3 |

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 3 of 43

| **Issues** (Non-binding statement of issues on appeal.  Attach additional page if necessary) |
| --- |
| Please see Attachment No. 4 |

| **Adverse Parties** (List adverse parties to this appeal and their attorneys; provide party's address if the party is not represented by counsel.  Attach additional page if necessary.) | |
| --- | --- |
| Adverse Party:<br><br>Common Benefit Fee and Cost Committee<br><br>Attorney: Henry Garrard<br>Address: Blasinggame, Burch, Garrard & Ashley<br>P.O. Box 832<br>Athens, GA 30603<br><br>E-mail: hgarrard@bbga.com<br><br>Phone: (706) 707-3217 | Adverse Party:<br><br><br>Attorney:<br>Address:<br><br><br><br>E-mail:<br><br>Phone: |
| **Adverse Parties (continued)** | |
| Adverse Party:<br><br>Attorney:<br>Address:<br><br><br>E-mail:<br><br>Phone: | Adverse Party:<br><br>Attorney:<br>Address:<br><br><br>E-mail:<br><br>Phone: |

| **Appellant** (Attach additional page if necessary.) | |
|---|---|
| Name: Kline & Specter, P.C. | Name: |
| Attorney: Lee B. Balefsky<br>Address: 1525 Locust Street<br>19th Floor<br>Philadelphia, PA 19102 | Attorney:<br>Address: |
| E-mail: lee.balefsky@klinespecter.com | E-mail: |
| Phone: (215)772-1302 | Phone: |

| **Appellant (continued)** | |
|---|---|
| Name: | Name: |
| Attorney:<br>Address: | Attorney:<br>Address: |
| E-mail: | E-mail: |
| Phone: | Phone: |

| Signature: *Charles Becker*                Date: 3/14/19 |
|---|
| Counsel for: Kline & Specter, P.C. |

**Certificate of Service**: I certify that on _____3/14/2019_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below (Attach additional page if necessary):

| Please see attached – | |
|---|---|
| *Charles Becker* | |
| Signature: | Date: 3/14/2019 |

## Attachment No. 1:  Appeal No. and Caption

These consolidated appeals have been assigned the following captions and appellate docket numbers:

*In re: C.R. Bard, Pelvic Repair System Products Liability Litigation.*
No. 19-1225 (2:10-md-02187),

KLINE & SPECTER, P.C., Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

---

*In re: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation*
No. 19-1227 (2:12-md-02325)

KLINE & SPECTER, P.C., Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

---

*In re: Boston Scientific Corp., Pelvic Repair System Products Liability Litigation*
No. 19-1226 (2:12-md-02326),

KLINE & SPECTER, P.C,. Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

---

*In re: Ethicon, Inc., Pelvic Repair System Products Liability Litigation*
No. 19-1224 (L) (2:12-md-02327)

KLINE & SPECTER, P.C., Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

---

*In re: Coloplast Corp., Pelvic Support Systems Products Liability Litigation*
No. 19-1229 (2:12-md-02387)

KLINE & SPECTER, P.C., Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

---

1

*In re: Cook Medical, Inc., Pelvic Repair System Products Liability Litigation*
No. 19-1230 (2:13-md-02440)

KLINE & SPECTER, P.C., Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

———————————————————

*In re: Neomedic Pelvic Repair System Products Liability Litigation*
No. 19-1228 (2:14-md-02511)

KLINE & SPECTER, P.C., Appellant
v.
COMMON BENEFIT FEE AND COST COMMITTEE, Appellee

———————————————————

**Attachment No. 2:  Originating No. & Caption**

These consolidated appeals were assigned the following captions and docket numbers in

the U.S. District Court for the Southern District of West Virginia:

*In re: C.R. Bard, Pelvic Repair System Products Liability Litigation*
Docket No. 2:10-md-02187

*In re: American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation*,
Docket No. 2:12-md-02325

*In re: Boston Scientific, Corp., Pelvic Repair System Products Liability Litigation*,
Docket No. 2:12-md-02326

*In re: Ethicon, Inc., Pelvic Repair System Products Liability Litigation*,
Docket No. 2:12-md-02327

*In re: Coloplast, Pelvic Repair System Products Liability Litigation*
Docket No. 2:10-md-02187

*In re: Cook Medical, Pelvic Repair System Products Liability Litigation*
Docket No. 2:13-md-02440

*In re: Neomedic, Pelvic Repair System Products Liability Litigation*,
Docket No. 2:10-md-02187

Filed: 03/14/2019   Pg: 8 of 43

Doc: 8

USCA4 Appeal: 19-1224

**Attachment No. 3: Nature of the Case**

In recent decades, medical device companies sold plastic mesh for permanent implantation into a woman's pelvis. The mesh, primarily repackaged hernia mesh, was supposed to support a woman's pelvic organs to ameliorate stress urinary incontinence or organ prolapse. Unfortunately, these transvaginal mesh products often cause serious physical injuries. The injuries include erosion of the mesh through the vaginal wall and into nearby pelvic organs, tissue degradation and scarring around the mesh, scarring within the vagina, shortening and deformation of the vagina, urinary retention, chronic pelvic pain, chronic pain with sexual intercourse (dyspareunia), and both urinary and sexual dysfunction. For many women, these conditions are painful, permanent, and irreversible. Over 104,000 women commenced lawsuits that were filed in or removed to federal court. Between 2010 and 2014, the Judicial Panel on Multidistrict Litigation (JPML) coordinated these various lawsuits in seven different multi-district litigation proceedings—one MDL proceedings for each mesh manufacturer against whom claims had been filed. The JPML assigned these seven MDL proceedings to Judge Joseph Goodwin of the United States District Court for the Southern District of West Virginia. Over 104,000 cases were coordinated in the seven MDL proceedings.

In 2012, Judge Goodwin ordered the creation of a Plaintiffs' Steering Committee to coordinate the seven MDL proceedings from the plaintiffs' side. (Lee Balefsky of Appellant Kline & Specter, P.C. serves on the steering committee.) In 2012, Judge Goodwin also entered an order regarding management of timekeeping, cost reimbursement, and related issues germane to the issue of common benefit fees.

In August 2013, Judge Goodwin entered an order establishing a fund to compensate and reimburse attorneys for MDL administration and common benefit work. The order required

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 9 of 43

defendants to hold back 5% of all amounts paid to resolve any covered claim—which included all claims in which any member of the Plaintiffs' Steering Committee had a financial interest whether pending in state or federal court.  It required the defendants to pay the held-back amount into a fund for payment of common benefit attorneys' fees and approved common benefit expenses. Judge Goodwin did not commit in the August 2013 order to a 5% common-benefit fee but established the fund to provide the pool of money from which an eventual common-benefit fee would be paid.

On January 15, 2016, Judge Goodwin entered his "Order Establishing Criteria for Applications to MDL Fund to Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL Administration and Common Benefit and Appointment of Common Benefit Fee and Cost Committee." This order established the process for reviewing and managing common benefit fees and expenses.  It set forth the criteria by which common benefit fee applications were to be reviewed and analyzed. It set forth a process for the sharing among plaintiffs' counsel of the Common Benefit Fund.  In addition the order appointed a Fee and Cost Committee, a nine-person committee responsible for recommending to Judge Goodwin the allocation of awards of attorneys' fees and costs to be made by the court from the Common Benefit Fund.  On June 23, 2017, Judge Goodwin also entered the "Order re: Fee Committee Protocol." This order establishes the procedure and provides further guidance for the FCC's review of time and expenses submitted by counsel seeking common benefit reimbursement.

November 12, 2018, the Fee and Cost Committee filed a Petition for an Award of Common Benefit Attorneys' Fees and Expenses seeking an order that 5% of all individual awards be held-back to form a common-benefit fund that would be allocated to counsel who performed common benefit work for fees and reimbursement of expenses.

Kline & Specter represents approximately 3,000 individuals who have filed lawsuits seeking recovery for personal injuries caused by pelvic mesh implants. Many of those individuals filed lawsuits coordinated in the instant MDL proceedings. Other individuals filed suit in various state courts around the country. Because Kline & Specter's Lee Balefsky is a member of the Plaintiffs' Steering Committee, all of the firm's clients would be obliged to pay a common benefit fee as directed by the Court. On November 28, 2018, Kline & Specter filed a response that opposed the proposed 5% common benefit fee as excessive and unreasonably generous given the relatively poor outcome of this litigation for individual plaintiffs. This response was not directed to the issue of Kline & Specter's individual allocation from the overall common-benefit fee. On behalf of the firm's clients, it argued that the aggregate fee itself was too large and that only a 2.5% aggregate fee should be allowed. The response highlighted, *inter alia*, (a) the Plaintiffs' Steering Committee's failure to achieve a global settlement of the pelvic mesh litigation; (b) the fact that thousands of cases remained to be resolved; (c) the inadequacy of the settlements, which averaged $40,000 per case, given the seriousness and permanency of the injuries suffered by the plaintiffs and especially given that the average trial award is $9.8 million; and (d) the failure to use the lodestar calculation to cross-check and determine an appropriate aggregate fee.

On January 30, 2019, Judge Goodwin entered an order granting the Fee and Cost Committee's requires for an aggregate 5% common-benefit fee (attached hereto). At the time of the order, the defendants had paid approximately $7.25 billion in settlements and judgments with respect to tens of thousands—but not all—of the pelvic mesh cases that had been filed. The 5% holdback order had led defendants to retain and pay $366,102,875.06 into the common-benefit fund. While the amount of the fee fund may grow based on future settlements, the court's order is final for appellate purposes because it established a fixed percentage that each affected plaintiff

must pay toward the common-benefit fee. *See In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294, 298-99 (3d Cir. 2005) (an order determining aggregate common-benefit fees is final for purposes of appellate review); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727 (3d Cir. 2001) (same). Kline & Specter thus appeals under 28 U.S.C. § 1291.

The January 30 order was cross-filed in each of the 7 MDL dockets concerning pelvic mesh. In an abundance of caution, Kline & Specter appealed the order in each docket in which it was entered. The orders and dockets are as follows:

1.    *In C.R. Bard, Pelvic Repair System Products Liability Litigation*, Docket No. 2:10-md-02187, Pretrial Order #298 and Memorandum Opinion entered January 30, 2019, Docket Entry No. 6986 (granting the Common Benefit Fee and Cost Committee's Petition for an Award of Common Benefit Attorneys' Fees and Expenses).

2.    *In American Medical Systems, Inc., Pelvic Repair System Products Liability Litigation*, Docket No. 2:12-md-02325, Pretrial Order #273 and Memorandum Opinion entered January 30, 2019, Docket Entry No. 7122 (same).

3.    *In Boston Scientific, Corp., Pelvic Repair System Products Liability Litigation*, Docket No. 2:12-md-02326, Pretrial Order #201and Memorandum Opinion, entered January 30, 2019, Docket Entry No. 7758 (same).

4.    *In Ethicon, Inc., Pelvic Repair System Products Liability Litigation*, Docket No. 2:12-md-02327, Pretrial Order #327 and Memorandum Opinion, entered January 30, 2019, Docket Entry No. 7519 (same).

5.    *In Coloplast, Pelvic Repair System Products Liability Litigation*, Docket No. 2:10-md-02187, Pretrial Order #148 and Memorandum Opinion, entered January 30, 2019, Docket Entry No. 2337 (same).

6.     *In Cook Medical, Pelvic Repair System Products Liability Litigation*, Docket No. 2:13-md-02440, Pretrial Order #86 and Memorandum Opinion, entered January 30, 2019, Docket Entry No. 691 (same).

7.     *In Neomedic, Pelvic Repair System Products Liability Litigation*, Docket No. 2:10-md-02187, Pretrial Order #39 and Memorandum Opinion, entered January 30, 2019, Docket Entry No. 198 (same).

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 13 of 43

## Attachment No. 4:  Issue Presented

The instant appeals raise the following question for the Court's consideration:

1.      Did the district court abuse its discretion in entering an order granting the Fee and Cost Committee's petition for an aggregate common-benefit award, and ordering that 5% of each plaintiffs' recovery—currently $366 million in the aggregate—be held back from plaintiff recoveries and used to pay common-benefit attorneys' fees and reimbursement of expenses, especially given the poor result that was achieved for the clients, the lack of global settlement, and the failure to use lodestar calculation to cross-check and help determine the overall common-benefit fee?

Filed: 03/14/2019        Pg: 14 of 43        Doc: 8        USCA4 Appeal: 19-1224

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

IN RE: ETHICON, INC.,
PELVIC REPAIR SYSTEM
PRODUCTS LIABILITY LITIGATION                                    MDL NO. 2327

_____

THIS DOCUMENT RELATES TO ALL CASES

**PRETRIAL ORDER # 327**
**MEMORANDUM OPINION AND ORDER**
(Re: Petition for an Award of Common Benefit Attorneys' Fees and Expenses)

Pending before the court is the Common Benefit Fee and Cost Committee's ("FCC")

Petition for an Award of Common Benefit Attorneys' Fees and Expenses ("Petition").[1] [ECF No.

7200]. In the Petition, the FCC asks the court to grant an award of attorneys' fees and expenses in

the amount of 5% of the settlements and judgments subject to the court's ordered common benefit

assessment. Following a period for objections, three plaintiffs' firms filed objections to the FCC's

Petition, and the FCC replied. The Petition is ripe for consideration because briefing is complete.

The seven multidistrict litigations ("MDLs") before this court comprise one of the largest

multidistrict litigation proceedings in this country's history. This nearly nine-year process is

ongoing. What began as 36 plaintiffs suing one company for one allegedly defective pelvic mesh

product transformed into over 104,000 individual plaintiffs suing numerous defendants who

manufactured many different pelvic mesh products. In addition to these complexities, many

individual plaintiffs were implanted with different products manufactured by multiple defendant

manufacturers across MDL lines. In tackling these complications, the plaintiffs' leadership

_____

[1] This identical Petition was filed in each of the individual MDLs assigned to me: 2:10-md-2187, 2:12-md-2325, 2:12-md-2326, 2:12-md-2327, 2:12-md-2387, 2:13-md-2440, and 2:14-md-2511.

organized and proposed to the court a structure for addressing global concerns that impacted cross-MDL issues. This required developing legal theories of liability and finding and vetting experts across the world who specialize in urology, surgery, materials, chemistry, and other specialties. It also required the taking of multitudinous depositions, analyzing, organizing, and storing tens of millions of defendant-produced documents, preparing and briefing hundreds of motions, preparing for and conducting bellwether trials, and eventually assisting many plaintiffs in reaching settlements. The fruits of this efficient process were made available to every plaintiff and their counsel. The court finds that every plaintiff benefited greatly from these efforts.

This court is now evaluating whether common benefit counsel are entitled to 5% of all recoveries for their efforts in this litigation. The court must determine if this large group of lawyers acting for the common benefit has earned and is entitled to nearly half a billion dollars when in fact the majority of plaintiffs are individually represented. As is the case in most large multidistrict litigation, the answer is properly found by analyzing several factors, the most important of which is the total recovery received by all plaintiffs.

In making this determination, I start with the commonsense observation that the common benefit work performed by leadership guaranteed that each plaintiff was the beneficiary of well-researched and briefed theories of liability with organized supporting factual resources and carefully vetted and developed expert opinion testimony making the case for general causation of damages resulting from allegedly defective products. Moreover, in the same vein of common-sense observation, I know that the leadership was able to provide informed settlement values to individual counsel as a result of their global experience in dealing with tens of thousands of cases. Finally, of the hundreds of firms representing 104,000 plaintiffs subject to the holdback, only three law firms have objected to the Petition. These objections are either frivolous or untimely.

2

Therefore, and as I will explain further below, after careful examination and after a lodestar cross-check I find that the holdback and award of 5% is reasonable and appropriate in each of these MDLs. Accordingly, the Petition is **GRANTED**.

## I.      Background

The seven pelvic mesh MDLs assigned to this court are virtually unprecedented in size and scope. In 2010, the Judicial Panel on Multidistrict Litigation ("JPML") transferred 36 individual pelvic mesh cases concerning the Avaulta line of pelvic organ prolapse repair devices, a device sold by C. R. Bard, Inc. ("Bard").[2] As time went on, numerous pelvic mesh cases were filed in different federal courts across the country against different pelvic mesh manufacturers. The plaintiffs' firms leading the litigation around the country discussed an MDL strategy, and in response to the similarity of pelvic mesh injuries allegedly caused by similar but different products manufactured by different defendants, requested that the JPML create three additional MDLs (2:12-md-2325,[3] 2:12-md-2326,[4] and 2:12-md-2327[5]) and send them to this court pursuant to 28 U.S.C. § 1407.

In transferring these MDLs, the JPML agreed with plaintiffs' leadership that: "The actions in each MDL share factual issues arising from allegations of defects in pelvic surgical mesh products manufactured by [the defendants]. Centralization therefore will eliminate duplicative discovery; prevent inconsistent pretrial rulings; and conserve the resources of the parties, their counsel and the judiciary." *In re Am. Med. Sys., Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 844 F.

---

[2] PTO # 1, In re: Avaulta, Pelvic Support Systems Products Liability Litigation, No. 2:10-md-2187 (later changed to C.R. Bard, Inc. ("Bard MDL 2187")) [ECF No. 2].
[3] PTO # 1, In re: American Medical Systems, Inc., Pelvic Repair Systems Products Liability Litigation, No. 2:12-md-2325 ("AMS MDL 2325") [ECF No. 2].
[4] PTO # 1, In re: Boston Scientific Corp., Pelvic Repair Systems Products Liability Litigation, No. 2:12-md-2326 ("BSC MDL 2326") [ECF No. 2].
[5] PTO # 1, In re: Ethicon, Inc., Pelvic Repair Systems Products Liability Litigation, No. 2:12-md-2327 ("Ethicon MDL 2327") [ECF No. 2].

Supp. 2d 1359, 1360 (J.P.M.L. 2012). Noting this court's role in presiding over the Bard MDL and its unique opportunity to preside over similar pelvic mesh cases, the JPML also stated: "[A] number of these actions are brought by plaintiffs who were implanted with multiple products made by multiple manufacturers. Centralization of the . . . MDLs in one court will allow for coordination of any overlapping issues of fact in such multi-product, multi-defendant actions." *Id.* at 1361. Pursuant to 28 U.S.C. § 1407, the JPML sent a fifth MDL in 2012, 2:12-md-2387,[6] a sixth in 2013, 2:13-md-2440,[7] and a seventh in 2014, 2:14-md-2511.[8]

To the court's knowledge, the JPML has never assigned seven individual MDLs with different but related products and different manufacturers to a single cross-cutting MDL coordinated proceeding within one court. The plaintiffs' leadership tackled this enormous challenge by accepting the court's guidance and proposing a Plaintiffs' Counsel Organization Structure ("Proposal Structure") in 2012, which called for a singular, cross-MDL plaintiffs' leadership structure to address common legal theories, defenses, experts, and scientific and medical claims. This court approved the Proposed Structure that facilitated the cross-MDL development and management of all facets of this litigation.[9]

It has been this court's goal to promote efficiencies and coordination across MDL lines. "In its most simplistic form, we have similar pelvic mesh products manufactured by different

---

[6] PTO # 1, In re: Coloplast Corp., Pelvic Support Systems Products Liability Litigation, No. 2:12-md-2387 ("Coloplast MDL 2387") [ECF No. 2].
[7] PTO # 1, In re: Cook Medical, Inc., Pelvic Repair System Products Liability Litigation, No. 2:13-md-2440 ("Cook MDL 2440") [ECF No. 2].
[8] PTO # 1, In re: Neomedic, Pelvic Repair System Products Liability Litigation, No. 2:14-md-2511 ("Neomedic MDL 2511") [ECF No. 2].
[9] The proposal called for "a Coordinating Co-Lead Counsel, an Executive Committee made up of Co-Leads for each MDL, and a singular [Plaintiffs' Steering Committee ("PSC")] [] to coordinate across MDL lines. . . . [T]he Coordinating Co-Lead Counsel in conjunction with the Executive Committee will be able to work across MDL lines in conjunction with one PSC to determine which lawyers are best suited to handle a given task. . . . Many of these tasks will not be MDL-specific, but rather will be common issues that will need a coordinated effort." [ECF No. 7200-1].

4

defendants that allegedly caused a variety of injuries to women. We suspect and hope that there are commonalities among the [multiple] MDLs."[10] Especially for the purposes of pretrial motions and discovery, this court has stated that "the most efficient way to handle the [multiple] MDLs is to consolidate as much as possible." *Id.*

Recognizing the challenges of litigating seven MDLs simultaneously, the plaintiffs' leadership proposed (and the court later appointed) a large 61-attorney PSC that was responsible for leading all of the litigation under a coordinated leadership structure. In order to promote the efficiencies, the court entered an order in all seven MDLs that stated: "It shall be the responsibility of the Coordinating Co-Lead Counsel to work across MDL lines in conjunction with the Executive Committee . . . ."[11] The Executive Committee was also responsible for appointing a "singular PSC to coordinate across MDL lines in the . . . separate pelvic mesh MDLs before this court."[12] This singular PSC worked and collaborated across MDL lines to develop the litigation strategy and theories of liability, depose experts, and absorb the massive litigation costs. The court appointed only one PSC to coordinate and advance all seven of the MDLs. This leadership structure made it possible for the plaintiffs to address common issues that affected all seven of the MDLs and to work with attorneys who were assisting with common benefit efforts. This approach saved money and helped to prevent cross-MDL conflicts and duplicative work. Plaintiffs' leadership and the participating attorneys working for the common benefit of plaintiffs in these MDLs comprise what the court will refer to as common benefit counsel ("common benefit counsel").

Creating a plaintiffs' leadership organization of considerable size and with extensive

---

[10] Transcript of Hearing at 33: 1-15, 2:12-md-2325 (S.D. W. Va. Apr. 13, 2012) [ECF No. 159].
[11] Bard MDL 2187 PTO # 33 [ECF No. 222], AMS MDL 2325 PTO # 4 [ECF No. 147], BSC MDL 2326 PTO # 4 [ECF No. 103], Ethicon MDL 2327 PTO # 4 [ECF No. 120], Coloplast MDL 2387 PTO # 2 [ECF No. 10], Cook MDL 2440 PTO # 4 [ECF No. 13], and Neomedic MDL 2511 PTO # 7 [ECF No. 12].
[12] *Id.*

USCA4 Appeal: 19-1224     Doc: 8     Filed: 03/14/2019     Pg: 18 of 43

experience was necessary. Moreover, the defendants were represented by some of the best law firms in the country. To achieve the goals of multidistrict litigation, I believed that a plaintiffs' leadership team would need to be very experienced, well-funded, and committed. The plaintiffs' leadership would be required to immediately create a structure defining this litigation and capable of the cooperative work of drafting master pleadings, plaintiff profile forms, plaintiff fact sheets, discovery plans, reporting procedures and funding arrangements necessary to achieve sufficient uniformity to allow the plaintiffs to benefit from the efficient cross-cutting MDL process. The PSC also addressed the economic disparity between the individual plaintiffs and the well-funded defendants. Leadership was required to spend tens of millions of dollars without guarantee of success. These costs continue but are a small part of what the common benefit fund was designed to compensate.

It is my opinion that all of the progress and efficiencies in these MDLs would have been impossible without this organizational structure. The FCC has represented that 900,000 hours were submitted by common benefit counsel for work performed for the common benefit of all MDL plaintiffs. Of those hours, the court appointed FCC has, after careful review, represented that 679,191.20 of these hours qualified for the common benefit. Tens of thousands of cases have been resolved, for a total sum to date of $7.25 billion. Five-percent (5%) ($366,102,875.06) has been paid into the common benefit fund by defendants.

Throughout this process, I issued orders dealing with the compensation to be received by plaintiffs' attorneys who worked on behalf of all the plaintiffs. For example, on October 4, 2012, I entered an Agreed Order Regarding Management of Timekeeping, Cost Reimbursement and Related Common Benefit Issues ("Management Order") establishing preliminary procedures and

6

guidelines for submitting applications seeking payment of common benefit fees and expenses.[13]
The Management Order appointed a Certified Public Accountant ("CPA"), paid with common
benefit funds, to review all time and expense records for the MDLs. Pursuant to the Management
Order, Chuck Smith, CPA, was required to work with the litigation's Co-Leads to manage the fund
and administer payment for attorney expenses.[14] I directed attorneys to record their time and
expense records for review by the accountant every six weeks. The Management Order explicitly
stated that counsel seeking consideration for common benefit compensation must acknowledge
this court's "final, non-appealable authority regarding the award of fees" and that the parties
"agreed to and therefore will be bound by the court's determination . . . [and] knowingly and
expressly waive any right to appeal those decisions or the ability to assert the lack of enforceability
of this Management Order or to otherwise challenge its adequacy."[15] Every member of the PSC
approved this Management Order, and the Management Order was entered in the seven MDLs.

On August 26, 2013, the court entered an "Agreed Order Establishing . . . [a] Fund to
Compensate and Reimburse Attorneys for Services Performed and Expenses Incurred for MDL
Administration and Common Benefit" ("Agreed Order").[16] The Agreed Order was entered in all
seven MDLs. There, the court ordered MDL defendants to withhold a 5% assessment on plaintiff
recoveries and directed defendants to pay the holdback assessments "directly into the . . . MDL
Fund as a credit against the Settlement of Judgment."[17] The court explicitly stated in the

---

[13] The court entered this Order in each of the individual MDLs: Bard MDL 2187 PTO # 54 [ECF No. 365], AMS
MDL 2325 PTO # 20 [ECF No. 303], BSC MDL 2326 PTO # 17 [ECF No. 212], Ethicon MDL 2327 PTO # 18 [ECF
No. 282], Coloplast MDL 2387 PTO # 6 [ECF No. 15], Cook MDL 2440 PTO # 11 [ECF No. 43], and Neomedic
MDL 2511 PTO # 20 [ECF No. 78].
[14] Chuck Smith and the accounting firm Smith Cochran Hicks PLLC have been handling these tasks.
[15] Id.
[16] The court enter this Order in each of the individual MDLs: Bard MDL 2187 PTO # 84 [ECF No. 634], AMS MDL
2325 PTO # 77 [ECF No. 833], BSC MDL 2326 PTO # 52 [ECF No. 508], Ethicon MDL 2327 PTO # 62 [ECF No.
747], Coloplast MDL 2387 PTO # 32 [ECF No. 124], Cook MDL 2440 PTO # 12 [ECF No. 46], and Neomedic MDL
2511 PTO # 21 [ECF No. 79].
[17] Id.

"Assessments and Payments into the MDL 2326 Fund for All Covered Claims" that "[n]othing in th[e] Agreed Order is intended to increase the attorneys' fee paid by a client."[18] With the 5% assessment paid into the MDL Fund, the court allowed for payment of "common benefit work and expenses[] [u]pon a proper showing and Order of the Court."[19] Subsequent to these two orders, the court appointed attorneys involved in the leadership of this litigation to a committee, the FCC, to receive and analyze common benefit fund requests and make recommendations to the court.[20] The FCC has filed the instant Petition, and the court now addresses it below.

## II.     Common Benefit Attorneys' Fees – Jurisdiction and Authority

The Supreme Court has long recognized an exception to the "American Rule" that prohibited a litigant's attorney from collecting attorneys' fees from the losing party. *See Internal Imp. Fund Trs. v. Greenough*, 105 U.S. 527, 537–38 (1881); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975). The exception "has become known as the 'common fund doctrine' or the 'common benefit doctrine,' [which] permits the creation of a common fund for the purpose of paying reasonable attorneys' fees." Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 374–75 (2014). The common fund doctrine is an equitable exception that creates a fund "for legal services beneficial to persons other than a particular client, thus spreading the cost of the litigation to all beneficiaries." *In re Vioxx Prods. Liab. Litig.*, 760 F. Supp. 2d 640, 647 (E.D. La. 2010). Although originally used in the context of class actions, MDL courts commonly "cite[] the common fund doctrine as a basis for assessing common benefit fees." *Id.* In the context of class actions, the common fund doctrine is used to

---

[18] *Id.*

[19] *Id.*

[20] The court entered this Order in each of the individual MDLs: Bard MDL 2187 PTO # 207 [ECF No. 1744], AMS MDL 2325 PTO # 204 [ECF No. 204], BSC MDL 2326 PTO # 136 [ECF No. 1289], Ethicon MDL 2327 PTO # 211 [ECF No. 1845], Coloplast MDL 2387 PTO # 85 [ECF No. 441], Cook MDL 2440 PTO # 71 [ECF No. 414], and Neomedic MDL 2511 PTO # 23 [ECF No. 85].

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 21 of 43

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 22 of 43

remedy the free-rider problem, where a class member benefits from the class recovery while never paying for counsel. *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 129 (2d Cir. 2010). This is because, even though individual plaintiffs are usually represented by individual counsel in MDLs, "there are substantial similarities to class actions" that warrant compensating benefits conferred by plaintiffs' counsel for the common good. *Id.* at 130.

A separate source of authority for MDL courts to assess attorneys' fees in common benefit fund cases comes from the inherent "'managerial' power over the consolidated litigation." *In re Genetically Modified Rice Litig.*, No. 4:06 MD 1811 CDP, 2010 WL 716190, at *4 (E.D. Mo. Feb. 24, 2010). Unlike class actions, "the [statutory] authority to create an MDL flows from 28 U.S.C. § 1407." *In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 517 (W.D. La. 2017). Once cases are consolidated under the umbrella of an MDL court's pretrial jurisdiction, "the court's express and inherent powers enable the judge to exercise extensive supervision and control [over the] litigation." FED. JUDICIAL CTR., MANUAL FOR COMPLEX LITIGATION, FOURTH § 10.1 (2004). The Fourth Circuit also recognizes a district court's "broad discretion in coordinating and administering multi-district litigation." *In re Showa Denko K.K. L-Tryptophan Prods. Liab. Litig.-II*, 953 F.2d 162, 165 (4th Cir. 1992).

The third source for this court's authority to assess attorneys' fees in these seven interrelated MDLs is the Participation Agreement entered into by all counsel who voluntarily signed the agreement. The court's discretion includes the authority to "appoint lead counsel, recognize steering committees of lawyers, [and] limit and manage discovery." *Id.* In these MDLs, the PSC entered into agreements with participating counsel who voluntarily signed the Participation Agreement, which was later incorporated into this court's Agreed Order. However, "[t]he agreement itself is not the source of the District Court's authority." *In re Avandia Mktg.,*

*Sales Practices & Prods. Liab. Litig.*, 617 Fed. Appx. 136, 143 (3d Cir. 2015). The source of the court's authority is in its discretion to manage the litigation in combination with the voluntarily entered into agreement. *Id*. "The agreement was simply incorporated into an order the District Court was empowered to issue." *Id*. Because this court is empowered to "govern[] how to compensate the Steering Committee for its work and because [the Participation Agreement] was incorporated into that order," this court has the jurisdiction to adjudicate fund claims by attorneys participating in the common benefit fund process in the seven MDLs. *Id*. The court now addresses the methodology for assessing the common benefit fund under its jurisdiction.

### III.    Methodology for Calculating Aggregate Attorneys' Fees Award

Throughout the history of MDL common fund calculations, courts have employed three approaches when assessing the reasonableness of attorney's fees: (1) the lodestar method, (2) the percentage method, or (3) the blended method which combines the first two approaches. Fallon, *supra*, at 381. Under the lodestar method, a court multiplies "the reasonable hours expended on the litigation by an adjusted hourly rate" to produce a multiplier whereas the percentage method "compensates attorneys who recovered some identified sum by awarding them a fraction of that sum[.]" *Id*.

Courts within our district frequently employ a blended approach. They award attorneys' fees based on a reasonable benchmark percentage of the fund verified by a lodestar cross-check. *See*, e.g., *Jones v. Dominion Res. Servs., Inc.*, 601 F. Supp. 2d 756, 758 (S.D. W. Va. 2009). Following this approach, the court will now (1) determine the value of the benefit common benefit counsel has provided to plaintiffs, (2) establish a benchmark percentage that common benefit counsel should be awarded based on awards given in similar MDLs, (3) apply the Fourth Circuit's

10

Pg: 23 of 43       Filed: 03/14/2019       Doc: 8       USCA4 Appeal: 19-1224

*Barber*[21] factors to assess the reasonableness of the benchmark percentage award, and (4) verify the reasonableness of the 5% award with a lodestar cross-check. *In re Vioxx*, 760 F. Supp. 2d at 652.

### 1. Valuation of the Benefit Received

The simple question the court is addressing is what percentage of the total recovery by plaintiffs is attributable to the work by common benefit counsel. In making the commonsense observation that common benefit counsel benefited each plaintiff in these MDLs, the court must determine how much that benefit is worth. To answer that question, the court must first determine the total recovery by the plaintiffs and then determine what amount of that total recovery is directly attributable to the efforts of common benefit counsel.

The court also notes that to date, not all plaintiffs have resolved their cases. This means that the total amount of recovery the 104,000 plaintiffs will potentially receive is not yet known. However, this court is equipped with sufficient information to make a reasonable estimate as to the total amount of recovery the plaintiffs will receive. Having presided over these MDLs for nearly nine years, the court is intimately aware of the cases that remain, the alleged injuries of the women, and the range of possible verdicts and settlement values available to them. Therefore, for the purposes of evaluating how much common benefit counsel's contributions are worth, the court is uniquely situated to make a reasonable estimate of the final total recovery amount. Because not all of the recoveries have been paid by the defendants, these MDL funds are pay-as-you-go, meaning the payments into the MDL common benefit funds will continue after this court's order is entered. "Where the settlement provides benefits on a 'pay-as-you-go' basis over a period beyond the point that a common benefit fee is to be awarded, the settlement fund also includes a

---

[21] *Barber v. KimBrell's, Inc.*, 577 F.2d 216, 226 (4th Cir. 1978).

reasonable estimate of the amount of future payments that will be made to" the individual plaintiffs. *In re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mex., on April 20, 2010*, MDL No. 2179, 2016 WL 6215974, at *15 (E.D. La. Oct. 25, 2016) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 334 (3d Cir. 1998)).

To date, the FCC represents that $7.25 billion has been paid out by the defendants to plaintiffs covered under the court's holdback. The FCC estimates that total settlements and judgments subject to the holdback will exceed $11 billion, and no objections were filed in response to the FCC's estimate. The court is fully aware of the plaintiffs' recoveries to date and finds that the estimate of $11 billion dollars is a reasonable estimate for the total amount of recoveries the plaintiffs will receive.

## 2. Benchmark Percentage

Now that the court has ascertained a reasonable estimate of the total recoveries the plaintiffs will receive, the next step requires the court "to arrive at an independent and justified reasonable percentage" for this litigation. *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 2013 WL 5295707, at *3 (E.D. La. Sept. 18, 2013). To clarify, the court is determining what percentage of each individual plaintiff's recovery should be reasonably awarded to the common benefit fund. That means that, whether a plaintiff was awarded $10,000 or $200,000, the court is assessing whether 5% of either of those figures is reasonable for common benefit compensation.

The court does this in part by looking at comparable awards in similar MDLs with common benefit attorneys. *See In re Actos*, 274 F. Supp. 3d at 524. Because the total anticipated recovery for all plaintiffs in these MDLs exceeds $1 billion, the court considers this a "super-mega-fund" litigation. *Id.* at 524–25. In *In re Actos*, the court found that the average fee awards in "super-mega-fund" litigation was 9.9%. *Id.* at 525. The court in *In re Actos* noted that "it, also, appears

12

that as the size of the recovery increases, the percentage [awarded] tends to decrease." *Id.* at 524.

Super-mega-fund cases are often near the 5% the FCC has requested:

| Case | Plaintiffs' Recoveries | Percent Award |
|------|------------------------|---------------|
| *In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249 (D.N.H. 2007) | $3.2 billion | 14.5% |
| *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 461 F. Supp. 2d 383 (D. Md. 2006) | $1.1 billion | 12% |
| *In re Actos*, 274 F. Supp. 3d 485 | $2.4 billion | 8.6% |
| *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 480 (E.D. Pa. 2008) | $6.44 billion | 6.75% |
| *In re Vioxx,* 760 F. Supp. 2d 640 | $4.85 billion | 6.5% |
| *Deepwater Horizon*, 2016 WL 6215974, at *16 | $13 billion | 4.3% |

Given the comparable recoveries and awards in similar-sized MDLs, and that 5% of $11 billion is reasonably comparable under all the circumstances with other MDL common benefit fund awards, the court finds the 5% benchmark for the FCC's Petition is very reasonable.

### 3. *Barber* Factors

The Fourth Circuit instructs courts to analyze fee awards using the factors known as the "*Barber* factors." *See Barber*, 577 F.2d at 226 (adopting the *Johnson* factors from *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 718–19 (5th Cir. 1974)); *see In re MRRM, P.A.*, 404 F.3d 863, 867 (4th Cir. 2005). Although the court is required to assess the reasonableness of awarding attorneys' fees, "[n]ot all [*Barber*] considerations apply to every case." *In re Serzone Prods Liab.*

13

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 26 of 43

*Litig.*, MDL No. 1477, 2007 WL 7701901, at *2 (S.D. W. Va. May 16, 2007).[22] "[T]rial courts [have] wide discretion in how they weigh different criteria touching upon the value of the service provided . . . ." *Id.* In some cases, certain factors are not relevant to the court's inquiry. *Id.* "It remains important, however, for the district court to provide a concise but clear explanation of its reasons for the fee award." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983).

### a. <u>Time and Labor Required (Factor 1); Preclusion of Other Employment (Factor 4); Attorney Expectations at the Outset of the Litigation (Factor 6)</u>

The common questions of fact making cases appropriate for MDL coordination allowed for a coordinated approach to be developed over time and implemented by leadership across all of the MDLs. Common benefit counsel crafted certain consistent themes and legal theories, cross-MDL scientific and medical experts, and coordinated the efforts of developing evidence and legal issues. However, the abundant differences between defendants and individual products necessitated intense and sustained effort over several years by leadership to develop a cross-cutting theory of liability applicable to the dozens of different products while also cultivating the experts necessary to proving general liability for the benefit of plaintiffs' attorneys working across MDL lines. The fact that this coordinated litigation ultimately involved seven MDLs with multiple products and multiple defendants required simultaneous efforts from teams of attorneys, working collaboratively on parallel tracks. The collective work from one product or one MDL aided the process overall while each product required specific focus in terms of liability discovery and pre-trial preparation, expert development, and trial work-up.

---

[22] The Fourth Circuit in *Barber* instructs district courts to consider: (1) the time and labor expended; (2) the novelty and difficulty of the question; (3) the skill required to properly perform the legal services; (4) the attorney's opportunity costs in pressing the litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the attorney and client; and (12) the size of fee awards in similar cases. *Barber*, 577 F.2d at 226.

14

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 28 of 43

The opportunity costs and time limitations imposed by the circumstances of these MDLs were likewise onerous. This litigation is not only one of the largest – if not *the* largest – mass tort product liability litigations in this nation's history, but it is the only mass tort products liability litigation in this country that has involved multiple related MDLs, each involving multiple products, coordinated before the same court simultaneously. For a number of years, the amount of time and effort necessary to coordinate this litigation significantly limited involvement in other matters for many of the lawyers responsible for leading this litigation. The burdens of funding this litigation through PSC contributions and tens of millions of dollars in held costs were substantial. The court has no doubt that pursuing this litigation limited, if not precluded, involvement in other litigations for many common benefit attorneys.

**b.  Novelty and Difficulty of the Issues (Factor 2); The Undesirability of the Case (Factor 10)**

As recognized in *In re Vioxx*, "all products liability cases pose significant challenges to plaintiffs' counsel" that are only compounded by the complexity "unique to the instant litigation." 760 F. Supp. 2d at 656. Individually, the cases in these MDLs involve complex prescription medical devices implanted by surgeons through an invasive surgical procedure. Thus, plaintiffs' leadership was not only required to address the difficult legal questions that arise in products liability cases generally but also had to navigate the unique regulatory, scientific and medical issues presented in these cases. There were also significant issues related to the treating physicians, which necessitated understanding and addressing questions such as surgical skill and experience, doctor training, patient selection, and in some cases, medical negligence.

The theory of how mesh allegedly caused injuries was a complex issue that required extensive research. Plaintiffs' leadership had to develop and define theories of liability to create a coherent theory of the problems allegedly caused by mesh implantation. Because each defendant

15

Pg: 29 of 43     Filed: 03/14/2019     Doc: 8     USCA4 Appeal: 19-1224

designed varying products, the plaintiffs were tasked with finding experts from different scientific fields, including pelvic repair surgeons, pain specialists, biomaterials experts, polymer scientists, biostatisticians, pathologists, and regulatory experts. The level of detail needed to discover and explain why plaintiffs believed certain products were defective compounded the complexity. The leadership's research provided cross-cutting MDL benefits merely by demonstrating why particular weaves used in a mesh design allegedly caused injuries. Several plaintiffs' experts conducted laboratory testing of the materials and products that resulted in extensive reports explaining their medical and scientific findings and opinions. All these materials were developed into trial strategies, necessarily translating difficult concepts into digestible form. These difficulties were compounded by the number of products and defendants involved in each MDL. The divergent issues presented by multiple products in the seven MDLs mandated an organized effort across all MDLs.  Any of the practical concerns that exist in litigating a large group of claims from across the country in a single court were only compounded by the variances presented in the cases unique to each MDL.

Given the complexity of these tasks, "the PSC was required to develop a sophisticated expertise in medical science, the scientific method, an encyclopedic knowledge of vast scientific and medical publications." *In re Actos,* 274 F. Supp. 3d at 528. Plaintiffs' leadership was subjected to different defense strategies and motions from nationally prominent law firms, which not only required hard work, but also ingenuity in working across MDL lines. Because there were different MDLs, products, and defendants, multitudes of dispositive motions were filed with *Daubert* challenges of nearly all of the plaintiffs' experts, often with multiple motions per expert. This motion practice covered a wide variety of legal and evidentiary issues, such as punitive damages, admissibly of regulatory evidence, and product warnings. Because of the leadership's efforts, these

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 30 of 43

complex legal and factual issues were resolved for all plaintiffs' counsel, for the common benefit in all seven MDLs.

> With each round of briefing across different MDLs, new arguments and different evidence yielded distinguishable results. While plaintiffs' leadership was responsible for common benefit work across the MDLs, it also oversaw case-specific preparation on motions and responses to defense motions that were used as templates for future motion practice to the common benefit of all plaintiffs. For each regulatory or scientific issue in these seven MDLs, plaintiffs' leadership had to track "the statutory and common laws of" numerous states across the country. *Deepwater Horizon*, 2016 WL 6215974, at *17. In addition to general discovery, "each [] case tried before this [c]ourt . . . involved unique, complicated, and disputed issues of specific causation." *In re Vioxx*, 760 F. Supp. 2d at 656. Before 2011, there were only a handful of firms involved in this mesh litigation. The risks and costs associated with leading this litigation have remained onerous from the beginning. With costs approaching tens of millions of dollars in expenses by common benefit counsel, the impediments to pursuing these cases were significant.

### c.   The Skill Required to Perform the Legal Services Adequately (Factor 3); The Experience, Reputation, and Ability of the Attorneys (Factor 9)

The novelty and difficulty of litigating seven separate MDLs in one court required unique skills to manage and coordinate such a large and varying process. Because the chance of success was not guaranteed in these cases, the quality of work is reflected in the significant verdicts achieved and the tens of thousands of settlements for plaintiffs. Managing this difficult task necessitated experienced attorneys who specialize in complex litigation.

The court appointed qualified and experienced counsel from across the country to lead plaintiffs' efforts. Many of the leadership law firms specialize in mass tort litigation, which provided leadership with the background necessary to tackle common MDL problems and adapt

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 31 of 43

to new developments unique to prosecuting seven related MDLs. These litigations required dedicated research and study to address the many novel legal, scientific, and medical issues. This meant undertaking enormous document discovery and taking depositions of the individual plaintiffs to develop a general theory of liability for these cases. In addition to the work by plaintiffs' leadership, "[t]he quality of opposing counsel is also important in evaluating the quality of the work done by the Plaintiffs' Counsel." *Jenson v. First Tr. Corp.*, CV 05-3124 ABC (CTx), 2008 WL 11338161, at *14 (C.D. Ca. June 9, 2008). It goes without saying that the defendants have hired qualified counsel. The plaintiffs' success is a testament to their skills and experience.

### d.  The Amount Involved and the Results Obtained (Factor 8)

The most important factor in determining the reasonableness of a common benefit fund fee award is the "degree of the success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992). Success is determined by the gross recovery, the number of individuals who benefit from settlements and verdicts, the degree to which plaintiffs are fully compensated, and the benefit to the public at large. *Deepwater Horizon*, 2016 WL 6215974, at *18; *see In re Diet Drugs*, 553 F. Supp. 2d at 472–73. To date, the majority of cases filed in the seven MDLs have been resolved. Of those cases that have reached settlements or verdicts, roughly $7.25 billion has been provided to the plaintiffs as compensation for their injuries with an estimated $3.75 billion in future recoveries. As a result of the work by the PSC, plaintiffs have been able to file claims in the seven MDLs and use the already-developed pretrial materials to seek relatively quick resolution of their cases. This benefited both the individual plaintiffs and the public at large by ensuring that alleged victims of pelvic mesh products across the country had access to a process that aided in compensating them for their alleged injuries in an efficient and streamlined process.

Filed: 03/14/2019     Pg: 32 of 43        Doc: 8        USCA4 Appeal: 19-1224

**e.** **The Customary Fee for Similar Work in the Community (Factor 5); Awards in Similar Cases (Factor 12)**

These factors were discussed at greater length above. The percentage fee award requested is comparable with other "super mega-fund" MDL fund awards. Therefore, these factors suggest the 5% fee is reasonable in light of other MDL court assessments.

**4.  Lodestar Cross-Check**

When used as a cross-check, the lodestar analysis "is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method." *In re Vioxx*, 760 F. Supp. 2d at 652. The lodestar cross-check is used to assess the reasonableness of the percentage method, and district courts "need not review actual billing records" and are free to rely on time summaries submitted by attorneys. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306–07 (3d Cir. 2005); *see also In re Vioxx*, 760 F. Supp. 2d at 659. Further, these MDLs encompass law firms from across the country and are national in scope. When selecting an hourly rate for determining legal fees the court cannot consider just one market because "'the relevant legal community' is one national in nature . . . [and the court will] consider those rates selected in similar MDLs." *In re Actos,* 274 F. Supp. 3d at 522. In *In re Actos*, the court only described a reasonable range for a lodestar cross-check without specifically finding a lodestar multiplier. *Id.* That is because the purpose of the cross-check is to serve as another data point to assess the reasonableness of the award, but it is not the primary factor.

The FCC has represented to the court that participating attorneys seeking compensation for common benefit work performed approximately 900,000 hours. Of the 900,000 hours submitted, the FCC recognized 679,191.20 hours as providing common benefit. It is estimated that the total common benefit fund will reach $550,000,000 once all cases in these seven MDLs have either reached a settlement or gone to verdict. After subtracting held costs and expenses already paid

from the fund, the FCC anticipates the fund will total $491,150,739.96. The FCC provided the court with a lodestar analysis for hourly rates at $300 and $500. There, the lodestar multipliers were 2.41 and 1.45, respectively. The range of hourly rates offered by the FCC is commensurate with figures produced in other MDLs. *See In re Guidant*, MDL No. 05–1708 (DWF/AJB), 2008 WL 682174, at *15 (D. Minn. March 7, 2008) (average attorney rate of $379.40 per hour); *In re Vioxx*, 760 F. Supp. 2d at 661 (average attorney rate of $443.29 per hour). Using a rough estimate of $400 per hour for a nation-wide effort, the lodestar cross-check amount (679,191.20 x $400/hour) is $271,676,480. The court then divides the anticipated amount by the cross-check amount (491,150,739.96 / 271,676,480) for a lodestar multiplier of 1.8.

While on the lower side of lodestar cross-checks, this amount is certainly within an acceptable range. *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB, 2018 WL 1635648, *9 (E.D. Pa. Apr. 4, 2018) (upholding a $1 billion settlement with a lodestar cross-check multiplier of 2.96 while noting multipliers are frequently awarded in ranges from one to four); *Deepwater Horizon*, 2016 WL 6215974, at *20 (upholding a 2.34 lodestar multiplier in a super-mega-fund MDL); *In re Avandia*, 2012 WL 6923367, at *10 (upholding a super-mega-fund MDL with a lodestar multiplier of 2.6, noting lower multipliers approved in other cases). Having established an initial benchmark percentage, analyzed common benefit counsels' work under the Fourth Circuit's *Barber* factors, and found all the factors to be reasonable compared against a lodestar cross-check, the court **FINDS** the 5% holdback assessment reasonable.

The court notes that this percentage results in a substantial amount of money awarded to common benefit counsel. However, based on the numerous factors discussed above and the awards given in similar MDLs, this court believes that the award given is conservative and serves to justly compensate common benefit counsel for their work without unnecessarily burdening the plaintiffs

20

in this litigation. In return for their effort to produce all the benefits mentioned above, no individual plaintiff was, or ever will be, subject to more than a 5% holdback for all the benefit common benefit counsel created.

## IV. Objections

On November 26, 2018, one plaintiffs' firm filed objections to the FCC's Petition, arguing that the PSC failed to reach a global settlement with the defendants and that the FCC failed to "use any particular methodology" when justifying its request for access to the 5% holdback the court previously ordered. [ECF No. 7242]. Subsequent to the court's ordered deadline for filing responses to the FCC's Petition, two firms filed untimely objections. While all three objections are either irrelevant or untimely in evaluating the FCC's Petition, "the [c]ourt has an independent duty to the [plaintiffs] and the public to ensure that such amounts are reasonable." *Deepwater Horizon,* 2016 WL 6215974, at *15.

### 1. Kline & Specter ("K&S") Objections

K&S, the only firm that filed a timely objection to the FCC's Petition, argues the FCC Petition award should be reduced from 5% to 2.5%. In support of the request, K&S makes four arguments that it believes require the court to reduce the common fund award. Of the four, two of K&S's arguments address what it believes to be the FCC's failure to use any specific methodology in its Petition to the court in support of its request for the 5% assessment and the appealability of this court's rulings. This court has already made its own independent finding that the 5% requested holdback is appropriate under the Fourth Circuit's instructions for assessing common benefit fees. As noted above in the initial benchmark analysis, the court determined its own benchmark for awarding fees and is not rubber-stamping the FCC's proposal. K&S then argues that the perceived disparate treatment is exacerbated by the FCC's failure to produce documents that show the FCC's

21

basis for determining allocations between different firms. This argument is premature and does not address the question before the court. Here, this court is making an independent finding of the reasonableness of an aggregate award to common benefit counsel, *not* the allocation to individual common benefit counsel or firms.

K&S also notes that it has not waived its right to appeal this court's determination of the Petition because the FCC has failed to act transparently, violated the Participation Agreement, and has given disparate treatment when dealing with FCC firms versus non-FCC firms. As K&S correctly acknowledges in its response, and as noted above, the Agreed Order provides that the decision by this court would be final and non-reviewable. Concerns about individual firm awards will be dealt with during the allocation process. Accordingly, these objections are **OVERRULED**.

### a. No Global Settlement Was Reached

K&S next argues that the failure to negotiate a global settlement on behalf of all of the plaintiffs is evidence that the PSC's work did not benefit all the MDL plaintiffs in resolving their cases. In particular, K&S notes that it is the individual work of plaintiffs' counsel negotiating and trying cases that results in victories for their clients. K&S claims that the FCC's analysis of similar percentage awards in establishing its own benchmark percentage fails to recognize that the majority of the FCC's cited litigations resulted in global settlements or court-ordered damages. K&S admits some work was done for the common benefit of the MDLs, but maintains that a lack of a global settlement evidences that much of the PSC's work was not for the common benefit. The court strongly disagrees.

Courts have enforced reasonable attorneys' fees awards in MDLs that did not reach global settlements or that involved plaintiffs who settled before the global settlement was reached. In *In re Zyprexa Products Liability Litigation*, the Second Circuit affirmed a district court's holdback

22

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 36 of 43

of common benefit funds from plaintiffs who prosecuted their cases individually and sought exemption from the holdback. 594 F.3d at 129–30. The court noted that district courts typically appoint lead counsel for the purposes of assisting with case management and coordinating proceedings. *Id.* There is a "desirability-indeed, the compelling need-to have pretrial proceedings managed or at least coordinated by lead counsel or a steering or executive committee [which] demands the existence of a source of compensation for their efforts on behalf of all." *Id.* at 130. In comparing MDLs to class actions, the court reasoned that "while individual plaintiffs are separately represented, they typically benefit also-often predominantly-from the work of the lead counsel or committee." *Id.*

Here, K&S's argument for reducing the fund award ignores the purpose of the common benefit fund. The efforts of plaintiffs' leadership on behalf of the common benefit are in constructing a theory of liability, developing cross-cutting expert testimony that is applicable to general theories of liability in these MDLS, securing pretrial rulings for all plaintiffs, and reducing the bargaining power each defense counsel has in negotiating settlements with individual plaintiffs. This allowed individual counsel to try cases where they felt confident a jury would favorably view their case, or negotiate a settlement for one, or a group of, clients based on the defendants' weakened position. Far from failing to provide a common benefit in the form of a global settlement, the plaintiffs' leadership facilitated the settlement of tens of thousands of cases through its persistent efforts to weaken the defendants' factual and legal standing compared to individual women across the country. Plaintiffs' leadership also provided the MDL plaintiffs with all the work-product they created and educated individual plaintiff attorneys on how to prosecute a pelvic mesh case. These are global benefits.

The purpose of the fund is to compensate counsel for the coordination, management, and

performance of mutually beneficial work on behalf of all the plaintiffs. As the court addressed above in applying the *Barber* factors, common benefit counsel have effectively coordinated and developed a prosecution strategy, defended motions, and deposed key defense witness, including experts for plaintiffs and defendants. That work has benefited all the plaintiffs who are subject to the 5% holdback. The compensation is awarding the efforts of attorneys who worked on global issues affecting the plaintiffs. Therefore, the court finds the lack of a global settlement does not warrant reducing the fee award.

### b.  Critical Work for the Common Benefit Going Uncompensated

Finally, K&S asserts that the recommended allocation by the FCC has emphasized its members' contributions at the expense of important work performed by non-FCC attorneys. That objection is irrelevant and premature at this juncture. Again, the court is not making a determination as to the reasonableness of allocation awards to each individual firm at this time. K&S is essentially arguing certain slices of the pie are too small before the court has even issued its order determining the size of the pie. The purpose of this court's order is to evaluate the reasonableness of the aggregate proposed award that will be individually allocated in a later order.

In arguing the FCC has treated non-FCC firms unequally, K&S also claims compensation for work in the Covidien[23] and Coloplast litigation should be denied because no common benefit work was performed. That is incorrect. Common benefit work was performed in these MDLs and participating counsel are entitled to be compensated for their work. Although the amount of contribution in each of the seven MDLs varies, common benefit awards are assessed on the benefit provided by coordinating efforts as a whole. *In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 582 F.3d 524, 547–48 (3d Cir.

---

[23] "Covidien" defendants, within the Bard MDL, refer to wholly-owned subsidiaries, Sofradim Production, S.A.S. ("Sofradim") and Tissue Science Laboratories ("TSL").

USCA4 Appeal: 19-1224      Doc: 8      Filed: 03/14/2019      Pg: 38 of 43

2009); *In re Genetically Modified Rice Litig.*, 2010 WL 716190, at \*5–6. In *In re Diet Drugs*, the Third Circuit reasoned that individual plaintiffs who already recovered from the defendant or opted out of the global settlement in favor of an individual settlement were still subject to a common benefit assessment fee. 582 F.3d at 547–48. The purpose of a common benefit fund is to compensate MDL leadership counsel who "confer[] a substantial benefit on the members of an ascertainable class . . . ." *Hall v.* Cole, 412 U.S. 1, 7 (1943). Here, a substantial benefit was conferred. As the court mentioned at great length above, the leadership oversaw the legal and factual issues regarding all seven MDLs, and developed any evidence or experts necessary to proving general liability.

In *In re Diet Drugs*, the Third Circuit recognized that even if counsel had opted out before a global settlement was reached or refused to use common benefit work product, leadership counsel secured "favorable discovery and evidentiary rulings that applied on a litigation-wide basis, and it enforced a uniform procedure for" many filings "that governed every MDL case against" the defendant. 582 F.3d at 548. Because the defendants knew the plaintiffs had access to the MDL common discovery, all the plaintiffs benefited in the defendant's "loss of bargaining power due to the [leadership's] efforts." *Id* at. 548. "[T]hose plaintiffs stood a better chance of recovery from [the defendant] than they would have absent the [leadership's] efforts." *Id.*

There is no material difference in regard to the Bard and Coloplast MDLs. All seven of the MDLs were transferred under this court's jurisdiction to manage the litigation in order to promote efficiencies across all of the MDLs. As the court previously mentioned, there is only one group of Co-Leads that coordinate with each MDL's leadership counsel. The common benefit work generated is broadly applicable to each MDL. Beyond the work already provided, plaintiffs' leadership has a continuing obligation to assist in case management and coordinating efforts of all

the MDLs consolidated under this court's jurisdiction. In many instances, the leadership directly assisted individual plaintiff's counsel in settling their cases. That alone subjects all MDL defendants, past and present, to a loss of bargaining power that would not exist absent leadership's efforts. Therefore, a substantial benefit has been conferred in all the MDLs, including the Bard and Coloplast MDLs.

Having explained why an assessment for all the MDLs is warranted, it is also necessary to briefly address K&S's claim that no common benefit work was performed in these two MDLs. First, in Coloplast, the FCC's reply to K&S's response correctly identifies numerous requests for document production, Coloplast counsel's responses to production requests, and document review that occurred in 2016. In addition to MDL work performed, K&S's counsel signed the holdback agreement entered in the Coloplast MDL that authorized a 5% assessment on Coloplast MDL settlements and verdicts. Even if K&S had not endorsed the Coloplast MDL assessments since signing the Participation Agreement over five years ago, the Coloplast MDL claimants substantially benefited from the PSC's organizing, managing, and undermining Coloplast's bargaining power.

Second, the FCC's reply correctly points to its efforts in reaching a stipulation where the parent company, Covidien, stood behind the judgments of its subsidiaries. This process served as a template for the stipulation reached in the AMS MDL, where Endo Pharmaceuticals stood behind the judgments and settlements of its subsidiary AMS. Beyond the substantial benefit conferred on the Covidien claimants, a Sofradim case was selected to go to trial as a bellwether case. Although the case eventually settled, the work performed to prepare the case for trial required marshalling all the evidence and arguments that would be necessary for a successful showing. K&S cannot both claim that the common benefit conferred in finding, researching, and deposing experts for

26

trial in certain MDLs is worth common benefit compensation, while simultaneously asserting the work prepared for prosecuting Bard defendants amounts to "no discovery." [ECF No. 7242]. Therefore, K&S's objections to the award have not persuaded the court to reduce the 5% assessment and are **OVERRULED**.

### 2.   Untimely Objections

Two plaintiffs' firms filed untimely objections after the court's ordered deadline for responses. [ECF Nos. 7259, 7483]. District courts are afforded "broad discretion in coordinating and administering multidistrict litigation." *In re Showa Denko*, 953 F.2d at 165. In the context of MDLs, there is an even greater deference paid to district court's docket management than in non-MDL proceedings. *In re Deepwater Horizon*, 907 F.3d 232, 235 (5th Cir. 2018). "The ability for 'judges to enforce orders pertaining to the progress of their cases' is most important in '[MDL] cases, where the very purpose of the centralization before the transferee judge is the efficient progress of the cases in preparation for trial.'" *Id.* (citing *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 248 (3d Cir. 2013)). District courts may extend timelines for untimely motions upon a showing of "excusable neglect." *Agnew v. United Leasing Corp.*, 680 Fed. App'x 149, 155 (4th Cir. 2017). Neither of these firms filed a motion to extend the court's ordered deadline for response briefs. Unlike *Agnew*, where the litigants filed a motion for an extension because of a calendaring mistake, these firms "failed to provide any explanation" for their failure to file a timely response. *Id.* In addition to never moving for leave to file an untimely response, the court finds it highly relevant that these firms raised their potential objections for the first time since the court entered the Agreed Order on August 26, 2013. Therefore, the objections are **OVERRULED**.

### V.   Conclusion

For the foregoing reasons, the court **ORDERS** that the FCC's Petition [ECF No. 7200] is

27

**GRANTED**. This award is 5% of the total recoveries, which is the equivalent of $366 million. The court **ORDERS** that the 5% assessment set forth in the court's previous Order shall be available for distribution as an award for common benefit attorneys' fees and expenses. The allocation of specific attorneys' fees and expenses will occur once a recommendation of allocation has been submitted to the court for review.

The court **DIRECTS** the Clerk to send a copy of this order in 2:12-md-2327. It shall be the responsibility of the parties to review and abide by all pretrial orders previously entered by the court. The orders may be accessed through CM/ECF system or the court's website at www.wvsd.uscourts.gov.

ENTER: January 30, 2019

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

**PROOF OF SERVICE**

I certify that a copy of the foregoing was served upon the following counsel by notice of electronic filing through the CM/ECF system:

Renee Baggett, Esq.
AYLSTOCK WIT KIN KREIS & OVERHOLTZ, PLLC
Suite 200
17 East Main Street
Pensacola, FL 32502

Riley L. Burnett, Jr., Esq.
BURNETT LAW FIRM
Suite 803
55 Waugh Drive
Houston, TX 77007

Thomas P. Cartmell, Esq.
WAGSTAFF & CARTMELL LLP
Suite 300
4740 Gran d Avenue
Kansas City, MO 64112

Clayton A. Clark, Esq.
CLARK LOVE & HUTSON, GP
440 Louisiana Street
Houston, TX 77002

Yvonne M. Flaherty, Esq.
LOCKRIDGE, G RINDAL & NAUEN, PLLP
Suite 2200
100 Washington Avenue, South
Minneapolis, MN 55401

Carl N. Frankovitch, Esq.
FRANKOVITCH , ANETAKIS, COLANTONIO & SIMON
337 Penco Road
Weirton, WV 26062

Henry G. Garrard, III, Esq.
BLASINGAME, BURCH, GARRARD & ASHLEY, PC

Suite 320
440 College Avenue North
Athens, GA 30603

William H. McKee, Jr., Esq.
1804 Louden Heights Road
Charleston, WV 25314

Joseph F. Rice, Esq.
MOTLEY RICE, LLC
28 Bridge side Boulevard
Mt. Pleasant, SC 29464

Benjamin L. Bailey, Esq.
Raymond S. Franks, II, Esq.
BAILEY & GLASSER, LLP
209 Capitol Street
Charleston, WV 25301


By:    /s/  *Charles L. Becker*
       Charles L. Becker, Esquire

Dated:  March 14, 2019