# Exhibit 7

```
1                   IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                          CHARLESTON DIVISION

4

5    IN RE:  C.R. BARD, INC. PELVIC REPAIR
             SYSTEM                             MDL NO. 2187
6            PRODUCTS LIABILITY LITIGATION

7    _____

                   IN THE UNITED STATES DISTRICT COURT
8              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          CHARLESTON DIVISION
9

10   IN RE:  AMERICAN MEDICAL SYSTEMS, INC.
             PELVIC REPAIR SYSTEM                MDL No. 2325
11           PRODUCTS LIABILITY LITIGATION

12   _____

                   IN THE UNITED STATES DISTRICT COURT
13             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                          CHARLESTON DIVISION
14

15   IN RE: BOSTON SCIENTIFIC CORP. PELVIC REPAIR
     SYSTEM PRODUCTS                             MDL No. 2326
16   LIABILITY LITIGATION

17

18   _____
                   IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
19                        CHARLESTON DIVISION

20   IN RE: ETHICON, INC. PELVIC REPAIR SYSTEM    MDL NO. 2327
             PRODUCTS LIABILITY LITIGATION
21   _____

22

23

24
```

Realtime Reporters, LLC
schedulerealtime@gmail.com 304-344-8463

VAGINAL MESH HEARINGS          SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018

```
 1                 IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                          CHARLESTON DIVISION

 3   IN RE:   COLOPLAST CORP. PELVIC SUPPORT SYSTEMS    MDL No. 2387
              PRODUCTS LIABILITY LITIGATION
 4
                   IN THE UNITED STATES DISTRICT COURT
 5           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                            CHARLESTON DIVISION
 6
     IN RE:   COOK MEDICAL, INC., PELVIC REPAIR SYSTEM  MDL No. 2440
 7            PRODUCTS LIABILITY LITIGATION

 8                 IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 9                          CHARLESTON DIVISION

10   IN RE:   NEOMEDIC PELVIC REPAIR SYSTEM PRODUCTS    MDL No. 2511
              LIABILITY LITIGATION
11

12

13        Statement before the Finance Committee by Shanin Specter,
     Tom Kline and Lee Balefski with Specter & Kline before Teresa
14   Reedy, a Registered Professional Reporter, at West Virginia
     Federal Courthouse, Charleston, West Virginia, on the 12th day
15   of June, 2018.

16

17

18                      REALTIME REPORTERS, LLC
19                           713 Lee Street
                          Charleston, WV  25301
20                          (304) 344-8463
                          realtimereporters.net
21

22

23

24
```

VAGINAL MESH HEARINGS          SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
                                                                        06/12/2018

```
 1                            APPEARANCES:

 2   COMMITTEE MEMBERS:

 3
     Clayton Clark, Clark, Love & Hutson
 4   Joe Rice, Motley, Rice, LLC
     Riley Burnett, Burnett Law Firm
 5   Tom Cartmell, Wagstaff & Cartmell, LLP
     Renee Baggett, Aylstock, Witkin, Kreis & Overholtz
 6   Henry Garrard, Blasingame, Burch, Garrard & Ashley
     Daniel Stack, Court-Appointed Special Advisor to FCC
 7   Carl N. Frankovitch, Frankovitch & Anetakis
     William H. McKee, Jr., WHM Resources, LLC
 8   Yvonne M. Flaherty, Lockridge, Grindal, Nauen, PLLP

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1          MR. GARRARD:  For the court reporter, please

2   give your names and your current --

3          MR. SPECTER:  Good afternoon.  Shanin Specter,

4   S-H-A-N-I-N, Specter, S-P-E-C-T-E-R from Kline & Specter in

5   Philadelphia.  To my right is Tom Kline, and to my left is Lee

6   Balefski, B-A-L-E-F-S-K-I.

7          MR. GARRARD:  Thank you.  We appreciate you

8   being here, and hope that you give us information that we

9   should consider that would help us as we deal with evaluating

10  time, expenses and contributions on this litigation.  So we

11  would open the floor to you.

12         MR. SPECTER:  Good afternoon.  We're here to

13  reiterate our firm's significant contributions for the Common

14  Benefit of the transvaginal mesh litigation.  We're also here

15  to express our concerns about the process, the disallowance by

16  the FCC of 70 percent of our time, the lack of transparency,

17  and answer any questions the FCC may have about our firm's

18  contribution.

19         Please note that we object to our counsel,

20  Bowles Rice, not being allowed at this meeting.

21         MR. GARRARD:  Say that again.

22         MR. SPECTER:  I said please note that we

23  object to our counsel, Bowles Rice, not being allowed at this

24  meeting.

```
1              MR. GARRARD:  Not to get into a dispute
2   with you, but nobody here said they couldn't be here.
3              MR. SPECTER:  Okay.  Well, we have
4   written information from you-all that indicated that to
5   us.
6              MR. GARRARD:  That was not the intent
7   of any written information to you.
8              MR. SPECTER:  In the course of Kline &
9   Specter's six-year involvement in this litigation, our
10  firm has, number one, done everything we've been asked
11  to do by leadership.  Number two, always volunteered
12  and offered to help with any project.  Number three, we
13  have never been questioned about our work product, work
14  ethic or the propriety of hours we have submitted for
15  any of the 37 reporting periods.  And, number four, we
16  have received numerous accolades for the work we did.
17             Since the establishment of the pelvic
18  mesh MDLs, lawyers and paralegals employed by Kline &
19  Specter have taken innumerable actions that have
20  provided common benefits and materially advanced the
21  interests of every plaintiff and claimant in the pelvic
22  mesh MDLs.
23             Kline & Specter has tried six pelvic
24  mesh cases to jury verdicts.  In five of those cases,
```

1   the plaintiffs prevailed.  Collectively, juries have

2   awarded Kline & Specter's clients $110 million in

3   damages.

4                    Kline & Specter submitted 32,270.19

5   hours of time for consideration of common benefit.

6   After the first review, the FCC approved only 5,202.95

7   of Kline & Specter's hours as for the common benefit of

8   all plaintiffs.  Following the submission of our

9   affidavit on February 9, 2018, requesting

10  reconsideration of our submitted time, the FCC approved

11  an additional 4,199.24 hours.  At this time, the fee

12  committee had identified a total of 9,42.19 of Kline &

13  Specter's hours for consideration as common benefit

14  time.  That means that there is a total of 22,868 hours

15  that the FCC proposes to disallow from our submission.

16  Over 70 percent of Kline & Specter's submitted hours.

17                    Furthermore, initial exclusion of the

18  additionally allowed 4,199.24 hours was not merited as

19  evidenced by its later inclusion.  While we appreciated

20  having more hours included, we note that the doubling

21  of the hours that had been accepted demonstrates the

22  underlying flaws in the process.

23                    Throughout the process of assessing

24  common benefit time, the FCC allowed firms such as

1   Kline & Specter to challenge the reduction of hours
2   made by the FCC to explain why these hours should be
3   considered for common benefit.  However, the FCC has
4   made that task overly burdensome, impractical, and
5   frankly impossible.  The FCC has provided blanket,
6   non-specific disallowances of this firm's time, making
7   a specific response to each fee entry a futile guessing
8   game.  This is fundamentally unfair.  It is a basic
9   tenet of justice that a party receive notice of the
10  nature of a claim or defense.  The lack of specificity
11  of the reason for the proposed disallowance prevents us
12  from meaningfully responding.
13              Kline & Specter has submitted discovery
14  requests -- requests which we reassert at this time and
15  requests which are fundamental to this process.  We,
16  again, request that the FCC produce the specific reason
17  for each of the proposed disallowed entries so that
18  Kline & Specter can respond in an informed, appropriate
19  and meaningful manner.
20              We further request first production of
21  each fee and expense request of each firm and the FCC's
22  response to each request.  Second, disclosure of the
23  amount of money received pursuant to the five-percent
24  assessment, along with a per-firm itemization of these

1   payments.  Third, all documents and emails relating to

2   any fee-sharing agreements between or among the members

3   of the FCC.  Fourth, all communications among FCC

4   members and all documents relating to FCC consideration

5   of the fee and expense reports.

6                   This information is necessary to ensure

7   that the FCC functions in accordance with the most

8   basic judicial standards of transparency and fairness

9   and is crucial to ensure that fee allocations are

10  appropriate.

11                  Kline & Specter also proposes making

12  the information sought available to every firm that has

13  submitted fee applications.  Making this information

14  available to every plaintiff's lawyer involved in this

15  process is in everyone's best interest, every attorney

16  and every client.  Fee disputes and other litigation

17  with millions of dollars at stake ought to be litigated

18  openly and transparently.  Attorneys are inclined to

19  argue over these generous fee awards and should be well

20  positioned to comment publicly and openly on each

21  other's relative contribution to the litigation.

22                  We currently have a second set of

23  discovery requests pending that have not been answered

24  or objected to.  The continued lack of receipt of this

1  information hampers our ability to meaningfully

2  participate in this proceeding.  Let me turn now to the

3  work performed.

4           Our affidavit speaks for itself as to

5  the important work Kline & Specter has done for the

6  Common Benefit.  We wish to highlight a few items.

7  First, as a firm, we've made huge commitment to this

8  litigation.

9           Second, Kline & Specter had 24

10 attorneys taking part in this litigation for which we

11 sought common benefit fees, including four of our

12 doctor-lawyers.  As we are here today, at this very

13 moment, we have 55 lawyers in our firm working in this

14 litigation including four in Suffolk, Massachusetts,

15 completing a trial against Boston Scientific.

16          Third, Kline & Specter Partner, Lee

17 Balefski, has served as a member of the MDL Plaintiff

18 Steering Committee, New Jersey Discovery Committee, and

19 as the liaison counsel in the Philadelphia Court of

20 Common Pleas Pelvic Mesh Litigation.

21          Fourth, Kline & Specter has performed a

22 total of over 32,000 hours of common benefit time.

23          Fifth, we've advanced millions of

24 dollars for both the common benefit and their

1    individual clients.

2              Sixth, most importantly, our work has

3    resulted in phenomenal success.  We obtained five jury

4    verdicts against Ethicon totaling over $110 million

5    including punitive damages.  In the course of these

6    trials, we obtained many significant rulings and

7    provided substantial contribution to the improvement of

8    the Ethicon trial package including, but not limited

9    to, providing new and updated depositions, deposition

10   cuts, pleadings, motions, and expert reports.

11             Seventh, our discovery team uncovered

12   critical documents and helped significantly in

13   depositions of the Ethicon corporate witnesses --

14   particularly at the onset of this litigation.

15   Attorneys at Kline & Specter were crucial in the

16   preparing and taking of almost all of these key

17   depositions that were used in trials across the

18   country.  Rightly so, hundreds of these hours have been

19   approved by the FCC as work being for the common

20   benefit and our effort and work in this regard was

21   lauded by other attorneys in this litigation.

22             Eighth, our work contributed to the

23   success and development of the trial package in the

24   earliest trials, including Gross versus Ethicon and

1   Lewis versus Ethicon.

2             Ninth, our battle to successfully

3   maintain jurisdiction over Ethicon in Pennsylvania was

4   critical to the common benefit by opening up a new

5   venue, forcing Ethicon to divert resources from other

6   venues and was likely critical in the settlement of

7   thousands of cases.

8             Tenth, despite these contributions,

9   over 70 percent of our hours have been disallowed by

10  the FCC.  It is difficult for us to determine why many

11  of these hours have been excluded.  We can only

12  conclude that many disallowances appear arbitrary.

13  There are times when certain work is approved for

14  common benefit and then we find an entry where similar

15  work is disallowed.  For example, a June 12, 2014 entry

16  for work performed by Attorney Catherine Foley was

17  described as, quote, review of Ethicon slash Secant

18  documents for West/Nadaeu, N-A-D-E-A-U, depositions,

19  unquote.  This entry was allowed.  A June 13, 2014

20  entry, the very next day for the continuation of the

21  same work, was then disallowed.

22             Similarly, an October 24, 2012 entry by

23  Attorney Roger Cameron for work spent preparing for

24  Ethicon corporate employee Axel Arnaud's deposition was

1   allowed, and an October 25, 2012 entry by Mr. Cameron,

2   for additional work regarding his deposition the very

3   next day, was disallowed.

4                    You've left it up to us and other firms

5   involved in this litigation to speculate.  We are left

6   scratching our collective heads, looking at the

7   thousands of disallowed entries, trying to fill in the

8   blank.  Obviously, the FCC made a determination at some

9   point in time.  There does exist a reason.  Why the

10  reasons are being withheld from the firms is

11  bewildering at this juncture.  We reiterate our request

12  for discovery and transparency in this process.

13                   Let me turn, if I may, to a couple of

14  the cases.  Hammons versus Ethicon.  In reviewing the

15  disallowance of the entries, we have ascertained that

16  over 4,000 of Kline & Specter's hours submitted for the

17  Hammons versus Ethicon case, tried in the Philadelphia

18  court of common pleas, were disallowed.  We disagree

19  with this determination and assert that our work in the

20  Hammons case benefited all plaintiffs in this

21  litigation.

22                   Hammons was in December 2015, before

23  Ethicon settled the majority of cases.  While the

24  Hammons case was the second trial involving the

1   Prolift, it was the first and only case where the jury
2   found for the plaintiff on a defective design claim.
3   The Gross verdicts -- Gross being the first Prolift
4   case to be tried -- was successful on the
5   failure-to-warn claim only.
6                 The design defect claim is at the heart
7   of these cases.  While the failure-to-warn claim is
8   case specific, it depends on the testimony of the
9   implanting doctor, who is the learned intermediary,
10  that the defect claim concerns the product itself and
11  is at issue in every case.  The bottom line is that the
12  verdict in Hammons was at least as, if not more,
13  significant for the common benefit as was the Gross
14  verdict and served to put Ethicon on notice that it
15  would probably be wise to seriously consider
16  settlement.
17                In addition to the significance of
18  findings on design defect, the plaintiff was awarded
19  $5.5 million in compensatory and $7 million in punitive
20  damages.  This was the largest Ethicon jury verdict to
21  date and the third largest verdict against any
22  defendant in the entire pelvic mesh litigation.
23                The significance of the Hammons verdict
24  was not just the verdict.  The trial package Kline &

1    Specter developed was requested and used by attorneys

2    around the country for their Ethicon MDL wave cases.

3    For example, on March 28, 2016, Kline & Specter

4    partner, Kila Baldwin, sent her deposition of

5    Ms. Hammons' treating physician, Dr. Julie Drolet, to

6    multiple attorneys with cases pending in the Ethicon

7    MDL.  She also sent the outline to Attorney Daniel

8    Thornburgh, who had requested it, writing, quote,

9    Thanks, Kila.  If you have your outline that you used

10   for this deposition, I think it would help others who

11   are preparing for Urogyn depositions in the Ethicon

12   Wave 1 expert depo phase we are in right now in the

13   MDL, unquote.

14            Additionally, the deposition cuts from

15   the de bene esse depositions of expert witnesses, such

16   as Dr. Daniel Elliot and Professor Uwe Klinge, which

17   were created by the Hammons trial team and played

18   during the Hammons trial were deemed admissible to be

19   used in Prolift Wave cases by magistrate Judge Cheryl

20   A. Eifert of the United States District Court for the

21   Southern District of West Virginia.

22            Let me speak now briefly about Carlino

23   versus Ethicon.  In contrast, the FCC approved our work

24   in Carlino versus Ethicon.  This was the second trial

1   involving Ethicon's TVT retropubic device and the first
2   verdict in favor of the plaintiff.  It was also Kline &
3   Specter's second pelvic mesh trial in the Philadelphia
4   Court of Common Pleas and, ultimately, our second
5   landmark verdict.  The jury awarded Mrs. Carlino 3.25
6   million in compensatory damages, $250,000 for
7   Mr. Carlino for loss of consortium and $10 million in
8   punitive damages.  Kline & Specter's work in Carlino
9   benefited all plaintiffs in this litigation and our
10  work in Hammons has proven to be equally as beneficial.
11              Let me comment briefly on three other
12  cases that we've tried.  Beltz, Engleman, and Ebaugh.
13  In addition to Hammons, work on three of our other
14  important trial verdicts -- Beltz, Engleman and Ebaugh,
15  was also disallowed.  While these trials occurred in
16  2017, after the stated cut-off date of January 1, 2017,
17  much of the work did not occur after that date.  It
18  occurred prior to this date.
19              We have been unable to determine if our
20  work on this case was disallowed because the trials and
21  verdicts occurred after the January 1, 2017 date or
22  because it was not considered common benefit work or
23  both or something else.  If it was because of the
24  timing of the verdicts, that causes us to wonder, will

1  these hours be considered at a later time and, if so,

2  when.  If these cases have been permanently excluded

3  because the work was not considered common benefit, we

4  would like to know why.

5                 At the end of 2016, there were a

6  significant number of active Ethicon cases, many of

7  which were being worked up for trial in the MDL Wave

8  process.  These three significant verdicts surely had

9  an impact in Ethicon's increased interest in settling

10 cases through 2017.  This work should be recognized.

11                It is important to note that it's not

12 just a single verdict that drives settlement.  It's

13 multiple verdicts that take their toll on defendants

14 and their resources.  To say that no verdicts after a

15 product's first verdict against it should be considered

16 for the common benefit is arbitrary and without basis.

17                Let me comment, if I may briefly, on

18 Ethicon's existence as the defendant in the

19 Philadelphia Court of Common Pleas.  Kline & Specter's

20 success in Philadelphia Court of Common Pleas has been

21 instrumental in helping drive Ethicon to settle cases,

22 bolstering trial packages, bringing about key rulings

23 and simply weakening Ethicon's ability to fight the

24 cases across the country.

1    Let me focus on Remands for a moment.
2  From the beginning, Ethicon vigorously fought the
3  establishment of a pelvic mesh mass tort program in
4  Philadelphia.  At the outset of filing our cases in the
5  PCCP, Ethicon removed the cases to federal court,
6  claiming fraudulent joinder regarding the naming of
7  Secant as a defendant.  Kline & Specter filed extensive
8  briefing defeating Ethicon's fraudulent joinder
9  argument and was able to effectively remand these cases
10  back to the Philadelphia Court of Common Pleas.
11  Hundreds of hours regarding these removals and remands
12  have been arbitrarily disallowed by the FCC, despite
13  the FCC correctly recognizing other work regarding
14  Secant and the establishment of the PCCP that did
15  benefit all litigants.  Again, we do not know why these
16  hours were disallowed.  The reasons were not provided.
17    Let me now focus for a moment on
18  jurisdiction.  Similarly after the fraudulent joinder
19  argument failed, Ethicon fought us on personal
20  jurisdiction multiple times, any and every way that
21  they could, and it appears that these hours have also
22  been disallowed.  We disagree with that determination.
23  Kline & Specter conducted hundreds of hours of
24  substantial legal work in order to establish that

 1   Secant's manufacturers of the mesh in Pennsylvania
 2   created a significant contact between Ethicon and
 3   Pennsylvania.  Kline & Specter successfully managed to
 4   keep 118 cases in the Philadelphia Court of Common
 5   Pleas, maintaining another avenue for litigating these
 6   cases against Ethicon and establishing further pressure
 7   on this defendant to the benefit of all pelvic mesh
 8   litigants.
 9                 Again, while some work regarding that
10   has been allowed, hundreds of hours have been left on
11   the table and disallowed; and given the information
12   provided by the FCC, we cannot determine why.
13                 Let me turn, if I may, to discuss the
14   Coloplast litigation.  Kline & Specter has been the
15   only firm to have performed significant work in the
16   Coloplast litigation, including the review of tens of
17   thousands of pages of documents.  More importantly, we
18   spent hundreds of hours working up the case of Jones
19   versus Coloplast, which was litigated in Philadelphia
20   County, and we received an eight-figure settlement in
21   that case, five percent of which went into the common
22   benefit assessment pool.
23                 None of the hours submitted by Kline &
24   Specter were allowed by the FCC.  Kline & Specter

1   cannot determine if any other firms were approved for

2   work in the Coloplast litigation, but we certainly were

3   not.  It seems fundamentally unfair that our work in

4   Coloplast, including the Jones case, was determined to

5   be global enough to assess our settlement by five

6   percent, but not global enough to be considered for the

7   common benefit of all plaintiffs in the litigation.  Of

8   course, we fought that five percent assessment, finding

9   it itself to be unfair.  At the very least, our work

10  provided a significant financial contribution to these

11  funds.

12                 In conclusion, Kline & Specter is proud

13  of the work we have done and the success that we have

14  achieved.  Work and success that has benefited

15  thousands of injured women across the country.  And

16  work that we continue to do.

17                 Throughout this process, we have

18  reiterated one request, transparency, and we imagine

19  that everyone involved in this litigation is or should

20  be on board with that.  At the April 2016 meeting with

21  the FCC held here in Charleston, West Virginia, it was

22  clearly stated that transparency will be the goal.

23  Each firm will be given an opportunity to comment on

24  other's submissions.  We now ask that this promise be

1   upheld.  We ask for fairness in the process, for

2   transparency, and to be recognized for the time and

3   effort Kline & Specter has put forth for the benefit of

4   all plaintiffs in this litigation.  We would be pleased

5   to respond to any comment or questions.

6                   MR. RICE:  I got a curiosity question.

7   I just don't know.  What is the status of the five

8   cases, as far as appeals or --

9                   MR. SPECTER:  Those cases are all on

10  appeal pending resolution.

11                  MR. RICE:  On a consolidated basis or

12  separate --

13                  MR. SPECTER:  They're all separate

14  appeals.

15                  MR. RICE:  Are they in the same

16  appellant court?

17                  MR. SPECTER:  Yes.

18                  MR. GARRARD:  I have a question.  In

19  the history of the transvaginal mesh and the MDL, what

20  assistance did your firm receive from members of the

21  MDL, from the PSC in terms of helping you prepare, for

22  example, for Ethicon trials and helping you prepare for

23  Boston Scientific trials?

24                  MR. SPECTER:  It's varied.  The Ethicon

```
 1   work, a lot of it was very good.
 2                   MR. GARRARD:  When you say good, you're
 3   referring to the work that was shared with you?
 4                   MR. SPECTER:  Yes.  There were fact
 5   witness testimony taken on videotape from Ethicon
 6   employees, some of which we used, although we recut
 7   them.  There were expert reports which formed the basis
 8   for experts that we decided to call.  Some of that was
 9   reworked by us.  There was document review that was
10   done, and we used some of those documents at trial.
11   Some of those documents were developed by work that we
12   did.  So it came through the MDL process in part
13   through our work.
14                   But I would say that the work done with
15   respect to the Prolift was very good.  The work on the
16   TVT was good.  Not as extensive, but good, as far as it
17   went.  On Boston Scientific, it was not as well
18   developed and we had to develop a lot of that.
19                   MR. GARRARD:  Enlighten just a little
20   bit, when you say you had to develop Boston Scientific,
21   give us some specifics, if you don't mind, as to what
22   your firm did in developing that.
23                   MR. SPECTER:  I think for that, Henry,
24   I'd like to respond to you in writing if I could.  I'd
```

1  like to consult with Kila Baldwin in our firm to give
2  you a thorough answer to that.  She has been primarily
3  responsible for that work, along with Chris Gomez.  I'd
4  like to give you a more complete response.  I can
5  comment with greater specificity, as can Mr. Kline on
6  Ethicon because we've tried those cases ourselves.
7               MR. GARRARD:  I was specifically
8  interested in Boston, but if you want to give me
9  something, that's fine.  I will leave --
10              MR. SPECTER:  Good.  Thank you.
11              MR. GARRARD:  It is my belief that the
12 FCC recognized work your firm did in Engleman, Carlino
13 and Harris.  I may have misunderstood you, but I
14 thought, as to one of those cases, you said we did not.
15 Did I misunderstand you?
16              MR. SPECTER:  Yes.
17              MR. KLINE:  The Engleman case, Henry,
18 was tried in 2017.  I did not -- in my review of the
19 entries, did not see any work recognized for the
20 Engleman case.
21              MR. GARRARD:  For the trial in 2017 or
22 the work up to?
23              MR. KLINE:  For either.
24              MR. GARRARD:  I want to check on that

1  because I thought at least some of that work had been

2  recognized and I could be in error but --

3                    MR. CLARK:  Was that the TVTS case,

4  where both Mr. Cartmell's firm and my firm worked with

5  you on that?

6                    MR. BALEFSKI:  That was the TVT case.

7  That we -- no, that was --

8                    MR. CLARK:  -- do you recall?

9                    MR. BALEFSKI:  It was the TVT.

10                    MR. GARRARD:  What was the TVTS case?

11                    MR. BALEFSKI:  The TVTS case that Ben

12  Anderson tried.

13                    MR. SPECTER:  With us.

14                    MR. CLARK:  But the workup prior to

15  that is what I'm asking you about, prior to the cut-off

16  time.  Because you didn't do all the workup just before

17  you tried the case.  I think some of the work was done

18  before and I'm just curious if you recognized whether

19  or not that work was, in fact, recognized as common

20  benefit.

21                    MR. BALEFSKI: I don't believe it was.

22  I will defer to --

23                    MR. GARRARD:  I will be sure that we

24  check on that.

1          MR. SPECTER:  On Engleman, the bulk of

2   our work was done late in the process, to answer your

3   question, Clayton.

4          MR. CLARK:  I believe that it was late

5   2015 that you began working on the case, as far as we

6   do, and we started getting requests for information and

7   Will Longquist from our office also worked on that case

8   as well, with delivering work we had done on it --

9          MS. BAGGETT:  And us.

10          MR. CLARK:  -- correct case.  But I

11   believe that was a secure case; is that right?

12          MS. BAGGETT:  Yeah.

13          MR. GARRARD:  Lee, or any of you, in

14   the course of the work you did, did you provide expert

15   reports that were new experts, new generated experts to

16   any of the firms involved in the MDL for uralitization?

17          MR. KLINE:  We did provide a new expert

18   report from a Dr. Ralph Zipper, which we worked on with

19   a couple of the other firms involved.  We also worked

20   extensively with Drs. Rosenzweig and Margolis to update

21   and refine their reports and, more importantly, their

22   testimony.

23          MR. GARRARD:  What I was interested

24   in -- no trick question -- is as to whether there were

1  new experts you developed.  I mean, I'm familiar with

2  Zipper.  I'm familiar with the others.  I probably knew

3  Zipper before any of you guys did and I'm interested in

4  whether you had new experts you developed that got

5  expert reports and shared those with the MDL?

6              MR. SPECTER:  I don't believe so beyond

7  what Lee had said to you.  We certainly did not do

8  everything that was litigation.

9              MR. GARRARD:  I'm not suggesting --

10              MR. SPECTER:  -- and we didn't do most

11  things.  Other people did most things but we did

12  largely in this litigation what we were asked to do by

13  leadership, and if we had been asked to develop

14  experts, we would have done that.

15              MR. GARRARD:  On Coloplast, tell me a

16  little bit about the extent of the work you did in

17  Coloplast.  The Court here basically stayed discovery

18  and I believe there was a request, at some point, for

19  you providing to some of the Coloplast leadership some

20  information you had worked on.  Educate us just a

21  little bit about that, if you would please.

22              MR. BALEFSKI:  We filed

23  interrogatories and requests for production in

24  Philadelphia County in the Jones case, and were

1   provided with millions of pages of documents for
2   review.  We broke those up into different people in the
3   firm, reviewed those documents and pulled the key
4   liability documents for Coloplast.  In addition, we
5   took four depositions in Minneapolis of Coloplast
6   corporate employees so those -- and whatever we were
7   asked to provide, I think we did to whoever wanted it.
8   I mean, there was a protective order in place, where
9   there was some issues as to whether we could do it, but
10  to the extent we could do it, we did.  So the Coloplast
11  work is now available for anybody who wants it.
12                  MR. GARRARD:  I recall there being an
13  issue, at some point, Lee, as to whether you could or
14  would provide, for example, documents that you had
15  secured in your case over to the MDL and, if you would,
16  educate us as to the history of that, whether there was
17  resistance to provide, whether you felt you couldn't
18  provide it because of the protective order and what,
19  if, anything ultimately was provided.
20                  MR. BALEFSKI:  There was -- we had no
21  problem providing anything we could.  There were
22  protective orders in place in Philadelphia County that
23  we had to get Coloplast's permission to get around in
24  order to provide the documents.  Eventually, we did

1  and, eventually, we provided whatever documents were

2  requested to anyone.

3              MR. GARRARD:  Do you know what exactly

4  it is of what you provided?  Was it the gross documents

5  you received?  Was it some segregation of documents?

6              MR. BALEFSKI:  We provided a -- what we

7  felt were the key liability documents to whoever in the

8  MDL wanted them.  We also provided copies of the

9  deposition transcripts that we took.  We also provided

10  summaries, I believe if I'm not wrong, of what we -- of

11  those documents and what we garnered from those

12  documents.  I think, subject to the constraints we were

13  under, which we eventually got out from under, we

14  provided everything that we were asked to.  I know

15  that.

16              MR. GARRARD:  Do you recall which of

17  the leadership you provided that to?

18              MR. BALEFSKI:  It would have probably

19  been Skeeter.  I'm not sure who else.

20              MR. GARRARD:  Anything else you want to

21  tell us?

22              MR. CARTMELL: On Coloplast, real quick,

23  did you get to expert reports in that case, in other

24  words, generate any expert reports?

```
 1              MR. BALEFSKI  We did not -- we
 2   generated -- yes, we generated case-specific expert
 3   reports.  We did not generate a generic expert report.
 4   We're actually working on that right now.
 5              MR. SPECTER:  Yeah, just a couple other
 6   problems on Coloplast.  One is that it's a matter
 7   that's available to you, in terms of the records that
 8   you -- that the common benefit fund received a million
 9   dollars on the Jones case, which represents five
10   percent of --
11              MR. GARRARD:  I'm aware of that.
12              MR. SPECTER:  -- the settlement.  So
13   that there has been a benefit to counsel, with regard
14   to our work on that case.  That's very significant.
15              MR. GARRARD:  I'm aware of the history.
16              MR. SPECTER:  The other thing I want to
17   comment on is that that litigation is ongoing.  We have
18   quite a few cases against Coloplast currently and we
19   are engaged now in discovery with them and we're
20   prepared to share everything we obtained to the degree
21   we possibly can with anybody else who wants it.
22              MR. GARRARD:  Currently, discovery is
23   basically stayed in Coloplast in the MDL, so I'm aware
24   of the factors in relation to the payment of the five
```

```
 1   percent and first, I think, you guys said we don't
 2   really think we ought to and we said pay it and you
 3   paid it.
 4               MR. SPECTER:  Unless we can hold
 5   something additional, which is you said he was going to
 6   make a determination at a later point as to whether
 7   it's an appropriate allocation to come.
 8               MR. GARRARD:  I think that's maybe his
 9   policy, that if somebody objects, you got to pay it and
10   then if you want to object later, you get to object
11   later.
12               Anything else you guys would like us to
13   know?
14               MR. BALEFSKI:  May I ask a question?
15               MR. GARRARD:  Yes.
16               MR. SLACK:  I just wanted to ask this
17   question because Mr. Specter made a pretty good point,
18   which I think is commonly true, about the fact that the
19   state court trials still put pressure on defendants to
20   settle, but in my experience, I think there are -- all
21   state court trials that are -- that, while they
22   continue to put pressure on the defendant, don't
23   qualify as common benefit.  So I was just curious about
24   your perception of that and if you've had other DLs
```

```
 1    where you felt that was given common benefit
 2    qualification.
 3              MR. SPECTER:  Well, I would start with
 4    the proposition that our understanding was that work
 5    that was done on the state court trials would be
 6    considered as common benefit in this litigation, so
 7    let's just begin with that.
 8              With respect to what happens in other
 9    places, in other jurisdictions, we haven't been
10    involved in a lot of MDLs, Judge Stack.  So I can't
11    give you a comprehensive answer about that.
12              MR. SLACK:  Okay.  That's fair.
13              MR. CLARK:  Can you tell me which
14    Boston product is being tried right now?
15              MR. BALEFSKI:  Pinnacle.
16              MR. CLARK:  You're aware there was a
17    verdict in Florida regarding Pinnacle cases of four
18    consolidated plaintiffs?  Did you get that transcript
19    from the MDL?
20              MR. SPECTER:  I'm sure we did, yes, and
21    those materials -- that's part of what I would like to
22    have Ms. Baldwin provide to Mr. Garrard is information
23    such as that, where there had been assistance from the
24    work that has been done by those who have been involved
```

```
 1   in that litigation.
 2                MR. CLARK:  I just want to make sure
 3   that you received it because it was tried, verdict and
 4   appealed; and the appeal was also on the 13th.
 5                MR. SPECTER:  Yes, I know it was an
 6   outstanding recovery.
 7                MR. GARRARD:  Anything else you'd like
 8   to share?
 9                MR. RICE:  In the submission, you
10   designate partner, you designate associate, and you
11   designate counsel.
12                MR. SPECTER: Right.
13                MR. RICE:  What's the difference?  I
14   got the partner part.  What's the difference between
15   the associate and counsel?
16                MR. BALEFSKI:  Associate is somebody
17   who is employed by Kline & Specter.  Counsel is someone
18   who is employed by Kline & Specter on a temporary or
19   contract basis.
20                MR. RICE:  A lot of times -- and do the
21   counsel -- is that basically document review?  Is that
22   generally contract lawyers doing document review?
23                MR. BALEFSKI:  Majority, yes.  In
24   addition to that, they're involved in legal writing,
```

```
 1   briefing, helping with depositions.  In a couple
 2   instances, actually taking depositions, which I think
 3   we submitted for Mr. Cameron early on in the Ethicon
 4   litigation.  He not only was involved in preparing for
 5   depositions, but he actually was -- took one or two
 6   depositions.
 7                   MR. RICE:  Okay.
 8                   MR. BALEFSKI:  It's not just document
 9   review.  That answer your question?
10                   MR. RICE:  Yeah, I just -- there was
11   some -- I just hadn't seen the distinction.  I was
12   trying to figure out what it was.
13                   MR. GARRARD:  Thank you-all for coming.
14   Appreciate your candor.
15                   (Concluded.)
16
17
18
19
20
21
22
23
24
```

```
1   STATE OF WEST VIRGINIA,

2   COUNTY OF WOOD, to wit;

3

4          I, Teresa Reedy, a Notary Public within and for the
    County and State aforesaid, duly commissioned and qualified,
5   do hereby certify that the foregoing proceeding was duly taken
    by me and before me at the time and place and for the purpose
6   specified in the caption hereof.

7          I further certify that the attached transcript meets
    the requirements set forth within Article 27, Chapter 47 of
8   the West Virginia Code to the best of my ability.

9          I do further certify that the said proceeding was
    correctly taken by me in shorthand notes, and that the same
10  were accurately written out in full and reduced to
    typewriting.
11
           I further certify that I am neither attorney or
12  counsel for, nor related to or employed by, any of the parties
    to the action in which this deposition is taken, and further
13  that I am not a relative or employee of any attorney or
    counsel employed by the parties or financially interested in
14  the action and that the attached transcript meets the
    requirements set forth within article twenty-seven, chapter
15  forty-seven of the West Virginia Code.

16         My commission expires March 13, 2023.  Given under
    my hand this 12th day of August, 2018.
17

18  _____
    Teresa L. Reedy, RPR
19

20

21

22

23

24
```

VAGINAL MESH HEARINGS

SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018 Index: $10..Carlino

**$**

**$10** 15:7
**$110** 6:2 10:4
**$250,000** 15:6
**$5.5** 13:19
**$7** 13:19

**1**

**1** 14:12 15:16,21
**118** 18:4
**12** 11:15
**13** 11:19
**13th** 31:4

**2**

**2012** 11:22 12:1
**2014** 11:15,19
**2015** 12:22 24:5
**2016** 14:3 16:5 19:20
**2017** 15:16,21 16:10 22:18,21
**2018** 6:9
**22,868** 6:14
**24** 9:9 11:22
**25** 12:1
**28** 14:3

**3**

**3.25** 15:5
**32,000** 9:22
**32,270.19** 6:4
**37** 5:15

**4**

**4,000** 12:16
**4,199.24** 6:11,18

**5**

**5,202.95** 6:6
**55** 9:13

**7**

**70** 4:16 6:16 11:9

**9**

**9** 6:9
**9,42.19** 6:12

**A**

**ability** 9:1 16:23
**accepted** 6:21
**accolades** 5:16
**accordance** 8:7
**achieved** 19:14
**actions** 5:19
**active** 16:6
**addition** 13:17 15:13 26:4 31:24
**additional** 6:11 12:2 29:5
**additionally** 6:18 14:14
**admissible** 14:18
**advanced** 5:20 9:23
**affidavit** 6:9 9:4

**afternoon** 4:3,12
**agreements** 8:2
**allocation** 29:7
**allocations** 8:9
**allowed** 4:20,23 6:18,24 11:19 12:1 18:10,24
**amount** 7:23
**Anderson** 23:12
**appeal** 20:10 31:4
**appealed** 31:4
**appeals** 20:8,14
**appears** 17:21
**appellant** 20:16
**applications** 8:13
**appreciated** 6:19
**approved** 6:6,10 10:19 11:13 14:23 19:1
**April** 19:20
**arbitrarily** 17:12
**arbitrary** 11:12 16:16
**argue** 8:19
**argument** 17:9,19
**Arnaud's** 11:24
**ascertained** 12:15
**assert** 12:19
**assess** 19:5
**assessing** 6:23
**assessment** 7:24 18:22 19:8
**assistance** 20:20 30:23
**associate** 31:10, 15,16

**attorney** 8:15 11:16,23 14:7
**attorneys** 8:18 9:10 10:15,21 14:1, 6
**avenue** 18:5
**awarded** 6:2 13:18 15:5
**awards** 8:19
**aware** 28:11,15,23 30:16
**Axel** 11:24

**B**

**B-A-L-E-F-S-K-I** 4:6
**back** 17:10
**BAGGETT** 24:9,12
**Baldwin** 14:4 22:1 30:22
**Balefski** 4:6 9:17 23:6,9,11,21 25:22 26:20 27:6,18 28:1 29:14 30:15 31:16, 23 32:8
**basic** 7:8 8:8
**basically** 25:17 28:23 31:21
**basis** 16:16 20:11 21:7 31:19
**battle** 11:2
**began** 24:5
**begin** 30:7
**beginning** 17:2
**belief** 22:11
**Beltz** 15:12,14
**Ben** 23:11
**bene** 14:15

**beneficial** 15:10
**benefit** 4:14 6:5,7, 13,24 7:3 9:6,11, 22,24 10:20 11:4, 14 13:13 15:22 16:3,16 17:15 18:7, 22 19:7 20:3 23:20 28:8,13 29:23 30:1, 6
**benefited** 12:20 15:9 19:14
**benefits** 5:20
**bewildering** 12:11
**bit** 21:20 25:16,21
**blank** 12:8
**blanket** 7:5
**board** 19:20
**bolstering** 16:22
**Boston** 9:15 20:23 21:17,20 22:8 30:14
**bottom** 13:11
**Bowles** 4:20,23
**briefing** 17:8 32:1
**briefly** 14:22 15:11 16:17
**bringing** 16:22
**broke** 26:2
**bulk** 24:1
**burdensome** 7:4

**C**

**call** 21:8
**Cameron** 11:23 12:1 32:3
**candor** 32:14
**Carlino** 14:22,24 15:5,7,8 22:12

**CARTMELL** 27:22

**Cartmell's** 23:4

**case** 12:17,20,24 13:1,4,8,11 15:20 18:18,21 19:4 22:17,20 23:3,6,10, 11,17 24:5,7,10,11 25:24 26:15 27:23 28:9,14

**case-specific** 28:2

**cases** 5:24 11:7 12:14,23 13:7 14:2, 6,19 15:12 16:2,6, 10,21,24 17:4,5,9 18:4,6 20:8,9 22:6, 14 28:18 30:17

**Catherine** 11:16

**challenge** 7:1

**Charleston** 19:21

**check** 22:24 23:24

**Cheryl** 14:19

**Chris** 22:3

**claim** 7:10 13:2,5, 6,7,10

**claimant** 5:21

**claiming** 17:6

**CLARK** 23:3,8,14 24:4,10 30:13,16 31:2

**Clayton** 24:3

**client** 8:16

**clients** 6:2 10:1

**collective** 12:6

**Collectively** 6:1

**Coloplast** 18:14, 16,19 19:2,4 25:15, 17,19 26:4,5,10 27:22 28:6,18,23

**Coloplast's** 26:23

**comment** 8:20 15:11 16:17 19:23 20:5 22:5 28:17

**commitment** 9:7

**committee** 6:12 9:18

**common** 4:13 5:20 6:5,7,13,24 7:3 9:6, 11,20,22,24 10:19 11:4,14 12:18 13:13 15:4,22 16:3, 16,19,20 17:10 18:4,21 19:7 23:19 28:8 29:23 30:1,6

**commonly** 29:18

**communications** 8:3

**compensatory** 13:19 15:6

**complete** 22:4

**completing** 9:15

**comprehensive** 30:11

**concerns** 4:15 13:10

**conclude** 11:12

**Concluded** 32:15

**conclusion** 19:12

**conducted** 17:23

**consideration** 6:5,13 8:4

**considered** 7:3 15:22 16:1,3,15 19:6 30:6

**consolidated** 20:11 30:18

**consortium** 15:7

**constraints** 27:12

**consult** 22:1

**contact** 18:2

**continuation** 11:20

**continue** 19:16 29:22

**continued** 8:24

**contract** 31:19,22

**contrast** 14:23

**contributed** 10:22

**contribution** 4:18 8:21 10:7 19:10

**contributions** 4:10,13 11:8

**copies** 27:8

**corporate** 10:13 11:24 26:6

**correct** 24:10

**correctly** 17:13

**counsel** 4:19,23 9:19 28:13 31:11, 15,17,21

**country** 10:18 14:2 16:24 19:15

**County** 18:20 25:24 26:22

**couple** 12:13 24:19 28:5 32:1

**court** 4:1 9:19 12:18 14:20 15:4 16:19,20 17:5,10 18:4 20:16 25:17 29:19,21 30:5

**created** 14:17 18:2

**critical** 10:12 11:4, 6

**crucial** 8:9 10:15

**curiosity** 20:6

**curious** 23:18 29:23

**current** 4:2

**cut-off** 15:16 23:15

**cuts** 10:10 14:14

**D**

**damages** 6:3 10:5 13:20 15:6,8

**Daniel** 14:7,16

**date** 13:21 15:16, 17,18,21

**day** 11:20 12:3

**de** 14:15

**deal** 4:9

**December** 12:22

**decided** 21:8

**deemed** 14:18

**defeating** 17:8

**defect** 13:6,10,18

**defective** 13:2

**defendant** 13:22 16:18 17:7 18:7 29:22

**defendants** 16:13 29:19

**defense** 7:10

**defer** 23:22

**degree** 28:20

**delivering** 24:8

**demonstrates** 6:21

**depends** 13:8

**depo** 14:12

**deposition** 10:9 11:24 12:2 14:4,10, 14 27:9

**depositions** 10:9, 13,17 11:18 14:11, 15 26:5 32:1,2,5,6

**design** 13:2,6,18

**designate** 31:10, 11

**determination** 12:8,19 17:22 29:6

**determine** 11:10 15:19 18:12 19:1

**determined** 19:4

**develop** 21:18,20 25:13

**developed** 14:1 21:11,18 25:1,4

**developing** 21:22

**development** 10:23

**device** 15:1

**difference** 31:13, 14

**difficult** 11:10

**disagree** 12:18 17:22

**disallow** 6:15

**disallowance** 4:15 7:11 12:15

**disallowances** 7:6 11:12

**disallowed** 7:17 11:9,15,21 12:3,7, 18 15:15,20 17:12, 16,22 18:11

**disclosure** 7:22

**discovery** 7:13 8:23 9:18 10:11 12:12 25:17 28:19, 22

**discuss** 18:13

**dispute** 5:1

**disputes** 8:16

**distinction** 32:11

VAGINAL MESH HEARINGS          SHANIN SPECTER, TOM KLINE AND LEE BALEFSKI STATEMENT
06/12/2018 Index: District..gross

District 14:20,21

divert 11:5

DLS 29:24

doctor 13:9

doctor-lawyers 9:12

document 21:9 31:21,22 32:8

documents 8:1,4 10:12 11:18 18:17 21:10,11 26:1,3,4, 14,24 27:1,4,5,7, 11,12

dollars 8:17 9:24 28:9

doubling 6:20

drive 16:21

drives 16:12

Drolet 14:5

Drs 24:20

**E**

earliest 10:24

early 32:3

Ebaugh 15:12,14

educate 25:20 26:16

effectively 17:9

effort 10:20 20:3

Eifert 14:20

eight-figure 18:20

Eighth 10:22

Elliot 14:16

emails 8:1

employed 5:18 31:17,18

employee 11:24

employees 21:6 26:6

end 16:5

engaged 28:19

Engleman 15:12, 14 22:12,17,20 24:1

Enlighten 21:19

ensure 8:6,9

entire 13:22

entries 7:17 12:7, 15 22:19

entry 7:7 11:14,15, 19,20,22 12:1

equally 15:10

error 23:2

esse 14:15

establish 17:24

establishing 18:6

establishment 5:17 17:3,14

ethic 5:14

Ethicon 10:4,8,13, 24 11:1,3,5,17,24 12:14,17,23 13:14, 20 14:2,6,11,23,24 16:6,21 17:2,5,19 18:2,6 20:22,24 21:5 22:6 32:3

Ethicon's 15:1 16:9,18,23 17:8

evaluating 4:9

eventually 26:24 27:1,13

everyone's 8:15

evidenced 6:19

excluded 11:11 16:2

exclusion 6:17

exist 12:9

existence 16:18

expense 7:21 8:5

expenses 4:10

experience 29:20

expert 10:10 14:12,15 21:7 24:14,17 25:5 27:23,24 28:2,3

experts 21:8 24:15 25:1,4,14

explain 7:2

express 4:15

extensive 17:7 21:16

extensively 24:20

extent 25:16 26:10

**F**

fact 21:4 23:19 29:18

factors 28:24

failed 17:19

failure-to-warn 13:5,7

fair 30:12

fairness 8:8 20:1

familiar 25:1,2

favor 15:2

FCC 4:16,17 6:6, 10,15,24 7:2,3,5,16 8:3,4,7 10:19 11:10 12:8 14:23 17:12, 13 18:12,24 19:21 22:12

FCC's 7:21

February 6:9

federal 17:5

fee 6:11 7:7,21 8:5, 9,13,16,19

fee-sharing 8:2

fees 9:11

felt 26:17 27:7 30:1

fight 16:23

figure 32:12

filed 17:7 25:22

filing 17:4

fill 12:7

financial 19:10

find 11:14

finding 19:8

findings 13:18

fine 22:9

firm 5:10 7:21 8:12 9:7,13 18:15 19:23 20:20 21:22 22:1, 12 23:4 26:3

firm's 4:13,17 7:6

firms 6:24 12:4,10 19:1 24:16,19

five-percent 7:23

flaws 6:22

floor 4:11

Florida 30:17

focus 17:1,17

Foley 11:16

forcing 11:5

formed 21:7

fought 17:2,19 19:8

found 13:2

Fourth 8:3 9:21

frankly 7:5

fraudulent 17:6,8, 18

functions 8:7

fund 28:8

fundamental 7:15

fundamentally 7:8 19:3

funds 19:11

futile 7:7

**G**

game 7:8

garnered 27:11

Garrard 4:1,7,21 5:1,6 20:18 21:2,19 22:7,11,21,24 23:10,23 24:13,23 25:9,15 26:12 27:3, 16,20 28:11,15,22 29:8,15 30:22 31:7 32:13

generally 31:22

generate 27:24 28:3

generated 24:15 28:2

generic 28:3

generous 8:19

give 4:2,8 21:21 22:1,4,8 30:11

global 19:5,6

goal 19:22

Gomez 22:3

good 4:3,12 21:1,2, 15,16 22:10 29:17

greater 22:5

gross 10:24 13:3, 13 27:4

**guessing** 7:7
**guys** 25:3 29:1,12

**H**

**Hammons** 12:14, 17,20,22,24 13:12, 23 14:17,18 15:10, 13
**Hammons'** 14:5
**hampers** 9:1
**Harris** 22:13
**heads** 12:6
**heart** 13:6
**held** 19:21
**helped** 10:12
**helping** 16:21 20:21,22 32:1
**Henry** 21:23 22:17
**highlight** 9:6
**history** 20:19 26:16 28:15
**hold** 29:4
**hope** 4:8
**hours** 5:14 6:5,7, 11,13,14,16,18,20, 21 7:1,2 9:22 10:18 11:9,11 12:16 16:1 17:11,16,21,23 18:10,18,23
**huge** 9:7
**hundreds** 10:18 17:11,23 18:10,18

**I**

**identified** 6:12
**imagine** 19:18
**impact** 16:9
**implanting** 13:9
**important** 9:5 15:14 16:11
**importantly** 10:2 18:17 24:21
**impossible** 7:5
**impractical** 7:4
**improvement** 10:7
**inclined** 8:18
**included** 6:20
**including** 9:11,14 10:5,8,24 18:16 19:4
**inclusion** 6:19
**increased** 16:9
**individual** 10:1
**information** 4:8 5:4,7 8:6,12,13 9:1 18:11 24:6 25:20 30:22
**informed** 7:18
**initial** 6:17
**injured** 19:15
**innumerable** 5:19
**instances** 32:2
**instrumental** 16:21
**intent** 5:6
**interest** 8:15 16:9
**interested** 22:8 24:23 25:3
**interests** 5:21
**intermediary** 13:9
**interrogatories** 25:23
**involved** 8:14 12:5 19:19 24:16,19 30:10,24 31:24 32:4
**involvement** 5:9
**involving** 12:24 15:1
**issue** 13:11 26:13
**issues** 26:9
**itemization** 7:24
**items** 9:6

**J**

**January** 15:16,21
**Jersey** 9:18
**joinder** 17:6,8,18
**Jones** 18:18 19:4 25:24 28:9
**Judge** 14:19 30:10
**judicial** 8:8
**Julie** 14:5
**juncture** 12:11
**June** 11:15,19
**juries** 6:1
**jurisdiction** 11:3 17:18,20
**jurisdictions** 30:9
**jury** 5:24 10:3 13:1, 20 15:5
**justice** 7:9

**K**

**key** 10:16 16:22 26:3 27:7
**Kila** 14:4,9 22:1
**Kline** 4:4,5 5:8,18, 23 6:2,4,7,12,16 7:1,13,18 8:11 9:5, 9,16,21 10:15 12:16 13:24 14:3 15:2,8 16:19 17:7, 23 18:3,14,23,24 19:12 20:3 22:5,17, 23 24:17 31:17,18
**Klinge** 14:16
**knew** 25:2

**L**

**lack** 4:16 7:10 8:24
**landmark** 15:5
**largely** 25:12
**largest** 13:20,21
**late** 24:2,4
**lauded** 10:21
**lawyer** 8:14
**lawyers** 5:18 9:13 31:22
**leadership** 5:11 25:13,19 27:17
**learned** 13:9
**leave** 22:9
**Lee** 4:5 9:16 24:13 25:7 26:13
**left** 4:5 12:4,5 18:10
**legal** 17:24 31:24
**Lewis** 11:1
**liability** 26:4 27:7
**liaison** 9:19
**limited** 10:8
**litigants** 17:15 18:8
**litigated** 8:17 18:19
**litigating** 18:5
**litigation** 4:10,14 5:9 8:16,21 9:8,10, 14,20 10:14,21 12:5,21 13:22 15:9 18:14,16 19:2,7,19 20:4 25:8,12 28:17 30:6 31:1 32:4
**Longquist** 24:7
**loss** 15:7
**lot** 21:1,18 30:10 31:20

**M**

**made** 7:2,4 9:7 12:8 29:17
**magistrate** 14:19
**maintain** 11:3
**maintaining** 18:5
**majority** 12:23 31:23
**make** 29:6 31:2
**making** 7:6 8:11, 13
**managed** 18:3
**manner** 7:19
**manufacturers** 18:1
**March** 14:3
**Margolis** 24:20
**mass** 17:3
**Massachusetts** 9:14
**materially** 5:20
**materials** 30:21
**matter** 28:6
**MDL** 9:17 14:2,7,13 16:7 20:19,21 21:12 24:16 25:5 26:15 27:8 28:23 30:19

**MDLS** 5:18,22 30:10

**meaningful** 7:19

**meaningfully** 7:12 9:1

**means** 6:14

**meeting** 4:20,24 19:20

**member** 9:17

**members** 8:2,4 20:20

**merited** 6:18

**mesh** 4:14 5:18,22, 24 9:20 13:22 15:3 17:3 18:1,7 20:19

**million** 6:2 10:4 13:19 15:6,7 28:8

**millions** 8:17 9:23 26:1

**mind** 21:21

**Minneapolis** 26:5

**misunderstand** 22:15

**misunderstood** 22:13

**moment** 9:13 17:1, 17

**money** 7:23

**motions** 10:10

**multiple** 14:6 16:13 17:20

**N**

**N-A-D-E-A-U** 11:18

**names** 4:2

**naming** 17:6

**nature** 7:10

**Ninth** 11:2

**non-specific** 7:6

**note** 4:19,22 6:20 16:11

**notice** 7:9 13:14

**number** 5:10,11, 12,15 16:6

**numerous** 5:16

**O**

**object** 4:19,23 29:10

**objected** 8:24

**objects** 29:9

**obtained** 10:3,6 28:20

**occur** 15:17

**occurred** 15:15, 18,21

**October** 11:22 12:1

**offered** 5:12

**office** 24:7

**ongoing** 28:17

**onset** 10:14

**open** 4:11

**opening** 11:4

**openly** 8:18,20

**opportunity** 19:23

**order** 17:24 26:8, 18,24

**orders** 26:22

**other's** 8:21 19:24

**outline** 14:7,9

**outset** 17:4

**outstanding** 31:6

**overly** 7:4

**P**

**package** 10:8,23 13:24

**packages** 16:22

**pages** 18:17 26:1

**paid** 29:3

**paralegals** 5:18

**part** 9:10 21:12 30:21 31:14

**participate** 9:2

**partner** 9:16 14:4 31:10,14

**party** 7:9

**pay** 29:2,9

**payment** 28:24

**payments** 8:1

**PCCP** 17:5,14

**pelvic** 5:17,21,23 9:20 13:22 15:3 17:3 18:7

**pending** 8:23 14:6 20:10

**Pennsylvania** 11:3 18:1,3

**people** 25:11 26:2

**per-firm** 7:24

**percent** 4:16 6:16 11:9 18:21 19:6,8 28:10 29:1

**perception** 29:24

**performed** 9:3,21 11:16 18:15

**periods** 5:15

**permanently** 16:2

**permission** 26:23

**personal** 17:19

**phase** 14:12

**phenomenal** 10:3

**Philadelphia** 4:5 9:19 12:17 15:3 16:19,20 17:4,10 18:4,19 25:24 26:22

**physician** 14:5

**Pinnacle** 30:15,17

**place** 26:8,22

**places** 30:9

**plaintiff** 5:21 9:17 13:2,18 15:2

**plaintiff's** 8:14

**plaintiffs** 6:1,8 12:20 15:9 19:7 20:4 30:18

**played** 14:17

**pleadings** 10:10

**pleas** 9:20 12:18 15:4 16:19,20 17:10 18:5

**pleased** 20:4

**point** 12:9 25:18 26:13 29:6,17

**policy** 29:9

**pool** 18:22

**positioned** 8:20

**possibly** 28:21

**prepare** 20:21,22

**prepared** 28:20

**preparing** 10:16 11:23 14:11 32:4

**pressure** 18:6 29:19,22

**pretty** 29:17

**prevailed** 6:1

**prevents** 7:11

**primarily** 22:2

**prior** 15:18 23:14, 15

**problem** 26:21

**problems** 28:6

**proceeding** 9:2

**process** 4:15 6:22, 23 7:15 8:15 12:12 16:8 19:17 20:1 21:12 24:2

**produce** 7:16

**product** 5:13 13:10 30:14

**product's** 16:15

**production** 7:20 25:23

**Professor** 14:16

**program** 17:3

**project** 5:12

**Prolift** 13:1,3 14:19 21:15

**promise** 19:24

**proposed** 7:11,17

**proposes** 6:15 8:11

**proposition** 30:4

**propriety** 5:14

**protective** 26:8, 18,22

**proud** 19:12

**proven** 15:10

**provide** 24:14,17 26:7,14,17,18,24 30:22

**provided** 5:20 7:5 10:7 17:16 18:12 19:10 26:1,19 27:1, 4,6,8,9,14,17

providing 10:9
25:19 26:21

PSC 20:21

publicly 8:20

pulled 26:3

punitive 10:5
13:19 15:8

pursuant 7:23

put 13:14 20:3
29:19,22

Q

qualification 30:2

qualify 29:23

question 20:6,18
24:3,24 29:14,17
32:9

questioned 5:13

questions 4:17
20:5

quick 27:22

quote 11:17 14:8

R

Ralph 24:18

real 27:22

reason 7:11,16
12:9

reasons 12:10
17:16

reassert 7:14

recall 23:8 26:12
27:16

receipt 8:24

receive 7:9 20:20

received 5:16 7:23
18:20 27:5 28:8

31:3

recognized 16:10
20:2 22:12,19 23:2,
18,19

recognizing 17:13

reconsideration
6:10

records 28:7

recovery 31:6

recut 21:6

reduction 7:1

referring 21:3

refine 24:21

regard 10:20 28:13

reiterate 4:13
12:11

reiterated 19:18

relating 8:1,4

relation 28:24

relative 8:21

remand 17:9

remands 17:1,11

removals 17:11

removed 17:5

report 24:18 28:3

reporter 4:1

reporting 5:15

reports 8:5 10:10
21:7 24:15,21 25:5
27:23,24 28:3

represents 28:9

request 7:16,20,
21,22 12:11 19:18
25:18

requested 14:1,8
27:2

requesting 6:9

requests 7:14,15
8:23 24:6 25:23

resistance 26:17

resolution 20:10

resources 11:5
16:14

respect 21:15 30:8

respond 7:18 20:5
21:24

responding 7:12

response 7:7,22
22:4

responsible 22:3

resulted 10:3

retropubic 15:1

review 6:6 11:17
18:16 21:9 22:18
26:2 31:21,22 32:9

reviewed 26:3

reviewing 12:14

reworked 21:9

Rice 4:20,23 20:6,
11,15 31:9,13,20
32:7,10

Rightly 10:18

Roger 11:23

Rosenzweig
24:20

rulings 10:6 16:22

S

S-H-A-N-I-N 4:4

S-P-E-C-T-E-R
4:4

Scientific 9:15
20:23 21:17,20

scratching 12:6

Secant 11:17 17:7,
14

Secant's 18:1

secure 24:11

secured 26:15

segregation 27:5

separate 20:12,13

served 9:17 13:14

set 8:22

settle 16:21 29:20

settled 12:23

settlement 11:6
13:16 16:12 18:20
19:5 28:12

settling 16:9

Seventh 10:11

Shanin 4:3

share 28:20 31:8

shared 21:3 25:5

significance
13:17,23

significant 4:13
10:6 13:13 16:6,8
18:2,15 19:10
28:14

significantly
10:12

similar 11:14

Similarly 11:22
17:18

simply 16:23

single 16:12

six-year 5:9

Sixth 10:2

Skeeter 27:19

SLACK 29:16
30:12

slash 11:17

sought 8:12 9:11

Southern 14:21

speak 14:22

speaks 9:4

specific 7:7,16
13:8

specifically 22:7

specificity 7:10
22:5

specifics 21:21

Specter 4:3,4,12,
22 5:3,8,19,23 6:4
7:1,13,18 8:11 9:5,
9,16,21 10:15 14:1,
3 17:7,23 18:3,14,
24 19:12 20:3,9,13,
17,24 21:4,23
22:10,16 23:13
24:1 25:6,10 28:5,
12,16 29:4,17 30:3,
20 31:5,12,17,18

Specter's 5:9 6:2,
7,13,16 12:16 15:3,
8 16:19

speculate 12:5

spent 11:23 18:18

Stack 30:10

stake 8:17

standards 8:8

start 30:3

started 24:6

state 29:19,21 30:5

stated 15:16 19:22

States 14:20

status 20:7

stayed 25:17 28:23

Steering 9:18

subject 27:12

submission 6:8, 15 31:9

submissions 19:24

submitted 5:14 6:4,10,16 7:13 8:13 12:16 18:23 32:3

substantial 10:7 17:24

success 10:3,23 16:20 19:13,14

successful 13:4

successfully 11:2 18:3

Suffolk 9:14

suggesting 25:9

summaries 27:10

surely 16:8

T

table 18:11

taking 9:10 10:16 32:2

task 7:4

team 10:11 14:17

temporary 31:18

tenet 7:9

tens 18:16

Tenth 11:8

terms 20:21 28:7

testimony 13:8 21:5 24:22

thing 28:16

things 25:11

Thornburgh 14:8

thought 22:14 23:1

thousands 11:7 12:7 18:17 19:15

time 4:10,16 6:5, 10,11,14,24 7:6,14 9:22 12:9 16:1 20:2 23:16

times 11:13 17:20 31:20

timing 15:24

today 9:12

toll 16:13

Tom 4:5

tort 17:3

total 6:12,14 9:22

totaling 10:4

transcript 30:18

transcripts 27:9

transparency 4:16 8:8 12:12 19:18,22 20:2

transparently 8:18

transvaginal 4:14 20:19

treating 14:5

trial 9:15 10:8,23 12:24 13:24 14:17, 18,24 15:3,14 16:7, 22 21:10 22:21

trials 10:6,17,24 15:15,20 20:22,23 29:19,21 30:5

trick 24:24

true 29:18

turn 9:2 12:13 18:13

TVT 15:1 21:16 23:6,9

TVTS 23:3,10,11

U

ultimately 15:4 26:19

unable 15:19

uncovered 10:11

underlying 6:22

understanding 30:4

unfair 7:8 19:3,9

United 14:20

unquote 11:19 14:13

update 24:20

updated 10:9

upheld 20:1

uralitization 24:16

Urogyn 14:11

Uwe 14:16

V

varied 20:24

venue 11:5

venues 11:6

verdict 13:12,14, 20,21,23,24 15:2,5 16:12,15 30:17 31:3

verdicts 5:24 10:4 13:3 15:14,21,24 16:8,13,14

versus 10:24 11:1 12:14,17 14:23,24 18:19

videotape 21:5

vigorously 17:2

Virginia 14:21 19:21

volunteered 5:11

W

wanted 26:7 27:8 29:16

wave 14:2,12,19 16:7

weakening 16:23

West 14:21 19:21

West/nadeau 11:18

wise 13:15

withheld 12:10

witnesses 10:13 14:15

women 19:15

words 27:24

work 5:13,16 9:3,5 10:2,19,20,22 11:13,15,16,21,23 12:2,19 14:23 15:8, 10,13,17,20,22 16:3,10 17:13,24 18:9,15 19:2,3,9, 13,14,16 21:1,3,11, 13,14,15 22:3,12, 19,22 23:1,17,19 24:2,8,14 25:16 26:11 28:14 30:4, 24

worked 16:7 23:4 24:7,18,19 25:20

working 9:13 18:18 24:5 28:4

workup 23:14,16

writing 14:8 21:24 31:24

written 5:4,7

wrong 27:10

Y

you-all 5:4 32:13

Z

Zipper 24:18 25:2, 3